## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NICHOLAS KNOPICK<br>151 Idle Road<br>Marysville, Pennsylvania 17053-9503<br>Plaintiff,<br><br>v.<br><br>UBS Financial Services, Inc.<br>500 East Pratt Street, Baltimore, MD 21202<br>AND Susan Seifert<br>Defendants. | : Civil Action No. :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

### CLASS ACTION COMPLAINT

Nicholas Knopick, an individual investor, brings this action to recover money that was effectively stolen from him by UBS AG, and to recover damages because Defendants and UBS AG deceived him and caused him to enter an illegal banking relationship with UBS AG. Had Defendants or UBS AG told Mr. Knopick the truth when they first asked to handle Mr. Knopick's money in 2007, he never would have done business with UBS AG.

UBS AG, Switzerland's largest bank, is a criminal enterprise that for decades made millions in illicit profits by selling Americans secret, illegal brokerage accounts that were concealed from the I.R.S., thus allowing UBS AG and its American customers to commit tax fraud. While UBS AG claims to have purged itself of the illegal, secret account scheme (at least with respect to secret accounts for Americans) it has never been held accountable for the remainder of its scheme, to wit i) the complicity of its U.S. brokers in arranging the illegal Swiss accounts,[1] or ii) the illegal component of even the legal accounts at UBS AG's allegedly

---

[1] One need only ask how thousands of Americans came to have personal meetings in UBS offices in the Untied States, or clandestine meetings in hotel rooms, with Swiss bankers they had never met before, to realize that the U.S. UBS brokers were arranging the meetings.

legitimate subsidiary, UBS Swiss Financial Advisors ("UBS SFA"), which required Americans to open *illegal* bank accounts at UBS AG.[2]

UBS AG knew, in the early 2000's, that its illegal scheme risked scrutiny from U.S. tax and law enforcement officials, but at the time UBS AG doubled down on its criminal enterprise and chose to only alter its business to lessen the chance of prosecution, without abandoning the illicit, tax-fraud scheme. In 2005, UBS AG began offering securities accounts to Americans at UBS SFA, an investment advisor registered with the SEC, which was in reality a front to divert law enforcement attention from tax cheats with secret accounts at UBS AG.

A U.S. citizen employed by UBS AG ultimately blew the whistle on UBS AG's illegal, tax fraud accounts, which subsequently led to SEC and DOJ investigations of UBS AG, beginning in 2006 or 2007. The investigation and threatened prosecution of UBS AG focused on the illegal "black" securities accounts (as they were known to the criminals who ran UBS AG and the secret accounts) UBS AG provided to dishonest Americans. UBS AG paid $780 million in 2009 for a Deferred Prosecution Agreement ("DPA") in lieu of indictment. The size of the payment UBS AG made to the U.S. distracted public and media attention from the massive criminal scheme in the U.S. that was forgiven without public airing, fine, or sanction.

UBS AG was guilty of a vastly larger criminal conspiracy than the secret tax-free account scheme that it paid $780 million to escape. In truth, UBS AG had for years used its U.S. broker-dealers (many formerly of Paine Webber, which UBS acquired in 2000), registered with the SEC and regulated by FINRA, to arrange illegal meetings between high net worth U.S. customers and Swiss bankers who routinely travelled to the U.S. to illegally solicit Americans' secret investments in Switzerland with UBS AG. The American broker-dealers, of course, were

---

[2] UBS AG's internal documents instructed employees in 2004 and 2007 that UBS AG was not licensed to conduct banking in Switzerland with U.S. citizens.

compensated for facilitating these illegal meetings between the Swiss bankers and the wealthy Americans and the illegal "black" accounts that resulted from those meetings. Thus, the regulated U.S. broker dealers, who handled U.S. customers' legitimate securities transactions, also offered an "off the menu" illegal service; *entre* Swiss bankers and the illegal, tax-free secret Swiss accounts they sold when they came the U.S.

In 2007, UBS FS led Mr. Knopick, and other members of the class, to an investment advisor – an alleged employee of a UBS Swiss sister-company – who personally travelled to the U.S. to solicit U.S. citizens to invest their dollars with him in Zurich. Much of Mr. Knopick's $12+ million investment was lost after his investment instructions were ignored in order to facilitate UBS AG's tax fraud and unlawful Swiss banking schemes. Mr. Knopick's money was effectively stolen when UBS SFA ignored his investment requests, bought risky Asian equities for his portfolio, then liquidated all the stocks against Mr. Knopick's express instructions to insure that UBS AG's illegal margin loans were repaid, lest the perpetrator of the tax fraud scheme (UBS AG) suffer the loss of a single Swiss franc.

UBS SFA was not the legitimate fiduciary, registered under the Investment Advisers Act of 1940 it held itself out to be. Instead, UBS SFA was a front, an apparently legitimate broker where UBS AG's tax cheat customers could park a fraction of their money in order to confound U.S. authorities looking for Americans with "black" accounts at UBS AG. Many of the Swiss bankers that staffed UBS SFA were criminals who had perpetrated UBS AG's tax fraud conspiracy while employed at UBS AG, and then moved to UBS SFA, touted to be the alleged "clean" UBS entity, registered with the SEC and supposedly compliant with U.S. tax laws.

Table of Contents

Page

I. INTRODUCTION / NATURE OF THE ACTION ................................................... 1

II. JURISDICTION AND VENUE............................................................................ 4

III. PARTIES............................................................................................................ 5

IV. OTHER PLAYERS ............................................................................................ 6

V. FACTUAL BACKGROUND.................................................................................6
    A. Plaintiff's Contract With UBS FS And Prior Dispute History ................... 11

    B. Contract With UBS AG And Dispute History ........................................... 12

VI. CONTRACT WITH UBS SFA AND DISPUTE HISTORY ........................... 15

VII. DOJ AND SEC INVESTIGATION, UBS DEFERRED PROSECUTION
AGREEMENT.... .................................................................................................. 19

VIII. CLASS ACTION ALLEGATIONS...............................................................26
    A. Numerosity Federal Rule Of Civil Procedure 23(A)(1)........................... 27
    B. Commonality And Predominance - Federal Rule Of Civil Procedure 23(A)(2)
    And 23(B)(3).................................................................................................. 27
    C. Typicality - Federal Rule Of Civil Procedure 23(A)(3)............................ 28
    D. Adequacy Of Representation - Federal Rule Of Civil Procedure 23(A)(4)................. 28
    E. Superiority - Federal Rule Of Civil Procedure 23(B)(3)........................... 29

IX. EQUITABLE TOLLING, DISCOVERY RULE REGARDING STATUTES OF
LIMITATIONS .................................................................................................. 30

X. COUNTS ........................................................................................................... 31
    COUNT I FRAUD............................................................................................ 31
    COUNT II GROSS NEGLIGENCE................................................................ 33
    COUNT III  BREACH OF FIDUCIARY DUTY............................................ 35
    COUNT IV UNJUST ENRICHMENT ........................................................... 37
    COUNT V  BREACH OF CONTRACT ......................................................... 38
    COUNT VI VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES
    AND CONSUMER PROTECTION LAW, 73. P.S. § 201-2(XXI) ................................ 40
    COUNT VII  VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349..... 42
    COUNT VIII FEDERAL RICO VIOLATION 18 U.S.C. 1962(C)… ........................... 42

    A. RICO Enterprise........................................................................................ 43
    B. Predicate Acts Mail And Wire Fraud ....................................................... 45
    C. Pattern Of Racketeering ............................................................................ 46

Table of Contents
(continued)

Page

D. Damages ............................................................................................ 49

COUNT IX VIOLATION OF 18 U.S.C. 1962(D) BY  CONSPIRACY TO
VIOLATE 18 U.S.C. 1962(C) ................................................................. 50

**XI. PRAYER FOR RELIEF** ......................................................................... **51**

Plaintiff, Nicholas Knopick ("Plaintiff"), by and through his attorneys, on behalf of himself and all others similarly situated, brings this Class Action Complaint against Defendants, UBS Financial Services Inc. and Susan Seifert based upon personal knowledge as to his own acts, and upon information and belief and the investigation of his counsel as to all other matters, and alleges as follows:

## I.   INTRODUCTION / NATURE OF THE ACTION

1.      Plaintiff brings this action on his own behalf and as a Class Action on behalf of a class consisting of all other citizens of Pennsylvania and elsewhere who have been wronged by Defendants in this manner.   Plaintiff and the Class seek to recover damages caused to the Plaintiff and Class by Defendants' a) recommendations as fiduciaries to enter to illegal contracts with UBS AG and UBS Swiss Financial Advisors; b) recommendations as fiduciaries to enter into a financial advising relationship with Andreas Knöpfel, the UBS AG/Swiss Financial Advisors representative, who was a participant in the UBS AG tax fraud scheme being investigated by the Securities Exchange Commission ("SEC") and Department of Justice ("DOJ"); c) recommendations as fiduciaries that Andreas Knöpfel and UBS AG and UBS Swiss Financial Advisors were competent, even experts, at international investments, investment management and financial advising; and d) failure to disclose that UBS AG and UBS Swiss Financial Advisors were under investigation by the SEC and the DOJ for facilitating a massive tax fraud scheme in the U.S. and elsewhere.

2.      Defendants knew and failed to disclose that UBS AG, in order to avoid detection of its illegal activities of, among other things, engaging in the receipt of deposits and transmission of money and making consumer loans in contravention of state, federal and international banking laws, instructed its agents to avoid establishing "relationships for securities products or services with new clients in the United States *with the use of U.S. jurisdictional*

1

*means."* UBS AG instructed its agents to "not contact securities clients in the United States through the telephone, mail, email, advertising, the internet or personal visits." According to UBS AG's training guidance, "[a]ny client request to receive mail relating to a securities account at a U.S. address other otherwise receive information concerning securities services or products in the United States <u>must be denied.</u>"(emphasis in original). UBS AG further instructed that "no solicitation of account opening [for banking services should] take[] place in the United States." While UBS AG recognized "it may be necessary to obtain a state license to offer lending products . . . [and that] state consumer protection laws [] may apply," UBS AG opened banking accounts with Mr. Knopick and other Class members in the US without complying with state licensing requirements, including Pennsylvania, and without complying with state consumer protection laws, including Pennsylvania. UBS AG opened banking accounts with Mr. Knopick and other Class members in the U.S. without complying with its own internal guidance.

3. UBS AG's internal communications forbid any agent "who communicates with a prospective client concerning banking products or services [to] communicate with that prospective client concerning securities services or products." Nevertheless, when UBS Financial Services ("UBS FS") introduced Mr. Knopick to Mr. Knöpfel, an agent of both UBS AG and UBS Swiss Financial Advisors ("UBS SFA"), the topics discussed were both banking (i.e. deposits, withdrawals and margin lending) and securities products and services (i.e. financial advising).

4. UBS AG's internal communications further instructed agents: "Traveling Officers may not be directly involved in the execution of the account opening documentation while in the United States or in mailing of the documentation from the prospective client to the booking center outside of the United States."

2

5.    Further, UBS AG developed "Case Studies" for its illegal "cross-border" business as part of the training and development of their agents for this business.  In these Case Studies, UBS AG instructs agents, for example, "with the intention to avoid having to carry [sensitive – i.e. damaging] documents with you, [to send] an envelope with some of the sensitive account related data to your hotel (alternatively, a friend in the respective country whom you know very well; a family member; a local business contact)."  In another case study, UBS AG instructs:

> After passing the immigration desk during your trip to the USA/Canada, you are intercepted by the authorities.  By checking your Palm, they find all your client meetings.  Fortunately, you stored only very short remarks of the different meetings and no names.
> As you spend one week in the same hotel, the longer you stay there, the more you get the feeling of being observed.  Sometimes you even doubt if all the hotel employees are working for the hotel.  A lot of client meetings are held in your suite of the hotel.
> One morning you are intercepted by an FBI-agent.  He looks for some information about one of your clients and explains to you, that your client is involved in illegal activities.
> Question 1: What would you do in such a situation?
> Question 2: What are the signs indicating that something is going on?

6.    Despite these internal strictures and the laws they were intended to address, UBS AG instituted an aggressive "Referral Campaign", providing incentives to USB's U.S. brokers to introduce their American clients with "Net New Money" to the Swiss bank and financial advisors.  UBS instituted the "KeyClient" initiative and the "Referral Program" to achieve two goals: Achieve Net New Money goals and to "increase cooperation between UBS, the Private Bank and the other Business Groups of UBS and between the Client Advisors and the Product Specialist."  According to UBS AG, "[t]he success of these initiatives [were] crucial for the success of the Integrated Business Model of UBS."

7.    Pursuant to the Referral Program, each "Country Team" making a referral would get .33% of the revenues generated by the Financial Advisor for a time period of four years.

3

UBS AG set a target of 5 referrals from each Client Advisor, with a reward for each Client Advisor achieving the most referrals ("amount of money and number of referrals") of a Breitling wristwatch customized with the UBS logo.

8.     UBS FS, UBS AG, UBS SFA, Ms. Seifert, Mr. Knöpfel and, later, Rene Elste, all worked together to induce Mr. Knopick and the class members to a) enter into illegal banking contracts, including the deposit of money with UBS AG in contravention of state, federal and international laws, b)  transmit money to UBS AG in contravention of state, federal and international laws, c) borrow and repay money to UBS AG in contravention of state, federal and international laws, particularly, but not exclusively, reporting requirements; d) rely upon UBS SFA, Mr. Knöpfel and, later Mr. Elste, to invest and manage and provide financial advising services, when i) they were not qualified to do so, and ii) when they were under investigation by the SEC and the DOJ for a huge tax evasion scheme.  Further UBS FS failed to disclose to Mr. Knopick and the class members that Andreas Knöpfel, UBS AG and UBS SFA were under investigation by the SEC and DOJ.

9.     All these actions were taken in concert with the objectives of 1) obtaining "Net New Money" for management by UBS AG and UBS SFA; 2) enriching UBS AG, the parent company of the "Integrated Business"; and 3) attempting to avoid detection of the UBS AG tax evasion scheme by providing seemingly legitimate advising services to US citizens who were properly reporting to the Internal Revenue Service ("IRS").

## II.     JURISDICTION AND VENUE

10.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) in that these complaints are putative class actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are thousands of members in the proposed class and at least one member of the class of Plaintiffs is a citizen of a state different

from any Defendant.  This court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as the claims involve a federal question under RICO, 18 U.S.C. 1962(C).

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) as Plaintiff had a residence in Pennsylvania at the time the Plaintiff entered into the transaction with Defendants; Plaintiff and Defendants also entered into a consumer and business contractual relationship in Pennsylvania and Defendants do business in Philadelphia.  Venue is also proper under 28 U.S.C. § 1391(b)(3) as Defendants are subject to this court's personal jurisdiction with respect to this action. *See also* 42 Pa. Consol. Stat. Ann. § 5322.

12.     In addition, in connection with the acts and conduct complained of, Defendants directly or indirectly used the means instrumentalities of interstate commerce including use of the internet.

## III.   PARTIES

13.     Plaintiff Mr. Knopick is a natural person who maintained a residence at 151 Idle Road, Marysville, Pennsylvania at the time of Respondents' wrongful conduct complained of herein.

14.     Defendant UBS Financial Services, Inc. ("UBS FS") is an American subsidiary of the Swiss banking giant UBS AG and is a registered broker-dealer and investment advisor.  At all relevant times, including the present, UBS FS has done business with Mr. Knopick through its Baltimore, MD office.  UBS continues to serve as Mr. Knopick's fiduciary investment advisor and broker.

15.     Susan Seifert is a natural person and a licensed securities broker.  Ms. Seifert works in UBS' Baltimore office and continues to serve as Mr. Knopick's fiduciary investment advisor and broker.  Ms. Seifert has a customer complaint history in her FINRA broker-check record.

5

IV.   **OTHER PLAYERS**

16.     UBS Swiss Financial Advisors, Inc. ("UBS SFA") is a corporation with its principal place of business located in Zurich, Switzerland. UBS SFA is a wholly-owned subsidiary of UBS AG and is registered as an investment advisor in the United States with the Securities and Exchange Commission.

17.     UBS AG is a corporation registered to do business in Pennsylvania as a foreign corporation and has a registered agent for service at the address as set forth in the above caption. Upon information and belief, UBS AG is not certified as a bank to engage in this Commonwealth in the business of receiving money for deposit or transmission pursuant to Section 105 of the Pennsylvania Bank Code of 1965

18.     Rene Elste is an adult individual employed by UBS SFA.  At all relevant times, defendant Rene Elste was the employee/agent of Defendant UBS SFA, acting in the course and scope of his employment/agency and in furtherance of the interests of defendants.

19.     Andreas Knöpfel is an adult individual employed by Vontobel Swiss Wealth Advisors AG.  At all relevant times, defendant Andreas Knöpfel was the employee/agent of Defendant UBS SFA and UBS AG, acting in the course and scope of his employment/agency and in furtherance of the interests of defendants.

V.    **FACTUAL BACKGROUND**

20.     In January, 2007, Mr. Knopick opened a brokerage account with UBS FS and placed several million dollars in the account.  Working with Ms. Seifert, Mr. Knopick invested conservatively in blue chip common stocks with high dividend yields, and used those dividends to make interest payments on margin loans that Mr. Knopick used, in part, to fund his securities purchases.  Mr. Knopick had followed this investment strategy successfully for years and his efforts had been rewarded with significant earnings.  Mr. Knopick carefully explained his

strategy to Ms. Seifert when he opened his account, and she clearly understood as she subsequently followed Mr. Knopick's instructions.

21.     In March or April, 2007, only months after opening Mr. Knopick's UBS FS account, Ms. Seifert introduced Mr. Knopick to Andreas Knöpfel, who Ms. Seifert claimed was a skilled Swiss investment advisor with UBS SFA, owned by UBS AG and a sister-corporation of UBS FS.  Apparently Mr. Knöpfel traveled to the U.S. to solicit investments from Americans, and UBS FS and Ms. Seifert accommodated Mr. Knöpfel by introducing him to Mr. Knopick and praising the investment prowess of Mr. Knöpfel and UBS SFA.  According to UBS AG's promotional materials available in the U.S., which are consistent with Mr. Knopick's experience, UBS AG and its subsidiaries actually operate as one entity governed by UBS AG.  The multiplicity of legal entities appears to be a favorable optic to placate U.S. authorities, who have repeatedly caught UBS AG violating U.S. tax laws and reporting requirements.

22.     Mr. Knopick was persuaded by Mr. Knöpfel's claims of success as an investment advisor and the recommendations of UBS FS and Ms. Seifert and opened two fiduciary investment accounts with UBS SFA.  Mr. Knopick completed a form W-9 and provided UBS SFA his social security number for reporting purposes.  Mr. Knopick funded the two accounts with a wire transfer deposit in the amount of $12,445,483.47 from his Wachovia Bank account in Pennsylvania to UBS AG in Switzerland.  As he had with Ms. Seifert, Mr. Knopick carefully explained his investment strategy to Mr. Knöpfel, in Ms. Seifert's presence.

23.     In connection with his deposit of money with UBS AG, Mr. Knopick was required to sign certain account agreements with UBS AG relating to a deposit account and a margin loan account.

24.     Upon information and belief, any and all cash generated by Mr. Knopick's

7

investments with UBS SFA were deposited to his UBS AG account. Similarly, on numerous occasions, Mr. Knopick withdrew cash, often, if not always, loaned by UBS AG, from his UBS AG account and the money was transferred by UBS AG in Switzerland to Mr. Knopick's US bank accounts.

25.    Also, on numerous occasions, UBS AG and UBS SFA increased Mr. Knopick's margin loans to UBS AG by the transfer of cash between them.

26.    UBS AG mailed statements and correspondence to Mr. Knopick in Pennsylvania, including statements and correspondence regarding deposits to and withdrawals from Mr. Knopick's UBS AG accounts, increases to Mr. Knopick's credit at UBS AG and payments by Mr. Knopick to UBS AG on account of his loans.

27.    UBS AG and Mr. Knopick engaged in numerous telephone conferences over Mr. Knopick's Pennsylvania-based cell phone, including conferences where Mr. Knopick instructed deposits to and withdrawals from his UBS AG accounts, increases to Mr. Knopick's credit at UBS AG and payments by Mr. Knopick to UBS AG on account of his loans.

28.    UBS AG faxed numerous communications to Mr. Knopick in Pennsylvania including communications regarding deposits to and withdrawals from Mr. Knopick's UBS AG accounts, increases to Mr. Knopick's credit at UBS AG and payments by Mr. Knopick to UBS AG on account of his loans.

29.    Mr. Knöpfel ignored Mr. Knopick's instructions and invested Mr. Knopick's money wildly, trading his dollars into foreign currencies and purchasing an inexplicable collection of stocks and bonds denominated in those foreign currencies. Mr. Knöpfel was never authorized by Mr. Knopick to purchase bonds for Mr. Knopick's account, or to invest contrary to Mr. Knopick's time-proven strategy.

30.     Mr. Knöpfel and his assistant (also an agent of both UBS AG and UBS SFA) routinely told Mr. Knopick, in telephone calls from Switzerland to Pennsylvania and elsewhere in the U.S., that his investments were performing well, and consistently concealed from Mr. Knopick that 1) his money had been invested against his instructions and 2) his account was excessively leveraged with loans from UBS AG secured by his UBS SFA investments.  They also never disclosed that UBS AG and UBS SFA were under investigation for a massive tax evasion scheme in the US and that his account had been created as a cover for that scheme.

31.     In September, 2008, UBS SFA first contacted Mr. Knopick to inform him that his portfolio may need to be liquidated to pay the UBS AG loans.  Mr. Knöpfel had leveraged Mr. Knopick's UBS SFA account to purchase volatile securities, and had purchased bonds that paid interest at a rate that was <u>lower</u> than the interest rate on the margin loans.

32.     At some point between August and October, 2008, it appears that Mr. Knöpfel was removed from his job and was replaced by Rene Elste, but Mr. Elste concealed from Mr. Knopick all details regarding why his fiduciary advisor Mr. Knöpfel simply vanished.

33.     As Mr. Knopick's fiduciaries, UBS AG, UBS FS and UBS SFA were obligated to inform Mr. Knopick why Knöpfel was removed and whether he had engaged in misconduct.

34.     As the debt and equity markets melted down in late 2008, UBS SFA continued to liquidate Mr. Knopick's portfolio at fire sale prices to satisfy UBS AG's loan repayment requirements.  UBS SFA and Mr. Elste dissuaded Mr. Knopick from withdrawing his money promptly, ostensibly to feed UBS AG's appetite for the loan repayments.  In the end, Mr. Knopick's $12+ million investment was whittled to roughly $900,000.

35.     When Mr. Knopick asked Ms. Seifert to explain how Mr. Knöpfel, UBS AG and UBS SFA could have lost virtually all of his money, Ms. Seifert said that Mr. Knöpfel had left

9

UBS AG and that she had observed in other such circumstances, UBS FS or its sister companies typically would make the customer whole. Whether Mr. Knöpfel actually misappropriated Mr. Knopick's money is unknown, as UBS FS, Seifert, UBS AG and UBS SFA have provided no further explanation to Mr. Knopick. Given the close interaction between the companies in the UBS AG empire, Ms. Seifert's statements to Mr. Knopick, and the fact that UBS FS and Seifert have access to information regarding Mr. Knöpfel's disappearance and Mr. Knopick's losses, but have chosen to conceal the information from Mr. Knopick, a negative inference is warranted.

36.     UBS FS has been uncooperative with Mr. Knopick's efforts to obtain the complete file related to his UBS AG and UBS SFA accounts, and has taken preposterous and groundless litigation positions in efforts to avoid providing discovery or litigating in the U.S. (despite being a registered investment advisor).

37.     The only documents UBS SFA provided Mr. Knopick are contracts and alleged account statements, but no trade authorizations or confirmations, notes of phone calls, memoranda, or the like.

38.     The only documents UBS AG provided to Mr. Knopick are contracts and account statements, but no communications or other documentation.

39.     Based solely upon the limited information Mr. Knopick has been able to obtain to date, UBS AG, along with UBS SFA and their collective agents, Andres Knöpfel and Rene Elste, fraudulently and deceitfully conspired to and did lose or steal approximately $12 million from Plaintiff's Swiss accounts during two to three weeks in September of 2008, and then conspired with their U.S. affiliates, Ms. Seifert and UBS FS, to conceal the theft, loss and fraud from Plaintiff for approximately five years.

40.     Defendants' concealment of facts from Mr. Knopick requires that the Court apply

the discovery rule to equitably toll the running of any period of limitations, laches, or estoppel.

### A.   PLAINTIFF'S CONTRACT WITH UBS FS AND PRIOR DISPUTE HISTORY

41.   On or about January 19, 2007, Mr. Knopick signed the "Client Information and Agreement for Individuals" relating to UBS FS accounts and acknowledged the "Master Account Agreement" terms and conditions, including the arbitration provision.  See Exhibit A, "UBS FS Agreement" and "Master Account Agreement."   Members of the Class signed similar agreements with UBS FS.

42.   The UBS FS Master Account Agreement included an arbitration provision requiring arbitration of "any and all controversies which may arise between you and UBS Financial Services Inc. concerning any accounts, transaction, dispute or the construction, performance or breach of this or any other Agreement." Exhibit A, Master Account Agreement, p. 20.

43.   The UBS FS Master Account Agreement provided that "[a]ny arbitration under this Agreement . . . shall be conducted before an arbitration panel convened by the New York Stock Exchange, Inc. or the National Association of Securities Dealers, Inc. . ." Id.

44.   However, the UBS FS Master Account Agreement also provided, "No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration Agreement against any person who has initiated in corporate a putative class action." Id, p. 21.

45.   From September 2008 to November 2013, Mr. Knopick attempted to obtain information concerning his UBS AG and UBS SFA accounts from UBS FS and Seifert, to no avail other than Seifert's cryptic comments regarding Mr. Knopick's missing money, Mr. Knöpfel's leaving the companies, and UBS's propensity to make customers whole.  Soon after

these comments by Ms. Seifert, Mr. Knopick's further inquiries to Ms. Seifert and her colleagues at UBS FS were met with resistance and stonewalling.

46.     On November 8, 2013, Knopick filed a Praecipe for Writ of Summons in the Pennsylvania Court of Common Pleas for Dauphin County against UBS FS, Ms. Seifert, UBS AG and UBS SFA.

47.     On January 25, 2014, Knopick sought pre-complaint discovery from UBS FS and Ms. Seifert pursuant to Pennsylvania Rule of Civil Procedure 4019(e).

48.     UBS FS and Seifert refused to comply with Mr. Knopick's pre-complaint discovery requests, invoking the UBS FS Master Account Agreement's arbitration provision.

49.     On May 19, 2014, the Dauphin County Court issued an order dismissing Plaintiff's Writ as to UBS FS and Ms. Seifert and compelling arbitration with these parties.

50.     On August 27, 2014, Mr. Knopick filed his Arbitration Statement with FINRA against UBS FS and Seifert asserting substantially the same claims as set forth in this Class Action Complaint.

51.     Counsel for UBS FS and Ms. Seifert objected to Mr. Knopick's attempt to assert class action claims in the FINRA arbitration.

**B.     CONTRACT WITH UBS AG AND DISPUTE HISTORY**

52.     Based upon the recommendation of Ms. Seifert and UBS FS, and without knowledge of the ongoing SEC and DOJ investigation of UBS AG and UBS SFA, and without knowledge that the contracts were illegal under state, federal and international banking laws, on April 3, 2007, in Marysville, PA, Mr. Knopick signed the Basic Document for Account/Custody Account Relationship with UBS AG.   Exhibit B, attached hereto, "UBS AG Contract Documents."   Members of the Class signed similar documents with UBS AG.

53.     Basic Document for Account/Custody Account Relationship provided, in part:

> I hereby authorize UBS to use all or part of the funds available at any given time in my UBS account to make investments on a fiduciary basis in the name of UBS, but for my account and at my risk.

Id.

54.     The Basic Document for Account/Custody Account Relationship provided, in part:

> The present agreement and/or Declaration shall be <u>exclusively governed by and construed in accordance with Swiss law</u>. . . . [T]he <u>exclusive place of</u> jurisdiction for any disputes arising out of an in connection with the present Agreement and/or Declaration shall be <u>Zurich, Switzerland</u>. UBS reserves the right, however, to take legal action against the Undersigned before the authority of his/her domicile or before any other competent authority, in which even exclusively Swiss law shall remain applicable.

> Id. (emphasis in original)

55.     The Basic Document for Account/Custody Account Relationship was signed by Fridolin Wittmer "Mgmt W9 Americas" and Mark Mottet "WM W9 US Clients." On or about March 3, 2007, noting the "account opening" had taken place "in person." Id. Members of the Class similarly executed their documents with UBS AG.

56.     The Basic Document for Account/Custody Account Relationship had attached to it a copy of Mr. Knopick's passport along, with a notary public's attestation of authenticity from Perry County, Pennsylvania, along with a UBS form entitled Verification of the beneficial owner's identity, which was signed by Andreas Knöpfel, indicating his affiliation with UBS Swiss Financial Advisors, Fridolin Wittmer and Mark Mottet. Id.

57.     Mr. Knopick signed the Basic Document for Account/Custody Account Relationship in Pennsylvania.

58.     Mr. Knopick also signed the UBS AG Basic Agreement for collateral loans in Marysville, PA on or about April 3, 2007. Id. Members of the Class signed similar documents

with UBS AG.

59.     The Basic Agreement for collateral loans provided, in part:

> The present agreement and/or Declaration shall be <u>exclusively</u>
> <u>governed by and construed in accordance with Swiss law</u>.  . . .
> [T]he <u>exclusive place of</u> jurisdiction for any disputes arising out of
> an in connection with the present Agreement and/or Declaration
> shall be <u>Zurich, Switzerland</u>.  UBS reserves the right, however, to
> take legal action against the Undersigned before the authority of
> his/her domicile or before any other competent authority, in which
> even exclusively Swiss law shall remain applicable.

Id. (emphasis in original).

60.     Mr. Knopick also signed a UBS form entitled "Creation of Pledge (with list of the charged/pledged assets) on April 11, 2007 in Marysville, PA.  The identified pledged assets were Mr. Knopick's UBS Swiss Financial Advisors accounts.  Members of the Class signed similar documents.

61.     Mr. Knopick also signed a UBS form entitled "Specific Safe Custody and Pledgeholdership Agreement between himself, UBS AG and UBS Swiss Financial Advisors on April 3, 2007 in Marysville, PA.  Members of the Class signed similar documents.

62.     This Pledgeholdership Agreement makes clear that UBS AG "as lender" and Mr. Knopick "as borrower" have signed the Basic Agreement for Collateral Loans, "which requires [Mr. Knopick] to provide collateral to UBS as security for the performance of the obligations in respect of the Basic Agreement for collateral loans."  Id.

63.     According to the Pledgeholdership Agreement, UBS SFA was to provide to UBS AG "on a daily basis [] statements related to the Collateral (type, lending value of individual assets, number and market value of the individual asses as well as account and asset details and account data on a consolidated basis)."  Id.

64.     These agreements were illegal and unauthorized under state, federal and

14

international law, in that, among other things, they constituted UBS AG's unregistered, uncertified, unlicensed banking activities in Pennsylvania and elsewhere in the US as it pertains to members of the Class.

65.     The choice of law and forum selection provisions of these illegal, fraudulently induced contracts are unlawful, unreasonable and unconscionable.

66.     On November 8, 2013, Mr. Knopick filed a Praecipe for Writ of Summons and served UBS AG via its registered agent for service in Pennsylvania.

67.     On or about May 19, 2013, Mr. Knopick served pre-complaint discovery to UBS AG seeking basic information concerning his accounts, Mr. Knöpfel and the loss of his money.

68.     Instead of responding to Mr. Knopick's pre-complaint discovery, UBS AG objected to the suit on the grounds that, among other things, it was not subject to jurisdiction in Pennsylvania, despite its registered agent for service here, and that UBS AG's forum selection clauses barred Plaintiff's Pennsylvania suit.

69.     Mr. Knopick filed a motion to compel UBS AG's compliance with his pre-complaint discovery.

## VI.    CONTRACT WITH UBS SFA AND DISPUTE HISTORY

70.     Based upon the recommendation of Seifert and UBS FS and their introduction of Mr. Knopick to Andreas Knöpfel, without knowledge that UBS SFA and Mr. Knöpfel were under investigation by the DOJ and SEC, Mr. Knopick signed the Basic document for account/custody account relationship with UBS Swiss Financial Advisors AG dated January 23, 2007 and also April 3, 2007 in Marysville, PA.  Exhibit C attached hereto, "UBS SFA Contract Documents."  Members of the Class signed similar documents.

71.     The Basic Document for Account/Custody Account Relationship specifically provided for all correspondence to be "sent to my/our home address" indicated as Marysville, PA

on the form.

72.     The Basic Document for Account/Custody Account Relationship provided, in part:

> I hereby authorize UBS to use all or part of the funds available at any given time in my UBS account to make investments on a fiduciary basis in the name of UBS, but for my account and at my risk.

Id.

73.   The Basic Document for Account/Custody Account Relationship provided, in part:

> The present agreement and/or Declaration shall be exclusively governed by and construed in accordance with Swiss law.  . . . [T]he exclusive place of jurisdiction for any disputes arising out of an in connection with the present Agreement and/or Declaration shall be Zurich, Switzerland.  UBS reserves the right, however, to take legal action against the Undersigned before the authority of his/her domicile or before any other competent authority, in which even exclusively Swiss law shall remain applicable.

Id. (emphasis in original)

74.     The Basic Document for Account/Custody Account Relationship was signed by Andreas Knöpfel, UBS Swiss Financial Advisors and noted the "account opening" was "by correspondence."

75.     The UBS SFA Contract Documents included an Asset Management Agreement. See Exhibit C attached hereto.  The Asset Management Agreement required UBS SFA to manage Mr. Knopick's assets accounting his "Program Specification," which should have included a "Selected Program", "Investment Strategy", Reference Currency and Specific Investment Instructions."   Members of the Class signed similar documents.

76.     The Asset Management Agreement gave UBS SFA "absolute discretion" to buy and sell assets and "carry out investments on a fiduciary basis in all countries and currencies,

16

execute all types of transactions, decide on investment timing, and "carry out all and any other transactions for your account as it may from time to time determine."  See Exhibit C, Asset Management Agreement, paragraph 1.5, p. 1.

77.   The UBS SFA Contract Documents included a "Portfolio Management International" form purporting to provide Mr. Knopick's "Investment Strategies", Risk Tolerance and "Selected Investment Strategy."  Exhibit C, Portfolio Management International. The section entitled "Investment Strategies" was not filled out.  Mr. Knopick indicated above average risk tolerance and a "growth" investment strategy.  The Portfolio Management International form is signed by Mr. Knopick and Mr. Knöpfel and Mr. Knöpfel's signature indicates Mr. Knopick signed it in his presence or the signature was verified.  Members of the Class signed similar documents.

78.   While the "Investment Strategy" section of the Portfolio Management International form was not filled out, Mr. Knopick told both Mr. Knöpfel and Ms. Seifert his investment strategy – to purchase assets with dividends that cover the interest on the margin loans. The Basic Document for Account/Custody Account Relationship had attached to it a copy of Mr. Knopick's passport along, with a notary public's attestation of authenticity from Perry County, Pennsylvania, along with a UBS form entitled Verification of the beneficial owner's identity, which was signed by Andreas Knöpfel, indicating his affiliation with UBS Swiss Financial Advisors, Fridolin Wittmer and Mark Mottet. Id.

79.   The UBS SFA Contract Documents included a Portfolio Management Asia Opportunities form.  The "Investment Strategies" section of the form was not filled out.  The "Risk Tolerance" section indicated above average risk tolerance and the "Selected Investment Strategy" indicated "Equity."  This document also indicates it was signed in Mr. Knöpfel's

presence or the signature was verified.

80.     The UBS SFA Contract Documents include the Client Privacy Notice and Disclosure Statement for Discretionary Programs.  See Exhibit C.

81.     Section 2 of the Client Privacy Notice and Disclosure Statement recites "UBS SFA's Fiduciary Responsibilities as a Registered Investment Advisor", which include acting in the client's best interests and in the event of a conflict of interest, UBS SFA must place the client's interests before its own, along with disclosing such conflicts to the client and that UBS SFA must treat all clients fairly and equitably and cannot advantage one client over another, and that the investment decisions or recommendations UBS SFA makes for the client must be suitable and appropriate for the client and *"consistent with the client's investment objectives and goals."*  Exhibit C, Disclosure Statement, Section 2.

82.     According to the Disclosure Statement, the minimum fee UBS SFA obtained for management of Mr. Knopick's UBS Portfolio Management International Account was CHF14,500, but was likely as high as CHF19,575 annually.

83.     According to the Disclosure Statement, the minimum fee UBS SFA obtained for management of Mr. Knopick's UBS Portfolio Management Asian Opportunities account was CHF18,500, but was likely as high as CHF30,525 per year.

84.     While UBS SFA disclosed some of its conflicts of interest in the Disclosure Statement, UBS SFA did not disclose that in 2007 through 2009, it was being investigated by the DOJ and SEC for its involvement in a huge tax evasion scheme.  UBS SFA did not disclose that its purpose in obtaining US financial advising clients who properly reported their tax information was to disguise the tax evasion scheme.  UBS SFA did not disclose that the provision of loans and acceptance of deposits by UBS AG was in violation of state, federal and international

banking laws for, among other things, unregistered, uncertified, unlicensed banking activities in Pennsylvania and elsewhere in the US as it relates to other Class Members.

85.     Further UBS SFA and Mr. Knöpfel held themselves out as experts in international investment strategy, when in reality they were never selling investment strategy, they were selling secrecy for their tax evasion clients. Members of the Class were similarly treated.

86.     The choice of law and forum selection provisions of these contracts are unlawful, unreasonable and unconscionable.

87.     On November 8, 2013, Mr. Knopick filed a Praecipe for Writ of Summons and served UBS AG via its registered agent for service in Pennsylvania.

88.     On or about July 20, 2014, the Writ was duly served upon UBS SFA pursuant to the Hauge Convention.

## VII.  DOJ AND SEC INVESTIGATION, UBS DEFERRED PROSECUTION AGREEMENT

89.     While Mr. Knopick's investments with UBS SFA were not part of UBS AG's years-long scheme to defraud the United States by concealing dishonest Americans' taxable earnings in undeclared, so-called "black" accounts at UBS AG, upon information and belief, his investments and relationship were used by UBS AG and UBS SFA, with UBS FS's knowledge and without disclosure to Mr. Knopick, to cover for the black accounts.  Members of the Class were similarly treated.

90.     UBS AG paid $780 million in 2009 to receive a Deferred Prosecution Agreement in lieu of indictment for its tax crimes.  Mr. Knopick, however, sought no unlawful benefits and provided truthful information to permit lawful tax reporting by UBS AG and its affiliates.

91.     However, Mr. Knopick has now determined that his UBS SFA investment advisor was part of UBS AG's criminal element, explaining much of the wrongful conduct

alleged herein and UBS FS's strident efforts over five years to cover it up.

92.     Mr. Knopick has also recently discovered that UBS FS and Ms. Seifert's referral of him to UBS SFA, which necessarily required a banking relationship with UBS AG in order to fund his account and maintain margin loans, was unlawful because UBS AG was not authorized by U.S. law to transact banking business with American consumers in Switzerland and failed to report such activities.

93.     Mr. Knöpfel was a member of UBS SFA's Wealth Management Consulting team, serving along with bankers Renzo Gadola, Christos Bagios and Rene Marty, among others.  Mr. Knöpfel, Mr. Bagios, and Mr. Marty appear to have been a working group as they changed jobs together in virtual lockstep.

94.     FINRA registration records show the three at UBS AG until 2005, then at SFA until January 2009, when they all moved to Credit Suisse Private Advisors.[3]   FINRA registrations do not show any other UBS AG/SFA bankers moving together to the same employers at the same times.

95.     Mr. Bagios proved to be one of the many corrupt UBS AG bankers who participated in the criminal scheme to hide Americans' earnings from the IRS, and he pleaded guilty to conspiracy to defraud the United States in violation of 18 U.S.C. § 371.[4]

96.     Mr. Bagios was but one of many tax criminals at UBS AG; the government has compiled a list of sixty four co-conspirators; "virtually every [UBS AG] employee whose responsibilities ever touched on the U.S. cross-border business . . . ," and no doubt including

---

[3] Mr. Knöpfel's FINRA registration omits his move from UBS AG to SFA in 2005, but his online resume includes this detail, and he executed contract documents with Mr. Knopick as an employee of UBS SFA.  *See* www.vontobeladvsiors.com/EN/About-us-Management-Team-Andreas-Knoepfel (last visited August 14, 2014).

[4] *United States v. Bagios*, No. 12-CR-60260-KAM, S.D.Fla., Nov. 6, 2012.

Knöpfel.[5]

97.   UBS SFA was held out by UBS AG, UBS FS and Seifert and other UBS FS brokers as the "clean" UBS entity: registered with SEC as an investment advisor and requiring tax reporting of all its U.S. clients.  However, as part of his guilty plea, Mr. Bagios revealed that he allowed an UBS SFA account to be used to facilitate the repatriation of funds to the U.S. after a transfer from an illegal UBS AG "black" account.  SFA was, therefore, an instrumentality used in furtherance of UBS AG's criminal scheme.

98.   Mr. Knöpfel's resume states that he moved from SFA to Credit Suisse Private Advisors between December 2008 and February 2009.  As alleged in more detail below, however, Mr. Knöpfel inexplicably disappeared from his job as Mr. Knopick's investment advisor in August, 2008, a time of "tense discussions [with] the U.S. Department of Justice" when the DOJ sent the "unmistakable warning that UBS's other senior executives and the bank itself would be indicted next . . . ."[6]

99.   Mr. Knöpfel spent twenty-three years at UBS AG (including UBS SFA), during the time UBS AG was engaged in the criminal tax scheme, he appears to have worked in a small group with a confessed tax criminal, fled his job with no explanation to his client, and resumed work at a Credit Suisse subsidiary with the admitted criminal Mr. Bagios.

100.   Unsurprisingly, in May, 2014, Credit Suisse pled guilty to charges arising from a criminal tax fraud scheme identical to UBS AG's and agreed to pay a total of $2.6 billion for resolution in the process.

---

[5] *Raoul Weil's Motion to Obtain Testimony From Foreign Witnesses Via Live Video Conference* at 4, No. 08-60322-CR-COHN, S.D.Fla., July 14, 2014 (ECF No. 63).  Weil is the former chairman and chief executive officer of UBS AG's Global Wealth Management &  Business Banking, now a failed fugitive awaiting trial in Florida for his role in the criminal tax avoidance scheme.

[6] *Id.* at 1.

101.    In September or October, 2008, UBS SFA and Mr. Elste first contacted Mr. Knopick to inform him that his portfolio may be liquidated to pay margin calls.  The margin loans being called were made to Mr. Knopick by UBS AG.  It now appears that UBS AG violated law and its internal policies by engaging in unreported, unregistered, unlicensed banking activities in relation to Mr. Knopick and other Members of the Class.  The U.S. Senate Permanent Subcommittee on Investigations reported that while "UBS AG is licensed to operate as a bank and broker-dealer in the United States, those licenses do not extend to its non-U.S. offices or affiliates providing banking or securities services to U.S. residents.[7]  UBS AG internal documents provided to the U.S. Senate echo that UBS AG's U.S. licenses "do not permit non-U.S. offices or affiliates of UBS AG to provide banking or securities services to U.S. residents," and that U.S. licenses "do not encompass cross border services provided to U.S. residents by UBS AG offices of affiliates outside of the United States."[8]

102.    Upon information and belief, UBS AG's unlawful banking relationships with U.S. citizens were routine and were facilitated by UBS FS brokers and investment advisers who referred their U.S. customers to the Swiss bank, resulting in either personal meetings with Swiss bankers in the U.S., or contacts with UBS AG through the instrumentalities of interstate commerce in the U.S.  Mr. Knopick was required to wire his account opening deposit with UBS SFA to UBS AG, and UBS SFA required that his margin account be opened at UBS AG.  Thus, in order to do business with the SEC-registered investment adviser, UBS SFA, Mr. Knopick and similarly situated class members were required to do business with UBS AG, which was engaging in unlawful banking with U.S. citizens.

---

[7] *Tax Haven Banks and U.S. Tax Compliance*, Staff Report, U.S. Senate Permanent Subcommittee on Investigations at 89, July 17, 2008.

[8] *Id.*, Ex. 86 at 2, document PSI-OPB-0000269; Ex 85 at 1, document PSI-OPB-0000103.

103.   On information and belief, the concert of action between UBS FS, Seifert and other brokers, UBS SFA, Mr. Knöpfel and other advisors, UBS AG, and its management was known to and communicated to, if not directly operated by, senior management of each of those entities.

104.   At some point between August and October, 2008, it appears that Mr. Knöpfel left his job and was replaced by Rene Elste, but Mr. Elste later concealed from Mr. Knopick all details regarding as to when and why his fiduciary advisor Mr. Knöpfel simply vanished.  As Mr. Knopick's fiduciaries, UBS AG, UBS FS, Seifert, UBS SFA and Elste were obligated to inform Mr. Knopick why Mr. Knöpfel was removed and whether he had engaged in misconduct. Members of the Class were similarly situated as it pertained to their UBS fiduciary counterparts, including UBS FS brokers around the country.

105.   As the debt and equity markets melted down in late 2008, UBS SFA and Mr. Elste continued to liquidate Mr. Knopick's portfolio, and upon information and belief, the portfolios of other similarly situated class members, at fire sale prices to satisfy UBS AG's margin calls.  UBS SFA dissuaded Mr. Knopick and other similarly situated class members from withdrawing their remaining money promptly, ostensibly to feed UBS AG's appetite for margin calls (even though it had made the loans unlawfully) and/or to aid in the cover up of the tax fraud scheme.  In the end, Mr. Knopick's $12+ million investment and all of his gains were whittled to roughly $900,000, as were the portfolios of similarly situated class members.

106.   When Mr. Knopick later asked Seifert to explain how Mr. Knöpfel could have lost virtually all of his money, Seifert said that it appeared that Mr. Knöpfel was "gone" and so was Mr. Knopick's money, and that she had observed that in such circumstances, UBS FS or its sister companies typically made the customer whole.  Seifert's candid admission convinced Mr.

Knopick that Seifert had learned that Mr. Knöpfel had taken Mr. Knopick's money. Whether Mr. Knöpfel actually misappropriated Mr. Knopick's money is unknown, as UBS AG, UBS FS, Seifert, and UBS SFA and Mr. Elste have provided no further explanation to Mr. Knopick and have resisted all attempts to obtain additional information. Given the concert of action between the companies in the UBS AG empire, it is obvious that UBS FS and Seifert and other UBS FS brokers have access to information regarding Mr. Knöpfel's disappearance and Mr. Knopick's losses, but have chosen to conceal the information from Mr. Knopick. UBS FS, Ms. Seiffert, UBS AG and UBS SFA have all been uncooperative with Mr. Knopick's efforts to obtain the complete file related to his accounts, and have taken preposterous and groundless litigation positions in efforts to avoid providing discovery or litigating in the U.S. (despite being a registered investment advisor).

107. In addition, UBS FS and Ms. Seifert have concealed, and continue to conceal, from Mr. Knopick and other similarly situated class members, including current and continuing customers, that:

i) UBS AG was under criminal investigation in September, 2007, for, among other things, improper dealings with US citizens, a fact that UBS AG learned from the Department of Justice ("DOJ") in 2007 when DOJ informed UBS AG that it had received information about the cross-border tax fraud scheme from Bradley Birkenfeld, a former UBS AG private banker;

ii) UBS AG was contacted by the SEC in December, 2007, regarding UBS AG's cross-border tax scheme;

iii) Prior to May, 2008, the government had detained in Florida a senior UBS AG private banking official from Switzerland, allegedly seizing his computer and other evidence;

iv) In May, 2008, the government arrested a private banker formerly employed by UBS AG on charges of conspiracy to defraud the IRS of $7.2 million in taxes on $200 million in hidden assets;

v) In June, 2008, Birkenfeld pleaded guilty to conspiracy to defraud the IRS;

24

vi)     In February, 2009, UBS AG entered into a Deferred Prosecution Agreement with the DOJ and paid $780 million in order to escape prosecution;

vii)    Former members of UBS SFA's Wealth Management Consulting team, and Knöpfel co-workers, Renzo Gadola and Christos Bagios have been convicted of conspiracy to defraud the United States.

109.    The facts concealed from Mr. Knopick and other similarly situated class members by UBS FS and Ms. Seifert and other UBS brokers regarding UBS AG's and UBS SFA's criminal conduct and, in 2007 until February, 2009, the facts regarding the possibility of indictment and the range of possible punishment, and the possible consequences to Mr. Knopick, were material facts to Mr. Knopick and other similarly situated class members, as they would be to any reasonable investor.  UBS FS and Seifert and other UBS FS brokers had, and have, a duty to disclose these facts to Mr. Knopick and other similarly situated class members, had these facts been known to them, they would never have entered into an investment agreement with UBS SFA or banking activities with UBS AG.  They are entitled to rescind their alleged agreements with UBS SFA and UBS AG and, because UBS FS and Seifert and other UBS FS brokers caused them to enter those agreements through their inducement and omissions of material facts, they are responsible for all of the damages Plaintiff and other Class members have suffered, including but not limited to the amount of the rescission claims of Mr. Knopick and other similarly situated class members.

110.    UBS FS and Seifert and other UBS FS broker's fraudulent concealment of facts from Mr. Knopick and other similarly situated class members is an independent and actionable breach of duty, and requires application of the discovery rule to toll the running of any period of limitations, laches, or estoppel.  In addition, UBS FS and Seifert and other UBS FS broker's concealment of material facts entitles Mr. Knopick and other similarly situated class members to

rescind any transaction that Defendants induced them enter, and Defendants are liable for all losses Mr. Knopick other similarly situated class members incurred as a result of those transactions.

111.    Mr. Knopick brings his claims regarding UBS FS and Seifert and other UBS FS broker's unlawful referral of him and other Class members to UBS SFA and UBS AG as an individual claim and as a class action comprising all customers of UBS AG and UBS SFA similarly situated; *i.e.* unlawfully referred to UBS AG and UBS SFA from 2000 to 2010.  The number of UBS FS customers that were referred to UBS SFA and required to do business with UBS AG, or directly to UBS AG, when UBS AG was prohibited by law and internal policy from providing unreported, unlicensed, unregistered banking services to U.S. citizens is so numerous that joinder of all members is impracticable in this proceeding.  There are questions of law or fact common to the class; *inter alia,* whether UBS FS and its employees wrongfully referred U.S. citizens to UBS AG and UBS SFA when UBS AG was prohibited by law and internal policy from providing banking services to U.S. citizens and UBS AG and UBS SFA were under investigation by the DOJ and SEC for a massive tax fraud scheme and whether those customers are entitled to rescind their contracts and receive their money back.  Mr. Knopick's claims are typical of the claims of the class; Mr. Knopick sought only to open a securities account that offered margin lending and he was forced to do business with UBS AG.  Mr. Knopick is a suitable class representative and will fairly and adequately protect the interests of the class.

## VIII.   CLASS ACTION ALLEGATIONS

112.    Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all others similarly situated.

113.    Plaintiff represents a Class (the "Nationwide Class" or the "Class") initially defined as:

All persons referred by UBS FS, Seifert and/or other UBS FS brokers to enter into banking contracts with UBS AG and financial advising contracts with UBS SFA, and did so, between 2000 and 2010.

114.    Excluded from the Class are: Officers and directors and employees and family members of officers, directors and employees of UBS FS, UBS AG and UBS SFA.

115.    This action has been brought and may properly be maintained on behalf of the Plaintiff and Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

### A.      Numerosity Federal Rule of Civil Procedure 23(a)(1).

116.    The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Plaintiffs do not know the exact size or identities of the proposed Class, since such information is in the exclusive control of the Defendants. Thus, the class may consist of ten thousand members or more. Therefore, the proposed class is so numerous that joinder of all members is impracticable. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

### B.      Commonality and Predominance - Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)

117.    This action involves common questions of law and fact, which predominate over any questions affecting individual Class and State Subclass members, including, without limitation:

a.      Whether UBS FS and its employees wrongfully referred U.S. citizens to UBS AG and UBS SFA when UBS AG was prohibited by law and internal policy from providing banking services to U.S. customers

b.      Whether UBS FS and its employees wrongfully referred U.S. citizens to UBS AG and UBS SFA when UBS AG and UBS SFA were under investigation by the DOJ and SEC for a massive tax fraud scheme and failed to discuss such information to US customers

c.      Whether UBS FS and its employees made false and misleading statements to US customers concerning the expertise of UBS SFA and UBS AG in international banking and financial advising

d.      Whether those customers are entitled to rescind their contracts and receive their money back;

e.      Whether UBS FS and its employees are liable for the damages incurred by US customers as a result of UBS FS's wrongful conduct

### C.      Typicality - Federal Rule of Civil Procedure 23(a)(3)

118.    Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendants' wrongful conduct as described above. Plaintiff is a member of the Class and Plaintiff's claims are typical of those of the Class because, among other things, members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal, state and international laws.

### D.      Adequacy of Representation - Federal Rule of Civil Procedure 23(a)(4).

119.    Plaintiff is an adequate Class representative because his interest do not conflict with the interests of the other members of the Class he respectively seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff

intends to prosecute this action vigorously. The Class interests will be fairly and adequately protected by Plaintiff and his counsel. Plaintiff's interests are consistent with, and not antagonistic to, those of the members of the Class.

### E.   Superiority - Federal Rule of Civil Procedure 23(b)(3).

120.    Class certification pursuant to Rule 23(b)(1) is appropriate because the prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications with respect to individual members of the class, and could substantially impede the ability of other members to protect their interests.

121.    Class certification pursuant to Rule 23(b)(3) is also appropriate because class action treatment is a superior method for the fair and efficient adjudication of the controversy. Common issues predominate over individual issues, and there is no interest by members of the class in individually controlling the prosecution of separate actions.

122.    The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

123.    Without a class action, individual class members would face burdensome litigation expenses, deterring them from bringing suits that would adequately protect their rights. The class action device in this civil RICO action provides access to the courts and a measure of

justice and accountability for the individual and business claimants whose incomes, business and properties have been damaged by Defendants fraudulent and unlawful conduct.

124.    Plaintiff and all Class members seek treble damages for their injury under the federal civil RICO provisions of 18 U.S.C. § 1964(c), including but not limited to economic damages, cost of the suit, attorney's fees, and any other relief to which they may be entitled in law and/or equity.

## IX.    EQUITABLE TOLLING, DISCOVERY RULE REGARDING STATUTES OF LIMITATIONS

125.    Any applicable statutes of limitations have been tolled by Defendants' illegal, deceptive, and fraudulent practices. Defendants have concealed from Plaintiff and the Class the truth about their illegal, deceptive, and fraudulent practices described herein, thereby tolling the running of any applicable statutes of limitations.

126.    Plaintiffs and members of the Class have been unable to obtain vital information bearing on their claims absent any fault or lack of diligence on their part.  Plaintiff and the other Class members could not reasonably have discovered the fraudulent and unlawful nature of Defendants' conduct.  Defendants had actual or constructive knowledge that their conduct was illegal and deceptive, in that they consciously concealed the schemes set forth herein.

127.    Plaintiff and the Class did not have any reason to know of the RICO violations or injuries described herein and did not and could not have known of Defendants' violations of federal, state and international law.  Plaintiff and the Class were relieved of any duty to investigate because they reasonably and justifiably relied on Defendants to fulfill their fiduciary duties. Even assuming there had been some indication of wrongdoing (which there was not), and Plaintiff and the Class had attempted to investigate, such investigation would have been futile because it would not have uncovered the true, unlawful nature of Defendants' criminal enterprise

and profiteering schemes alleged herein.

128.    The purposes of the statutes of limitations period are satisfied because Defendants cannot claim prejudice due to a late filing where Plaintiff and the Class filed suit promptly upon discovering the facts essential to their claims, described herein, which Defendants knowingly concealed.

129.    Accordingly, Defendants are estopped from relying upon a statute of limitations defense because they purposefully concealed the true nature of the accounts, and they concealed the fraudulent nature of the loss of monies in the accounts.

## X.    COUNTS

### COUNT I

### **FRAUD**

130.    Plaintiff incorporates by reference each and every paragraphs above as if fully set forth herein

131.    Defendants and other UBS FS brokers represented to Mr. Knopick and similarly situated members of the Class, among other things, that Mr. Knöpfel and other UBS SFA advisors were skilled Swiss investment advisors with significant investment prowess.

132.    Defendants represented to Mr. Knopick and similarly situated members of the Class that, among other things, UBS SFA and UBS AG had expertise in international banking and investing, would act in the best interest of the client in making investment decisions and that their investments would be consistent with the client's objectives and goals, knowing such representations to be false because UBS AG and UBS SFA did not sell investment services, they sold secrecy.

133.    Defendants failed to disclose to Mr. Knopick and similarly situated members of the Class that, among other things, UBS SFA and UBS AG were being investigated by the DOJ

and SEC for a massive tax evasion scheme and that one of their purposes in obtaining additional US customers was to facilitate the tax evasion scheme; failed to disclose to Mr. Knopick and similarly situated members of the Class that, among other things, UBS AG was not registered or licensed for banking activities in Pennsylvania or other states in the US and that UBS AG did not properly report tax information and other information to US authorities.

134.   Defendants' representations were false and made to mislead Mr. Knopick and similarly situated members of the Class.

135.   Upon information and belief, Defendants made these misrepresentations with knowledge of their falsity, reckless disregard for their truth, or without reasonable grounds for believing the representations to be true when they were made in order to induce Plaintiff and similarly situated members of the Class to invest and bank with UBS AG and UBS SFA and increase Defendants' profits and fees.

136.   Defendants intended that Mr. Knopick and similarly situated members of the Class would rely on the misrepresentations in deciding whether to invest money and bank with UBS AG and UBS SFA.

137.   Mr. Knopick and similarly situated members of the Class reasonably and justifiably relied on Defendants' misrepresentations and concealments and, as a result, invested with UBS AG and UBS SFA.

138.   UBS AG and UBS SFA, with the knowledge of UBS FS and its employees, thereafter squandered Plaintiff's approximate $12 million investment and the investments of similarly situated members of the Class in a span of less than three weeks. Such fraud directly and proximately caused Plaintiff and similarly situated members of the Class substantial damages, as set forth above.

WHEREFORE, Plaintiff and similarly situated members of the Class respectfully requests that this Court enter judgment in their favor and against Defendants awarding Plaintiff and similarly situated members of the Class compensatory damages in an amount in excess of $5,000,000, punitive damages, costs, interest and such other and further relief as this Court may deem just and equitable.

## COUNT II

### **GROSS NEGLIGENCE**

139.   Plaintiff incorporates by reference all of the paragraphs above as if fully set forth herein.

140.   Defendants owed Plaintiff and similarly situated members of the Class a duty to act with due care in carrying out any transactions on his behalf and/or in identifying, structuring, analyzing or effectuating any investments on their behalf. Defendants owed Plaintiff and similarly situated members of the Class a duty to abide by state, federal and international banking and reporting laws and requirements. Defendants owed Plaintiff and similarly situated members of the Class a duty to put their interests above the interests of Defendants and their affiliates.

141.   Mr. Knopick clearly explained his investment strategy, of investing in blue chip common stocks with high dividend yields and using those dividends to make interest payments on margin loans to use, in part, to fund securities purchases, to Mr. Knöpfel. Members of the Class similarly explained their investment strategies to UBS FS brokers and UBS SFA advisors.

142.   However, Defendants knew Mr. Knöpfel ignored Mr. Knopick's specific instructions and invested Mr. Knopick's money wildly, trading his dollars into foreign currencies and purchasing an inexplicable collection of stocks and bonds denominated in those foreign

currencies.  Mr. Knöpfel and other UBS SFA advisors similarly disregarded the instructions of similarly situated members of the Class.

143.    Mr. Knöpfel was never authorized by Mr. Knopick to purchase bonds for Mr. Knopick's account, or to invest contrary to Mr. Knopick's time-proven strategy.  Mr. Knöpfel and other UBS SFA advisors were similarly never authorized by members of the Class to deviate from their investment strategies.

144.    Defendants owed Plaintiff and similarly situated members of the Class a duty to ensure that UBS SFA made investment decisions suitable and appropriate for them and consistent with their investment objectives and goals

145.    Defendants also owed Plaintiff and similarly situated members of the Class a duty to exercise reasonable care in disclosing information material to their investments, including disclosing that UBS AG and UBS SFA were under investigation by the DOJ and SEC for a massive tax fraud scheme and that US customer accounts were used to facilitate the scheme and that UBS SFA was not in the business of selling investment advice, it was in the business of selling secrecy.

146.    However, Mr. Knöpfel and his assistant routinely told Mr. Knopick, in telephone calls from Switzerland to Pennsylvania and elsewhere in the U.S., that his investments were performing well, and consistently concealed from Mr. Knopick that 1) his money had been invested against his instructions and 2) his account was excessively leveraged and 3) that his banking relationship with UBS AG was unlawful, unregistered and unreported and was being used as cover for UBS SFA's black accounts. Members of the Class received similarly false information from their UBS SFA advisors.

34

147.    Further, when defendant Mr. Knöpfel was removed from his job and replaced by Mr. Elste, Defendants concealed from Mr. Knopick all details regarding when and why his fiduciary advisor simply vanished.  Members of the Class received similar treatment.

148.    Additionally, as the debt and equity markets melted down in late 2008, UBS SFA continued to liquidate Mr. Knopick's portfolio at fire sale prices to satisfy UBS AG's margin calls and Defendants dissuaded Mr. Knopick from withdrawing his money promptly.  Members of the Class received similar treatment.

149.    Defendants grossly breached their duties by misrepresenting material information and recklessly and wantonly failing to manage the funds of Plaintiff and similarly situated members of the Class according to their instructions and with due care, as well as with commercial standards and practices followed by the investment industries.

150.    As a direct and proximate result of Defendants' gross negligence, Plaintiff and similarly situated members of the Class suffered substantial monetary damages.

WHEREFORE, Plaintiff and similarly situated members of the Class respectfully requests that this Court enter judgment in his favor and against Defendants awarding Plaintiff and similarly situated members of the Class compensatory damages in an amount in excess of $5,000,000, punitive damages, costs, interest and such other and further relief as this Court may deem just and equitable.

## COUNT III

### BREACH OF FIDUCIARY DUTY

151.    Plaintiff incorporates by reference each and every one of the paragraphs above as if fully set forth herein.

152.    Defendants provided brokerage and investment advisory services to Mr. Knopick beginning in January 2007.  As a result of that relationship, Defendants owed fiduciary duties to

Mr. Knopick, which required Defendants to put Mr. Knopick's interests ahead of their own, and discharge the duties of care, loyalty, and good faith. Members of the Class were similarly treated.

153.   Further, the contract documents with UBS AG specifically state that UBS AG will invest the funds in Plaintiff's UBS account on a fiduciary basis. See Exhibit "C" (Basic document for account/custody account relationship). Members of the Class were similarly situated.

154.   Additionally, UBS SFA has multiple "Fiduciary Responsibilities as a Registered Investment Adviser" which include, but are not limited to: (a) "UBS-SFA must act in what it reasonably believes to be in the Client's best interests and in the event of a conflict of interest, UBS-SFA must place the Client's interests before its own"; (b) "UBS-SFA is obligated to disclose to the Client all material conflicts between the Client's and UBS-SFA's interests"; and (c) "The investment decisions or recommendations UBS-SFA makes for the Client must be suitable and appropriate for the Client and consistent with the Client's investment objectives and goals" See Exhibit B. Members of the Class were similarly situated.

155.   Defendants owed fiduciary duties of loyalty, care, and good faith to Plaintiff and similarly situated members of the class.

156.   Mr. Knopick and members of the Class carefully explained their investment strategy when they opened their accounts.

157.   However, defendant Mr.  Knöpfel ignored Mr. Knopick's instructions and invested Mr. Knopick's money wildly, trading his dollars into foreign currencies and purchasing an inexplicable collection of stocks and bonds denominated in those foreign currencies. Mr. Knöpfel was never authorized by Mr. Knopick to purchase bonds for Mr. Knopick's account, or

to invest contrary to Mr. Knopick's time-proven strategy.  Members of the Class were similarly treated by Mr. Knöpfel and other UBS SFA advisors and UBS FS Brokers.

158.    Further, and as stated above, at some point between August and October 2008, it appears that Mr.  Knöpfel was removed from his job and replaced by Mr. Elste, but UBS FS, UBS SFA, UBS AG and Mr. Elste concealed from Mr. Knopick all details regarding when and why his fiduciary advisor Mr. Knöpfel simply vanished.  Members of the Class were similarly treated.

159.    As Mr. As Mr. Knopick's fiduciaries, Defendants were obligated to inform Mr. Knopick when and why Mr. Knöpfel was removed and whether he had engaged in misconduct, as well as the fact that UBS AG and UBS SFA were under investigation by the SEC and DOJ for tax fraud and that UBS AG was not licensed or registered to engage in banking activities in the US and did not report such activities in contravention of state, federal and international law.

160.    Additionally, as the debt and equity markets melted down in late 2008, UBS SFA continued to liquidate Mr. Knopick's portfolio at fire sale prices to satisfy UBS AG's margin calls.  UBS SFA dissuaded Mr. Knopick from withdrawing his money promptly, ostensibly to feed UBS AG's appetite for margin calls.  Members of the Class were similarly treated.

161.    By their actions set forth above, Defendants breached their fiduciary duties owed to Mr. Knopick and similarly situated members of the Class.

162.    Defendants breached their fiduciary duties by misrepresenting material information, both before Mr. Knopick invested in UBS SFA and banked with UBS AG and during the course of the parties' relationship, and failing to ensure management of Mr. Knopick's investment in accordance with his wishes and instructions, as well as the standards and practices followed by the investment industries. Defendants also breached their fiduciary duties by

37

concealing from Mr. Knopick that UBS SFA and UBS AG were under investigation for tax fraud by the SEC and DOJ and that UBS AG was not licensed or registered for banking activities in the US and failed to properly report such activities in contravention of state, federal and international law.  Members of the class were similarly treated.

163.    The above-alleged breaches of fiduciary duties were undertaken and committed by Defendants intentionally and in bad faith, by willful misconduct, and in knowing disregard of the rights of Plaintiff and similarly situated members of the Class.

164.    As a direct and proximate result of Defendants' breaches, Plaintiff and similarly situated members of the Class have suffered substantial monetary damages.

WHEREFORE, Plaintiff and similarly situated members of the Class respectfully request that this Court enter judgment in their favor and against Defendants awarding Plaintiff and similarly situated members of the Class compensatory damages in an amount in excess of $5,000,000, punitive damages, costs, interest and such other and further relief as this Court may deem just and equitable.

## COUNT IV

## UNJUST ENRICHMENT

165.    Plaintiff incorporates all preceding paragraphs, as if fully set forth herein.

166.    Plaintiff and similarly situated members of the Class invested money with UBS AG and UBS SFA as a result of Defendants' misrepresentations.

167.    Defendants knew that the reason Plaintiff and similarly situated members of the Class invested with UBS AG and UBS SFA was the misrepresentations made by Defendants.

168.    Defendants have taken significant monies from Plaintiff and similarly situated members of the Class for their use and benefit, to the detriment of Plaintiff.

169.    Defendants misappropriated Plaintiff's approximate $12 million investment for their own use and benefit.

170.    Defendants have been unjustly enriched by wrongfully using Plaintiff's investment funds for their own purposes, to Plaintiff's detriment, as Plaintiff lost his significant investment in a span of less than three weeks.

171.    Allowing Defendants to retain such funds taken from Plaintiff would be unjust and inequitable.

172.    The Court should require Defendants to repay any and all monies that they took from Plaintiffs for their own use and benefit.

WHEREFORE, Plaintiff and members of the Class respectfully request that this Court enter judgment in their favor and against Defendants awarding Plaintiff and members of the Class compensatory damages in an amount in excess of $5,000,000, punitive damages, costs, interest and such other and further relief as this Court may deem just and equitable.

## COUNT V

## BREACH OF CONTRACT

173.    Plaintiff incorporates by reference all preceding paragraphs, as if fully set forth herein.

174.    Plaintiff entered into a written contract with Defendants that established his relationship with Defendants. At a minimum, that contract required Defendants to act in Mr. Knopick's interest, in good faith, and to deal honestly with Mr. Knopick. Members of the Class entered similar contracts.

175.    Defendants were required by contract to, among other things, make investments on a fiduciary basis and disclose material information and avoid conflicts of interest.

176.   However, defendant Mr. Knöpfel, and other UBS SFA advisors, ignored Mr. Knopick's and other Class member's instructions and invested their money wildly, trading dollars into foreign currencies and purchasing an inexplicable collection of stocks and bonds denominated in those foreign currencies.  Mr. Knöpfel and the other UBS SFA advisors were never authorized by Mr. Knopick and other Class members to purchase bonds for Mr. Knopick's account, or to invest contrary to Mr. Knopick's time-proven strategy or other Class member's instructions.

177.   Further, in late 2008, UBS SFA continued to liquidate Mr. Knopick's portfolio at fire sale prices to satisfy UBS AG's margin calls.  UBS SFA dissuaded Mr. Knopick from withdrawing his money promptly, ostensibly to feed UBS AG's appetite for margin calls. Members of the Class were treated similarly.

178.   In a matter of weeks, Mr. Knopick's $12+ million investment was whittled to approximately $900,000. Members of the Class had similar results.

179.   By their actions set forth above, Defendants failed to perform under their contracts with Plaintiff and the Class members.

180.   Defendants' failure to perform their duties under their contracts was without justification and/or excuse, and constituted a total and material breach of the contract between the parties.

181.   Plaintiff and the Class members gave consideration that was fair and reasonable, and have performed all conditions, covenants, and promises required to be performed under their contracts with Defendants.

182.    As a result of Defendants' breach of the contract, Plaintiff and Class members suffered and will continue to suffer reasonable and foreseeable consequential damages resulting from such breach, including the loss of his investment monies.

183.    As a direct and proximate result of Defendants' breach of contract, Plaintiff and the have suffered substantial monetary damages.

WHEREFORE, Plaintiff and the Class  respectfully request that this Court enter judgment in their favor and against Defendants awarding Plaintiff and the Class compensatory damages in an amount in excess of $5,000,000 punitive damages, costs, interest and such other and further relief as this Court may deem just and equitable.

## COUNT VI

## <u>VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE</u>
## <u>PRACTICES AND CONSUMER PROTECTION LAW, 73. P.S. § 201-2(XXI)</u>

184.    Plaintiff incorporates by reference all of the above paragraphs, as if fully set forth herein.

185.    At all relevant times material hereto, Defendants conducted trade and commerce within the meaning of the Pennsylvania Unfair Trade Practices & Consumer Protection Law ("UTPCPL")

186.    Plaintiff and each Class member is a "person" as defined and construed under the UTPCPL.

187.    Defendants and other UBS FS brokers violated the UTPCPL as Mr. Knopick and the Class are persons who purchased services for their personal purposes, and UBS FS, Seifert and other UBS FS brokers, UBS AG, UBS SFA, Mr. Knöpfel, and Mr. Elste engaged in unfair or deceptive acts and practices, which include representing that the services had characteristics that

they did not have and by engaging in fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding, including all of the allegations set forth in this Complaint.

126.    Defendants introduced Mr. Knöpfel to Mr. Knopick and encouraged Mr. Knopick to entrust his money to Mr. Knöpfel.  Respondents held Mr. Knöpfel out as qualified and responsible, initially blamed Mr. Knopick's losses on Mr. Knöpfel's misappropriation, and then refused to provide further truthful information to Mr. Knopick, all as alleged above.  Defendants failed to ensure management of Mr. Knopick's investment in accordance with his wishes and instructions, as well as the standards and practices followed by the investment industries. Defendants concealed from Mr. Knopick that UBS SFA and UBS AG were under investigation for tax fraud by the SEC and DOJ and were using UBS SFA accounts such as Mr. Knopick's for cover and that UBS AG was not licensed or registered for banking activities in the US and failed to properly report such activities in contravention of state, federal and international law. Members of the class were similarly treated.

188.    Defendants' conduct as set forth above and herein constitutes an unconscionable commercial practice comprised of deceptive acts of practices in violation of the UTPCPL, 73 P.S. § 201-2(xxi).

189.    Plaintiff and the Class suffered actionable and ascertainable losses of money as a result of Defendants' unconscionable, deceptive and/or unfair trade practices, including, but not limited to, the actions as described above and incorporated herein by reference.

190.    As a direct and proximate result of Defendants' violation of the UTPCPL, Plaintiff and the Class have suffered substantial monetary damages, in the amount of their losses, and the attorney's fees they have incurred in pursuing their claims, and the willful and malicious

nature of the conduct involved justifies an additional award of treble damages and exemplary damages to the extent allowed by law.

WHEREFORE, Plaintiff and the Class respectfully request that this Court enter judgment in their favor and against Defendants awarding Plaintiff and the Class compensatory damages in an amount in excess of $5,000,000 punitive damages, costs, interest and such other and further relief as this Court may deem just and equitable.

## COUNT VII

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349

191.    Plaintiff incorporates by reference all of the above paragraphs, as if fully set forth herein.

192.    Defendants and other UBS FS brokers violated, and continue to violate through their deceptive concealment of facts, New York General Business Law § 349 as follows: (i) Mr. Knopick and the Class members dealt with UBS FS and Seifert and other UBS FS brokers as consumers, and UBS FS and Seifert and other UBS FS brokers engaged in consumer-oriented misconduct which was, and is, deceptive and materially misleading to a reasonable consumer, (ii) UBS FS and Seifert and other UBS FS brokers engaged, and continue to engage, in acts or practices that were, and are, misleading in a material respect, and (iii) Mr. Knopick and the Class were injured as a result of the deceptive acts or practices, all as alleged above.

193.    Mr. Knopick and the Class have suffered actual damages by Defendants' wrongful conduct in the amount of their losses incurred at USB SFA and UBS AG and the attorney's fees they incurred in pursuing their claims. The willful and malicious nature of the conduct involved justifies an additional award of treble damages, exemplary damages to the extent allowed by law, and attorney's fees.

WHEREFORE, Plaintiff and the Class respectfully request that this Court enter judgment in their favor and against Defendants awarding Plaintiff and the Class compensatory damages in an amount in excess of $5,000,000, punitive damages, costs, interest and such other and further relief as this Court may deem just and equitable.

## COUNT VIII

## FEDERAL RICO VIOLATION 18 U.S.C. 1962(C)

194.    Plaintiff incorporates herein by reference the allegations contained in all of the preceding paragraphs above as though set forth in their entirety.

195.    The claim of federal RICO violation against the Defendant arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968.

196.    Plaintiff, each Class member, and each Defendant is a "person," as that term is defined in 18 U.S.C. § 1961(3).

197.    At all times relevant to this complaint, Defendants including agents and employees of the defendants, collectively, have constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that is, a group of business entities or individuals associated in fact, which was engaged in, and the activities of which affected, interstate commerce and foreign commerce, that included UBS AG and its affiliate UBS SFA along with several of their respective employees and officers, including, Mr. Knopefel etc.

198.    Defendants, UBS SFA and UBS AG participated in the operation and management of the enterprise, collectively referred to herein as the "UBS Enterprise."

199.    In addition to any legitimate transactions, the course of conduct of this enterprise included rendering financial services through a pattern of racketeering activity. It appears that the Defendants intended to defraud Plaintiff, and the Class, using its services through a pattern of racketeering activity.in violation of 18 U.S.C. § 1962(c).

44

A.      **RICO Enterprise.**

200.    This UBS Enterprise possessed and continues to possess a common purpose and goal, a membership, organizational structure, and ongoing relationships between UBS FS, UBS SFA and UBS AG with sufficient longevity to permit and enable pursuit of the UBS Enterprise's purpose and long-term objective through a continuous course of conduct that affected and continues to affect interstate and foreign commerce.

201.    The UBS Enterprise exists separate and apart from its pattern of racketeering activity, inasmuch as the Defendants and UBS Enterprise have multiple goals, not all of which are fraudulent. The lawful activity engaged in by the UBS Enterprise includes ongoing financial services. From at least April 2007 through September 2008, and potentially the present, the affiliation between Mr. Knöpfel and UBS AG and UBS SFA and UBS FS and its brokers constituted an enterprise. Defendants conducted and participated in that enterprise's affairs through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (c).

202.    UBS AG, UBS FS, UBS SFA and their agents are "persons" under the civil RICO statute because it knowingly and fraudulently conducted and participated in the conduct, the management and the operation of the UBS Enterprise's affairs, directly or indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). UBS AG, UBS FS, UBS SFA and their agents engaged in such unlawful conduct by using the UBS Enterprise to conduct lawful activities as well as to further its fraudulent scheme of causing false and misleading information disseminated to investors by email, interstate wires or interstate carriers regarding the investors' accounts.

203.   Defendants violated RICO and injured Plaintiff and class members in their business or property by reason of its conduct of the UBS Enterprise not to pursue gain, but to do so by unlawful means: to maximize its gain and profit through a pattern and practice of misrepresentation and concealment of the systematic decisions. As the direct, proximate and foreseeable result of this violative pattern, Plaintiff and the class were been injured by loss of their investment.

204.   This common purpose was induce U.S. citizens into contracting with the UBS Enterprise, to invest their monies with the UBS Enterprise and then for Defendants to perpetrate a fraud on them to avoid U.S. penalties and criminal charges, by effectively "losing" the investment.

205.   This RICO enterprise has remained in existence for several years, enabling its members to pursue the UBS Enterprise's purpose. Defendants have conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that began in at least 2007 and likely continues through the present and has consisted of hundreds of thousands (or millions) of acts of mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, and 18 USC § 1952.

**B.    Predicate Acts Mail and Wire Fraud**

206.   As described in greater detail in Section X of this Complaint, UBS SFA and UBS AG engaged in a scheme or artifice to induce U.S. citizens into contracting with the UBS Enterprise, to invest their monies with the UBS Enterprise and then for Defendants to perpetrate a fraud on them to avoid U.S. penalties and criminal charges, by effectively "losing" the investment.

207.   In implementing the scheme, Defendants were acutely aware that Plaintiff and the other Class members depend on the honesty and integrity of Defendants in representing the

accuracy of the accounts Plaintiff and the other Class members also rely on State, federal and international law obligating Defendants to act legally, and to be prudent financial advisors, in good faith and fair dealings under their fiduciary duty. And it was reasonable to presume that Defendants conduct complied with obligations under state. Federal and international law.

208.     As part of their participation, Defendants knowingly and intentionally sent, mailed, and transmitted or caused to be sent, mailed, or transmitted information in interstate or foreign commerce. These documents constituted numerous and repeated violations of the federal mail and wire fraud statutes in violation of 18 U.S.C. §§ 1341, 1343, as well as a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961 (1), 1962 (c). Defendants knew, or at a minimum were reckless in not knowing, that the documents were misleading, deceptive, and/or false when sent, as a result of the actions of their officers and employees pursuant to the scheme outlined in this Complaint.

209.     The U.S. mail or wire services, including internet, telephone and email were used in furtherance of the scheme. Use of the mail or wire services was either known to Defendants or it was reasonably foreseeable that they would be used for this purpose.

210.     As described throughout this Complaint, Defendants' repeated violations of the federal mail and wire fraud statutes, which have all occurred in the last few years, all as part of and in furtherance of the scheme to defraud include:

a:     Concealing that UBS SFA and UBS AG were under investigation for tax fraud by the SEC and DOJ and were using UBS SFA accounts such as Mr. Knopick's for cover

b.     Concealing that UBS AG was not licensed or registered for banking activities in the US and failed to properly report such activities in contravention of state, federal and international law.

c.      Concealing UBS SFA and UBS AG were not experienced or knowledgable in international banking or investing, were not selling investment advice, but were selling secrecy to their tax fraud client

d.      engaging in unlawful banking activities in the US in contravention of state, federal and international law, including accepting deposits and transmitting money and lending;

e.      engaging in unreported banking activities in the US in contravention of state, federal and international law, including not reporting events associated with deposits, transmitting money and lending.

**C.    Pattern of Racketeering**

211.    As detailed above, Defendants pattern of racketeering activity includes acts indictable as mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343. Defendants fraudulent scheme consisted of, among other things: (a) deliberately misrepresenting (b) actively concealing, and causing others to conceal, information about the true and accurate nature of the investment accounts (c) intentionally misrepresenting and concealing Defendants role and participation in the a variety of events.

212.    These violations constitute a pattern of racketeering. They are related in that they share the same purpose of defrauding investors; involve the same participants, victims, and methods of commission. And because Defendants' large-scale activities occurred over a period of several years and are continuing unabated, they amount to or pose a threat of continued illegal and potentially criminal activity.

213.    The above-described racketeering activities amounted to a common course of conduct intended to deceive and harm Plaintiffs and the other Class members. Each such racketeering activity was related, had similar purposes, involved the same or similar participants

48

and methods of commission, and had similar results affecting similar victims, including Plaintiffs and the other Class members. Defendants racketeering activities are part of their ongoing business and constitute a continuing threat to the property of Plaintiff and the other Class members.

214.    Each of the Defendants conducted and participated in the affairs of the above-referenced UBS Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The Defendants' pattern of racketeering likely involved thousands of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their scheme. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the Defendants intended to defraud Plaintiffs, the members of the Class and other intended victims.

215.    The Defendants' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to exclude impartial and objective appraisers, that is, Plaintiffs and members of the Class. Each separate use of the U.S. mails and/or interstate wire facilities employed by the Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the Class. Each Defendant has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the UBS Enterprise.

216.    Each of the Defendants associated with the RICO enterprise knew of the existence of the enterprise and its related activities. UBS FS, UBS AG, and UBS SFA, through each of

their designated officers and employees, devised the scheme and coordinated with each other UBS entity to carry it out. Individual Defendants oversaw, directed, and managed various aspects of the scheme, including authorizing UBS employees to employ unscrupulous methods to locate unwitting investors.

217.   Defendants and their employees conducted and participated in the affairs of the RICO enterprise through a pattern of racketeering activity. Each of the Defendants participated in the UBS Enterprise's decision-making or were plainly integral to carrying out the scheme to defraud. Specifically, UBS AG, UBS FS, and UBS SFA, through its employees, including Mr. Knoepfel and Ms. Seifert, set up the process for locating U.S. investors to induce such investors to invest with the UBS Enterprise. Defendants and its officers and employees, including Ms. Seifert oversaw and coordinated with UBS AG and its officers and employees, including Mr. Knoepfel to ensure that the processes were carried out according to plan.

218.   UBS FS, UBS SFA and UBS AG actively participated in this scheme by, for example, misrepresenting to their investors the financial statements and records, using tactics that would guarantee that investors would not understand their financial statement, and intentionally misleading their clients to believe the investments and banking relationships were legal, safe and secure.

219.   As part of their participation, Defendants knowingly and intentionally sent, mailed, and transmitted or caused to be sent, mailed, or transmitted information in interstate or foreign commerce. These documents constituted numerous and repeated violations of the federal mail and wire fraud statutes in violation of 18 U.S.C. §§ 1341, 1343, as well as a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961 (1), 1962 (c). Defendants knew, or at a minimum were reckless in not knowing, that the documents were misleading, deceptive, and/or

false when sent, as a result of the actions of their officers and employees pursuant to the scheme outlined in this Complaint.

220.    Plaintiffs have sufficiently alleged these predicate acts and pattern of racketeering to state a claim under 18 U.S.C. § 1962. As a proximate result of the pattern of racketeering activity and RICO violations engaged in by Defendants, Plaintiffs and the Class members have suffered injury to their business and property.

**D.      Damages**

221.    Defendants' conduct and pattern of racketeering activity foreseeably and proximately caused damages to Plaintiffs and to members of the Class. The Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs and members of the Class to be injured. Under the provisions of Section 1964(c) of RICO, the Defendants are jointly and severally liable to Plaintiffs and members of the Class for three times the damages that Plaintiffs and the Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

222.    Plaintiffs and the other Class members have been injured in their property by reason of these violations in that Plaintiffs and the other Class members have made at least hundreds of millions of dollars that they would not have lost had Defendant not engaged in its pattern of racketeering activity.

223.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendant is liable to Plaintiffs and the other Class members for the damages Plaintiffs and the other Class members have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT IX

## VIOLATION OF 18 U.S.C. 1962(D) BY CONSPIRACY
## TO VIOLATE 18 U.S.C. 1962(C)

224.   Plaintiffs incorporate by reference each of the above paragraphs of this Complaint as though fully stated herein.

225.   Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

226.   Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c) UBS Enterprises described above, through a pattern of racketeering activity.

227.   As discussed above, Defendants have engaged in numerous overt and predicate racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff and the other Class members of their money.

228.   The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

229.   Defendant has sought to and has engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts:

a.   Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 &1342;

b.   Multiple instances of mail fraud violations of 18 U.S.C. §§ 1341 and 1346;

c.   Multiple instances of wire fraud violations of 18 U.S.C. §§1343 and 1346;

d.      Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952;

230.    As a direct and proximate result of Defendants overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff and the other Class members have been and are continuing to be injured in their business or property as set forth more fully above.

231.    Defendants violations of the above federal and state laws and the effects thereof detailed above are continuing and will continue. Plaintiff and the other Class members have been injured in their property by reason of these violations in that Plaintiff and the other Class members have lost at least millions of dollars that they would not have lost had Defendant not conspired to violate 18 U.S.C. § 1962(c).

232.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendant is liable to Plaintiff and the other Class members for the damages Plaintiff and the other Class members have sustained, plus the cost of this suit, including reasonable attorneys' fees.

WHEREFORE, Plaintiff and the Class respectfully request that this Court enter judgment in their favor and against Defendants awarding Plaintiff and the Class compensatory damages in an amount in excess of $5,000,000, punitive damages, costs, interest and such other and further relief as this Court may deem just and equitable.

## XI.    PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, and for the wrongs cited factually and legally in this Complaint, judgment should be rendered in Plaintiff and the Class members' favor against UBS as follows:

a.   An award of compensatory damages that will fairly represent the economic injuries to the Plaintiffs and Class members'

b.   An award of treble damages herein pursuant to 18 U.S.C. § 1964(c);

c.   An award of attorneys' fees pursuant to 18 U.S.C. § 1964(c);

d.   Pre-judgment interest on all awards;

e.   Appropriate injunctive relief;

f.   An order certifying the Class and any appropriate subclasses as set forth herein under the appropriate provisions of F.R.C.P. 23, appointing Plaintiffs as Class Representatives, and appointing the undersigned counsel as counsel for the Class; and

g.   All further relief as the Court and/or the jury may deem appropriate, legal or equitable, in any form to which Plaintiffs may be entitled.

Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 1, 2014.

Respectfully submitted,

KUTAK ROCK LLP

By: _____

Julie B. Negovan, ID No. 81231
KUTAK ROCK LLP
Two Liberty Place, Suite 28B
50 South 16th Street
Philadelphia, PA  19102
(215) 299-4384

*Counsel for Plaintiff*

54

# EXHIBIT A

JW 0121967

## ❖ UBS

Client ID: 1883286400

# Client Information and Agreement for Individuals

## Basic Information

Complete a separate form for each Sole Owner Primary Account Holder Joint Account Holder Minor Custodian Parent Guardian Committeeman or Conservator

If you have additional client addresses please fill out the Additional Client Address Information form

**This address cannot be a post office box**

| | |
|---|---|
| Nicholas — First Name | W — Middle Name |
| Knopick — Last Name | |
| Citizenship ☑ USA ☐ Other (specify) | |
| 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 — Social Security Number | |
| Passport/C EDULA and Green Card Number (if non-U S and no Social Security Number specified) | |
| E-mail Address (optional) | |
| Tax Bracket (optional) | |

151 Idle Road — Legal Residence Address Line 1

Legal Residence Address Line 2

Marysville — City   PA — State   17053 — Zip

Home phone [7 1 7] - [9 5 7] - [4 4 0 5]

Fax (optional) [   ] - [   ] - [   ]

Mobile (optional) [   ] - [   ] - [   ]

Have you moved in the past 6 months? ☑ No ☐ Yes
*If yes please provide proof of residence at your current address*

## Financial Information

If you share assets with another person please provide financial information (e g annual income liquid assets net worth) per individual For example a total net worth of $50 000 should be split as you deem appropriate

Annual Income $ 72,000.00

Liquid Assets $ 15,000,000.00

Net Worth $ 15,000,000.00 (exclusive of residence)

Investment Experience (in years)

30 Equities   30 Bonds   30 Futures

30 Options Buy   30 Options Sell

Other financial firms where accounts are held (optional)

Do you currently have any loans outstanding? (optional)
☐ No ☐ Yes specify

| Loan 1 Amount | Interest Rate |
|---|---|
| Loan 2 Amount | Interest Rate |

Is the Client or spouse any beneficial owners trustees/executors or any of their relatives who share the same home acting as an individual a fiduciary or corporate officer a control person of any publicly traded corporation (i e policy making officers directors or 10% share holders)? ☑ No ☐ Yes specify

| Firm | Percentage |
|---|---|

## Personal Information

If you answer yes to the NYSE Rule 407 question a letter of authorization from the firm specified must be obtained before the account can be opened

Date of Birth 05/31/1951

Gender ☑ Male ☐ Female

Marital Status
☐ Single ☐ Married ☑ Divorced ☐ Widowed

Number of dependents [0 1]

| Dependent Name (optional) | Social Security # | Date of Birth |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |

Emergency Contact Name and Phone Number (optional)

Is the Client the client's spouse any beneficial owners or any trustees/executors affiliated with any securities firm broker/dealer subsidiary of a financial institution securities or commodities exchange self regulatory organization or the UBS auditor (currently Ernst & Young)? (NYSE Rule 407)
☑ No ☐ Yes specify

Firm

Is the Client an employee or related to an employee of UBS AG its subsidiaries or affiliates (e g UBS Financial Services Inc UBS Securities LLC)?
☑ No ☐ Yes specify

Affiliate/Subsidiary

Employee Name/SS#

**Continue →**

CL INDIV (Rev 9/06)

©2006 UBS Financial Services Inc All rights reserved Member SIPC

1

*JW01219-67*

### ❄ UBS

## Employment Information

This section must be completed if your employment status is employed or self-employed

**Status** *(select one)*

☑ Employed  ☐ Self Employed  ☐ Student
☐ Retired  ☐ Self Supported  ☐ Volunteer
☐ Unemployed  ☐ Work in the Home

*UPS WORLD HEADQUARTERS*
Employer Name

*55 GLENLAKE PARKWAY NE*
Employer's Street Address

*ATLANTA* *GA* *30328*
City  State  Zip

Occupation: *UPS - PILOT*

*1-800-743-5877*
Business Phone *(optional)*

Industry (i e Construction Service etc) *(optional)*

|___|___|___|-|___|___|___|-|___|___|___|___|
Business Fax *(optional)*

## Client Agreement

**BY SIGNING BELOW I UNDERSTAND ACKNOWLEDGE AND AGREE TO EACH OF THE FOLLOWING**

**A.** That I have reviewed the section entitled Conducting Business with UBS Guide to Investment Advisory and Broker Dealer Services I understand the material distinctions between advisory and broker dealer services and acknowledge that the Master Account Agreement found in the Important Account Information and Disclosures booklet establishes a brokerage account and UBS obligations as it pertains to that account will be that of a broker dealer as described in the disclosure section and in the brokerage agreement

**B** UBS Financial Services does not provide legal or tax advice

**C** In accordance with the last paragraph of the Master Account Agreement titled Arbitration I am agreeing in advance to arbitrate any controversies which may arise with UBS Financial Services and others

**D** Unless I write to and authorize UBS Financial Services to do so UBS Financial Services will not supply my name to issuers of any securities held in my account I will receive information from UBS Financial Services regarding those securities but I will not receive information regarding those securities directly from the issuer

**E** I have received and read a copy of this Client Information and Agreement For Individuals form the IRA Account Application or Resource Management Account Application form ( Account Application ) as applicable and the Master Account Agreement (which contains a copy of these Paragraphs A through F) and I agree to be bound by their terms and conditions to the same extent as if those terms and conditions were contained in this document as of this date

**F** I have received a copy of read and understand the Firm's Loan Disclosure Statement Information About Your Relationship with UBS and the Important Account Information and Disclosures booklet containing among other things the Master Account Agreement UBS Retirement Money Fund prospectus UBS RMA Money Funds prospectus UBS Financial Services Client Privacy Notice the Deposit Account Sweep

Program Disclosure Statement the Statement of Credit Practices Instructions for W 9 Preparation Selected Fee & Charges and other terms and conditions and important information regarding my account with UBS Financial Services I agree to be bound by the terms and conditions in the Important Account Information and Disclosures booklet to the same extent as if those terms and conditions were contained in this document

**G** Information I provide in this form will supersede comparable information I may have provided in a previous Client Information and Agreement for Individuals form or account application and agreement

**W 9 Form Certification**

I certify as the Account Holder or in my representative capacity for the Account Holder by signing below and under penalties of perjury that (1) the taxpayer identification number set forth herein is the Account Holder's correct taxpayer identification number (or the Account Holder is waiting for a number to be issued to the Account Holder) and (2) the Account Holder is not subject to backup withholding because (a) the Account Holder is exempt from backup withholding or (b) the Account Holder has not been notified by the Internal Revenue Service (IRS) that the Account Holder is subject to backup withholding as a result of a failure to report all interest or dividends or (c) the IRS has notified the Account Holder that the Account Holder is no longer subject to backup withholding and (3) the Account Holder is a U S person (including a U S resident alien)

**Certification Instruction** The Account Holder understands that the Account Holder must strike out item (2) above if the Account Holder has been notified by the IRS that the Account Holder is subject to backup withholding because the Account Holder failed to report all interest or dividends on the Account Holder's tax return **The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding**

Is this a custodial account? ☐ Yes  ☑ No  If yes only the custodian's signature is required

▶ **Sign Here**

Signature

Print Name: Nicholas W Knopick

Date: *1-19-07*

*1-19-07*

CL INDIV (Rev 9/06)

©2006 UBS Financial Services Inc All rights reserved Member SIPC

Stop ■

# Master Account Agreement

*Client Agreement – Client Information and Agreement For Individuals Form*

**BY SIGNING THE CLIENT INFORMATION AND AGREEMENT FOR INDIVIDUALS FORM, I UNDERSTAND, ACKNOWLEDGE AND AGREE TO EACH OF THE FOLLOWING:**

**A.** That I have reviewed the section entitled Conducting Business with UBS: Guide to Investment Advisory and Broker Dealer Services. I understand the material distinctions between advisory and broker-dealer services and acknowledge that, when the agreement contained in the Important Information and Disclosure booklet is executed to establish a brokerage account, UBS' obligations as it pertains to that account will be that of "broker-dealer" as described in the disclosure section and in the brokerage agreement.

**B.** UBS Financial Services does not provide legal or tax advice.

**C.** In accordance with the last paragraph of the Master Account Agreement titled "Arbitration," I am agreeing in advance to arbitrate any controversies which may arise with UBS Financial Services and others.

**D.** Unless I write to and authorize UBS Financial Services to do so, UBS Financial Services will not supply my name to issuers of any securities held in my account. I will receive information from UBS Financial Services regarding those securities, but I will not receive information regarding those securities directly from the issuer.

**E.** I have received and read a copy of the Client Information and Agreement For Individuals form, the IRA Account Application or Resource Management Account Application form ("Account Application"), as applicable, and the Master Account Agreement, and I agree to be bound by their terms and conditions to the same extent as if those terms and conditions were contained in this document.

**F.** I have received a copy of, read and understand the Firm's Loan Disclosure Statement, Information About Your Relationship with UBS, and this booklet containing, among other things, the Master Account Agreement, UBS Retirement Money Fund prospectus, UBS RMA Money Funds prospectus, UBS Financial Services' Client Privacy Notice, the Deposit Account Sweep Program Disclosure Statement, the Statement of Credit Practices, Instructions for W-9 Preparation, Selected Fee & Charges and other terms and conditions and important information regarding my account with UBS Financial Services. I agree to be bound by the terms and conditions in this booklet to the same extent as if those terms and conditions were contained in the Client Information and Agreement For Individuals form.

**G.** Information I provide in this form will supersede comparable information I may have provided in a previous Client Information and Agreement for Individuals form or account application and agreement.

*Client Agreement – Resource Management Account Application*

**BY SIGNING THE ACCOUNT APPLICATION, I UNDERSTAND, ACKNOWLEDGE AND AGREE TO EACH OF THE FOLLOWING:**

**A.** I have reviewed the section entitled Conducting Business with UBS: Guide to Investment Advisory and Broker Dealer Services. I understand the material distinctions between advisory and broker-dealer services and acknowledge that, the Master Account Agreement found in the "Important Account Information and Disclosures" booklet establishes a brokerage account, and UBS' obligations as it pertains to that account will be that of a "broker-dealer" as described in the disclosure section and in the brokerage agreement.

**B.** Upon execution of this Resource Management Account Application ("Account Application"), I will have supplied all of the information requested in the Account Application and the Client Information and Agreement For Individuals form, and I confirm that all of the information provided is true and accurate. I understand that I will receive a written notice of certain information I have provided about myself and this Account and I agree to review that notice and promptly notify UBS Financial Services in writing of any material changes to any or all of the information contained in the Client Information and Agreement For Individuals form and this Account Application, including, but not limited to, information relating to my financial situation or investment objectives.

**C. In accordance with the last paragraph of the Master Account Agreement titled "Arbitration," I am agreeing in advance to arbitrate any controversies which may arise with UBS Financial Services and others.**

**D. If my account is established with margin, certain of the securities in my account may be loaned to UBS Financial Services or to others.**

**E.** My account will be charged an annual service fee as described in the Fees and Charges section of the Master Account Agreement.

**F.** If I select the RMA Premier Level program, an additional annual upgrade fee will be charged as described in this booklet.

**G.** I have received a copy of, read and understand this booklet containing, among other things, the Master Account Agreement, the Bill Payment and Electronic Funds Transfer Services Agreement and the UBS American Express Cardholder Agreement. I agree to be bound by the terms and conditions in this booklet to the same extent as if those terms and conditions were contained in the Resource Management Account Application.

**H.** I agree that this Account is also governed by my Client Information and Agreement For Individuals form, and the other documents incorporated there by reference.

**I. If I have applied for the UBS Visa Signature credit card I agree to be bound by the terms and conditions stated in the UBS Visa Signature Credit Card Acknowledgement in the Account Application.**

6

*Client Agreement – IRA Account Application*

I hereby establish the type of Individual Retirement Account selected on this Application ("IRA") and designate UBS Financial Services Inc. ("UBS Financial Services") to serve as custodian of the IRA under the terms of the related Custodial Agreement and effective upon UBS Financial Services Inc.'s acceptance. **BY SIGNING THE ACCOUNT APPLICATION, I UNDERSTAND, ACKNOWLEDGE AND AGREE THAT:**

**A.** I have reviewed the section entitled Conducting Business with UBS: Guide to Investment Advisory and Broker Dealer Services. I understand the material distinctions between advisory and broker-dealer services and acknowledge that, the Master Account Agreement found in the "Important Information and Disclosures" booklet establishes a brokerage account, and UBS' obligations as it pertains to that account will be that of a "broker-dealer" as described in the disclosure section and in the brokerage agreement.

**B.** Upon execution of this IRA Account Application ("Account Application"), I will have supplied all of the information requested in the Account Application and the Client Information and Agreement For Individuals form, and I confirm that all of the information provided is true and accurate. I understand that I will receive a written notice of certain information I have provided about myself and this Account and I agree to review that notice and promptly notify UBS Financial Services in writing of any material changes to any or all of the information contained in the Client Information and Agreement For Individuals form and this Account Application, including, but not limited to, information relating to my financial situation or investment objectives.

**C.** An annual service fee will be charged as described in the Fees and Charges section of the Master Account Agreement.

**D.** I have received a copy of, read and understand this booklet containing, among other things, the Master Account Agreement, the Custodial Agreement and Disclosure Statement applicable to the IRA. I agree to be bound by the terms and conditions in this booklet to the same extent as if those terms and conditions were contained in the IRA Account Application.

**E.** Pursuant to the Custodial Agreement, any interest in this IRA that is not effectively disposed of by the beneficiary designation I make in this Application or any subsequent beneficiary designation will be paid to my surviving spouse, and if no surviving spouse, to my estate.

**F.** I agree that this Account is also governed by my Client Information and Agreement For Individuals form, and the other documents incorporated there by reference.

**Important Information About UBS Bank USA Deposit Sweep Program**

Resource Management Accounts (RMA), IRA RMA accounts, Business Services Account BSA Accounts, Coverdell Education Savings Accounts, and Individual Retirement Accounts of Eligible Participants **automatically** default to the Deposit Account Sweep Program unless you select one of the other sweep options available. You should review the UBS Financial Services Deposit Account Sweep Program Disclosure Statement carefully before selecting their sweep option and should note the following:

The Deposit Accounts are insured by the FDIC to a maximum of $100,000 (for individual accounts) or $200,000 (for joint accounts) (in each case, including principal and interest) for the total amount of all Deposit Accounts held in each recognized legal capacity (for example, individual accounts, joint accounts, certain retirement accounts, etc.). If you have multiple accounts at UBS Financial Services held in the same recognized legal capacity that sweep into the Deposit Accounts, once those accounts exceed, as applicable, $100,000 or $200,000 in the aggregate, then your aggregate funds on deposit with UBS Bank USA will exceed FDIC insurance coverage limits. UBS Financial Services is not responsible for any insured or uninsured portion of the Deposit Accounts.

The Deposit Accounts are insured by the FDIC to a maximum of $100,000 (for individual accounts), $200,000 (for joint accounts) and $250,000 for some retirement accounts (in each case, including principal and interest) for the total amount of all Deposit Accounts held in each recognized legal capacity (for example, individual accounts, joint accounts, certain retirement accounts, etc.). If you have multiple accounts at UBS Financial Services held in the same recognized legal capacity that sweep into the Deposit Accounts, once uninvested cash in those accounts exceed, as applicable, $100,000, $200,000 or $250,000 in the aggregate (as applicable), then your aggregate funds on deposit with UBS Bank USA will exceed FDIC insurance coverage limits. UBS Financial Services is not responsible for any insured or uninsured portion of the Deposit Accounts.

UBS Bank USA, UBS AG and UBS Financial Services Inc. may receive substantial financial benefits for activities related to the Deposit Accounts.

**Please see the UBS Financial Services Deposit Account Sweep Program Disclosure Statement for details.**

*Resource Management Account, Business Services Account BSA, ERISA Plan, Individual Retirement Account, and Coverdell Education Savings Account Agreement*

**Authorization**

Trust account clients may opt for the Personal Trust Account (PTA) which is an RMA for trust accounts and hereafter deemed included in references to "RMA."

You understand and agree that your request to open an Account is subject to the receipt of a signed application and the approval by UBS Financial Services in its sole discretion. If approved, UBS Financial Services will open your RMA or UBS Financial Services BSA after receipt by UBS Financial Services of a signed Application and, if applicable, a completed section for checks and UBS American Express Card or UBS Visa Signature credit card and/or margin if you select such features. Certain of the services may be subject to limitations on their availability as required by law, regulation, rule or UBS Financial Services' policies. You will automatically be considered for margin unless you have indicated on the Application your election not to be considered for margin or you have requested the opening of an Account for which UBS Financial Services Inc. does not extend margin (e.g., an Individual

7

Retirement Account, ERISA Plan, Coverdell Education Savings Account, 403(b)(7) Account, UGMA, UTMA, Estate or 529 Plan Account). By signing the Application, you acknowledge that you have received and read this booklet.

Your authorization shall remain in full force and effect until a reasonable time following the receipt by UBS Financial Services of written notice of revocation.

### Sweep Options
Resource Management Accounts and UBS Financial Services BSA accounts of Eligible Participants automatically default to the Deposit Account Sweep Program (without limit if no limit is selected) unless you affirmatively elect a tax-free Fund (that is, California Municipal Fund, New Jersey Municipal Fund, New York Municipal Fund or Tax-Free Fund on the Application (the "Primary Sweep Option").

If you are not an Eligible Participant and do not affirmatively elect a Fund on the Application, available funds will be automatically swept into the Money Market Portfolio, except for ERISA Plans which sweep into Retirement Money Fund.

If you have chosen a limit for the Deposit Account Sweep Program, available balances in excess of such limits will automatically be invested in the Funds, Other Sweep Option or, if applicable, Retirement Money Fund (Individual Retirement Accounts, Coverdell Education Savings Accounts, and ERISA Plans only) selected on the Application.

You hereby authorize UBS Financial Services to invest or "sweep" available credit balances, for which no interest is otherwise earned or paid, in the Account into the Deposit Accounts, or the Funds, or Other Sweep Option selected on the Application, depending upon whether or not you are an Eligible Participant, or if you have elected a tax-free Fund, as instructed in the Application, and subsequently liquidate any such shares so purchased or withdraw Deposit Account balances at such times, and for such periods of time as UBS Financial Services may decide in its sole discretion.

Additionally, you authorize UBS Financial Services to make withdrawals in accordance with the terms of this booklet. You agree that UBS Financial Services has the right to withhold any redemption, liquidation or withdrawal proceeds or other payments from your Account until all funds placed on account in your Account have been collected. The collection periods are set forth in this booklet.

You acknowledge that UBS Financial Services may delay acting on your instructions or effecting payments until your Account contains funds sufficient to meet your obligations.

If you are opening an account for an ERISA Plan, you are required to select a money market fund sweep feature or Other Sweep Option. If no money market fund sweep feature or Other Sweep Option is selected, you authorize UBS Financial Services Inc. to sweep available credit balances into the UBS Retirement Money Fund subject to the terms and conditions contained in the

prospectus which is provided to you upon opening the Account. If you affirmatively elect not to have a sweep feature, there will be no automatic sweep from the Account and credit balances will not earn an investment return.

This authorization shall remain in full force and effect until a reasonable time following the receipt by UBS Financial Services' of written notice of revocation.

### Check Writing Privilege
If you agree to accept the check writing feature on the Application, you may write checks or authorize drafts against an RMA or UBS Financial Services BSA checking account serviced by the Check Provider. You may use these checks only in conjunction with your RMA or UBS Financial Services BSA and only up to amounts within the Account's "Withdrawal Limit" as defined in this booklet. You authorize UBS Financial Services to reimburse the Check Provider in federal funds when checks or drafts are presented to the Check Provider and to automatically debit your RMA or UBS Financial Services BSA on the day of payment to the Check Provider. You agree to have sufficient assets in your RMA or UBS Financial Services BSA on the day UBS Financial Services receives notification for payment from the Check Provider of payment of a check as well as on the day you write the check. You understand that the checks may be used in the same manner and are subject to the normal procedures, rules and regulations as regular checks payable at the Check Provider. You hereby authorize the Check Provider to honor checks (a) bearing a signature with an approved first name, a middle initial or a name deleted or added if the Check Provider otherwise reasonably believes the signature to be authorized and (b) bearing only one signature unless you instruct the Check Provider in writing that multiple signatures are required. Further, you authorize the Check Provider to honor unsigned drafts presented by third parties based on a signed separate written authorization from you to any such third party.

### UBS American Express® Card
You understand and agree that by signing the Application, you have requested one or more UBS American Express Card(s) (each, a "Card") unless you have elected otherwise on the Application or the account is a trust, estate, guardian, committeeman, or conservator account. Cards are not permitted where the Account is an Individual Retirement Account, ERISA Plan, Coverdell Education Savings Account, 529 Plan, or 403(b)(7) Account. You authorize UBS Financial Services and the Card Issuer to effect Card transactions in the manner described in this booklet.

You understand that the Card Issuer will allow Card transactions to the "Withdrawal Limit" (as described in this booklet). You agree to have sufficient available assets to make payment in full for Card transactions as they become available and understand that if sufficient assets are not available to cover Card transactions, the Card Issuer may suspend and/or then cancel your Card. You agree that the use of any Card in connection with your RMA or UBS Financial Services BSA will also be governed by the terms and conditions contained in the Cardholder Agreement set forth in this

8

Important Account Information and Disclosures booklet and you agree to comply with such terms and conditions.

American Express converts transactions in foreign currencies into U.S. dollars. Unless a particular rate is required by applicable law, foreign transactions are converted using wholesale interbank rates selected by American Express on the business day prior to the day on which the transactions are processed by American Express. The currency conversion rate used on the conversion date may differ from the rate in effect on the date you used your UBS American Express Card. American Express assesses a currency conversion factor of 1.5% to the converted amount (in other words to the U.S. dollar equivalent of the foreign transaction) and this factor will be aggregated with the converted amount on your statement.

If you are a UBS Select American Express Cardholder, and you use your UBS American Express Card or account to effect a transaction with a business, other entity or person located outside of the United States, the Card Issuer will charge a Foreign Country Transaction Fee of one-half of one percent (0.50%) of the U.S. dollar amount. The Card Issuer's Foreign Country Transaction Fee is in addition to the currency conversion factor assessed by American Express discussed in the previous paragraph.

UBS Premier American Express Cardholders will not be charged a Foreign Country Transaction Fee by the Card Issuer and will only be assessed the currency conversion factor by American Express as discussed above.

By accepting a Card, you agree that you will not dispose of your assets in your RMA or UBS Financial Services BSA or any other account you may have with UBS Financial Services, if such disposal will negatively affect your ability to pay for Card transactions. You understand and agree that UBS Financial Services has the right to apply assets in any of your accounts with UBS Financial Services to pay debts incurred on your Card, or to pursue any of your other assets to pay debts incurred on your Card.

**Limitations**
You agree that Cards or checks issued in connection with your RMA or UBS Financial Services BSA cannot be used to purchase securities or any other products or services available through UBS Financial Services. You further understand and agree that UBS Financial Services may request and the Card Issuer and Check Provider may provide UBS Financial Services with copies of checks and/or Card and bill payment drafts processed from your RMA or Business Services Account BSA.

**Payments**
You authorize UBS Financial Services to pay from the Withdrawal Limit in your RMA or UBS Financial Services BSA all debts incurred by you to UBS Financial Services, the Card Issuer or the Check Provider in connection with RMA or UBS Financial Services BSA services as set forth in the "Payments" section of this booklet. Debts include, but are not limited to, the amounts you owe to UBS Financial Services for securities purchases, RMA or UBS Financial Services BSA Account fees, drafts, fees for federal fund wires, customary transactional and brokerage fees as well as

interest you may owe UBS Financial Services as a result of margin calls and/or loans in any of your accounts with UBS Financial Services. Debts also include any Card transactions, Bill Payment service transaction debits, Electronic Funds Transfers, drafts or check charges, or any other means by which you authorize a third party to debit any of your accounts with UBS Financial Services (in the case of the Card Issuer or Check Provider limited, however, to the amount of the Withdrawal Limit). This is in addition to, and not in any way limiting, any other rights UBS Financial Services may have, including without limitation, under the heading "Security Interest" of the General Terms and Conditions hereof.

*Margin Agreement*

**Authorization**
You will automatically be considered for margin unless you have indicated on the Application that you do not wish to be considered for margin or you have requested the opening of an Account for which UBS Financial Services Inc., which provides margin services for UBS Financial Services clients, does not extend margin (e.g., an Individual Retirement Account, ERISA Plan, Coverdell Education Savings Account, 403(b)(7) Account, UGMA, UTMA, Estate or 529 Plan Account). For Managed Account programs, margin is not permitted unless expressly approved by UBS Financial Services. If you are adding services to an existing Account that has margin, the margin feature will automatically apply to your upgraded Account. You acknowledge that UBS Financial Services will receive increased compensation in connection with the Account from your use of margin borrowing. In return for UBS Financial Services' extension or maintenance of credit in connection with this Account, you acknowledge that UBS Financial Services and its successors and assignees are authorized in the usual course of business to lend, relend, hypothecate, pledge or repledge separately or together with property of others, either to UBS Financial Services or to others, any Property which UBS Financial Services may carry for you on margin or until such time as payment is received for any such Property. Due to industry regulations, in certain circumstances, such loans may limit, in whole or in part, your ability to exercise voting rights of the securities lent. UBS Financial Services will determine which of your voting rights are limited via an impartial lottery allocation system. Therefore, in some cases, you may receive proxy materials indicating voting rights for a fewer number of shares than are held in your Account, or you may not receive any proxy materials. You agree to participate in the lottery allocation system and to be bound by its results. In connection with such loans and in connection with securities loans made to you in connection with short sales, UBS Financial Services is authorized to receive and retain certain benefits (including, but not limited to, interest on collateral posted for such loans) to which you will not be entitled. Your authorization of a margin feature shall remain in full force until UBS Financial Services receives written notice of revocation.

**Margin Requirements**
You agree to maintain in the Account such positions and margin as required by all applicable statutes, rules, regulations, procedures and customs or as UBS Financial Services deems necessary or

advisable, and where applicable, to satisfy any and all margin calls issued in connection with the Account.

## Risk

You understand that there are substantial risks involved in trading securities on margin, especially in periods of market volatility. When you buy on margin, losses can increase significantly just as gains can increase. A decline in the value of the securities securing your margin loan may require you to deposit additional funds into the Account. Unlike a cash trade, when a trade is done on margin, losses can exceed the amount of capital you committed to the trade. If you fail to promptly meet a margin call, and under certain other circumstances, UBS Financial Services can, among other things, force the sale of securities in the Account without notifying you, and you may have to sell the securities at unfavorable prices. For small transactions, the costs involved in utilizing margin may outweigh any benefit to you. Please review carefully the disclosure document entitled "Loan Disclosure Statement—Risk Factors You Should Consider Before Using Margin or Other Loans Secured by Your Securities Accounts" included with the Application for a detailed discussion of the risks involved with the use of margin.

## Liquidation and Covering Positions

UBS Financial Services shall have the right, at any time and without prior notice, to satisfy a margin call or to obtain full payment of the margin loan, all without demand for margin or additional margin, other notice of sale or purchase, or other notice of advertisement. To satisfy a margin call or to obtain full payment of the margin loan, UBS Financial Services shall have the right in accordance with UBS Financial Services' general policies regarding UBS Financial Services' margin maintenance requirements then in existence (or, if in its discretion UBS Financial Services considers it necessary for your or UBS Financial Services' protection; or, in the event of a petition in bankruptcy, or for the appointment of a receiver, is filed by or against you, or an attachment is levied against any account with UBS Financial Services or in the event of your death or dissolution) to (i) require additional collateral, (ii) sell any or all Property in any of your accounts with UBS Financial Services, whether carried individually or jointly with others, (iii) buy any or all Property which may be held short in the Account, (iv) cancel any open orders and close any or all outstanding contracts or (v) liquidate any of your accounts with UBS Financial Services. Any such sales or purchases may be made at UBS Financial Services' discretion on any exchange or other market where such business is usually transacted, or at public auction or private sale, and UBS Financial Services may be the purchaser for UBS Financial Services' own account. UBS Financial Services shall not be responsible for losses incurred by you if UBS Financial Services sells your Property or positions, irrespective of whether or not UBS Financial Services notifies you of a margin call giving rise to such sale. UBS Financial Services may at any time, and in its sole discretion, subject to applicable rules and regulations, amend the requirements applicable to your margin account, including changing the level of credit available to you and applicable maintenance requirements. It is understood that a prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of UBS Financial Services' right to sell or buy without demand or notice as herein

provided. In addition, as set forth in the "Liquidation of Collateral or Account" section in this booklet, UBS Financial Services may satisfy any and all amounts that you owe in connection with the Account from any or all Property held in the Account or in any other account you may have with UBS Financial Services.

## Agreement for Joint Accounts

The form of ownership selected for your Account may have significant legal consequences. Any references to a particular form of joint ownership contained in the Application or other Account documentation are for convenience only and you should not rely on the reference as meaning such form of ownership is recognized in a particular state or otherwise appropriate for you.

If you need information about what form of ownership is appropriate for you, you should consult your tax or legal advisor. UBS Financial Services and its employees do not give tax or legal advice. If the Application includes an election for a Joint Account, you request and instruct UBS Financial Services to open an account (the "Joint Account") on UBS Financial Services' books for the purchase and sale of stocks, bonds, options and other securities, evidences of indebtedness and commodities. You agree that any and all controversies which may arise between you and UBS Financial Services are subject to the arbitration and governing law clauses contained herein. See the "Applicable Law" and "Arbitration" sections.

Any individual who is a Joint Account Holder has full power and authority to make purchases and sales, including short sales (if you have authorized margin), to withdraw any and all Property from, or to do anything else in reference to the Joint Account, either individually or in your joint names, and UBS Financial Services, the Card Issuer and the Check Provider are authorized and directed to act upon instructions received from any individual Account Holder and to accept payment and securities from any individual Account Holder for the credit of the Joint Account. In consideration of UBS Financial Services carrying a Joint Account on margin or otherwise, you each agree to be jointly and severally liable for the Joint Account and in connection with any transaction in the Joint Account and to pay on demand any debit balance or losses at any time due in the Joint Account. Any and all notices, communications, or any demands for margin calls sent to any individual Account Holder shall be binding upon all, and may be given by mail or other means of communication. UBS Financial Services, in its sole discretion, may at any time demand payment on any debit balance or losses, irrespective of when due, in the Joint Account, suspend all activity in the Joint Account pending instructions from a court of competent jurisdiction or require that instructions pertaining to the Joint Account or the property therein be in writing signed by both or all Account Holders. The individual authority of each individual Account Holder to act in connection with the Joint Account shall continue until a reasonable time after UBS Financial Services receives written notice from any individual Account Holder closing the Joint Account.

Each Account Holder agrees to indemnify and hold UBS Financial Services, the Primary Sweep Option, or Other Sweep Options or the RMA Money Market Portfolio, as applicable, and the Card

Issuer and Check Provider harmless from and against any losses, causes of action, damages and expenses arising from or as a result of UBS Financial Services or the Card Issuer or Check Provider following the instructions of any of the Account Holders.

*General Terms and Conditions*

## Client Representation

The individual(s) signing the Application represent(s) to have reached the age of majority according to the laws of the state of your residence and according to the laws of the State of New York or if the individual(s) is signing on behalf of an organization, he/she/it has the authority to execute this Agreement. You represent that it is duly authorized to conduct business in the jurisdiction from which it transacts business. You agree to abide by UBS Financial Services' policies, and the "Rules and Regulations" as set forth in this booklet. You will notify UBS Financial Services promptly if you are or become employed by any of the following: any exchange or any corporation of which any exchange owns a majority of the capital stock; any member or firm registered on any exchange; any bank, trust company, insurance company; or any company or individual dealing, either as broker or principal, in stocks, bonds or any other securities, commodities, commercial paper or other financial instruments or assets. Except as provided for, or disclosed, in this Agreement, no one other than you has or will have an interest in the Account unless and until UBS Financial Services is notified in writing by you, and under such circumstances until UBS Financial Services Inc., UBS Financial Services' clearing firm, agrees to continue to carry the Account. You understand that UBS Financial Services is prohibited under the National Association of Securities Dealers (NASD) Free Riding and Withholding Interpretation from selling securities in certain public offerings to persons restricted by such rules. Unless you have so described on the Application, you are not presently so restricted, and if you are or become so restricted, you agree to notify UBS Financial Services promptly. You (or where you are not a natural person, each of the individual(s) signing the Application) represent that he, she or it has and will have all necessary licenses, authorizations, consents, approvals (and if you are not an individual, powers in its authorization papers) to enable you to effect all transactions in investments under the Terms and Conditions of this Agreement. The individual(s) signing the Application further represents and warrants that if you are a corporation, limited liability company, partnership, sole proprietorship, foundation/charitable organization, ERISA Plan, custodian, conservator, guardian, executor or trustee, each of such individuals or entities signing on behalf of you have the authority to open this Account on your behalf and to conduct transactions on your behalf, including without limitation, transactions involving the remittance or withdrawal of cash or other Property to or from an account and transfers/distributions from the Account by check, automatic fund transfer, debit card (if used) or otherwise to such individuals or entities and others.

Subject to any applicable financial privacy laws and regulations, you understand and agree that data regarding you and the Account may be shared with UBS Financial Services' affiliates. Further, subject to any applicable financial privacy laws and

regulations, you request that UBS Financial Services share such personal financial data with the Card Issuer and Check Provider and other non-affiliates of UBS Financial Services as is necessary or advisable to effect, administer or enforce, or to service, process or maintain, all transactions and accounts contemplated by this Agreement. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information and/or documentation that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents. We may also screen your name against various databases to verify your identity. In the event that UBS Financial Services is unable to verify your identity, UBS Financial Services shall have the right, at any time and without prior notice, to (i) sell any or all Property in any of your accounts with UBS Financial Services, whether carried individually or jointly with others, (ii) buy any or all Property which may be held short in your account, (iii) cancel any open orders and close any or all outstanding contracts, (iv) liquidate any of your accounts with UBS Financial Services, or (v) distribute the assets in your Account to you. UBS Financial Services shall not be responsible for losses you incur if UBS Financial Services sells your Property or positions, nor for taxable consequences of liquidating assets and/or distributing them to you.

You authorize UBS Financial Services to obtain a credit report or other credit references concerning you (including, without limitation, making verbal or written inquiries concerning your credit history) or to otherwise verify or update credit information given to UBS Financial Services at any time. You authorize the release of this credit report or other credit information to the Card Issuer and Check Provider or to UBS Financial Services affiliates as it deems necessary or advisable to effect, administer or enforce, or to service, process or maintain all transactions and accounts contemplated by this Agreement, and for the purpose of offering additional products, from time to time, to you. You authorize UBS Financial Services to exchange your information with any party it reasonably believes is conducting a legitimate credit inquiry in accordance with the Fair Credit Reporting Act. UBS Financial Services may also share credit or other transactional experience with your designated UBS Financial Services Financial Advisor or other parties designated by you.

## Rules and Regulations

All transactions in the Account shall be subject to the constitution, rules, regulations and custom and usage of the exchange or market and its clearing agency, if any, on which such transactions are executed by UBS Financial Services or UBS Financial Services' agents, including UBS Financial Services Inc. and other subsidiaries and affiliates. Such transactions are also subject, where applicable, to the provisions, rules and regulations of the Securities and Exchange Commission, the Commodity Futures Trading Commission, and the Board of Governors of the Federal Reserve System in existence at this time and as later amended and supplemented. You acknowledge that UBS Financial Services is subject to examination by various federal, state and self-regulatory

11

organizations and that books and records maintained by UBS Financial Services are subject to inspection and subpoena by these regulators and by federal, state, and local law enforcement officials. You also acknowledge that such regulators and officials may, pursuant to treaty or other arrangements, in turn disclose such information to the officials or regulators of other countries, and that U.S. courts may be required to compel UBS Financial Services to disclose such information to the officials or regulators of other countries. You agree that UBS Financial Services may disclose to such regulators and officials information about your transactions in the Account without notice to you. In addition, UBS Financial Services may in the context of a private dispute be required by subpoena or other judicial process to disclose information or produce documentation related to you, the Account or other accounts at UBS Financial Services. You acknowledge and agree that UBS Financial Services reserves the right, in its sole discretion, to respond to subpoenas and judicial process as it deems appropriate.

**Anti-Money Laundering**
UBS Financial Services is firmly committed to compliance with all applicable laws, rules and regulations, including those related to combating money laundering. You understand and agree that you must take all necessary steps to comply with the anti-money laundering laws, rules and regulations of your country of origin, country of residence and the situs of your transaction.

**Liability**
You acknowledge and agree that you will be personally liable for any fees or other obligations accruing to UBS Financial Services under this Agreement and you (including each joint account holder) hereby agree to indemnify UBS Financial Services, the Other Sweep Options or the Funds as applicable, and the Card Issuer and the Check Provider against any losses arising from (a) any and all Account transactions effected or incurred by any person authorized to effect such transactions, including without limitation redemption of any shares of Funds, Other Sweep Options and any other money market fund and similar fund shares, deposits and withdrawals of funds from the Primary Sweep Option, use of the check writing privilege (including unsigned drafts presented by third parties), security transactions, Card transactions, Bill Payment Services and Electronic Funds Transfer Service transactions and (b) any debits, charges, fees or other obligations in the Account.

You shall at all times be liable for the payment of any amounts advanced, any debit balances or other obligations owing in the Account and you shall be liable to UBS Financial Services for any deficiency remaining in the Account in the event of liquidation thereof, in whole or in part, by either you or UBS Financial Services. Additionally, you agree to be liable to UBS Financial Services for any accrued interest on any such amounts at UBS Financial Services' then customary rate, if applicable, or otherwise the maximum rate allowable by law. You further agree to indemnify UBS Financial Services against any loss, cost, expense, liability or damages arising out of your obligations hereunder. You will be liable for the reasonable costs and expenses of collection (including attorney's fees), for any unpaid losses, fees or other

amounts owed by you to UBS Financial Services or against which you have indemnified UBS Financial Services under the preceding sentence. You shall be liable for any and all losses, claims, damages, penalties, fines, settlements, costs, causes of action, debts, dues, sums of money, accounts, accountings, reckonings, acts, omissions, demands, obligations, actions, suits, proceedings, judgments, liabilities and expenses (including without limitation all expenses of litigation or preparation therefor, whether or not UBS Financial Services is a party thereto) which UBS Financial Services may pay or incur arising out of any claims by any person or entity in any way relating to this Account. Neither UBS Financial Services nor its officers, directors, employees or agents shall under any circumstances or for any reason have any liability to you for any consequential damages arising out of this Agreement and/or any services provided pursuant to this Agreement. You (and, in the case of a Joint Account, each individual Account Holder) agree that, in the event of the death of any Account Holder, the survivor(s) or the estate shall immediately give UBS Financial Services written notice thereof, and UBS Financial Services may, before or after receiving such notice, take such actions, require such papers, inheritance or estate tax waivers or federal transfer certificates, retain such portion of the Account or any other account you may have with UBS Financial Services and restrict transactions in the Account as UBS Financial Services may deem advisable to protect UBS Financial Services against any tax, liability, penalty or loss under any present or future laws or otherwise. Your estate and the Account shall be jointly liable for all costs (including reasonable attorney's fees and costs) UBS Financial Services and/or the Card Issuer and the Check Provider may incur in connection with the disposition of the Account and related assets and liabilities in the event of your death, disability or dissolution.

UBS Financial Services and/or the Card Issuer and the Check Provider shall be entitled to recover from a Joint Account or from any Account Holder prior to any distribution of Property such costs as it may incur, including reasonable attorney's fees, as a result of any dispute between the Account Holders relating to or arising from a Joint Account or occasioned by the death of one or more Account Holders holding a Joint Account.

The estate of any Account Holder holding a Joint Account who shall have died shall be liable and the survivor shall continue to be liable, jointly and severally, to UBS Financial Services and/or the Card Issuer and/or the Check Provider for any net debit balance or loss in the Joint Account in any way resulting from the completion of the transactions initiated prior to receipt, by UBS Financial Services, of the written notice of the death of the decedent, or incurred in the liquidation of the Joint Account or the adjustment of the interests of the respective parties. The estate of the decedent and the survivor shall hereby jointly and severally agree to fully indemnify and hold harmless UBS Financial Services and the Card Issuer and the Check Provider from any liability for any taxes which may be owed in connection therewith or any claims by third parties.

If the Account is maintained with rights of survivorship, in the event of the death of either or any Account Holder, all assets in the Account shall pass to and be vested in the survivor(s) on the

same terms and conditions as previously held, without in any manner releasing the decedent's estate from the liabilities herein.

## Security Interest

As security for the payment of all liabilities or indebtedness presently outstanding or to be incurred under this or any other agreement between UBS Financial Services and you, you grant UBS Financial Services a security interest in any and all Property belonging to you or in which you may have any legal, equitable or other interest held by UBS Financial Services or carried in any of your accounts with UBS Financial Services. All Property shall be subject to such security interest as collateral for the discharge of your obligations to UBS Financial Services, wherever or however arising and without regard to whether or not UBS Financial Services made loans with respect to such Property. In enforcing UBS Financial Services' security interest, UBS Financial Services shall have the discretion to determine the amount, order and manner of Property to be sold and shall have all the rights and remedies available to a secured party under the UCC. Without UBS Financial Services' prior written consent, you will not cause or allow any of the Property held in any of your accounts with UBS Financial Services, whether now owned or hereafter acquired, to be or become subject to any liens, security interests, mortgages or encumbrances of any nature other than UBS Financial Services' security interest therein.

## Liquidation of Collateral or Account

UBS Financial Services may satisfy any and all amounts that you owe UBS Financial Services in connection with the Account from Property held by UBS Financial Services or carried in any of your accounts with UBS Financial Services. Additionally, UBS Financial Services may sell any or all Property held in any of your accounts with UBS Financial Services and cancel any open orders for the purchase or sale of any Property without notice in the event of your death or dissolution or whenever in UBS Financial Services' discretion UBS Financial Services considers it necessary for its protection. In such events UBS Financial Services also may borrow or buy-in all Property held in any of your accounts with UBS Financial Services required to make delivery against any sale effected for you. Such sale or purchase may be public or private and may be made without advertising or notice to you and in such a manner as UBS Financial Services may in its discretion determine. No demands, calls, tenders or notices by UBS Financial Services shall invalidate this waiver by you. At any such sale UBS Financial Services may purchase the Property free of any right of redemption and you shall be liable for any remaining deficiency in any of your accounts with UBS Financial Services, plus any accrued interest on such deficiency at UBS Financial Services' then customary rate, if applicable, or, if not applicable, the maximum rate allowable by law. UBS Financial Services shall not be liable to you in any way for any adverse tax consequences resulting from a liquidation of appreciated collateral.

## Orders, Executions, Deliveries, Settlements and Oral Authorizations

Any order which you give shall be binding upon you, and your personal representative(s) or authorized agents until UBS Financial Services receives notice of your death, in the case of an individual,

or dissolution, in the case of an entity. Such death or dissolution and notice will not affect UBS Financial Services' right to take any action which UBS could have taken if you had not died or been dissolved. You agree that UBS Financial Services shall incur no liability in acting upon oral instructions given to UBS Financial Services by you or your authorized agent concerning the Account. In giving orders to sell, you will inform UBS Financial Services which sales are "short" sales and which are "long" sales. A "short" sale means any sale of a security not owned by the seller or any sale that is consummated by delivery of a borrowed security. The designation of a sale order as "long" is your representation that you own the security, and if the security is not in UBS Financial Services' possession at the time of the contract for sale, you agree to deliver it to UBS Financial Services by the settlement date. In case of non-delivery of a security, UBS Financial Services is authorized to purchase the security to cover your position and charge any loss, commissions and fees to the Account. You agree that if UBS Financial Services fails to receive payment for securities purchased by you, UBS Financial Services may, without prior demand or notice, sell securities or other Property held by UBS Financial Services in any of your accounts with UBS Financial Services and any resulting loss may be charged to the Account. You understand and acknowledge that securities can be traded in more than one marketplace. Unless you direct that an order to purchase or sell securities be executed on a specified exchange or market and UBS Financial Services agrees to such execution, UBS Financial Services will, in its sole discretion, subject to applicable regulatory requirements and without prior notification to you, execute the order on the over-the-counter market in any location or on any exchange, including a foreign exchange where such security is traded, either on a principal or agency basis.

## Principal Transactions; Client/Firm Relationship

You understand that UBS Financial Services Inc. may execute securities transactions in the Account acting as principal and expressly directs UBS Financial Services Inc. to enter into such principal transaction in any case where UBS Financial Services Inc. would execute such transactions as principal in the ordinary course of its business. Unless otherwise agreed to in writing, (1) you agree that UBS Financial Services Inc. shall have no authority or responsibility to act as a "fiduciary" as such term is defined in Section 3(21) of ERISA or Section 4975(e)(3) of the Internal Revenue Code, or to act as an "investment adviser" as such term is defined in Section 1.1 of the Investment Advisers Act of 1940, and (2) you shall make your own independent decisions regarding investments in the Account.

## For ERISA Plans, Trusts and Custodial Accounts

If you are acting as executor, trustee, conservator, guardian or custodian, you understand that you are a fiduciary on behalf of the beneficial owners of the Account and that you have a fiduciary duty to use the services and features provided through the Account for the benefit of the beneficial owners of the Account and not for your own benefit. You acknowledge that you have made an independent determination that Account activity is suitable and appropriate for the beneficial owners of such Account and that the compensation to be received by UBS Financial

13

Services in connection with the Account is reasonable. You understand and agree that this determination is solely your responsibility and not UBS Financial Services'.

**Non-disclosure of Confidential and Material, Non-public Information**

UBS Financial Services provides a variety of services to its customers. In connection with providing these services, employees of UBS Financial Services may from time to time come into possession of confidential and material, non-public information. Under applicable law, employees of UBS Financial Services are prohibited from improperly disclosing or using such information for their personal benefit or for the benefit of any other person, regardless of whether such other person is a customer of UBS Financial Services. UBS Financial Services maintains and enforces written policies and procedures that (1) prohibit the communication of such information to persons who do not have a legitimate need to know and (2) assure that UBS Financial Services meets its obligations to customers and otherwise remains in compliance with applicable law. You understand and agree that these policies and procedures are necessary and appropriate and recognizes that, in certain circumstances, employees of UBS Financial Services will have knowledge of certain confidential and material, non-public information which, if disclosed, might affect your decision to buy, sell or hold a security, but that they shall be prohibited from communicating such information to you. You also understand and agree that UBS Financial Services shall have no responsibility or liability to you for failing to disclose such information to you as a result of following its policies and procedures designed to provide reasonable assurances that it is complying with the law.

**Non-U.S. Securities**

If the Account contains securities issued by a non-U.S. issuer, you acknowledge, to the extent UBS Financial Services Inc. is acting solely as a custodian with respect to such securities, that absent arrangements by either the issuer or you with UBS Financial Services to the contrary regarding distribution of issuer communications, UBS Financial Services Inc. will not be obligated to distribute issuer communications to you.

**Restrictions on Trading**

You understand that UBS Financial Services may, in its sole discretion, with or without prior notice, prohibit or restrict trading of securities or substitution of securities in the Account and refuse to enter into any transactions with you.

**Deposits of Funds**

All checks for deposit to the Account should be made payable to, or be endorsed to, UBS Financial Services Inc or to UBS Financial Services Inc. for the benefit of [Your Name] and/or [Title of Account].

**Electronic Transfer of Funds**

When giving UBS Financial Services instructions to accept or transfer funds electronically to or from the Account to any bank or other entity, you agree to provide UBS Financial Services with an accurate name and account number designating the account to receive such funds. You acknowledge that neither UBS Financial

Services nor the bank or other receiving or transmitting entity is under any obligation to verify the identity of the beneficiary of the funds transfer and may rely exclusively upon the name or account number provided by you. You agree to indemnify and hold UBS Financial Services harmless from and against any and all cost, expense, claims or liabilities arising from the provision by you of an inaccurate name or account number. When accepting or transferring funds, neither UBS Financial Services nor the bank or other receiving or transmitting entity is under any obligation to determine whether the name and number provided by the Client refer to the same person or entity.

**Transfer of Excess Funds; Exchange Rate Fluctuations**

UBS Financial Services may transfer excess funds between any of your accounts (including the Account) with UBS Financial Services (including commodity accounts) for any reason not in conflict with the Commodity Exchange Act or any other applicable law. If UBS Financial Services effects any transactions for you requiring a foreign currency, any profit or loss as a result of a fluctuation in the applicable exchange rate will be charged or credited to the Account.

**Principal, Interest and Dividend Payments**

With respect to principal and interest payments on debt instruments, UBS Financial Services may credit the Account with principal and interest due on the payment dates and UBS Financial Services will be entitled to recover any such payments from you if the same are not actually received by UBS Financial Services from the trustee or paying agent. You acknowledge that interest will not be paid to you on credit balances in the Account unless specifically agreed to by UBS Financial Services in writing. UBS Financial Services is not required to remit interest or dividends to you on a daily basis.

**Impartial Lottery Allocation System; Call Features**

When UBS Financial Services holds bonds or preferred stocks on your behalf in UBS Financial Services' (street) name or in bearer form which are callable in part, you agree to participate in the impartial lottery allocation system of the called securities in accordance with the provisions of the New York Stock Exchange, Inc. rules. Further, you understand that when the call is favorable, no allocation will be made to any account in which UBS Financial Services, its officers, or employees have a beneficial interest until all of your other positions in such securities are satisfied on an impartial lottery basis. You understand that UBS Financial Services may not receive timely notice of calls and may be required to allocate called securities on an "as of" basis. In those cases, you agree to participate in the lottery allocation system and to be bound by its results. For debt securities, call or other redemption features, in addition to those disclosed on the trade confirmation, may exist. Debt securities subject to call or redemption features, such as sinking funds, may be redeemed in whole or in part before maturity, or before the first scheduled call dates. The existence of sinking funds, or other special mandatory redemption features, may not be disclosed on a trade confirmation. It is your obligation to review all prospectuses and offering statements you may receive, and to understand the risks of extraordinary calls or early redemptions, which may affect yield. Issuers may from time

14

to time publish notices of offers to redeem debt securities within limited time, price and tender parameters. You understand and agree that UBS Financial Services is not obligated to notify you of such published calls, nor will UBS Financial Services tender any securities on your behalf when you have failed to request the tender in a timely manner.

### Fees and Charges

You will pay UBS Financial Services the applicable RMA/Business Services Account BSA annual fee as set forth in this section. The annual service fee and any other fees are subject to change by UBS Financial Services at any time. UBS Financial Services reserves the right to begin to impose charges for utilization of RMA or Business Services Account BSA features beyond the annual fee at any future date. You authorize UBS Financial Services to charge the annual service fee and to charge your Account for all other fees you owe. If this is a Custodial account and you do not select any RMA features the RMA annual service fee is waived. If the Custodial account has any of the RMA features, the RMA annual service fee will apply.

You will pay the Check Provider and/or UBS Financial Services customary fees for specially imprinted checks, stop payment orders, copies of checks more than one month old, and checks returned for insufficient funds.

UBS Financial Services reserves the right to begin to impose charges for utilization of RMA or Business Services Account BSA features beyond the annual fee at any future date.

You understand that UBS Financial Services Inc. may impose various service charges and other fees relating to the Account as well as charge commissions, fees, markups and/or other fees and charges for execution of transactions to purchase and sell securities, options or other Property through UBS Financial Services and its affiliates, which amounts may include, but not be limited to, transaction fees (rounded to the nearest penny on each sale transaction); subscription fees for U.S. Government and Government agency issues; security transfer fees; insurance premiums, and other charges associated with the handling and transfer of securities, funds and assets. You agree to pay such charges, commissions and/or fees at UBS Financial Services Inc.'s then prevailing rates. You also understand that such charges, commissions and/or fees may be imposed or changed from time to time without notice to you, unless required by rules or regulations, and you agree to be bound thereby.

Unless the Account is for an Individual Retirement Account, ERISA Plan, 403(b)(7) Account, or Coverdell Education Savings Account that UBS Financial Services Inc. has investment discretion over or has agreed in writing to act as a "fiduciary" (as defined in Section 3(21) of ERISA or Section 4975(e)(3) of the Internal Revenue Code) to, UBS Financial Services will earn income (at prevailing market rates on overnight investments) on deposits and credits to the Account, until the cash balances are invested or swept into the Deposit Account Sweep Program, a money fund or Other Sweep Option.

Once cash balances are credited to the Account they are generally invested in the applicable sweep option on the next business day pursuant to the policies contained in this booklet (subject to any investment minimums for the sweep option, as provided in the applicable prospectus). You agree that the amount of income shall be part of UBS Financial Services Inc. compensation for services rendered with respect to the Account, which shall be separate from and in addition to compensation described in the applicable fee schedule for the Account and that the amount of such compensation, together with all compensation received by UBS Financial Services, is reasonable. You may be subject to an account transfer fee if you instruct UBS Financial Services Inc. to transfer the Account. In addition, you will be charged an administrative fee for the Account if it produces revenues below a minimum threshold amount for the 12-month period ending each November 30. If this is an Individual Retirement Account, you may be subject to an account transfer fee if you instruct UBS Financial Services Inc. to transfer the Account. You agree to pay a late charge, to the extent permitted by law, if you purchase securities on a cash basis and fail to pay for such securities by the settlement date. Any late charge UBS Financial Services Inc. may impose will be at the maximum rate of interest set forth in UBS Financial Services Inc.'s then current "Statement of Credit Practices" (which is found in this booklet), if applicable, or otherwise at the maximum rate permissible by law, and may be charged from the settlement date to the date of payment, without regard to UBS Financial Services Inc.'s rights to sell the securities in accordance with this Agreement and applicable laws, rules and regulations. You may obtain UBS Financial Services Inc.'s then current fees and charges by contacting your Financial Advisor or the local branch office.

Set forth below are some of the more common fees and charges normally associated with the maintenance of the Account, but the list is not all-inclusive. Your Financial Advisor can supply specific information regarding fees and charges that may apply to the Account. Note, however, that certain types of accounts, such as UBS InsightOne, are exempt from several of the charges listed below as a result of fees charged for such accounts instead of transaction fees.

| | |
|---|---|
| Resource Management Account[1,5] (Primary Account) | $150.00 |
| Resource Management Account[1,5] (Secondary Account) | $ 75.00 |
| IRA Resource Management Account (Primary Account) | $150.00 |
| IRA Resource Management Account (Secondary Account) | $ 75.00 |
| Individual Retirement Account (IRA)[1] | $ 40.00 |
| Coverdell Education Savings Account (CESA)[1] | $ 40.00 |
| 403(b)(7) Custodial Account[1] | $ 40.00 |
| Qualified Plan Prototype Document Fee[1] | $100.00 |
| RMA/IRA Fee Cap[5] | $325.00 |
| Business Services Account BSA | $150.00 |
| Business Services Account BSA Qualified Plans[1] | $150.00 |
| UBS Rewards[2] | $ 50.00 |
| IRA and 403(b)(7) Termination/Transfer Fee | $ 75.00 |
| CESA Transfer Fee | $ 75.00 |
| Resource Management Account/Business Services Account BSA Termination Fee | $ 75.00 |
| Processing and Handling Fee (per transaction) | $ 5.25 |
| Account Transfer Fee | $ 75.00 |
| Security Transfer Fee[3] | $ 25.00 |
| Returned Check | $ 25.00 |
| Account Maintenance Fee[4] | $ 75.00 |
| Stop Payment Transfer Fee | $ 15.00 |
| RMA / Business Services Account BSA Bounced Check Fee | $ 15.00 |
| Bill Payment, Automatic Payment, or Electronic Funds Transfer Returned–Item Fee | $ 15.00 |
| Federal Fund Wire Transfer (outgoing wires only) | $ 25.00 |

## Program Level Fees

| | Select Level | | Premier Level | | Charter Level | |
|---|---|---|---|---|---|---|
| **Single Account** | | | | | | |
| Account Holder | $ | 0 | $ | 350 | $ | 1500 |
| 2nd Individual | $ | 0 | $ | 175 | $ | 1000 |
| 3rd Individual | $ | 0 | $ | 175 | $ | 1000 |
| 4th Individual | $ | 0 | $ | 175 | $ | 1000 |
| 5th Individual and above | $ | 50 | $ | 175 | $ | 1000 |
| **Joint Account** | | | | | | |
| Account Holder | $ | 0 | $ | 350 | $ | 1500 |
| 2nd Individual | $ | 0 | $ | 0 | $ | 0 |
| 3rd Individual | $ | 0 | $ | 175 | $ | 1000 |
| 4th Individual | $ | 0 | $ | 175 | $ | 1000 |
| 5th Individual and above | $ | 50 | $ | 175 | $ | 1000 |

A change from Premier Level to Charter Level will result in another fee being assessed to the account. We will rebate the Premier Level fee to the account if the account upgrades to the Charter Level within 6 months of the Premier Level fee being charged

1 Annual fee.
2 For Business Services Account BSA, this fee is deducted from your account at the end of the month following enrollment.
3 Per security charge for legal transfer, transfer and ship, and restricted stock re-registration.
4 This fee is charged if the account generates less than $100 in commissions, account fees (e.g., fees for RMA, Business Services Account BSA, Managed accounts under a wrap fee program) or margin interest over a specified 12 month period.
5 Eligibility for the RMA and IRA Fee Cap will be calculated based on the number of RMAs and IRAs in your Marketing Relationship. For information on how UBS Financial Services determines your Marketing Relationship, please see Section III, page 12 of this booklet.

**Interest Charges**

All amounts advanced and other balances due shall be charged interest in accordance with UBS Financial Services' usual custom, which may include the compounding of interest, including any increases in rates which reflect adjustments in, as applicable, UBS Financial Services' Base Loan Rate (as such term is defined in the Statement of Credit Practices) or other reference rate (i.e., LIBOR Rate or Prime Rate) referred to in the applicable Statement of Credit Practices and such other charges as UBS Financial Services may make to cover UBS Financial Services' facilities and extra services.

*Additional Compensation*

**Revenue Sharing Compensation.** In addition to the sales loads and 12b-1 fees, and processing fees, UBS Financial Services Inc. receives revenue sharing payments from many of the distributors and/or advisors of the mutual funds that we sell. These amounts are based on two components (i) the amount of sales by UBS Financial Services Inc. of the mutual funds of a particular fund family, and (ii) the amount of mutual fund assets of that particular fund family held by UBS Financial Services Inc. clients. These payments are made in exchange for, and represent the value to those mutual fund companies of, being able to distribute their mutual funds through our network of Financial Advisors and their clients. We require that these payments be made directly by the distributor or advisor to us and do not permit payments to be made by use of mutual fund portfolio trading commissions, because revenue sharing payments are intended to compensate us for ancillary services in connection with effecting sales of mutual fund shares. We receive payments of this kind from many of the approximately 150 mutual fund distributors and/or advisors whose mutual funds are made available to our clients. Generally, UBS does not rebate any of these amounts to you or pay them to the Financial Advisor or his or her branch office.

**Please see our public website at www.ubs.com/mutualfundrevenuesharing for a current description of our revenue sharing compensation.**

We receive payments of this kind from many of the approximately 150 different mutual fund distributors and/or advisors whose mutual funds are made available to our clients. Revenue sharing payments are intended to compensate UBS Financial Services Inc. for ancillary services in connection with effecting purchases of shares of the funds. These payments are made in exchange for, and represent the value to those mutual fund companies of, being able to distribute their mutual funds through our network of Financial Advisors and their clients.

Based on our reviews and evaluations of the mutual fund companies, we divide the universe of fund companies whose funds we offer into two categories: (i) fund companies with branch access ("Tier I" fund companies); and (ii) fund companies without branch access ("Tier II" fund companies). Representatives of Tier I fund companies are provided, subject to Branch Office Manager discretion, greater access to our branch offices and Financial Advisors for training, marketing and other promotional activities. As a general

rule, such in-person branch access and marketing support is not provided to Tier II fund companies. Branch access and other corporate support provides enhanced opportunities for the mutual fund companies to promote their mutual funds to our Financial Advisors, which could cause our Financial Advisor to focus on, and recommend to clients, mutual funds from Tier I fund companies in the normal course of their business. Tier I fund companies represented approximately 80% of our total mutual fund sales in 2004. A list of our Tier I mutual fund companies is available on our public website at **www.ubs.com/mutualfundrevenuesharing.**

Many mutual funds companies in both Tier I and Tier II pay revenue sharing to us. While the payment of revenue sharing is a factor in determining whether a fund company is placed in Tier I or Tier II, such payment is never the sole determinant in these decisions. UBS Financial Services Inc. determines the level of access to our branches based on our own review and evaluation of mutual funds and fund families.

Although we seek to apply a level, standard payment schedule for all of the mutual fund companies whose funds we sell, we recognize that mutual fund companies approach revenue sharing in a variety of ways, and that some mutual fund companies may decline to pay revenue sharing exactly at the levels listed above or at all, which may present a financial disincentive for us to promote the sale of those funds that do not pay us at the levels listed above. **Please see www.ubs.com/mutualfundrevenuesharing for a detailed description of the revenue sharing compensation.**

We also receive networking fees in consideration for certain other services we provide mutual funds. These fees generally are paid from investor assets in mutual funds, but in some cases may be subsidized in part by affiliates of the mutual funds, and are generally calculated by applying our standard networking rate of $12 to each mutual fund position that exceeds $500 and is held at UBS.

Revenue sharing payments may present a conflict between our interests and the interests of our customers, because the payments give us a financial incentive to recommend that our customers buy and hold shares of those funds that we maintain on our distribution platform and for which we receive revenue sharing payments. Although approximately 2,500 mutual funds from nearly 150 different mutual fund families are available through our distribution system, this is only a part of the universe of mutual funds that are available to our customers in the marketplace. Certain other mutual may be purchased by our customers through the FundConnect system for a separate charge. In addition, because the rate and amount of revenue sharing payments that we receive may vary among the 150 mutual fund families on our distribution platform, we may have a financial disincentive to promote the sale of those funds that do not pay us at those stated rates.

In addition to commissions received in connection with the sale or distribution of annuity contracts and unit investment trust units to our clients, we receive revenue sharing compensation from many of the insurance companies underwriting the annuity contracts, affiliates of the insurance companies or sponsors of the unit investment trusts we distribute.

17

**Contributions to Training and Education Expenses.** In addition to the contributions listed above, from time to time, mutual fund, insurance companies, money managers or their affiliates ("vendors") may subsidize a portion of the cost of training and achievement seminars we offer to Financial Advisors through specialized firm-wide programs and consulting training forums.

The subsidies may vary among vendors, and no vendor is required to participate in the seminars or to contribute to the costs of the seminars in order to have their products available or distributed through our platform. Your Financial Advisor does not receive a portion of these payments.

**Non-Cash Compensation.** In addition to the revenue sharing payments describe above, we and our Financial Advisors, may, from time to time, receive non-cash compensation from mutual fund companies, money managers, insurance vendors, and sponsors of products we distribute in the form of: (i) occasional gifts; (ii) occasional meals, tickets or other entertainment; (iii) sponsorship support of training events for our sales force; and/or (iv) various forms of marketing support.

**Other Compensation.** In addition, our affiliates receive trading commissions and other compensation from mutual funds and insurance companies whose products we distribute.

**Disability or Incompetency**
This Agreement shall survive your death, dissolution, disability or incompetence.

**Unforeseeable Events/Force Majeur**
UBS Financial Services shall not be liable for losses caused directly or indirectly by government restrictions, exchange controls, exchange or market rulings, suspension of trading, war, strikes or other conditions beyond UBS Financial Services' control, including but not limited to, extreme market volatility, trading volumes, or the failure of any processing or trading system whether proprietary or non-proprietary in nature.

**Successors and Assigns**
This Agreement shall be binding upon you and your personal representatives, heirs, estate, executors, administrators, committee and/or conservators, successors and assigns, and shall inure to the benefit of UBS Financial Services and its successors and assigns and each subsequent holder of this Agreement. You may not assign or transfer any of your rights or obligations under this Agreement without UBS Financial Services' prior written consent. UBS Financial Services may assign this Agreement or any of its rights and powers under this Agreement, and, in the event of such assignment, the assignee shall have the same rights and remedies as if originally named in this Agreement in UBS Financial Services' place. From and after the date of any such assignment, UBS Financial Services shall have no further liability to you under the terms of this Agreement.

**Sub-Brokers**
UBS Financial Services may employ sub-brokers and shall be responsible only for reasonable care in their selection. UBS Financial Services may deal with market makers or members of any exchange known as specialists or known as odd-lot dealers and in the execution of your orders they may act as sub-brokers for you and may also buy or sell the Property for themselves as dealers for their own account.

UBS Financial Services Inc. may hold securities as a Securities Intermediary in accordance with industry custom and practice and employ one or more Securities Intermediaries, including Securities Intermediaries outside the United States, with respect to any and all Property held for you.

**Introduced Accounts**
If the Account has been introduced to UBS Financial Services Inc. and is carried by UBS Financial Services Inc. only as a clearing broker, you agree that UBS Financial Services Inc. is not responsible for the conduct of the introducing broker and UBS Financial Services Inc.'s only responsibilities to you relate to UBS Financial Services Inc.'s execution, clearing and bookkeeping of transactions in the Account and to any other services and responsibilities agreed to in writing by UBS Financial Services Inc. During the term of any clearing agreement between UBS Financial Services Inc. and any introducing broker/dealer that UBS Financial Services Inc. is providing clearing services for, UBS Financial Services Inc.'s rights and benefits under this Agreement shall inure to any such introducing broker/dealer. UBS Financial Services Inc. is authorized to accept from the introducing broker, without further inquiry or investigation by UBS Financial Services Inc., (a) orders for the purchase or sale in the Account of such securities and other Property on margin or otherwise, and (b) any other instructions from the introducing broker concerning the Account. In no event shall UBS Financial Services Inc. be liable for any acts or omissions of any introducing broker or its agents, contractors or employees.

**Independent Research**
UBS Financial Services offers you access to independent research on all domestic and selected international stocks covered by UBS Research. The providers of this independent research are chosen by an Independent Consultant, not by UBS Financial Services. You agree that UBS Financial Services will not be responsible or liable for (i) the procurement decisions of the Independent Consultant with respect to the independent research, (ii) the independent research or its content, (iii) customer transactions, to the extent based on the independent research, or (iv) claims arising from or in connection with the inclusion of independent research ratings in the Firm's confirmations and periodic account statements or on the UBS independent research website, to the extent such claims are based on those ratings. You also agree that UBS Financial Services will not be required to supervise the production of the independent research procured by the independent consultant and will have no responsibility to comment on the content of the independent research.

## Changes to Agreement

Upon written notice to you, UBS Financial Services may change this Agreement at any time and may cease to offer any or all services described in this Agreement. Any such change will become effective on the date of the notice unless the notice specifies a later date. However, you will remain liable for any outstanding debits and/or charges in the Account. Your continued acceptance of services under this Agreement will be deemed to constitute acceptance of such change. All other changes to this Agreement shall not be effective except by a writing signed by UBS Financial Services.

## Termination of Account

You understand that you or UBS Financial Services may terminate the Account or any Account feature or service at any time and for any reason. If the Account is terminated either by UBS Financial Services or you, you will promptly return any unused checks and Card(s). Failure to return such checks and Card(s) to UBS Financial Services may result in a delay in complying with your instructions as to the disposition of your assets in the Account. You will remain responsible for debits and charges whether arising before or after such termination. You agree to pay UBS Financial Services and the Card Issuer and the Check Provider promptly for all amounts outstanding in the Account. Upon termination, you authorize UBS Financial Services to liquidate all of your securities that cannot be transferred into your name and to distribute all such assets to you whether or not such liquidation and/or distribution shall cause taxable consequences to you. You further agree that UBS Financial Services may withhold from the assets then in the Account any amounts that UBS Financial Services reasonably believes necessary to pay (1) any federal, state or local tax withholding obligations of UBS Financial Services and (2) for any outstanding debts to UBS Financial Services or the Card Issuer and the Check Provider or their respective affiliates or subsidiaries, and to apply such assets first to pay UBS Financial Services, and second to pay the Card Issuer and the Check Provider, if applicable.

## Additional Documentation

Should any supplemental agreements be required as a result of your request for UBS Financial Services to approve additional services or features available from UBS Financial Services, or be required for any other reason whatsoever, you will execute UBS Financial Services' form of such agreements, which shall thereupon supplement and, if applicable, become part of this Agreement and apply to the Account.

## Waiver Not Implied

UBS Financial Services' failure to insist at any time upon strict compliance with this Agreement or with any of its terms or any continued course of such conduct on UBS Financial Services' part shall not constitute or be considered a waiver by UBS Financial Services of any of its rights or your obligations.

## Binding Notice of Agreement

You expressly agree that UBS Financial Services shall not be bound by any representation or agreement made by any of UBS Financial Services' employees or agents which purports to affect or diminish UBS Financial Services' rights under this Agreement.

## Accuracy of Reports; Communications

You shall carefully review all monthly or quarterly account statements and confirmations promptly upon receipt for accuracy and consistency with your instructions and investment objectives. You shall immediately notify the Branch Office Manager of the UBS Financial Services Branch Office where the Account is maintained if such documents are not received in a timely manner or are inaccurate. Unless otherwise set forth in this booklet, confirmation of orders and monthly or quarterly statements of the Account shall be conclusive if not objected to in writing addressed to the Branch Office Manager of the UBS Financial Services Branch Office where the Account is maintained within ten days after mailing by UBS Financial Services to you. You acknowledge that UBS Financial Services may rely upon your failure to object in a timely manner to transactions or entries and shall not be responsible for losses which could have been avoided had you given prompt notice as provided above. All such documents shall thereafter be deemed accurate and in accordance with your instructions and investment objectives. Notwithstanding the foregoing, if you are mistakenly credited with funds or securities, you shall promptly return such funds or securities upon your discovery of the error or upon request by UBS Financial Services. UBS Financial Services shall not be responsible for any transactions not reflected on your monthly or quarterly statement unless an objection is made in writing to the Branch Office Manager in accordance with the above requirements. You shall notify UBS Financial Services in writing if you do not receive a confirmation within ten days from the date of a transaction.

You acknowledge and agree that UBS Financial Services may, from time to time, monitor and/or electronically record conversations between you and UBS Financial Services' employees or agents for the purpose of quality assurance, employee training, and the mutual protection of you and UBS Financial Services. Any such recordings may be offered by UBS Financial Services as evidence in any arbitration or other proceeding relating to this Agreement or the Account.

You acknowledge that the price of any security shown on a confirmation which has been executed on more than one exchange, or in more than one market, or had multiple executions, may be the average price of the security for those executions and agree to the use of such average price trades on confirmations issued by UBS Financial Services Inc. Actual prices, quantities of each execution and market of execution shall be provided upon written request.

## Written Notice

Communications may be sent to you at your address or at such other address as you give to UBS Financial Services in writing. All communications so sent, whether by mail, telegraph, facsimile, electronic mail, messenger or otherwise will be considered to have been given to you personally upon such sending, whether or not you actually received them.

Except for ERISA Plans and Individual Retirement Accounts, where UBS Financial Services has forwarded proxy materials to you, and does not receive voting instructions from you within the designated time frame, UBS Financial Services will exercise its discretionary vote as recommended by the Board of Directors of the issuer of the security, where permitted by the rules of the New York Stock Exchange.

**Entire Agreement**
The provisions of this Agreement and the documents referenced herein constitute, and are intended to constitute, the entire agreement between you and UBS Financial Services with respect to the Account and supercede any prior agreements relating thereto. Other than as expressly provided in this Agreement, UBS Financial Services does not undertake any obligations and incurs no duties or obligations other than those set forth in this Agreement, statute or government regulation.

**Applicable Law**
This Agreement, its enforcement and the relationship between you and UBS Financial Services shall be governed by the laws of the State of New York, including the arbitration provisions contained herein, without giving effect to the choice of law or conflict of laws provisions thereof, and shall be binding upon you, your authorized agents, personal representatives, heirs, successors and assigns, provided that there is no inconsistency with the federal securities laws, and provided further in connection with any Card issued, the Cardholder Agreement shall be governed by federal laws and the law designated by the Card Issuer in the Cardholder Agreement. In the event that the arbitration clause contained herein is found to be unenforceable, you and UBS Financial Services agree that they will, for purposes of determining all matters with regard to this Agreement, submit to the exclusive jurisdiction of the courts of the State of New York and the federal courts sitting in the Southern District of New York. You also consent to service of process by certified mail to the Account's address of record and waives any forum non-conveniens and venue claims. You and UBS Financial Services agree that if any term, covenant, condition, or provision of this Agreement is held to be invalid, void, or unenforceable, the remainder of the provisions shall remain in full force and effect, and shall in no way be impaired or invalidated and shall be construed (to the maximum extent possible) in such a way as to give effect to the intent of the invalid, void, or unenforceable provision in question.

**Arbitration**
This agreement contains a predispute arbitration clause. By signing an arbitration agreement the parties agree as follows:

- Arbitration is final and binding on the parties. All parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.

- The parties are waiving their right to seek remedies in court, including the right to jury trial. Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.

- Pre-arbitration discovery is generally more limited than and different from court proceedings. The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.

- The arbitrator's award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. The arbitrators do not have to explain the reason(s) for their award.

- The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

- The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.

- The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.

- You agree, and by carrying an account for you UBS Financial Services Inc. agrees, that any and all controversies which may arise between you and UBS Financial Services Inc. concerning any account(s), transaction, dispute or the construction, performance, or breach of this or any other Agreement, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration. Any arbitration under this Agreement shall be held under and pursuant to and be governed by the Federal Arbitration Act, and shall be conducted before an arbitration panel convened by the New York Stock Exchange, Inc. or the National Association of Securities Dealers, Inc. you may also select any other national security exchange's arbitration forum upon which UBS Financial Services Inc. is legally required to arbitrate the controversy with Client, including, where applicable, the Municipal Securities Rulemaking Board. Such arbitration shall be governed by the rules of the organization convening the panel. You may elect in the first instance the arbitration forum, but if you fail to make such election, by registered letter or telegram addressed to UBS Financial Services Inc. at 1200 Harbor Boulevard, 10th Floor, Weehawken, NJ 07086, Attn: Legal Department, before the expiration of five days (5) after receipt of a written request from UBS Financial Services Inc. to make such election, then UBS Financial Services Inc. may make such election. The award of the arbitrators, or of the majority of them, shall be final, and judgment upon the award rendered may be entered in any court of competent jurisdiction.

- No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration Agreement against any person who has initiated in court a putative class action; who is a member of a putative class who has opted out of the class with respect to any claims encompassed by the putative class action until:
  - (I)   THE CLASS CERTIFICATION IS DENIED;
  - (II)  THE CLASS IS DECERTIFIED; OR
  - (III) THE CUSTOMER IS EXCLUDED FROM THE CLASS BY THE COURT.

- Such forbearance to enforce an Agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.

- You expressly agree that service of process in any action shall be sufficient if served by certified mail, return receipt requested, at your last address known to UBS Financial Services Inc.

- You expressly waive any defense to service of process as set forth above.



UBS Financial Services Inc.
www.ubs.com/financialservicesinc
060920 · R049

UBS Financial Services Inc. and UBS International Inc. are subsidiaries of UBS AG.

# EXHIBIT B

 **UBS**

UBS AG
Postfach
8098 Zürich
Tel. +41-44-234 11 11

Wealth Management
Legal WM Americas (International)

Patrick Mathieu
PIDMX9
Bahnhofstrasse 45
CH-8098 Zürich
Tel. +41-44-2348909
Fax +41-44-2374712
patrick.mathieu@ubs.com

www.ubs.com

Mr. Nicholas Knopick
211 N. Record Suite 450
Dallas, TX 75202
United States of America

10 December 2013

**Re: Nick Knopick / Account relationship 0230-257253**

Dear Mr. Knopick

Reference is made to your letter dated 14 October 2013 in captioned matter which was forwarded by UBS Swiss Financial Advisers AG to the UBS AG Legal Department.

First of all, we would like to apologize for the delay in responding to your document request for your former account relationship 0230-257253. This was partially due because your letter did not contain an account number and the account relationship in question being closed since 2009 so that part of the documentation had to be retrieved from the archive.

Based on your request, please find enclosed the following sets of documentation:

- Basic account opening documents, including credit agreements;
- Instructions and correspondence;
- Account statements for EUR current account 0230-257253.61E; and
- Account statements for USD current account 0230-257253.60B.

We hope that with these enclosures, we have adequately responded to your document request.

Yours sincerely

UBS AG

Patrick Mathieu
Executive Director
Legal Counsel

Gilles Jages
Director
Legal Counsel

Enclosures mentioned

p.11

## ⚜ UBS

Master no. 930.257253

# Basic document for account/custody account relationship

**Basic data**

| | |
|---|---|
| Type of relationship | Named account relationship individual |
| Account-holding branch office | UBS AG*  Zurich, Switzerland |
| | (* hereinafter referred to throughout the Agreement as 'UBS') |
| Status of documents | Account opening |

**Accountholder**

Mr.
Title (Mr/Mrs/Miss/Ms/Other)

KNOPICK
Last name

NICHOLAS
First name

151 Idle Road
Street/No.

Marysville, PA  17053-9503
Postal code/City

USA
Country

1951-05-12
Birth date

USA
Nationality

Please enclose copies of the identification documents presented

**Correspondence instructions**

Except in special circumstances, correspondence is

☒ to be sent to the domicile address (original)          Number of copies   1

☐ to be sent to the following address

☐ Original                                              ☐ Duplicate

Number of copies   _                                    Number of copies   _

| | |
|---|---|
| Language of correspondence | English |
| Home phone no. | (717) 957-4405 |
| Office phone no. | (717) 342-1040 |

**General authorization for fiduciary investments**

I hereby authorize UBS to use all or part of the funds available at a given time in my UBS account to make investments on a fiduciary basis in the name of UBS, but for my account and at my risk. UBS shall only make use of this authorization, once I have instructed them to do so. Should UBS not receive or not receive in time (i.e. at least five days before maturity of the investment concerned) other instructions from me, UBS may choose debtor, amount, currency and maturity at its discretion and is subject to any measures ordered by the country of the currency concerned and the country where the funds are invested. The authorization to re-invest shall remain in force even after my death or incapacity to act.

63055 E  V5          26.01.2007          .9                    30.03.2007          Page 1/2

I-20070425-014967

p.12

**※ UBS**

Master no.
030.257253

## General conditions and place of jurisdiction

UBS may credit remittances received in a currency for which there is no corresponding account to an already existing account or may maintain them in the currency received. UBS is also specifically entitled to open additional accounts in the name of the accountholder in order to credit remittances in foreign currencies.
The following regulations/conditions also apply to this account/custody account relationships:
General Conditions, Basic conditions for the use of electronic aids, Special Terms and Conditions for the use of the UBS customer card with PIN code, Regulations governing safe custody and metal accounts, Information from the Swiss Bankers Association on the changes to the Consumar Credit Act.
I have received and taken note of those conditions/regulations and agree to be bound by them.
I hereby agree to inform UBS immediately of any change in address. If UBS does not have my current address, I will pay all

the currently valid charges and fees. If the consent of the spouse is required by law for an account to be opened, UBS is entitled to assume that this consent has been given.
UBS is not obliged to execute instructions or orders received by e-mail or any other form of electronic communication unless there is a special written agreement.
The present Agreement and/or Declaration shall be exclusively governed by and construed in accordance with Swiss law. The place of performance of all obligations of both parties, the place of debt collection, the latter only for Customers domiciled outside Switzerland, as well as the exclusive place of jurisdiction for any disputes arising out of and in connection with the present Agreement and/or Declaration shall be Zurich, Switzerland. UBS reserves the right, however, to take legal action against the Undersigned before the authority of his/her domicile or before any other competent authority, in which event exclusively Swiss law shall remain applicable.

I instruct UBS to maintain an account in accordance with the information supplied above.

Lionarsville PA   4-3-07
Place/Date

X
Signature   KNOPICK NICHOLAS

---

For internal bank use only

Account opening   ☐ by correspondence
Customer identification carried out as per regulations
OU-Ref. EB6N-WTD

Signature of the supervisor required for all clients within WML, GK/FX, Multinationals and Recovery.
OU-Ref.

63055 E   V5      26.01.2007      j9

☒ in person

Customer Adviser's signature

Supervisor's signature

30.03.2007

Fridolin Wittmer
EB6N-WTD
Mgmt W9 Americas
+41-44-237 23 02

Mark Matter
WM W9 US Clients
B16A EM7X-MFQ
044/237 3345

2/2

J-20070425-0J-4968

230-257253

70-406086-5

Andreas Knöpfel ED
UBS Swiss Financial Advisors
ETSM
Tel. 044/237 87 64

1/26/07

2007 JUN 19 P 2:02



Kopie des Original
Fridolin Wittmer
Mgmt vra Americas
Tel. 044/237 23 12
24.4.07

I CERTIFY THAT THIS IS A COPY OF NICHOLAS WRITTEN KNOPICK'S
PASSPORT IN WITNESS WHEREOF, I HERE UNTO SET MY HAND
AND OFFICIAL SEAL       Susan K. Roadabaugh
                        NOTARY PUBLIC

NOTARIAL SEAL
Susan K. Roadabaugh, Notary Public
Rye Twp., Perry County
My Commission Expires Oct 3 2007

1-20070425-014689

03/04 2007 11:49 FAX  0041442378799        UBS SFA AG                              @013/018

## �֍ UBS                                    A          Master no.
                                                       930·957953

## Verification of the beneficial owner's identity

(Form A as per Art. 3 and 4 CDB)

Account/Custody Account no.                     Contracting partner

·                                               KNOPICK, NICHOLAS W.

Category

The contracting partner hereby declares:
(mark with a cross where appropriate)

☒ that the contracting partner is the sole beneficial owner of the assets concerned.

☐ that the beneficial owner/s of the assets concerned is/are:

Last Name/First
Name (or company)
Address (Domicile)/
Country

Date of birth                                   Nationality

Internal Ref. no.

The contracting partner undertakes to inform the bank, of his own accord, about any changes

X  MARYSVILLE, PA.  4-3-07     X
   Place/Date                              Signature of the contracting partner

Wilfully entering false information in this form is a criminal offense (art. 251 of the Swiss Penal Code, forgery of documents;
under penalty of penal servitude of up to five years or a prison sentence).

                                                        Fridolin Wittmer
                                                        EB6N-WTD
                                                        Mgmt W9 Americas
                                                        +41 44-237 23 02

                                                        Andreas Knöpfel, ED
                                                        UBS Swiss Financial Advisers
                                                        ET5M-4IV
For internal bank use only        Signature(s) verified          Tel. 044 237 87 64
                                  OU-Ref. ET5D-WTD  Customer Adviser's signature
Signature of the supervisor required for all clients within WMI, GK/FK, Multinationals and Recovery.
                                  OU-Ref.                  Supervisor's signature      Mark Mottet
                                                                              WMI/WB US Clients
63249 E  V5      23.03.2007        12                        30.03.2007      B16A EM7X-MFQ
                                                                            044/237 3345
                 J-20070425-014969

03/04 2007 11:49 FAX 0041442378799        UBS SFA AG        ☒014/018

 **UBS**

Master no.
930 . 257253
For internal bank use only

# Basic Agreement for collateral loans

**UBS AG**
Bahnhofstrasse 45
P.O. Box
CH-8098 Zurich
(hereinafter referred to as "UBS")

and

Nicholas Knopick
151 Idle Road
Marysville, PA  17053-9503
USA
(hereinafter referred to as the "Client")

**1.    Scope of application**
This Agreement applies to all loans and transactions involving a financial commitment from UBS (such as overdrafts, fixed advances, guarantees, trading transactions that require a margin), hereinafter referred to as "loan(s)" where the Client's assets or those of a third party are pledged to UBS as collateral. It applies to loans granted during the business relationship between UBS and the Client either upon or after its signature. UBS reserves the right to confirm in writing the terms agreed for individual loans. UBS further reserves the right to require supplementary agreements and/or the countersignature of special declarations for certain types of transaction.

**2.    Lending principles**
Only freely tradable securities and other easily marketable assets, such as precious metals, fiduciary investments, claims in respect of life assurance policies etc., can normally be used as collateral. Loans must be covered at all times by the lending value of the assets pledged to UBS. The lending value corresponds to the value of the collateral less a margin, the amount of which is based on the type of assets pledged, their market or nominal value and risk profile. The applicable lending value normally represents the maximum possible credit facility.
UBS shall decide as it deems appropriate which assets are acceptable as collateral, the collateral value and the margin rates. It shall reserve the right to change the lending principles at any time and without any prior notice. Upon request, UBS shall advise the Client at any time of the current lending value of his/her assets and the loan availability options.

**3.    Requirement for use of credit facilities**
Every use of a credit facility shall require an application from the Client, an adequate lending value of the pledged assets and the prior approval of UBS.
The Client's loan application may be made expressly or implicitly. For instance, an instruction to buy securities shall be regarded as a loan application if the Client does not have the necessary liquid funds or does not have them in full. Loan approval shall normally be granted verbally or implicitly by the relevant bookings being made to the Client's account and execution of the required transaction. There is no entitlement to the granting of loans, even after signature of this Agreement.

**4.    Security**
Assets deposited with UBS Swiss Financial Advisers AG which were or are to be pledged under one or more separate creations

of pledge shall serve as security for loans granted under this Agreement and any loans existing before the latter was signed.

**5.    Fall in the lending value**
If the lending value of the pledged assets falls below all loans granted under this Agreement and any previously existing loans (including accrued and current interest), UBS shall be entitled to proceed in accordance with the terms of the separately signed creation of pledge.
If UBS declares that a fixed advance is due for early repayment, the Client shall be liable for all losses and/or costs incurred by UBS as a result, and in particular any difference between the contractually agreed base interest rate and the reinvestment rate that UBS could receive on the Euromarket for the currency in question and remaining term. If the reinvestment rate is higher than the agreed base interest rate, the client is entitled to the amount resulting from such difference, whereby any costs incurred by UBS in regard to the cancellation are deducted.
If UBS has issued guarantees, then if the lending value falls below that of loans granted, it shall be entitled to dispose of the collateral automatically if, upon simple demand from UBS, the Client cannot provide additional security or have the guarantees taken over. The proceeds from the disposal of the collateral shall remain pledged to UBS until the guarantees expire.

**6.    Conditions**

**6.1    Overdrafts**
The prevailing interest rates for overdrafts in Swiss francs and foreign currencies will be provided to the Client upon request.
At the end of each calendar quarter, a closing statement showing interest charges shall be provided. UBS shall be entitled to adjust interest rates for overdrafts granted at any time with immediate effect to reflect conditions (market and risk conditions).

**6.2    Fixed advances**
The Client shall advise UBS of the required amount and term by two working days at the latest before the fixed advance is required or due for renewal. The interest rate shall then be determined.
For any advance with a term of up to and including 6 months, principal and interest shall be calculated and charged as a single payment on expiration of the term.

61°63

61968 E  V2       01.01.2007       J3                    30.03.2007            Page 1/2

 **UBS**

Master no.
930·257253
For internal bank use only

For any advance with a term of more than 6 months, interest shall be calculated and charged at the end of each calendar quarter. Principal and interest shall be calculated and charged on expiration of the term. Interest shall be debited to the relevant current account.

6.3    Interest calculation
For most currencies interest shall be calculated on a 365/360 basis, i.e. the actual number of days per month divided by a 360-day year. However for certain specific currencies interest shall be calculated on 365-day year basis.

7.    Joint and several liability
If loans are granted to more than one person, each individual shall be jointly and severally liable to UBS for the entire commitment as borrower.

8.    Payments
All payments to UBS of interest and principal shall be made on a net basis with no deduction of any kind for current or future taxes, duties, charges etc.
If existing or future, Swiss or foreign legal provisions prevent an interest payment being made separately from a tax or duty, the

amount of interest payable shall be increased so that UBS is guaranteed payment of the agreed net interest at all times.

9.    Termination
Either party shall have the right to terminate this Agreement at any time with immediate effect. Upon termination, overdrafts shall become due for immediate repayment and fixed advances upon the expiration of the agreed term. Any guarantees issued by UBS shall remain in effect with no changes until their expiration in accordance with the terms and conditions applicable in each case, and the Client shall remain fully liable.

10.    Applicable law and jurisdiction
The present Agreement and/or Declaration shall be exclusively governed by and construed in accordance with Swiss law. The place of performance of all obligations of both parties, the place of debt collection, the latter only for customers domiciled outside Switzerland, as well as the exclusive place of jurisdiction for any disputes arising out of and in connection with the present Agreement and/or Declaration shall be Zurich, Switzerland.
UBS reserves the right, however, to take legal action against the Client before the authority of his/her/its domicile or before any other competent authority, in which event exclusively Swiss law shall remain applicable.

Documentation
The following documents form an integral part of this Agreement:
–   Specific Safe Custody and Pledgeholdership Agreement
–   Creation(s) of pledge (with list of the charged/pledged assets) dated _____ (already signed)
–   Creation of pledge (with list of the charged/pledged assets) (to be signed)
–   General Conditions of UBS

This Agreement was executed in ____ original copies.

Zurich, 24.4.07
Place/Date

Fridolin Wittmer
EB6N-WTD
Mgmt W9 Americas
+41-44-237 23 02
UBS AG

Mark Mottet
WM W9 US Clients
B16A EM7X-MFQ
044/237-3345

X MARYSVILLE, PA.  4-3-07
Place/Date

X

For internal bank use only

Signature(s) verified/Signed in my presence

OU-Ref. EFLD_WTD

Signature

Fridolin Wittmer
EB6N-WTD
Mgmt W9 Americas
+41-44-237 23 02

61968 E   V2     01.01.2007          JB                                    30.03.2007          Page 2/2

J-20070425-014971

11/04 2007 13:17 FAX  0041442378799       UBS SFA AG                    ☑001/002

 **UBS**

Master no. _____
930 .057253
For internal bank use only

## Creation of Pledge
## (with list of the charged/pledged assets)

(Applicable Swiss law utilizes only the German term 'Pfand' and makes no distinction between 'charge' or 'pledge'. Each time the word 'charge' or 'pledge' is mentioned in this document, it should be understood within the meaning of the German term 'Pfand'.)

I/We        Nicholas Knopick

151 Idle Road

Marysville, PA  17053-9503

USA

hereby charge/pledge, in accordance with the law and the conditions of UBS (hereinafter UBS) as set out below by way of security for all rights and claims (arising from loans, credits or other contractual obligations, including any pending obligations, e.g. rights of recourse), which UBS has or may have at any time

against      Nicholas Knopick

151 Idle Road

Marysville, PA  17053-9503

USA

(hereinafter the Debtor(s))

resulting from his/her/their business relationship with UBS, all assets listed overleaf, together with future rights appertaining to securities such as bonus shares, warrants and subscription rights, etc. (including all periodic or other proceeds, in particular interest and coupons due or to become due) as well as claims arising from securities lending, especially those relating to the return of the securities lent and to collateral provided by the borrower or any third party. Should the charged/pledged assets become exchanged, the newly acquired securities automatically take the place of the earlier charged/pledged assets and become similarly charged/pledged.

1.   I/We authorize UBS to take all steps which it considers expedient for the creation and realization of these securities and undertake to fulfil immediately all formalities which UBS may require upon simple request. UBS may collect from third parties any assets hereby charged/pledged and hold such assets itself, and may collect claims charged/pledged hereunder; in the case of mortgage deeds, all rights appertaining to the mortgage credit or may be exercised.

2.   Should the value of the securities fall below the customary or agreed margin, or if UBS should, for any other reason, consider the assets charged/pledged as no longer adequate cover for its claims, the Debtor(s) shall be bound upon simple request by UBS either to reduce the debt through repayments or to furnish sufficient additional security, so as to re-establish the said margin. In the event that the Debtor(s) fail(s) to comply with this demand within such time limit as may be set by UBS at its entire discretion, the debt shall become repayable immediately upon expiration of the time limit. Where, for any reason of fact or law or in the event of extraordinary circumstances, UBS is unable to notify the Debtor(s) immediately of a fall in value of the securities below the customary or agreed margin, the full amount of the outstanding claims of UBS shall become immediately due and payable.

3.   As soon as a debt becomes due, either in whole or in part, UBS shall have the right but not the obligation to realize, on the open market, without delay, at its discretion the assets charged/pledged, which are hereby transferred to UBS for such purpose, and to give notice and demand payment of claims charged/pledged hereunder, without regard to the formalities laid down by the Swiss Federal Statute on Debt Enforcement & Bankruptcy, and to apply the proceeds towards the satisfaction of its claims of whatsoever nature, whether in respect of capital, interest, commission or charges. UBS is at liberty, notwithstanding the provisions of art. 41 of the Swiss Federal Statute on Debt Enforcement & Bankruptcy, to institute and pursue the ordinary proceedings for debt recovery without having first to realize the assets charged/pledged, which are hereby transferred to UBS for such purpose, or to institute proceedings for the realization of said security. Proceeds from the enforcement of securities shall remain pledged in favour of UBS until full repayment of all debts remain pledged to above. Any surplus shall be reimbursed to the Chargor(s)/ Pledger(s). The Debtor(s) shall remain liable for any shortfall.

4.   Where more than one debt is outstanding and/or the securities consist of more than one item, UBS shall be entitled to freely decide on the chronological order in which claims are redeemed and security shall be realized.

61969

61969 E  V1      12.2005     J2                                      10.04.2007                        Page 1/2

J-20070425-014972

11/04 2007 13:17 FAX  0041442376799      UBS SFA AG                    002/002


**UBS**

Master no.
230 . 957253
For internal bank use only

5.   Where securities, uncertificated rights, in particular securities whose printing has been deferred, have been pledged and are subject to termination, drawing, repayment or any other changes, then it shall be exclusively the concern of the Chargor(s)/Pledger(s) to take the required measures. The Chargor(s)/Pledger(s) remain fully responsible for any consequences which result from omission or neglect on his/her/their part. However, UBS may take any such measures it deems necessary in order to protect its own interests.

6.   Where the creditor and the debtor of a mortgage deed, which has been charged/pledged to UBS, are one and the same person, the mortgage deed is considered to contain a three-month period of notice to repay and an interest rate (according to art. 818 Swiss Civil Code) of 10% p.a. as from the establishment of the deed (interest payment days 30 June/31 December), such interest also being charged/pledged. In the event UBS realizes such a mortgage deed on the open market, settlement shall occur no later than at the sale of the property.

7.   All acts of notification from UBS shall be deemed to have been served with legal effect if they have been sent to the last address indicated to UBS by the Debtor(s) or Chargor(s)/Pledger(s).

8.   Applicable law and jurisdiction
The present Agreement and/or Declaration shall be exclusively governed by and construed in accordance with Swiss law. The place of performance of all obligations of both parties, the place of debt collection, the latter only for Customers domiciled outside Switzerland, as well as the exclusive place of jurisdiction for any disputes arising out of and in connection with the present Agreement and/or Declaration shall be Zurich, Switzerland. UBS reserves the right, however, to take legal action against the Undersigned before the authority of his/her/its domicile or before any other competent authority, in which event exclusively Swiss law shall remain applicable.

List of charged/pledged securities

As charged/pledged securities are considered all assets deposited at any given time at UBS Swiss Financial Advisers AG

under the safe custody/current account number    70.486086_5 and 70.166850_8

and in the name of              Nicholas Knopick

including credit balances, accessory rights, related privileges etc.

X MARYSVILLE, PA - USA
Place/Date
4-11-07

X _____
Signature(s)

Read and approved*

* To be signed by the Debtor(s) if the assets charged/pledged are
deposited by a third party.

Fridolin Wittmer
EB6N-WTD
Mgmt W9 Americas
+41-44-237 23 02

For internal bank use only        Signature(s) verified/Signed in my presence

Ott-Ref.   ETLD-WTD

Signature

UBS Swiss Financial Advisers
ET5M-JIV
Tel. +41 237 67 64

61969 E  V1    12.2005    .J2

J-20070425-0)4973

10.04.2007                    Page 2/2

03/04 2007 11:47 FAX  0041442378799          UBS SFA AG                    ☑ 009/018

UBS

Master no.
930-957253
For internal bank use only

## Specific Safe Custody and Pledgeholdership Agreement
(hereinafter "Agreement")

between

**UBS AG**
Bahnhofstrasse 45
P.O. Box
CH-8098 Zurich
(hereinafter referred to as 'UBS')

and

**Nicholas Knopick**
151 Idle Road
Marysville, PA  17053-9503
USA
(hereinafter referred to as 'Pledgor')

and

**UBS Swiss Financial Advisers AG**
Löwenstrasse 49
P.O. Box
CH-8098 Zurich
(hereinafter referred to as 'Pledgeholder')

1.    UBS AG, Zurich, as lender (hereinafter referred to as 'UBS'), and Nicholas Knopick as borrower (hereinafter referred to as 'Pledgor') have signed and entered into a Basic Agreement for collateral loans, which requires the Pledgor to provide collateral to UBS as security for the performance of the obligations in respect of the Basic Agreement for collateral loans. In addition, the Pledgor has signed a Creation of Pledge with list of the charged/pledged assets (hereinafter referred to as 'Creation of Pledge').
The Pledgor requests to maintain with the Pledgeholder the collateral required under the terms of the Basic Agreement for collateral loans and the Creation of Pledge.

2.    After the signing of this Agreement the Pledgor is obliged to deposit assets with the Pledgeholder as of
_____ at the latest. The Pledgeholder hereby duly takes note of the fact, that the Pledgor granted to UBS in accordance with the Basic Agreement for collateral loans and the Creation of Pledge a lien as continuing security with respect to all his assets and other valuables presently or henceforth, including all subsidiary rights held in the account/custody account no.
_____ (hereinafter referred to as 'Accounts') with the Pledgeholder.
The Pledgeholder has taken note and accepts that all these assets, together with future rights appertaining to securities such as bonus shares, warrants and subscription rights etc. or other rights resulting from corporate actions, now and in future booked in the Accounts are pledged by the Pledgor in favour of UBS as collateral required under the terms of the Basic Agreement for collateral loans and the Creation of Pledge (hereinafter referred to as 'Collateral').

3.    UBS and the Pledgor herewith instruct the Pledgeholder and the Pledgeholder agrees to act as Pledgeholder with regard to the Collateral. The Pledgor agrees to maintain at all times

until termination of this Agreement the Collateral in the Accounts to secure the rights and claims which UBS may have under the Basic Agreement for collateral loans.

4.    During the validity of this Agreement the right to invest or manage the Collateral can be exercised by the Pledgor or Pledgeholder in accordance with their agreement, provided that the lending value of the Collateral as determined by UBS does not fall or stay below the aggregate exposure under the Basic Agreement for collateral loans.
Any withdrawals or transfers of assets from the Accounts need UBS's prior consent. UBS will give such consent provided that — due to these withdrawals or transfers — the lending value of the Collateral as determined by UBS does not fall or stay below the aggregate exposure under the Basic Agreement for collateral loans.
Neither the Pledgor nor any third party acting on behalf of the Pledgor nor the Pledgeholder are entitled to initiate any kind of transactions with a party other than UBS which create an exposure secured by the Collateral.

5.    Should the lending value of the Collateral, for whatever reason, no longer cover the aggregate exposure under the Basic Agreement for collateral loans, the Pledgor agrees that UBS will act according to the provisions of the Basic Agreement for collateral loans and the Creation of Pledge and is entitled to instruct the Pledgeholder to take the necessary action. The Pledgeholder agrees to follow such instructions.
The Pledgor explicitly agrees that the Pledgeholder shall be obliged without any right of objection to take any measures with respect to the Collateral as UBS may give an instruction. In no event shall any consent of the Pledgor or any third party acting on behalf of the Pledgor be required for the taking of any such action by the Pledgeholder. Further, if directed so by UBS, the Pledgeholder is obliged to seek for UBS's previous consent in writing prior to the

61970 E  V1      12.2005    J2

30.03.2007                    Page 1/3

1-20070425-014974

03/04 2007 11:47 FAX 0041442378799          UBS SFA AG                    ☑010/018

 **UBS**

Master no.
230 · 957253
For internal bank use only

execution of any instructions given by the Pledgor or any third party acting on behalf of the Pledgor.
Precedent to any instructions given to the Pledgeholder according to this Section 5, UBS shall inform the Pledgor and Pledgeholder of the fact that UBS's margin requirements are violated and that the Pledgeholder will no longer be allowed to execute any instructions without UBS's previous consent in writing and that any instructions given to the Pledgeholder by UBS shall prevail instructions given by Pledgor and/or any third party acting on behalf of the Pledgor with regard to the Collateral. UBS will inform the Pledgeholder and the Pledgor when such restrictions no longer apply.
The Pledgeholder is entitled and obliged to rely on any information received by UBS with regard to UBS's margin requirements.

6.    The Pledgeholder will supply UBS on a daily basis with statements related to the Collateral (type, lending value of individual assets, number and market value of the individual assets as well as account and asset details and account data on a consolidated basis) in the Accounts in a way and quality as mutually agreed by UBS and the Pledgeholder.
The Pledgeholder will supply UBS with a list of the providers of market (price) data used in the different markets. The Pledgeholder shall inform UBS of a change in the use of such providers of price data.
Furthermore, if requested by UBS, the Pledgeholder will provide UBS on a weekly basis copies of all official Account statements sent to the Pledgor.
The Pledgor agrees to such disclosure and hereby waives the production of any banking secrecy and privacy rights that the release of such information would otherwise violate.

7.    The Collateral shall at all times remain the property of the Pledgor subject only to the extent of the interest and rights therein of UBS as the pledgee under this Agreement, the Creation of Pledge and the Basic Agreement for collateral loans. In particular, unless instruction from UBS to the contrary has been delivered to the Pledgeholder, the Pledgor shall retain the unrestricted right to vote any securities constituting Collateral.

8.    The Pledgor represents and warrants that the Collateral is not and will not be subject to any lien, encumbrances, charge, security interest or other right of claim other than the lien in favor of UBS pursuant to the Basic Agreement for collateral loans and the Creation of Pledge, with the exception of the Pledgeholder's rights of pledge and set-off for commissions and fees with regard to the Accounts.

9.    The Pledgor hereby agrees to rank – with regard to the Collateral – for any lien, charge, security interests or right of set-off of any kind whatsoever emanating from its General Business Conditions or from any other source whether created by agreement or law behind UBS's security interests in the Collateral, with the exception of the Pledgeholder's rights of pledge and set-off for commissions and fees with regard to the Accounts.

10.    The Pledgeholder shall use its best efforts to notify UBS and the Pledgor as soon as possible if any notice of levy, lien, court order or other process purporting to affect the Collateral is received by it. The Pledgeholder will not agree with any third party that the Pledgeholder will comply with orders of such third party pursuant to the Accounts without the prior written consent of the Pledgor and UBS, unless required to do so by law.

11.    The Pledgeholder shall use its best efforts to ensure that the Collateral is legally and operationally perfected within any jurisdiction involved to ensure the liquidation of Collateral upon instruction of UBS according to Section 5 of this Agreement.
On request of UBS the Pledgeholder provides UBS with any information regarding perfection of securities, corporate actions, treatment of physical stocks in the vault of sub-custodians, UBS is entitled to give the Pledgeholder instructions with regard to Collateral perfection.
The Pledgeholder shall have the right to delegate its obligations with regard to the custody of the securities to agents such as sub-custodians or attorneys-in-fact as it shall deem appropriate in the different markets. The appointment of such agents shall be at the Pledgeholder's or the Pledgor's expense and shall not relieve the Pledgeholder of any of its obligations or liabilities under this Agreement. In particular, the Pledgeholder shall be responsible and incur liability with regard to the selection, the instruction and the supervision of such appointed agents.
Without limiting the foregoing and notwithstanding any provision to the contrary elsewhere, the Pledgeholder shall be responsible and liable that the instructions given by UBS according to Section 5 of this Agreement can be performed within a time limit customary in the respective markets.
Neither party shall however be responsible or liable for any failure or delay of the performance under this Agreement arising out of or caused directly or indirectly by circumstances beyond its control (force majeure).

12.    This Agreement enters into force when it is signed by all parties (Pledgor, Pledgeholder and UBS) and terminates as soon as there exist no outstanding obligations including contingent and other liabilities that the Pledgor have or may have under the Basic Agreement for collateral loans. UBS will then notify the Pledgor and the Pledgeholder in writing and release the Pledgeholder from all its obligations under this Agreement.

13.    The Pledgor agrees that it shall assume any and all obligations imposed now or hereafter by any applicable tax law with respect to any sale, transfer, delivery or receipt of Collateral under this Agreement and it further agrees to indemnify and hold the Pledgeholder harmless from and against any taxes, additions for late payment and other expenses that may be assessed against the Pledgeholder on any such sale, transfer, delivery or receipt.

14.    All charges for the Pledgeholder's services under this Agreement shall be paid by the Pledgor.

15.    Any amendment, modification or cancellation of this agreement can only be effected by UBS, Pledgeholder and Pledgor jointly and in writing.

16.    If any provision or condition of this Agreement shall be held to be invalid or unenforceable by any court or regulatory or self-regulatory agency or body, such invalidity or unenforceability shall attach only to such provision or condition. The validity of the remaining provisions and conditions shall not be affected thereby and this Agreement shall be carried out as if any such valid or unenforceable provision or condition were not contained herein.

17.    The present Agreement shall be exclusively governed by and construed in accordance with Swiss law. The exclusive place of jurisdiction for any disputes arising out of and in connection with the present Agreement shall be Zurich, Switzerland, UBS reserves the right, however, to take legal action against the Pledgor or the Pledgeholder before the authority of her/its domicile or before any other competent authority, in which event Swiss law shall remain applicable exclusively.

61970 E  V1      12.2005      J2                                        30.03.2007                  Page 2/3

I-20070425-014975

03/04 2007 11:50 FAX 0041442378799       UBS SFA AG                                    ☑018/018

**※UBS**

Master no.
230-257253
For internal bank use only

This Agreement was executed in three original copies.

*Zürich, 24. 4. 07*
Place/Date

UBS AG

Fridolin Wittmer
EB6N-WTD
Mgmt W9 Americas
+41-44-237 23 02

Mark Mottet
WM W9 US Clients
B16A EM7X-MFQ
044/237 3345

*X MARYSVILLE, PA. 4-3-07*
Place/Date

Nicholas Knopick

*Zürich 10/4/07*
Place/Date

Andreas Knöpfel, ED
UBS Swiss Financial Advisers
ET5M-4IV
Tel: 044/23  UBS Swiss Financial Advisers AG

Marty René
Executive Director

For internal bank use only          Signature(s) verified/Signed in my presence

OU-Ref. *ETLD-WTD*          Signature

Fridolin Wittmer
EB6N-WTD
Mgmt W9 Americas
+41-44-237 23 02

61970 E   V1     12.2005     /2                                    30.03.2007          Page 3/3

I-20070425-014976

# EXHIBIT C

 **UBS**

Portfolio number

# Basic document for account/custody account relationship

## Basic data

| | |
|---|---|
| Type of relationship | **Named account relationship individual** |
| Account-holding entity | **UBS Swiss Financial Advisers AG**<br>(hereinafter UBS SFA) |
| Status of documents | **New account opening** |

For the accountholder, please provide the last name, first name(s), full home address (street, city, state, postal code [ZIP], and country), date of birth and nationality.

## Accountholder 1   ☒ Mr     ☐ Mrs.

| | | | |
|---|---|---|---|
| Last name | **KNOPICK** | First name(s) | **NICHOLAS** |
| Street (no PO Box) | **151 Idle Road** | | |
| City, State | **Marysville, PA** | | |
| ZIP, Country | **17053-9503** | **USA** | |
| Date of birth | **1951-05-12** | Nationality | |

## Correspondence instructions

**Except in special circumstances, correspondence is**

☒ to be sent to my/our home address (original)

☐ to be sent to the following address

Original                                    Copy

_____        _____

_____        _____

_____        _____

To be retained and held available at UBS SFA, which is hereby discharged of any liability for possible consequences. I/We have duly received any and all communications retained in this manner. Mail, which is to be retained by UBS SFA, shall be deemed in case of doubt to have been delivered on the date it bears. Mail not claimed can be destroyed after a period of three years

| | | |
|---|---|---|
| Language for correspondence | **ENGLISH** | |
| Home phone number | **(717) 957-4405** | Office phone number  *717-342 1646* |

## Cash balances

My/our account may include cash balances (in one or more currencies) for a short-term pending investment, or, in some cases, for a longer-term as part of a (liquidity, cash, ready funds) allocation in my/our account. UBS SFA will hold such balances in a current account in my/our name at UBS SFA without interest on credit balances. Because the current account represents an obligation of UBS SFA to me/us, I am/we are aware that any cash balances in the current account are subject to the credit risk of UBS SFA.

 **UBS**

**Portfolio number**

70 - 486086 - 5

### General authorization for fiduciary investments

I/We hereby authorize UBS SFA to place any cash credit balance in my/our account, which is temporarily not invested, in cash equivalent fiduciary investments at a UBS branch or affiliate at such interest rates as offered from time to time by such UBS branch or affiliate.

Cash held in such fiduciary investments is available to me/us without any notice period.

Subject to specific instructions, I/We further authorize UBS SFA to make term fiduciary investments (time deposits) in its name but for my/our account and at my/our risk only.

Unless specifically instructed by me/us in writing, UBS SFA is entitled to select, at its own discretion, the investment bank, the amount, currency and term of such fiduciary investment.

Unless UBS SFA receives specific written instructions by me/us at the latest 5 bank business days prior to the repayment date of the fiduciary investment to the contrary, UBS SFA may renew such fiduciary investments at such terms, as it shall determine at its sole discretion.

UBS SFA's liability for the repayment of fiduciary investments is limited to the funds actually received from such investment bank. If the investment bank cannot or does not completely honor its repayment obligations for whatever reasons (including, but not limited to measures ordered by the country of the currency concerned and the country where the funds are invested), UBS SFA is obliged solely to assign to me/us any claim it may have against such investment bank on my/our behalf.

This general authorization to reinvest shall remain in force even after my/our death or incapacity to act.

### Authorization for exceptional overdraft

I/We acknowledge that this Basic document for account/custody account relationship does not authorize, nor shall be construed to authorize, me/us to draw any item on the account against insufficient funds.

In case of a charge against my/our current account which creates an overdraft, the amount of such overdraft shall represent a loan to me/us repayable immediately, and until paid, I/we shall be liable for interest on such overdraft assessed by UBS SFA at its, prevailing rate of interest for overdrafts (as in effect from time to time).

### Authorization for cash processing

I/We hereby authorize UBS SFA to disclose to UBS AG my/our name and account number to the extent necessary to process cash transfers.

### Assumed consent

If the consent of the spouse is required by law for an account to be opened, UBS SFA is entitled to assume that this consent has been given.

### Agreement to General conditions

The following regulations/conditions also apply to this account/custody account relationship:
General Conditions, the Regulations governing safe custody and metal accounts.

I/We have received and taken note of a copy of these conditions/regulations and agree to be bound by them.

### Applicable law and Place of jurisdiction

The present Agreement and/or Declaration shall be exclusively governed by and construed in accordance with Swiss law. The place of performance of all obligations of both parties, the place of debt collection, the latter only for clients domiciled outside Switzerland, as well as the exclusive place of jurisdiction for any disputes arising out of and in connection with the present Agreement and/or Declaration shall be Zurich, Switzerland.

UBS SFA reserves the right, however, to take legal action against me/us individually/collectively before the authority of my/our domicile or before any other competent authority, in which event exclusively Swiss law shall remain applicable

---

I/We instruct UBS SFA to maintain an account in accordance with the information supplied above.

MARYSVILLE, PA 2007-1-23

Place/Date

Signature Accountholder 1

---

For internal use only

Account opening          ✗ By correspondence

Client identification carried out as per regulations

OU-Ref. ERFF-4IV

OU-Ref. ERFF-YAR          Client Adviser's signature

Supervisor's signature

# ✠ UBS

Client ID

32536-393

# Asset Management Agreement

Client name: **KNOPICK, NICHOLAS W.**

By signing this form, you confirm your application to enter into an Asset Management Agreement, and if this application is accepted by UBS Swiss Financial Advisers AG (hereinafter UBS SFA), you consent to the following:

## 1 The Discretionary Service

1.1 UBS SFA will manage your assets at your risk and for a fee

1.2 You will provide UBS SFA, on a separate Form, with your Program Specification, i.e., Selected Program, Investment Strategy, Reference Currency and Specific Investment Instructions, if applicable.

1.3 Taking into consideration your Program Specification, UBS SFA will at its absolute discretion construct a portfolio for you by selecting the portfolio structure, asset classes and investment instruments ('Managed Portfolio'). The Managed Portfolio will be reviewed by UBS SFA on an ongoing basis and may be adjusted without prior reference to you.

1.4 Under this Asset Management Agreement, there may be more than one Managed Portfolio.

1.5 For every Managed Portfolio, UBS SFA may at its absolute discretion:
  a) buy and sell in cash or on a forward basis, but for your account and at your risk, any time deposits, precious metals, currencies, money and capital market investments (e.g. shares, bonds, notes, certificates, structured products, credit derivatives, loan stock rights), any instruments derived therefrom and its combinations (derivatives, hybrids, etc.), and any other listed and unlisted investment instruments;
  b) buy and sell in cash or on a forward basis, but for your account and at your risk, any investments in domestic and offshore investment companies, investment funds, any other collective investment and fund-like instruments (such as funds of funds, stock-exchange traded funds, SICAVs, in-house funds of UBS SFA's affiliates, unit trusts, limited partnerships, etc.), non-traditional investment instruments (hedge funds, fund of hedge funds, private equity, etc.), collective investments and investment company instruments investing in real estate, any real estate related investment instruments, money and capital market investment instruments, and any investment instruments derived therefrom and its combinations);
  c) carry out investments on a fiduciary basis in all countries and currencies in its own name, for your account and at your risk;
  d) execute all types of transactions on any futures and options market;
  e) decide on investment timing;
  f) decide to use or refrain from using measures to hedge against price, currency or interest risks, and choose investment instruments which appear appropriate for hedging, as well as use any other measures to optimize return on existing investments; and
  g) carry out all and any other transactions for your account as it may from time to time determine.

## 2 Program Specification

2.1 Each of your Program Specification takes into account your financial and personal circumstances as well as your ability to take risks. UBS SFA shall not assume any liability for your selection of any Program Specification.

2.2 Specific Investment Instructions may be accepted when they are within your selected Investment Strategy and Reference Currency.
If an investment instrument that is not in the investment universe of UBS SFA (as amended from time to time) is the subject of your Specific Investment Instructions, no ongoing monitoring will be conducted by UBS SFA in respect of such investment instrument, and it may not be included in a Managed Portfolio.

2.3 You shall provide UBS SFA in writing with the changes you wish to be made to a Program Specification. However UBS SFA may carry out such changes at its absolute discretion without the need to wait for receipt of your written instructions.

## 3 Risk Disclosure

3.1 You confirm that you have received, read and understood the brochure "Special Risks in Securities Trading".

3.2 You are familiar with and understand the types of investment instruments and asset classes mentioned in section 1.5 above and understand and accept the risks inherent in the same. Therefore, UBS SFA shall not provide you with any additional information or copy of any documentation setting out the key features of any such investment instruments or asset classes.
If you have issued Specific Investment Instructions regarding specific investment instruments or asset classes, you confirm that you are aware of the risks of these types of transactions and that you understand and accept their risks and characteristics. Therefore you agree that UBS SFA shall not provide you with any additional information or copy of any documentation setting out the key features of these types of transactions.

3.3 Depending on your Specific Investment Instructions a special emphasis on, or a special exposure to, certain investments may potentially result (i) in certain investments constituting a substantial portion of a specific Managed Portfolio and/or (ii) in deviations from the diversified asset allocation policy otherwise applied. Therefore, you agree that UBS SFA will not notify you of the existence of any such circumstances.

## 4 Documentation

Unless otherwise specified in this Asset Management Agreement, UBS SFA's General Conditions, the Regulations governing Safe Custody and Metal Accounts and the Basic Document for Account/Custody Account Relationship shall apply.

## 5 Client Information

You have provided all of the information relevant for this Asset Management Agreement. This information is true and correct. You shall notify UBS SFA (confirmed in writing) about any

 **UBS**

changes regarding your country of residence/domicile or any other circumstances which might have an impact on UBS SFA's regulatory obligations, the discretionary service, the Managed Portfolio or any other significant legal and financial aspects under this Asset Management Agreement.

**6      Delivery of Investment Instruments**

At its absolute discretion, UBS SFA may be prepared to accept investment instruments that are owned and held by you under other agreements with UBS SFA or under agreements with third parties for delivery into the Managed Portfolio(s). In the event that UBS SFA agrees to take delivery of such investment instruments, you will be notified by UBS SFA of any additional costs involved. No ongoing monitoring will be conducted by UBS SFA in respect of such investments instruments (see also section 2.2 above).

**7      Fees**

7.1     UBS SFA shall charge a fee for the services provided in connection with your Managed Portfolio(s). The fee for each Managed Portfolio is set forth in a separate fee schedule, which accompanies each Program Specification.

7.2     UBS SFA may amend the fee schedules at any time and will either inform you of any alteration by means of UBS SFA circular or in any other appropriate manner and in the absence of objection after 30 days of such communication the alterations are deemed to have been received and approved.

7.3     Any fee, remuneration or compensation such as issuing commission or distribution channel compensation received by UBS SFA from affiliates or third parties may be retained by UBS SFA and considered as additional compensation above and beyond the fee UBS SFA charges to you for the services provided (see also sections 13.4 and 13.5 below).

**8      Third-party Investment Instruments and Proprietary Investments**

Investments which may be conducted in connection with this Asset Management Agreement and the Managed Portfolio(s) may be made both in investment instruments from third-party providers as well as in investment instruments that are issued, advised, managed, set-up and/or controlled by UBS SFA or its affiliates.

**9      Performance of Investment Instruments**

9.1     UBS SFA shall have no responsibility for the performance of the investment instruments in which the Managed Portfolio(s) is (are) invested. Furthermore, with regard to third-party investment instruments UBS SFA shall not be liable for incorrect or omitted information in any prospectus or other material provided (as e.g. pricing information), nor shall UBS SFA have any liability for losses of any kind that are attributable to such incorrect or omitted information. In allocating investment instruments to the individual asset classes, UBS SFA may rely upon generally available information or information provided to UBS SFA by third parties.

9.2     Past performance, e.g. of an investment instrument, asset class, Investment Strategy and Reference Currency, is no indicator of future performance. No representative or agent of UBS SFA is authorized, now or in the future, to provide any assurances or guarantees orally or in writing with respect to the performance of an investment instrument, an asset class, an Investment

Strategy and/or Reference Currency or the impact of Specific Investment Instructions.

**10     Liquidity and Marketability**

Some investment instruments which may be used in connection with this Asset Management Agreement and the Managed Portfolio(s) are of a long-term nature. In particular, some of these investment instruments are non-public and not listed on a stock exchange or other organized market, and some of these investment instruments may only be terminated periodically or on certain dates (e.g. on specific dates four times a year). Additionally, the relevant provisions may require a notice period to be observed, possibly of several weeks, and also provide for deferred payment and payment subject to bid/ask spreads compared to the net asset value of such investment instruments. All of the above can delay the availability of any sale proceeds.

**11     Advice and Taxes**

11.1    UBS SFA does not provide advice in respect of any legal and tax ramifications of the investments conducted within this Asset Management Agreement and the Managed Portfolio(s). You should obtain appropriate advice from an independent tax or legal advisor.

11.2    You are responsible for all tax liability incurred as a result of transactions conducted in your Managed Portfolio(s), including any resulting tax liability upon redemption or liquidation of any investment instrument within the Managed Portfolio(s) or upon termination of this Asset Management Agreement or a specific Managed Portfolio. UBS SFA may withhold taxes in the amount required by applicable law or regulation, and may pay any such taxes to the appropriate government agencies.

**12     Due Diligence and Liability**

12.1    In performing this Asset Management Agreement, UBS SFA shall exercise the customary degree of due diligence.

12.2    For any investment decisions made in a specific Managed Portfolio, UBS SFA shall be liable only for gross negligence or bad faith.

12.3    UBS SFA shall have no responsibility whatsoever for minor negligence of auxiliary persons (art. 101 para III Swiss Code of Obligations).

12.4    Under no circumstances shall UBS SFA be liable for any consequential or special damages (such as, for example, any loss due to a unexecuted transaction, loss of profit, loss of data, damaged or unreadable data, damage to goodwill, damage to reputation or waste of management time), which are triggered or occur as a result of

a)      UBS SFA denying your application to enter into this Asset Management Agreement;

b)      your entering into this Asset Management Agreement;

c)      the termination of this Asset Management Agreement;

d)      UBS SFA denying your mandate for a specific Managed Portfolio;

e)      UBS SFA accepting your mandate for a specific Managed Portfolio;

f)      UBS SFA denying a Specific Investment Instruction for a specific Managed Portfolio;

g)      UBS SFA accepting a Specific Investment Instruction for a specific Managed Portfolio; or

h)      the termination of a specific Managed Portfolio

# ❋ UBS

12.5   If any claims are made by UBS SFA or against UBS SFA or against third parties or by third parties that are related to this Asset Management Agreement or a specific Managed Portfolio, you agree to provide UBS SFA with the required assistance.

12.6   Nothing in this Asset Management Agreement shall constitute a waiver or limitation of any rights that you may have under the U.S. Investment Advisers Act of 1940.

## 13   Potential Conflicts of Interest

13.1   UBS SFA and its affiliates (and their employees) shall be entitled at any time to hold long or short positions in the investment instruments held in Managed Portfolios, carry out transactions involving relevant investment instruments in the capacity of principal or agent, or provide advisory or any other services or have officers, who serve as directors either to/for the issuer of such investment instruments or to/for any company commercially or financially affiliated to such issuers.

13.2   UBS SFA shall under no circumstances be obliged to obtain non-public ("insider") information about any investment instrument and its issuer or, on the basis of such information of which it may potentially gain knowledge, buy or sell these investment instruments for your account.

13.3   All transactions under this Asset Management Agreement and in your Managed Portfolio(s) shall be made at your risk and carried out through brokers-dealers selected by UBS SFA. Transactions for your account will generally be effected or executed through UBS SFA's outside service provider, Wegelin & Co., a bank and securities dealer licensed and supervised by the Swiss Federal Banking Commission. However, UBS SFA may select another broker-dealer, including one affiliated with UBS SFA. In making any such selection, UBS SFA will consider a number of factors, including, without limitation, the overall direct net economic result to you (including commissions, which may not be the lowest available but which ordinarily will not be higher than the generally prevailing competitive rate), the financial strength and stability of the broker, the efficiency with which the transaction is effected, the ability to effect the transaction where a large block or other complicating factors are involved, the availability of the broker to stand ready to execute possible difficult transactions in the future, and other matters involved in the receipt of brokerage and research services, without having to demonstrate that any such factor is of a direct benefit to you.

13.4   UBS SFA may select investments in investment companies in which you are eligible to participate, notwithstanding that UBS SFA or its affiliates may act as investment advisor, general partner, sponsor or distributor, or provide any other service to those companies. In addition to the compensation paid to UBS SFA by you, you will also pay the fees and expenses of those companies as disclosed in their prospectuses or other offering documents, including investment advisory or other fees that may be paid to UBS SFA's affiliates. Furthermore, UBS SFA may receive payments of distribution and may receive from an affiliate a portion of the advisory or other fees paid to the affiliate by those companies (and keep such payments as additional compensation; see section 7.3 above) and thus may have an incentive to purchase or recommend those companies instead of other investments.

13.5   SFA may receive compensation for when client portfolios include products other than equity shares, bonds or

mutual fund shares, e.g. structured products (see also section 7.3 above). Such compensation may provide an incentive to SFA to invest on your behalf in such products.

## 14   Right of Lien

14.1   UBS SFA shall have a right of lien on all assets that UBS SFA holds for you in custody at any location. This right of lien includes, but is not limited to, any claim you might have against UBS SFA or a third party, but in the case of the latter only if such claim arose due to UBS SFA acting as intermediary between you and the third party. This right of lien covers any claim UBS SFA might have against you resulting from your business relationship with UBS SFA, independent of maturity or currency; it also covers your obligation to secure forward, option and futures transactions. However, this right of lien only becomes enforceable if there is a claim of UBS SFA against you, including, but not limited to, a claim to secure forward, option or futures transactions.

14.2   At its sole discretion, UBS SFA shall have the right to sell such assets (i.e. those subject to the lien) either by way of forced or private sale as soon as you fail to meet any obligation.   In the event that there is a General Agreement of Pledge and Assignment in place the same shall prevail.

## 15   Outsourcing

UBS SFA may outsource services under this Asset Management Agreement.

## 16   Commencement of the Asset Management Agreement and the Managed Portfolios

16.1   This Asset Management Agreement commences on the date on which your signed application is accepted by UBS SFA. Acceptance by UBS SFA may be delayed due to various reasons, including, but not limited to, insufficient documentation; UBS SFA shall bear no liability for any losses incurred due to such delays.

16.2   A specific Managed Portfolio commences on the date on which your signed Program Specification is accepted by UBS SFA. Acceptance by UBS SFA may be delayed due to various reasons, including, but not limited to, insufficient financing (e.g. if a minimum investment amount for your Managed Portfolio is requested); UBS SFA shall bear no liability for any losses incurred due to such delays.

## 17   Termination of the Asset Management Agreement or Managed Portfolios

17.1   This Asset Management Agreement may be terminated by either party at any time by giving written notice to the other party. With the termination of this Asset Management Agreement, all Managed Portfolios are also automatically terminated.

17.2   A specific Managed Portfolio may be terminated by either party at any time by giving written notice to the other party. With the termination of a specific Managed Portfolio, this Asset Management Agreement is not automatically terminated, but continues to be in effect.

17.3   If you terminate this Asset Management Agreement or a specific Managed Portfolio, the Agreement or the Managed Portfolio shall be terminated upon receipt of your written notice of termination by UBS SFA. If UBS SFA terminates the Agreement or a specific Manageo

 **UBS**

Portfolio, the termination shall be effective 30 working days following your receipt of the written notice of termination.

17.4 Neither the termination of this Asset Management Agreement nor the termination of a specific Managed Portfolio shall interrupt any transactions which are currently in progress. As a result, you agree that you will assume the responsibilities under any such transactions and you will sign any relevant agreements or other documentation necessary to complete such transactions.

17.5 In case of termination, fees shall be billed on a pro rata basis. Any fees paid in advance shall be reimbursed to you on a pro rata basis. Any portion of fees to be billed or reimbursed shall be due immediately upon the related invoice being sent following termination.

17.6 On termination of this Asset Management Agreement or of a specific Managed Portfolio, UBS SFA shall be entitled to return to the issuer or otherwise liquidate or dispose of any investment instruments which were invested exclusively within the Managed Portfolio(s) or which are non-transferable or which have been designated by UBS SFA as to be held in custody exclusively with UBS SFA.

**18   Death or Incapacity to Act**

In the event of your death or incapacity to act, this Asset Management Agreement and the Program Specification(s) shall remain in effect. However, UBS SFA shall be entitled, to suspend or refuse the execution of this Asset Management Agreement or any written or verbal instructions in connection with the Program Specification(s) if it becomes aware of your death or incapacity to act.

**19   Severability**

In the event that any part of this Asset Management Agreement is invalid or ceases to have legal effect, the remaining provisions shall continue in full force and effect. The provisions in respect of

the discretionary service shall be construed in such a way that the intended effect of such invalid or ineffective provisions shall be achieved to the greatest extent possible.

**20   Proxy Voting, Corporate Actions, Class Actions and Other Related Events**

UBS SFA will not vote or provide any advice about the voting of proxies solicited by, or with respect to, the issuers of any securities held in your accounts, nor will UBS SFA advise or take any action on your behalf with respect to legal proceedings, including bankruptcies and class actions, relating to securities in your account, or their issuers, except to the extent required by law.

**21   SEC Form (ADV Part II)**

You received UBS SFA's SEC (U.S. Securities Exchange Commission) Form ADV, Part II more than 48 hours prior to the commencement of this Agreement.

**22   Assignment**

This Asset Management Agreement may not be assigned (as that term is defined in the U.S. Investment Advisers Act of 1940) to any third party by UBS SFA without your consent.

**23   Place of Jurisdiction and Applicable Law**

The provisions of this Asset Management Agreement shall exclusively be governed by and construed in accordance with Swiss law. The place of performance, the place of debt collection and the exclusive place of jurisdiction for all disputes arising out of or in connection with this Asset Management Agreement shall be Zurich, Switzerland.

UBS SFA reserves the right, however, to take legal action against you before the competent authority at the place of your domicile, in which event Swiss law shall apply exclusively.

---

_JERSY...... PA_    _01 - 23 2007_      

City (place)      Date (month/day/year)          Signature

 

City (place)      Date (month/day/year)          Signature

---