IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NICHOLAS KNOPICK<br><br>                    Plaintiff,<br><br>          v.<br><br>UBS FINANCIAL SERVICES, INC.<br>And SUSAN SEIFERT<br><br>                    Defendants. | : : : : : : : : : : : : : : | Civil Action No.: 14-cv-05639<br>(Hon. Gerald Pappert)<br><br>Complaint:  Class Action<br><br>JURY TRIAL DEMANDED |

## AMENDED CLASS ACTION COMPLAINT

Nicholas Knopick, brings this action individually and as a representative of a class of similarly situated persons, to rescind contracts that are void for illegality, to recover money that was effectively stolen from him by UBS AG and Defendants, and to recover damages because Defendants and UBS AG deceived him, enticed him into investing with UBS Swiss Financial Advisors ("UBS SFA"), an entity established as part of an ongoing criminal conspiracy, and caused him to enter into an illegal banking relationship with UBS AG.  Had Defendants or UBS AG told Mr. Knopick the truth when they first asked to handle Mr. Knopick's money in 2007, he never would have done business with Defendants and UBS AG.

# TABLE OF CONTENTS

**PAGE**

**I.**     **INTRODUCTION / NATURE OF THE ACTION** ................................................ 1

**II.**    **JURISDICTION AND VENUE** ......................................................................... 5

**III.**   **PARTIES** ......................................................................................................... 6

**IV.**   **CO-CONSPIRATORS** ...................................................................................... 6

**V.**     **FACTS**                                       7
        A.  UBS AG'S CONSPIRACY TO DEFRAUD THE U.S.              7
        B.  MR. KNOPICK'S UBS FS AND UBS SFA ACCOUNTS
        C.  PLAINTIFF'S CONTRACT WITH UBS FS AND PRIOR DISPUTE HISTORY
        D.  PLAINTIFF'S CONTRACT WITH UBS AG AND PRIOR DISPUTE HISTORY
        E.  PLAINTIFF'S CONTRACT WITH UBS SFA AND PRIOR DISPUTE HISTORY

**VI.**   **CLASS ACTION ALLEGATIONS** .................................................................. 42
        A. Numerosity - Federal Rule Of Civil Procedure 23(a)(1) ............................... 43
        B. Commonality and Predominance - Federal Rule Of Civil Procedure 23(a)(2)
        and 23(b)(3) ....................................................................................................... 43
        C. Typicality - Federal Rule Of Civil Procedure 23(a)(3) ................................ 44
        D. Adequacy Of Representation - Federal Rule Of Civil Procedure 23(a)(4). ................ 44
        E. Superiority - Federal Rule Of Civil Procedure 23(b)(3). ................................. 45

**VII.**   **EQUITABLE TOLLING, DISCOVERY RULE REGARDING STATUTES OF
          LIMITATIONS** .............................................................................................. 46

**VIII.**   **COUNTS** ......................................................................................................... 47
        COUNT I - FRAUD ............................................................................................ 47
        COUNT II - GROSS NEGLIGENCE ................................................................ 49
        COUNT III - BREACH OF FIDUCIARY DUTY ............................................. 52
        COUNT IV - UNJUST ENRICHMENT ............................................................ 54
        COUNT V - BREACH OF CONTRACT ............................................................ 55
        COUNT VI - VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE
        PRACTICES AND CONSUMER PROTECTION LAW, 73. P.S. § 201-2(XXI) ............ 57
        COUNT VII - VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349 ....... 59
        COUNT VIII - RICO VIOLATION 18 U.S.C. 1962(C)…................................. 60

          A. RICO ENTERPRISE.................................................................................... 60
          B. MEANS AND METHODS OF THE ENTERPRISE..................................... 61
          C. PATTERN OF RACKETEERING (MAIL FRAUD) .................................. 62
          D. PATTERN OF RACKETEERING (WIRE FRAUD)................................... 49

        COUNT IX VIOLATION OF 18 U.S.C. 1962(D) BY  CONSPIRACY TO
        VIOLATE 18 U.S.C. 1962(C)............................................................................ 50
        A. RACKETEERING ENTERPRISE................................................................ 60
        B. PURPOSES OF THE ENTERPRISE............................................................ 61

C. MEANS AND METHODS OF THE ENTERPRISE.................................................. 62

D. THE RICO CONSPIRACY .................................................................................. 49

E. OVERT ACTS

**XI.   PRAYER FOR RELIEF** ................................................................................................ **51**

Plaintiff, Nicholas Knopick ("Plaintiff" or "Mr. Knopick"), by and through his attorneys, on behalf of himself and all others similarly situated, brings this Class Action Complaint against Defendants, UBS Financial Services Inc. ("UBS FS") and Susan Seifert ("Ms. Seifert"), based upon personal knowledge as to his own acts, and upon information and belief and the investigation of his counsel as to all other matters, and alleges as follows:

## I.      INTRODUCTION/NATURE OF THE ACTION

1.      Plaintiff brings this action on his own behalf and as a Class Action on behalf of a class consisting of all other citizens of Pennsylvania and elsewhere who have been wronged by Defendants and their co-conspirators in this manner.  Plaintiff and the Class seek to rescind contracts and to recover damages caused to the Plaintiff and Class by Defendants' a) recommendations as fiduciaries to enter into illegal contracts with UBS AG and UBS Swiss Financial Advisors ("UBS SFA"); b) recommendations as fiduciaries to enter into a financial advising relationship with Andreas Knöpfel ("Mr. Knöpfel"), a UBS AG representative, who was a participant in the UBS AG cross-border tax fraud scheme then being investigated by the Securities Exchange Commission ("SEC") and Department of Justice ("DOJ"); c) recommendations as fiduciaries that Mr. Knöpfel and UBS AG and UBS SFA were competent, even experts, at international investments, investment management and financial advising; and d) failure to disclose that UBS AG, UBS SFA, UBS FS, and their co-conspirators were under investigation by the SEC and the DOJ for facilitating a cross-border tax fraud scheme in the U.S. and elsewhere.

2.      Defendants knew and failed to disclose that UBS AG, in order to avoid detection of its illegal activities of, among other things, conspiracy to defraud the United States and engaging in the receipt of deposits, transmission of money, and making consumer loans in

**AMENDED CLASS ACTION COMPLAINT** – Page 1

contravention of state, federal and international banking laws, instructed its agents to avoid establishing "relationships for securities products or services with new clients in the United States *with the use of U.S. jurisdictional means.*"  In spite of internal instructions to UBS AG agents to "not contact securities clients in the United States through the telephone, mail, email, advertising, the internet or personal visits", which instructions were ostensibly prepared in anticipation of criminal prosecution, it was the policy of UBS AG to not only continue, but to expand, agent travel to the United States.  According to UBS AG's training guidance, "[a]ny client request to receive mail relating to a securities account at a U.S. address other otherwise receive information concerning securities services or products in the United States <u>must be denied.</u>"(emphasis in original).  UBS AG further instructed that "no solicitation of account opening [for banking services should] take [] place in the United States."  While UBS AG recognized "it may be necessary to obtain a state license to offer lending products . . . [and that] state consumer protection laws [] may apply," UBS AG opened banking accounts with Mr. Knopick and other Class members in the U.S. without complying with state licensing requirements, including Pennsylvania, and without complying with state consumer protection laws, including Pennsylvania.  UBS AG opened banking accounts with Mr. Knopick and other Class members in the U.S. without complying with its own internal guidance.

3.      UBS AG's internal policies forbade any agent "who communicates with a prospective client concerning banking products or services [to] communicate with that prospective client concerning securities services or products."  Nevertheless, when UBS FS introduced Mr. Knopick to Mr. Knöpfel, an agent of UBS AG, the topics discussed were both banking (i.e. deposits, withdrawals and margin lending) and securities products and services (i.e. financial advising).

<u>**AMENDED CLASS ACTION COMPLAINT**</u> – Page 2

4.      UBS AG's internal policies further instructed agents: "Traveling Officers may not be directly involved in the execution of the account opening documentation while in the United States or in mailing of the documentation from the prospective client to the booking center outside of the United States."

5.      UBS AG developed "Case Studies" for its illegal "cross-border" business as part of the training and development of its co-conspirator employees.  In these Case Studies, UBS AG instructs its co-conspirators, for example, "with the intention to avoid having to carry [sensitive – i.e. damaging] documents with you, [to send] an envelope with some of the sensitive account related data to your hotel (alternatively, a friend in the respective country whom you know very well; a family member; a local business contact)."  In another case study, UBS AG instructs:

> After passing the immigration desk during your trip to the USA/Canada, you are intercepted by the authorities.  By checking your Palm, they find all your client meetings.  Fortunately, you stored only very short remarks of the different meetings and no names.
> As you spend one week in the same hotel, the longer you stay there, the more you get the feeling of being observed.  Sometimes you even doubt if all the hotel employees are working for the hotel.  A lot of client meetings are held in your suite of the hotel.
> One morning you are intercepted by an FBI-agent.  He looks for some information about one of your clients and explains to you, that your client is involved in illegal activities.
> Question 1: What would you do in such a situation?
> Question 2: What are the signs indicating that something is going on?

6.      Despite these internal strictures and the laws they were intended to address, UBS AG instituted an aggressive "Referral Campaign", providing incentives to UBS AG's and/or UBS FS's U.S. brokers to introduce their American clients with "Net New Money" to UBS AG and its financial advisors.  UBS instituted the "KeyClient" initiative and the "Referral Program" to achieve two goals: Achieve Net New Money goals and to "increase cooperation between

UBS, the Private Bank and the other Business Groups of UBS and between the Client Advisors and the Product Specialist." According to UBS AG, "[t]he success of these initiatives [were] crucial for the success of the Integrated Business Model of UBS."

7.     Pursuant to the Referral Program, each "Country Team" making a referral would get .33% of the revenues generated by the Financial Advisor for a time period of four years. UBS AG set a target of 5 referrals from each Client Advisor, with a reward for each Client Advisor achieving the most referrals ("amount of money and number of referrals") being a Breitling wristwatch customized with the UBS logo.

8.     UBS FS, UBS AG, UBS SFA, Ms. Seifert, Mr. Knöpfel and, later, Rene Elste ("Mr. Elste"), all worked together to induce Mr. Knopick and the class members to a) enter into illegal banking contracts, including the deposit of money with UBS AG in contravention of state, federal and international laws, b) transmit money to UBS AG in contravention of state, federal and international laws, c) borrow from and repay money to UBS AG in contravention of state, federal and international laws [particularly, but not exclusively, reporting requirements]; d) rely upon UBS SFA, Mr. Knöpfel and, later Mr. Elste and other co-conspirators, to invest, manage, and provide financial advising services, when i) they were not qualified to do so, and ii) when they were under investigation by the SEC and the DOJ. Further, UBS FS and Ms. Seifert failed to disclose to Mr. Knopick and the class members that Mr. Knöpfel, UBS AG, UBS SFA, and their co-conspirators were under investigation by the SEC and DOJ.

9.     All these actions were taken in concert with the objectives of 1) obtaining "Net New Money" for management by UBS AG and UBS SFA; 2) enriching UBS AG, the parent company of the "Integrated Business"; and 3) attempting to avoid detection of the UBS AG

**AMENDED CLASS ACTION COMPLAINT** – Page 4

cross-border tax evasion scheme by providing seemingly legitimate advising services to US citizens who were properly reporting to the Internal Revenue Service ("IRS").

## II.   **JURISDICTION AND VENUE**

10.   This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) in that these complaints are putative class actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are thousands of members in the proposed class and at least one member of the class of Plaintiffs is a citizen of a state different from any Defendant.  This court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as the claims involve a federal question under RICO, 18 U.S.C. 1962(C).

11.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) as Plaintiff had a residence in Pennsylvania at the time the Plaintiff entered into the transaction with Defendants; Plaintiff and Defendants also entered into a consumer and business contractual relationship in Pennsylvania and Defendants do business in Philadelphia.  Venue is also proper under 28 U.S.C. § 1391(b)(3) as Defendants are subject to this court's personal jurisdiction with respect to this action. *See also* 42 Pa. Consol. Stat. Ann. § 5322.

12.   In addition, in connection with the acts and conduct complained of, Defendants directly or indirectly used the means and instrumentalities of interstate commerce including use of the internet.

13.   Defendants are subject to personal jurisdiction in this Court because Defendants purposefully directed activities, including and particularly, the activities complained of herein, towards residents of Pennsylvania who suffered injury as a result thereof. The Plaintiff's claims arise out of Defendants' forum related contacts.  The exercise of personal jurisdiction comports with fair play and substantial justice.  The facts related to the Defendants actions are set forth

**AMENDED CLASS ACTION COMPLAINT** – Page 5

below in Paragraphs 11, 14, 15, 26, 39, 52, 73, 77, 82, 86, 87, 88, 90, 108, 112, 116, 117, 118, 120, 121, 124, 128, 130, 131 and 149.

### III.  PARTIES

14.     Plaintiff Mr. Knopick is a natural person who maintained a residence at 151 Idle Road, Marysville, Pennsylvania at the time of Defendants' wrongful conduct complained of herein.  UBS FS mailed account statements to Mr. Knopick at his Marysville, Pennsylvania address.

15.     UBS FS is an American subsidiary of UBS AG and is a registered broker-dealer and investment advisor.   UBS FS is incorporated under the laws of Delaware and, upon information and belief,  maintains its principal place of business in Weehawken, NJ. UBS FS continues to serve as Mr. Knopick's fiduciary investment advisor and broker.

16.     Ms. Seifert is a natural person and a licensed securities broker.  Ms. Seifert works in UBS FS Baltimore office and continues to serve as Mr. Knopick's fiduciary investment advisor and broker.  Ms. Seifert has a customer complaint history in her FINRA broker-check record.

### IV.  CO-CONSPIRATORS

17.     UBS SFA is a Swiss corporation with its principal place of business located in Zurich, Switzerland. UBS SFA is a wholly-owned subsidiary of UBS AG and is registered as an investment advisor in the United States with the Securities and Exchange Commission.

18.     UBS AG is a corporation registered to do business in Pennsylvania as a foreign corporation.  Upon information and belief, UBS AG is not certified as a bank to engage in this Commonwealth in the business of receiving money for deposit or transmission pursuant to Section 105 of the Pennsylvania Bank Code of 1965. UBS AG is the ultimate decision maker for

all its subsidiary companies and UBS AG and its subsidiaries operate as a single business enterprise directed by UBS AG.

19.     Mr. Elste is an adult individual employed by UBS SFA and/or UBS AG.  At all relevant times, Mr. Elste was the employee/agent of Defendant UBS SFA and UBS AG, acting in the course and scope of his employment/agency and in furtherance of the interests of Defendants and UBS AG.

20.     Mr. Knöpfel is an adult individual employed by Vontobel Swiss Wealth Advisors AG.  At all relevant times, Mr. Knöpfel was the employee/agent of UBS AG, acting in the course and scope of his employment/agency and in furtherance of the interests of Defendants and UBS AG.

## V.     FACTS

### A.     UBS AG'S CONSPIRACY TO DEFRAUD THE U.S.

21.     While Mr. Knopick's investments with UBS SFA were not made to participate in UBS AG's years-long scheme to defraud the United States by concealing dishonest Americans' taxable earnings in undeclared, so-called "black accounts" at UBS AG, upon information and belief, his investments and relationship, and the very existence of UBS SFA, were used by UBS AG and UBS SFA, with UBS FS's knowledge and without disclosure to Mr. Knopick, to cover for the "black accounts".  Members of the Class were similarly treated.

22.     UBS AG is one of Switzerland's largest banks. From at least 2007 – 2010, UBS AG owned and operated banks, investment banks, and stock brokerage businesses throughout the world, also operating in the Eastern District of Pennsylvania and elsewhere in the United States. Because of UBS AG's ownership of banks and investment brokerages in the United States, United States tax laws applied to UBS AG and to its United States clients.

23.     UBS AG operated a cross-border banking business with United States clients

**AMENDED CLASS ACTION COMPLAINT** – Page 7

("United States cross-border business").  The United States cross-border business employed approximately 60 private bankers and had offices in Geneva, Zurich, and Lugano, Switzerland. These private bankers frequently traveled to the United States to meet with and to conduct business with their United States clients.

24.     The United States cross-border business provided private banking services to approximately 20,000 United States clients with assets worth approximately $20 billion. Approximately 17,000 of the 20,000 cross-border clients concealed their identities and the existence of their UBS AG accounts from the IRS.  Many of these clients willfully failed to pay tax to the IRS on income earned on their UBS AG accounts.  UBS AG assisted these United States clients in concealing the income earned on UBS AG accounts by failing to report IRS Form 1099 information to the IRS.  From 2002 through 2007, the United States cross-border business generated approximately $200 million a year in revenue for UBS AG.

25.     To carry out its illegal scheme, UBS AG routinely sent its employees, called Client Advisors ("CA's"), to the U.S. to meet with U.S. customers to discuss their secret Swiss accounts.  To avoid detection by U.S. authorities, the CA's travelled with Travel Access Server ("TAS") laptops, which were equipped with a secret, second hard drive that could only be accessed by entering a password after opening the computer's Solitaire game while using a coded USB stick.  The second hard drive allowed remote access from the U.S. to client account information hosted on a server in Zurich.  The second hard drive, however, could be erased by the CA, if detected by U.S. authorities, simply by entering a special code.  CA's also carried Palm Pilots that likewise could be erased by entering a code.  UBS AG's CA's routinely lied to U.S. Customs officers at the border about their employment role at UBS AG, in order to conceal the fact that they were entering the U.S. to conduct unlawful business.  The CA's carried

**AMENDED CLASS ACTION COMPLAINT** – Page 8

business cards that listed only their name, home address and home phone, with no mention of UBS AG or the UBS AG logo. Before traveling to the U.S., CA's or their assistants cut up client statements to remove names, account numbers, and UBS AG logos, so that if observed by U.S. authorities the statements could not be linked to UBS AG. At some point the IT department at UBS AG automated this process by creating a command that would print "sanitized" account statements with no client name, account number, or reference to UBS AG. If statements were shipped to the U.S. before the CA's travel, CA's were instructed to send them by FedEx using labels that did not list UBS AG or its Swiss address as the sender.

26.    Some UBS AG executives ("Executives") are co-conspirators not named as Defendants herein. These Executives occupied positions at the highest levels of management within UBS AG, including positions on the committees that oversaw legal, compliance, tax, risk, and regulatory issues related to the United States cross-border business.

27.    Some UBS AG employees who managed the United States cross-border business ("Managers") are co-conspirators not named as Defendants herein. These Managers were responsible for overseeing the United States cross-border business operations. These Managers were responsible for regulatory and compliance issues, as well as issues related to bankers' incentives and compensation. These Managers were also responsible for traveling to the United States to meet with UBS AG's wealthiest United States clients. These Managers reported directly to Executives.

28.    UBS AG's employees who managed the bankers servicing the United States cross-border business ("Desk Heads") are co-conspirators not named as Defendants herein. These Desk Heads exercised direct management over the day-to-day operations of the business. In addition to having management duties, Desk Heads traveled to the United States to conduct

**AMENDED CLASS ACTION COMPLAINT** – Page 9

unlicensed banking and investment advisory activity for UBS AG's United States clients. These Desk Heads reported directly to Managers.

29.     UBS AG's private bankers who serviced the United States clients ("Bankers") are co-conspirators not named as Defendants herein.  These Bankers were not licensed to engage in banking and investment advisory activity in the United States.   However, these Bankers routinely traveled to the United States to conduct unlicensed banking and investment advisory activity for UBS AG's United States clients.  While in Switzerland, these Bankers routinely communicated with their clients in the United States about banking and investment advice.  These Bankers reported directly to the Desk Heads.  UBS AG Executives and Managers authorized and encouraged through incentives Bankers' activities with respect to their United States clients.

30.     Despite the outrageous and clandestine efforts UBS AG undertook for its illegal business travel to the U.S., CA's understood U.S. travel was the only way to raise new money, and "Net New Money" was one of the two measures of CA performance that governed their compensation.  CA's, such as Georg Marti ("Mr. Marti") and Renzo Gadola ("Mr. Gadola"), have admitted they knew they were breaking U.S. law when they traveled to the U.S. for UBS AG.  Mr. Gadola described the CA's travel as "doing business with one foot in prison."

31.     Some of UBS AG's 20,000 United States clients are co-conspirators not named as Defendants herein. These United States clients knowingly concealed from the United States government, including the IRS, approximately $20 billion in assets held at UBS AG and willfully evaded United States income taxes owed on the income earned from their secret UBS AG accounts.   United States clients were required to report and pay taxes to the IRS on income they earned throughout the world, including income earned from the UBS AG account.

**AMENDED CLASS ACTION COMPLAINT** – Page 10

32.     UBS AG, together with its co-conspirators (including Defendants), unlawfully, willfully and knowingly, did combine, conspire, confederate and agree together and with each other to defraud the United States and an agency thereof, to wit, the Internal Revenue Service of the United States Department of Treasury in the ascertainment, computation, assessment and collection of federal income taxes.

33.     It was a part and an object of the conspiracy that UBS AG and its co-conspirators (including Defendants), would and did increase the profits of UBS AG by providing unlicensed and unregistered banking services and investment advice in the United States and other activities intended to conceal from the IRS the identities of UBS AG's United States clients, who willfully evaded their income tax obligations by, among other things, filing false income tax returns and failing to disclose the existence of their UBS AG account to the IRS.

34.     Among the means and methods by which UBS AG and its co-conspirators (including Defendants) would and did carry out the conspiracy were the following:

a.     It was part of the conspiracy that UBS AG, Executives, Managers, Desk Heads, and Bankers utilized nominee entities, encrypted laptops, numbered accounts, and other counter surveillance techniques to conceal the identities and offshore assets of United States clients from authorities in the United States.

b.     It was part of the conspiracy that UBS AG expanded its business beyond the borders of Switzerland in 2000 by purchasing Paine Webber, a large United States stock brokerage firm.  Executives at UBS AG voluntarily entered into an agreement, known as the Qualified Intermediary Agreement ("QI Agreement") with the IRS that required UBS AG to report to the United States income and other identifying information for its United States clients who held an interest in United States securities in an account at UBS AG.  Further, this agreement required UBS AG to withhold taxes from United States clients who directed investment activities in foreign securities from the United States.

c.     It was part of the conspiracy that UBS AG, Executives, and Managers entered into the QI Agreement and represented to the IRS that UBS AG was in compliance with the terms of the QI Agreement, while knowing that

**AMENDED CLASS ACTION COMPLAINT** – Page 11

the United States cross-border business was not conducted in a manner which complied with the terms of the QI Agreement.

d.      It was part of the conspiracy that UBS AG, Executives, and Managers mandated that Desk Heads and Bankers increase the United States cross-border business, knowing that this mandate would cause Bankers and Desk Heads to have increased unlicensed contacts with the United States, in violation of United States law and the QI Agreement.

e.      It was further part of the conspiracy that UBS AG, Executives, and Managers, who referred to the United States cross-border business as "toxic waste" because they knew that it was not being conducted in a manner that complied with United States law and the QI Agreement, put in place monetary incentives that rewarded Desk Heads and Bankers who increased the United States cross-border business.

f.      It was further part of the conspiracy that Managers, Desk Heads, and Bankers solicited new investments in the United States cross-border business by marketing UBS AG Swiss bank secrecy to United States clients interested in attempting to evade United States income taxes, in particular by claiming that UBS AG secrecy was impenetrable.

g.      It was further part of the conspiracy that UBS AG or its subsidiary operated a Global Referral program, managed by a Global Referral Desk in Weehawken, New Jersey, to manage broker efforts to attract customers to invest in undeclared accounts in Switzerland.

h.      It was further part of the conspiracy that Managers, Desk Heads, and Bankers provided unlicensed and unregistered banking services and investment advice to United States clients in person while on travel to the United States and by mailings, email, and telephone calls to and from the United States.

i.      It was further part of the conspiracy that when approached about the continuous unregistered and unlicensed contacts with the United States associated with the United States cross-border business, UBS AG and Executives would not implement effective restrictions on the United States cross-border business because the business was too profitable for UBS AG.

j.      It was further part of the conspiracy that UBS AG and Executives agreed to establish an entity registered as an investment adviser with the SEC in order to create the appearance of lawfully doing business with U.S. citizens, while continuing the unlawful United States cross-border business.

k.      It was further part of the conspiracy that UBS SFA was used to repatriate

**AMENDED CLASS ACTION COMPLAINT** – Page 12

funds to the U.S. from an undeclared UBS AG account and to convince U.S. authorities not to suspect that UBS SFA customers also had undeclared UBS AG accounts.

l.      It was further part of the conspiracy that UBS AG, Managers, Desk Heads, and Bankers assisted United States clients in preparing IRS Forms W-8BEN that falsely and fraudulently stated that nominee offshore structures, and not the United States clients, were the beneficial owners of offshore bank and financial accounts maintained in foreign countries, including accounts in Switzerland at UBS AG.

m.      It was further part of the conspiracy that some United States clients prepared and filed with the IRS income tax returns that falsely and fraudulently omitted income earned on their undeclared UBS AG account and that falsely and fraudulently reported that United States citizens did not have an interest in, or a signature or other authority over, financial accounts located in a foreign country.

n.      It was further part of the conspiracy that the United States clients failed to file with the Department of Treasury a Report of Foreign Bank and Financial Accounts, Form TD F 90-22.1, which would have disclosed the existence of and their interest in, or signature or other authority over, a financial account located in a foreign country.

35.     In furtherance of the conspiracy and to achieve the object and purpose thereof, at least one of the co-conspirators committed at least one of the following overt acts set forth below, among others, in the Eastern District of Pennsylvania and elsewhere.

36.     On or about July 6, 2000, a Manager authorized Bankers to refer United States clients to outside lawyers and accountants to create offshore structures to conceal from the IRS United States clients' UBS AG accounts, while knowing that creating these structures constituted helping the United States clients commit tax evasion.

37.     On or about July 14, 2000, Managers changed the wording on UBS AG Document 61393, Declaration for US Taxable Persons, from "I would like to avoid disclosure of my identity to the US IRS" to "I consent to the new tax regulations . . . ." after United States clients expressed fears that the form as originally drafted could be used as evidence against

**AMENDED CLASS ACTION COMPLAINT** – Page 13

them for tax evasion.

38.     UBS AG's knowledge that its secret accounts for U.S. citizens violated U.S. tax, securities, and banking laws extended above the CA's to the Managers and Executives.  It was UBS AG's Managers and Executives who for years resisted and prevented efforts to conform UBS AG's business to U.S. law, and affirmatively voted to continue UBS AG's illegal United States cross-border business even after it was well-known to management that the bank was breaking U.S. law.  As early as September 13, 2001, Franz Zimmermann ("Mr. Zimmermann") of the UBS AG legal department wrote a memorandum to Martin Liechti ("Mr. Liechti"), the head of UBS AG's America's business unit in Zurich, regarding "[c]ross-border activities into the United States from non-U.S. Offices of UBS."  Mr. Zimmermann wrote that "the potential sanctions are severe" to penalize UBS AG's unlicensed securities business with U.S. citizens.  Mr. Zimmerman also noted the "UBS would be vulnerable to its W-9 U.S. customers because nothing hinders them from filing a lawsuit against UBS in the United States (or elsewhere)".  Mr. Liechti correctly understood Mr. Zimmermann's advice to mean that every securities or banking transaction that UBS AG engaged in with U.S. citizens violated U.S. law, even for U.S. customers that had provided W-9's, because UBS AG was not registered to conduct securities or banking business with U.S. citizens in Switzerland.  Mr. Zimmermann's memo offered as an alternative to UBS AG's unlawful, unlicensed securities business the "Establishment of a Swiss SEC-registered Subsidiary."  This idea was simply part of UBS AG's effort to further UBS AG's conspiracy by purportedly legalizing one of the three illegal aspects (*i.e.* tax, securities, and banking law) of UBS AG's securities business with U.S. citizens.  An "SEC-registered" subsidiary would, ostensibly, legalize securities sales to UBS AG's W-9 customers; *i.e.* the 10% of UBS AG's U.S. customers who chose to provide a social security number to UBS AG, while

**AMENDED CLASS ACTION COMPLAINT** – Page 14

UBS AG continued to conspire with the other 90% of U.S. customers to hide their accounts from the IRS.  A registered subsidiary would also provide a distraction for UBS AG and its tax-cheat U.S. customers, who could both point to *de minimis* accounts at the registered entity to divert attention from, or prevent further investigation into, the "black accounts" at UBS AG.

39.     Long before UBS AG established UBS SFA, Mr. Liechti concluded in 2001 that UBS AG had no way to legally service U.S. customers who provided W-9's, no doubt because UBS AG was not SEC-registered and had no reporting capability with the IRS.  By the end of 2001, UBS AG had decided to put all the "black accounts" on portfolio management status, meaning that UBS AG made all investment decisions, in order to eliminate calls and contact with U.S. citizens.  UBS AG also decided to establish an SEC-registered unit for its small W-9 business, but implementation of the W-9 unit stalled in UBS AG's Business Committee and the W-9 unit was not operational until 2005, likely because UBS AG recognized early-on that "the set-up of a compliant entity in Switzerland adds costs and does not generate substantial additional revenues . . . ."

40.     On or about July 11, 2002, a Manager and others instructed Bankers to tell United States clients who were contemplating transferring their assets to another offshore bank that UBS AG has the largest number of United States clients among all banks outside the United States, creates jobs in the United States, has better lobbying possibilities in the United States than any other foreign bank and would not be pressured by United States authorities to disclose the clients' identities.

41.     In 2002, Hansruedi Schumacher ("Mr. Schumacher"), the Manager directly responsible for the Swiss CA's conducting illegal securities business in the U.S., with the sponsorship of Mr. Liechti, gave a presentation to UBS AG's Group Executive Committee

regarding UBS AG's cross-border business with Americans and informed the committee that UBS AG was not compliant with its QI Agreement with the IRS.

42.   On or about September 19, 2002, UBS AG and Executives on UBS AG's executive board knowingly failed to disclose to the IRS deficiencies in implementing UBS AG's requirements to report and withhold taxes for clients of the United States cross-border business that were discovered after the completion of an internal audit.

43.   On or about September 26, 2002, a Desk Head instructed Bankers that if they have unauthorized contact with United States clients in the United States, that the Bankers should not report the contact in UBS AG's internal computer system.

44.   In the third quarter of 2002, UBS AG undertook a "Centralization Program" to move its few W-9 customers into the Zurich headquarters of the bank.  UBS AG assigned Mr. Gadola, a CA who regularly traveled to the U.S. on unlawful securities business, to this project. The W-9 team operated through, at least, the end of 2004, and at the end of the project UBS SFA was established and some, if not all, of the W-9 customers were transferred there.

45.   In or about December 2002, UBS AG and Executives authorized Managers to institute a temporary five month CA travel ban to the United States.  The ban coincided with an IRS initiative relating to identifying holders of offshore credit cards.

46.   On or about January 22, 2003, after being advised by outside lawyers to take immediate action in order to build a defense against a possible future criminal case brought against UBS AG, a Manager instructed another Manager to limit written communications relating to offshore structures created for United States clients and instructed that Manager to begin issuing Form 1099 information to clients, but not to the IRS, for certain UBS AG accounts where UBS AG officials served as a manager for the offshore structures.

**AMENDED CLASS ACTION COMPLAINT** – Page 16

47.     In 2002, UBS AG and its outside tax counsel learned of an IRS investigation related to "black accounts."  On or about January 22, 2003, UBS AG's outside counsel at Baker & McKenzie in Zurich warned UBS AG that the goal of a then-ongoing IRS tax amnesty program for U.S. tax cheats was to bring criminal cases.  Baker & McKenzie warned that immediate action was required to build a defense against a future criminal case against UBS AG. UBS AG reacted by limiting written communications about offshore "structures" (shell corporations and foundations in tax-haven jurisdictions established at UBS AG's suggestion) for U.S. clients and issuing Form 1099 information for certain customers, but not to the IRS.

48.     On or about January 24, 2003, two Managers issued a form letter to United States clients reminding them that since at least 1939 UBS AG has been successful in concealing account holder identities from United States authorities and that even after UBS AG's presence in the United States recently increased after the purchase of Paine Webber, UBS AG was still dedicated to the protection of their identities.

49.     Also in January, 2003, Mr. Liechti made a presentation to UBS AG's Executive Board regarding an upcoming tax treaty and an Overseas Voluntary Compliance Initiative ("OVCI") the IRS was conducting for Americans with hidden overseas accounts.  Mr. Liechti advised the Board that the IRS would require U.S. tax cheats to name promoters they dealt with and reveal the details of the schemes in which they participated.  UBS AG reacted by imposing a travel ban on Swiss CA's so that CA's would not be caught in the U.S. in the presence of clients who were filling out OVCI forms.  When the OVCI ended, UBS AG lifted the travel ban and returned to "business as usual."

50.     On or about July 9, 2004, UBS AG admitted to the IRS that its United States based operations had failed to provide Form 1099 information to the IRS, had failed to

**AMENDED CLASS ACTION COMPLAINT** – Page 17

withhold the appropriate tax when required to do so, and had failed to properly document the owners of certain accounts, had failed to inform the IRS that the United States cross-border business continued to fail to provide Form 1099 information to the IRS, continued to fail to withhold the appropriate tax when required to do so, and continued to fail to properly document the owners of certain accounts.

51.    On or about August 17, 2004, Managers organized a meeting in Switzerland with outside lawyers and accountants to discuss the creation of structures and other vehicles for clients who wanted to conceal their UBS AG accounts and income derived therefrom from tax authorities in the United States and Canada.

52.    In or about September 2004, Desk Heads and Bankers received training in Switzerland on how to avoid detection by authorities when traveling in the United States on UBS AG business.

53.    UBS AG established UBS SFA as an artifice to further its massive, unlawful "black account" business, and the formation of UBS SFA was likely agreed to by UBS AG Executives because it only affected 10% of UBS AG's U.S. customers and cost virtually nothing to start up.  From 2001 to 2007, Executives and Managers debated how to deal with UBS AG's illegal "black account" business and whether to obey the law or to hold onto the illicit profits that UBS AG had traditionally earned from U.S. business.  The Executive decision makers who chose to continue the United States cross-border business were Raoul Weil ("Mr. Weil"), Peter Kurer ("Mr. Kurer"), and Marcel Rohner ("Mr. Rohner").  Even in October 2004, when UBS AG committed to establish an SEC-registered subsidiary to deal with U.S. citizens, internal documents listed as a "DON'T" – any discussion of "UBS AG regulatory position," no doubt because UBS AG was doing nothing to legalize its regulatory position *vis-à-vis* U.S. authorities,

be they SEC, IRS, or DOJ.   In addition, UBS AG determined to use Wegelin & Co. as "Outsourcing partner for back-office services" because Wegelin & Co. was "not exposed to SEC oversight."   Internal UBS AG memoranda make clear that UBS AG's goal was "protection of UBS AG Switzerland and its other clients from SEC oversight."

54.   Despite UBS SFA's SEC registration, it was an artifice in furtherance of the larger UBS AG fraud.  For example, Christos Bagios ("Mr. Bagios"), who joined UBS SFA from UBS AG, advised customers to open a declared account at UBS SFA, the purpose of which was to deceive U.S. authorities to not suspect that the same customers had secret, undeclared accounts at UBS AG.  While allegedly employed by UBS SFA, Mr. Bagios attended a meeting in California to discuss both a declared UBS SFA account and an undeclared UBS AG account. In 2007, Mr. Bagios permitted a customer to move $470,000 through a UBS SFA account to repatriate the funds from an undeclared UBS AG account.  Mr. Bagios described this process as washing the funds through accounts at UBS SFA before repatriating them to the U.S.   Mr. Bagios and Mr. Gadola assisted clients with undeclared accounts in moving them out of UBS AG and into other Swiss banks.

55.   UBS SFA's lack of substance as in investment advisory firm is further shown by the fact that Mr. Knöpfel was not shown on FINRA records as being a UBS SFA employee, and the allegations in Mr. Gadola's criminal case (to which he agreed) are that [Mr. Gadola] was an Executive Director of UBS's North American International business from the 1990's to 2008, which includes the time he allegedly worked for UBS SFA.

56.   Mr. Liechti, who had advanced within UBS AG with Mr. Weil, but by 2002 reported to Mr. Weil, determined that it was "mission impossible" to have CA's do business with U.S. citizens and at the same time comply with U.S. law.  Mr. Liechti encouraged Mr. Weil to

exit the illegal, U.S. business that Mr. Weil referred to as "toxic waste" and opposed Mr. Weil's initiatives like the "CCC" or "customer contact campaign" which dictated lists of U.S. customers that CA's were required to contact. Mr. Liechti viewed the CCC as a "blatantly obvious" bad idea that increased illegal contact with U.S. citizens, which, in turn, increased the risk that UBS AG's massive, illegal U.S. operation would be exposed.

57.     During calendar year 2004, approximately 32 Bankers traveled to the United States and met with United States clients approximately 3,800 times to provide unlicensed and unregistered banking services and investment advice relating to the clients' UBS AG account.

58.     On or about April 25, 2005, UBS AG and Executives instructed Managers, Desk Heads, and Bankers to grow the United States cross-border business.

59.     In 2005, UBS AG tasked Philip Marcovici ("Mr. Marcovici") of Baker & McKenzie, Zurich with approaching the IRS on a no-name basis to see if UBS AG's non-W-9, tax cheat customers could receive amnesty from the U.S. UBS AG was told the IRS would not permit amnesty, but instead would seek enforcement action. At the same time, Mr. Liechti decided that UBS AG should exit the non-W-9 U.S. business, in part because a UBS AG CA had been arrested, the SEC wanted to contact the CA, and other CA's were becoming afraid of U.S. travel.

60.     In or about early December 2005, Desk Heads and Bankers solicited new business from existing and prospective United States clients at Art Basel Miami Beach in Miami Beach, Florida.

61.     Mr. Liechti again encouraged Mr. Weil to exit UBS AG from the non-W-9 U.S. business. Mr. Weil assigned Mr. Liechti, along with Mr. Weil's chief of staff, to study UBS AG's U.S. cross-border business. Mr. Liechti named the study "Project Blessing," in part

because he thought it would be a blessing to get out of the illegal business with U.S. citizens. Mr. Liechti developed five options for exiting the illegal business, and met with Mr. Weil and Mr. Rohner to discuss the Project Blessing recommendations in early 2006. Mr. Weil was aware i) of the U.S. securities laws, ii) that UBS AG was violating U.S. law in every U.S. transaction, and iii) the risks of the 20,000 accounts that UBS AG was conspiring to hide from the IRS. Mr. Weil viewed the illegal business with U.S. citizens as a valuable asset that he thought he could sell for $2 billion, and rejected any option to comply with U.S. law that required any expense, stating "I will never take money in my hand (*i.e.* spend money) to solve this problem."

62. On or about March 31, 2006, Executives enacted restrictions that would have "little" or "some impact" on the profitability of the United States cross-border business.

63. In or about August 2006, UBS AG and Executives refused to approve the recommendations of Managers to wind down, sell, or spin off the United States cross-border business as too costly and requiring public disclosures that would harm UBS AG.

64. On or about September 26, 2006, Desk Heads and Bankers were trained at UBS AG on how to conduct business discreetly by using mail that would not show UBS AG's name and address, by changing hotels while traveling, and by using encrypted laptop computers when traveling to the United States on UBS AG business and when meeting with United States clients.

65. In August, 2007, UBS AG's leadership (Mr. Weil, Mr. Kurer, and Mr. Rohner) decided to "freeze" the unlawful, non-W-9 U.S. business rather than exit the business to comply with U.S. law. The next month, UBS AG learned that the DOJ was investigating UBS AG's United States cross-border business with U.S. tax cheats and UBS AG had earlier learned through a "Y. Bouhara" facsimile that former-UBS AG employee and whistle-blower Bradley

**AMENDED CLASS ACTION COMPLAINT** – Page 21

Birkenfeld ("Mr. Birkenfeld") had contacted the DOJ.

66.     In February, 2009, UBS AG admitted, among many specific details, that:

i)      from 2000 to 2007, UBS AG participated in a scheme to defraud the United States and the IRS;

ii)     UBS private bankers facilitated U.S. taxpayers who were evading taxes, by meeting with them in the U.S. and communicating with them by U.S. jurisdictional means, enabling the U.S. taxpayers to conceal from the IRS their securities and financial transactions in their UBS AG accounts; and,

iii)    UBS AG Executives and Managers who knew of the conduct described in sub-paragraph ii) continued to operate and expand the U.S. cross-border business because of its profitability.

67.     Twenty months later, UBS AG agreed with the DOJ to reporting obligations with respect to UBS AG accounts held by U.S. citizens who maintain securities accounts at UBS SFA. Nothing in UBS AG's agreement with the government states that the UBS AG accounts of UBS SFA account holders were legal prior to the reporting obligation agreement.

68.     Before agreeing to terms with the DOJ, UBS AG continued to parse language, or simply misrepresent facts, to mislead its customers and the U.S. Senate. For example, on July 7, 2008, Mark Branson ("Mr. Branson"), the CFO of UBS Global Wealth Management and Business Banking in Zurich, appeared before the Senate Permanent Subcommittee on Investigations ("Subcommittee") and brashly asserted that "[t]his cross-border business was and is entirely legal in both Switzerland and the United States." Mr. Branson was forced to eat his words eight months later, after UBS AG had admitted wrongdoing as part of a plea deal with the government, when Mr. Branson again appeared before the Subcommittee and groveled, "Mr. Chairman, we deeply regret our breaches of U.S. law."

69.     Despite agreeing to obey the law, UBS AG continued its pattern of unlawful conduct into 2014 with respect to Mr. Knopick. For example, after forcing Mr. Knopick to open

**AMENDED CLASS ACTION COMPLAINT** – Page 22

an unlawful bank account at UBS AG in order to transfer funds into UBS SFA, UBS SFA refused to return Mr. Knopick's funds when requested and instead forced him to borrow money from UBS AG when he sought a withdrawal. After foolishly investing Mr. Knopick's money, UBS SFA issued margin calls when equity prices fell in September, 2008. Even though UBS SFA had made the investment decisions that led to the margin calls, it refused to implement any strategy to protect Mr. Knopick's investment – even when requested by Mr. Knopick – and demanded he make investment decisions or have his portfolio liquidated to pay UBS AG. UBS AG gave Mr. Knopick's name to the FBI in the U.S. – even though he had provided a W-9. UBS AG took this retaliatory action after learning that Mr. Knopick had retained counsel to pursue UBS SFA and UBS AG. Finally, when Mr. Knopick asked to question, Susan Siefert, his SEC-registered broker about his losses, UBS AG used legal process in the U.S. to silence the broker and prevent its current customer from learning any facts about his account or Defendant's and UBS AG's misconduct.

70.    UBS did not cease its pattern of racketeering and criminal conduct. In 2012, UBS agreed to pay about $1.5 billion to settle LIBOR rigging charges, and a UBS unit in Japan, where much of the wrongdoing occurred, pleaded guilty to criminal fraud. The alleged illegality was "epic in scale," and "seriously compromised" the integrity of financial markets. Traders openly boasted to each other about their prowess at moving the influential rates up or down at their whims. "Think of me when yur on yur yacht in Monaco," one broker said in an electronic chat in 2009 with the UBS trader at the center of the alleged conspiracy, according to the DOJ. The broker congratulated the trader on "getting bloody good" at rate-rigging, regulators said.

71.    Undeterred, UBS AG continued its criminal conduct. In November of 2014, UBS was fined hundreds of millions of dollars for conspiring and rigging foreign exchange rates.

**AMENDED CLASS ACTION COMPLAINT** – Page 23

Complying with U.S. law is not part of UBS AG's business plan, and UBS AG's pattern of predicate RICO acts is well-established. In February, 2015, UBS AG and/or its subsidiaries were revealed to be under investigation again for a tax evasion scheme. This time the SEC and the U.S. Attorney for the Eastern District of New York are investigating sales of bearer bonds to U.S. citizens – bonds that can be undeclared and traded much like cash.

72.    While UBS AG claims to have purged itself of the illegal, United States cross-border scheme (at least with respect to secret accounts for Americans) it has never been held accountable for the remainder of its scheme, to wit i) the complicity of its U.S. brokers, at the former Paine Webber, in arranging the illegal Swiss accounts, or ii) the illegal component of the accounts at UBS SFA which required Americans to open *illegal* bank accounts at UBS AG.[1]

73.    UBS AG had for years used its U.S. broker-dealers (many formerly of Paine Webber, which UBS acquired in 2000), registered with the SEC and regulated by FINRA, to arrange illegal meetings between high net worth U.S. customers and UBS AG bankers who routinely travelled to the U.S. to illegally solicit Americans' secret investments in Switzerland with UBS AG. The American broker-dealers, of course, were compensated for facilitating these illegal meetings between the UBS AG bankers and the wealthy Americans and the illegal "black accounts" that resulted from those meetings. Thus, the regulated U.S. broker dealers, who handled U.S. customers' legitimate securities transactions, also offered an "off the menu" illegal service; *entre* UBS AG CA's and the illegal, tax-free secret Swiss accounts they sold when they came the U.S. The IRS was aware of these U.S.-to-Switzerland referrals and sought by John Doe subpoenas "documents pertaining to the referral of each US taxpayer interested in offshore accounts from UBS offices in the United States to UBS offices in Switzerland. These documents

---

[1] UBS AG's internal "Country Papers" instructed employees in 2004 and 2007 that UBS AG was not licensed to conduct banking in Switzerland with U.S. citizens.

**AMENDED CLASS ACTION COMPLAINT** – Page 24

will demonstrate the identity of the US taxpayers, the types of products and services provided by UBS, as well as **UBS's referral process . . .**" (emphasis added).

74.    The referral system was apparently more organized than the IRS knew at the time of the John Doe Subpoena.  The "Global Referral Desk" which ran the "Global Referral System" from Weehawken, New Jersey, was a highly organized scheme to recruit offshore investors to UBS AG in Switzerland.  However, when the IRS and DOJ attempted to enforce the John Doe Subpoena to obtain records of the Global Referral Desk, one of UBS AG's lawyers signed a declaration that claimed that the Global Referral Desk "did not systematically maintain or categorize all of the information relevant to this inquiry" and ultimately "[n]o responsive information was identified as a result of this review."

75.    UBS AG's claim, through the sworn statement of its lawyer, that it had no responsive Global Referral Desk documents, is inexplicable in light of the job description of Cindy Yang, a UBS FS employee from March 2007 – June 2009 (two months after the lawyer's declaration), which states:

Global program management
UBS FINANCIAL SERVICES INTERNATIONAL SALES, UBS FINANCIAL SERVICES INTERNATIONAL SALES MAR '07 – JUN '09 (2 YEARS, 3 MONTHS
3/07 6/09 UBS Financial Services International Sales Weehawken, NJ Global program management/performance analysis of 400 domestic branches/15 overseas offices. Developed, administered and tracked the Global Referral Program (Revenues of $2 million+ a year) Created and maintained website/hotline to correspond with sales force (8,000 Financial Advisors/Private Bankers) and the total US foreign client business ($8 Billion+ AuM Provided monthly performance reporting analysis and overview of international business distribution Coordinated with 15 global Wealth Management controllers on Global Referral quarterly reporting  Supported Wealth Management National Sales team on campaigns, initiatives and special project (i.e. client segmentation, identifying leading indicators of net new money & strategic coordination)

One Swiss media report speculated that UBS AG had shipped the responsive documents to Switzerland to evade compliance with the John Doe Subpoena.  Mr. Birkenfeld was quoted in

**AMENDED CLASS ACTION COMPLAINT** – Page 25

April, 2010 as saying a referral desk in New York promoted off-shore accounts to politicians who were handled through a Washington "PEP" office for "Politically Exposed People."

**B.      MR. KNOPICK'S UBS FS AND UBS SFA ACCOUNTS**

76.      In January, 2007, Mr. Knopick opened a brokerage account with UBS FS for retirement funds and placed several million dollars in the account.  Working with Ms. Seifert, Mr. Knopick invested conservatively in blue chip common stocks with high dividend yields.  Mr. Knopick had followed this investment strategy successfully for years and his efforts had been rewarded with significant earnings.  Mr. Knopick carefully explained his strategy to Ms. Seifert when he opened his account, and she clearly understood.

77.      In March or April, 2007, only months after opening Mr. Knopick's UBS FS account, Ms. Seifert introduced Mr. Knopick to Mr. Knöpfel, who Ms. Seifert claimed was a skilled Swiss investment advisor with UBS SFA, owned by UBS AG and a sister-corporation of UBS FS.  Apparently Mr. Knöpfel traveled to the U.S. to solicit investments from Americans, and UBS FS and Ms. Seifert accommodated Mr. Knöpfel by introducing him to Mr. Knopick and praising the investment prowess of Mr. Knöpfel and UBS SFA.  According to UBS AG's promotional materials available in the U.S., which are consistent with Mr. Knopick's experience, and recently disclosed internal documents and sworn testimony of UBS AG Executives and Managers, UBS AG and its subsidiaries actually operate as one entity governed by UBS AG. The multiplicity of legal entities appears to be a favorable optic to confuse and confound authorities in the U.S. and abroad, who have repeatedly caught UBS AG violating U.S. laws and reporting requirements.

78.      Mr. Knopick was persuaded by Mr. Knöpfel's claims of success as an investment advisor and the recommendations of UBS FS and Ms. Seifert and opened two fiduciary

**AMENDED CLASS ACTION COMPLAINT** – Page 26

investment accounts with UBS SFA. Mr. Knopick completed a form W-9 and provided UBS SFA his social security number for reporting purposes. UBS SFA sent Mr. Knopick's account statements to Mr. Knopick's Marysville, Pennsylvania address. Mr. Knopick funded the two accounts, as he was instructed, with a wire transfer deposit in the amount of $12,445,483.47 from his Wachovia Bank account in Pennsylvania to UBS AG in Switzerland. As he had with Ms. Seifert, Mr. Knopick carefully explained his investment strategy to Mr. Knöpfel, in Ms. Seifert's presence.

79.     In connection with his deposit of money with UBS AG, Mr. Knopick was required to sign certain account agreements with UBS AG, opening a deposit account and a margin loan account. He was not told that UBS AG was not licensed to accept deposits in Switzerland from U.S. citizens.

80.     Upon information and belief, any and all cash generated by Mr. Knopick's investments with UBS SFA were deposited to his UBS AG account. Similarly, on numerous occasions, Mr. Knopick withdrew cash, often, if not always, loaned by UBS AG, from his UBS AG account and the money was transferred by UBS AG in Switzerland to Mr. Knopick's US bank accounts.

81.     Also, on numerous occasions, UBS AG and UBS SFA increased Mr. Knopick's margin loans from UBS AG by the transfer of cash between them.

82.     UBS AG mailed statements and correspondence to Mr. Knopick in Pennsylvania, including statements and correspondence regarding deposits to and withdrawals from Mr. Knopick's UBS AG accounts, increases to Mr. Knopick's credit at UBS AG and payments by Mr. Knopick to UBS AG on account of his loans.

83.     UBS AG and Mr. Knopick engaged in numerous telephone conferences over Mr.

**AMENDED CLASS ACTION COMPLAINT** – Page 27

Knopick's Pennsylvania-based cell phone, including conferences where Mr. Knopick instructed deposits to and withdrawals from his UBS AG accounts, increases to Mr. Knopick's credit at UBS AG and payments by Mr. Knopick to UBS AG on account of his loans.

84.     UBS AG faxed numerous communications to Mr. Knopick in Pennsylvania including communications regarding deposits to and withdrawals from Mr. Knopick's UBS AG accounts, increases to Mr. Knopick's credit at UBS AG and payments by Mr. Knopick to UBS AG on account of his loans.

85.     Mr. Knöpfel, UBS AG and UBS SFA ignored Mr. Knopick's instructions and invested Mr. Knopick's money wildly and recklessly, trading his dollars into foreign currencies and purchasing an inexplicable collection of stocks and bonds denominated in those foreign currencies. Mr. Knöpfel was never authorized by Mr. Knopick to purchase bonds for Mr. Knopick's account, or to invest contrary to Mr. Knopick's time-proven strategy.

86.     Mr. Knöpfel and his assistant (also an agent of UBS AG and UBS SFA) routinely told Mr. Knopick, in telephone calls from Switzerland to Pennsylvania and elsewhere in the U.S., that his investments were performing well, and consistently concealed from Mr. Knopick that 1) his money had been invested against his instructions and 2) his account was excessively leveraged with loans from UBS AG secured by his UBS SFA investments.  They also never disclosed that UBS AG and UBS SFA were under investigation for a cross-border tax evasion scheme in the US and that UBS SFA, and his account had been created as a cover for, and in furtherance of, that scheme.

87.     In September, 2008 (as the DOJ was closing in on UBS AG's cross-border tax evasion scheme and indicting Mr. Weil), UBS SFA first contacted Mr. Knopick to inform him that his portfolio may need to be liquidated to pay the UBS AG loans.  Mr. Knöpfel had

leveraged Mr. Knopick's UBS SFA account to purchase volatile securities, and had purchased bonds that paid interest at a rate that was <u>lower</u> than the interest rate on the margin loans.

88.    At some point between August and October, 2008, it appears that Mr. Knöpfel was removed from his job and was replaced by Mr. Elste, but Mr. Elste concealed from Mr. Knopick all details regarding why his fiduciary advisor Mr. Knöpfel simply vanished.

89.    As Mr. Knopick's fiduciaries, UBS AG, UBS FS and UBS SFA were obligated to inform Mr. Knopick why Mr. Knöpfel was removed and whether he had engaged in misconduct.

90.    As the debt and equity markets melted down in late 2008, UBS SFA continued to liquidate Mr. Knopick's portfolio at fire sale prices to satisfy UBS AG's loan repayment requirements.   UBS SFA and Mr. Elste dissuaded Mr. Knopick from withdrawing his money promptly, ostensibly to feed UBS AG's appetite for the loan repayments.   In the end, Mr. Knopick's $12+ million investment was whittled to roughly $900,000.

91.    When Mr. Knopick asked Ms. Seifert to explain how Mr. Knöpfel, UBS AG and UBS SFA could have lost virtually all of his money, Ms. Seifert said that Mr. Knöpfel had left UBS SFA and that she had observed in other such circumstances, UBS FS or its sister companies typically would make the customer whole.   Whether Mr. Knöpfel actually misappropriated Mr. Knopick's money is unknown, as UBS FS, Ms. Seifert, UBS AG and UBS SFA have provided no further explanation to Mr. Knopick.   Given the unity of the companies in the UBS AG empire, Ms. Seifert's statements to Mr. Knopick, and the fact that UBS FS and Ms. Seifert have access to information regarding Mr. Knöpfel's disappearance and Mr. Knopick's losses, but have chosen to conceal the information from Mr. Knopick, a negative inference is warranted.

92.    UBS FS has been uncooperative with Mr. Knopick's efforts to obtain the complete file related to his UBS AG and UBS SFA accounts, and has taken preposterous and

**AMENDED CLASS ACTION COMPLAINT** – Page 29

groundless litigation positions in efforts to avoid providing discovery or litigating in the U.S. (despite being a registered investment advisor).

93.     The only documents UBS SFA provided Mr. Knopick are contracts and alleged account statements, but no trade authorizations or confirmations, notes of phone calls, and precious few memoranda, or the like.

94.     The only documents UBS AG provided to Mr. Knopick are contracts and account statements, but no communications or other documentation.

95.     Based solely upon the limited information Mr. Knopick has been able to obtain to date, UBS AG, along with UBS SFA and their collective agents and co-conspirators, Mr. Knöpfel and Mr. Elste, fraudulently and deceitfully conspired to and did lose or steal approximately $12 million from Plaintiff's Swiss accounts during two to three weeks in September of 2008, and then conspired with their U.S. affiliates, Ms. Seifert and UBS FS, to conceal the theft, loss and fraud from Plaintiff for approximately five years.

96.     Defendants' concealment of facts from Mr. Knopick requires that the Court apply the discovery rule to equitably toll the running of any period of limitations, laches, or estoppel that is not otherwise suspended by law.

### C.   PLAINTIFF'S CONTRACT WITH UBS FS AND PRIOR DISPUTE HISTORY

97.     On or about January 19, 2007, Mr. Knopick signed the "Client Information and Agreement for Individuals" relating to UBS FS accounts and acknowledged the "Master Account Agreement" terms and conditions, including the arbitration provision. See Exhibit A, "UBS FS Agreement" and "Master Account Agreement." Members of the Class signed similar agreements with UBS FS. To the extent those contracts relate to UBS SFA, UBS AG, or the Global Referral Program, they are unenforceable for illegality as part of the criminal conspiracy

described above.

98.    The UBS FS Master Account Agreement included an arbitration provision requiring arbitration of "any and all controversies which may arise between you and UBS Financial Services Inc. concerning any accounts, transaction, dispute or the construction, performance or breach of this or any other Agreement." Exhibit A, Master Account Agreement, p. 20.

99.    The UBS FS Master Account Agreement provided that "[a]ny arbitration under this Agreement . . . shall be conducted before an arbitration panel convened by the New York Stock Exchange, Inc. or the National Association of Securities Dealers, Inc. . ." Id.

100.    However, the UBS FS Master Account Agreement also provided, "No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration Agreement against any person who has initiated in corporate a putative class action." Id, p. 21.

101.    From September 2008 to November 2013, Mr. Knopick attempted to obtain information concerning his UBS AG and UBS SFA accounts from UBS FS and Ms. Seifert, to no avail other than Ms. Seifert's cryptic comments regarding Mr. Knopick's missing money, Mr. Knöpfel's leaving the companies, and UBS's propensity to make customers whole.  Soon after these comments by Ms. Seifert, Mr. Knopick's further inquiries to Ms. Seifert and her colleagues at UBS FS were met with resistance and stonewalling.

102.    On November 8, 2013, Mr. Knopick filed a Praecipe for Writ of Summons in the Pennsylvania Court of Common Pleas for Dauphin County against UBS FS, Ms. Seifert, UBS AG and UBS SFA.

103.    On January 25, 2014, Mr. Knopick sought pre-complaint discovery from UBS FS

**AMENDED CLASS ACTION COMPLAINT** – Page 31

and Ms. Seifert pursuant to Pennsylvania Rule of Civil Procedure 4019(e).

104.     UBS FS and Ms. Seifert refused to comply with Mr. Knopick's pre-complaint discovery requests, invoking the UBS FS Master Account Agreement's arbitration provision.

105.     On May 19, 2014, the Dauphin County Court issued an order dismissing Plaintiff's Writ as to UBS FS and Ms. Seifert and compelling arbitration with these parties.

106.     On August 27, 2014, Mr. Knopick filed his Arbitration Statement with FINRA against UBS FS and Ms. Seifert, asserting substantially the same claims as set forth in his original Class Action Complaint.

107.     Counsel for UBS FS and Ms. Seifert objected to Mr. Knopick's attempt to assert class action claims in the FINRA arbitration.

### D.     PLAINTIFF'S CONTRACT WITH UBS AG AND PRIOR DISPUTE HISTORY

108.     Based upon the recommendation of Ms. Seifert and UBS FS, and without knowledge of the ongoing SEC and DOJ investigation of UBS AG and UBS SFA, and without knowledge that the contracts were illegal under state, federal and international banking laws, on April 3, 2007, in Marysville, Pennsylvania, Mr. Knopick signed the Basic Document for Account/Custody Account Relationship with UBS AG.   Exhibit B, attached hereto, "UBS AG Contract Documents."   Members of the Class signed similar documents with UBS AG.

109.     The Basic Document for Account/Custody Account Relationship provided, in part:

> I hereby authorize UBS to use all or part of the funds available at any given time in my UBS account to make investments on a fiduciary basis in the name of UBS, but for my account and at my risk.

Id.

110.     The Basic Document for Account/Custody Account Relationship provided, in

**AMENDED CLASS ACTION COMPLAINT** – Page 32

part:

> The present agreement and/or Declaration shall be <u>exclusively governed by</u> <u>and construed in accordance with Swiss law</u>. . . . [T]he <u>exclusive place of</u> jurisdiction for any disputes arising out of an in connection with the present Agreement and/or Declaration shall be <u>Zurich, Switzerland</u>.  UBS reserves the right, however, to take legal action against the Undersigned before the authority of his/her domicile or before any other competent authority, in which even exclusively Swiss law shall remain applicable.

> Id. (emphasis in original)

111.   The Basic Document for Account/Custody Account Relationship was signed by Fridolin Wittmer "Mgmt W9 Americas" and Mark Mottet "WM W9 US Clients", on or about March 3, 2007, noting the "account opening" had taken place "in person." Id.  Members of the Class executed similar documents with UBS AG.

112.   The Basic Document for Account/Custody Account Relationship had attached to it a copy of Mr. Knopick's passport, with a notary public's attestation of authenticity from Perry County, Pennsylvania, along with a UBS form entitled Verification of the Beneficial Owner's Identity, which was signed by Mr. Knöpfel (indicating his alleged affiliation with UBS SFA), Fridolin Wittmer ("Mr. Wittmer") and Mark Mottet ("Mr. Mottet").  Id.

113.   Mr. Knopick signed the Basic Document for Account/Custody Account Relationship in Pennsylvania.

114.   Mr. Knopick also signed the UBS AG Basic Agreement for Collateral Loans in Marysville, Pennsylvania on or about April 3, 2007.  Id.  Members of the Class signed similar documents with UBS AG.

115.   The Basic Agreement for collateral loans provided, in part:

> The present agreement and/or Declaration shall be <u>exclusively governed by</u> <u>and construed in accordance with Swiss law</u>. . . . [T]he <u>exclusive place of</u> jurisdiction for any disputes arising out of an in connection with the present Agreement and/or Declaration shall be <u>Zurich, Switzerland</u>.  UBS reserves

**AMENDED CLASS ACTION COMPLAINT** – Page 33

the right, however, to take legal action against the Undersigned before the authority of his/her domicile or before any other competent authority, in which even exclusively Swiss law shall remain applicable.

Id. (emphasis in original).

116.    Mr. Knopick also signed a UBS form entitled "Creation of Pledge" (with list of the charged/pledged assets) on April 11, 2007 in Marysville, Pennsylvania.   The identified pledged assets were Mr. Knopick's UBS SFA accounts.   Members of the Class signed similar documents.

117.    Mr. Knopick also signed a UBS form entitled "Specific Safe Custody and Pledgeholdership Agreement" between himself, UBS AG and UBS SFA on April 3, 2007 in Marysville, Pennsylvania.  Members of the Class signed similar documents.

118.    This Pledgeholdership Agreement makes clear that UBS AG "as lender" and Mr. Knopick "as borrower" have signed the Basic Agreement for Collateral Loans, "which requires [Mr. Knopick] to provide collateral to UBS as security for the performance of the obligations in respect of the Basic Agreement for collateral loans." Id.

119.    According to the Pledgeholdership Agreement, UBS SFA was to provide to UBS AG "on a daily basis [] statements related to the Collateral (type, lending value of individual assets, number and market value of the individual assets as well as account and asset details and account data on a consolidated basis)." Id.

120.    These agreements were illegal and unauthorized under state, federal and international law, in that, among other things, they constituted UBS AG's unregistered, uncertified, unlicensed banking activities in Pennsylvania and elsewhere in the US as it pertains to members of the Class.

121.    The choice of law and forum selection provisions of these illegal, fraudulently induced contracts are unlawful, unreasonable, unconscionable, and unenforceable because of

**AMENDED CLASS ACTION COMPLAINT** – Page 34

illegality.

122.    On November 8, 2013, Mr. Knopick filed a Praecipe for Writ of Summons and served UBS AG via its registered agent for service in Pennsylvania.

123.    On or about May 19, 2013, Mr. Knopick served pre-complaint discovery to UBS AG seeking basic information concerning his accounts, Mr. Knöpfel and the loss of his money.

124.    Instead of responding to Mr. Knopick's pre-complaint discovery, UBS AG objected to the suit on the grounds that, among other things, it was not subject to jurisdiction in Pennsylvania, despite its registered agent for service here, and that UBS AG's forum selection clauses barred Plaintiff's Pennsylvania suit.

125.    Mr. Knopick filed a motion to compel UBS AG's compliance with his pre-complaint discovery.

### E.    PLAINTIFF'S CONTRACT WITH UBS SFA AND PRIOR DISPUTE HISTORY

126.    Based upon the recommendation of Ms. Seifert and UBS FS and their introduction of Mr. Knopick to Mr. Knöpfel, without knowledge that UBS SFA and Mr. Knöpfel were under investigation by the DOJ and SEC, and without knowledge that UBS SFA was created as an act in furtherance of concealing UBS AG's cross-border tax fraud scheme, Mr. Knopick signed the Basic Document for Account/Custody Account Relationship with UBS SFA dated January 23, 2007 and also April 3, 2007 in Marysville, Pennsylvania.  Exhibit C attached hereto, "UBS SFA Contract Documents."  Members of the Class signed similar documents.  For all the reasons stated above regarding the non-disclosure of UBS AG's criminal scheme, the Exhibit C documents are each void because of illegality.

127.    The Basic Document for Account/Custody Account Relationship specifically provided for all correspondence to be "sent to my/our home address" indicated as Marysville,

**AMENDED CLASS ACTION COMPLAINT** – Page 35

Pennsylvania on the form.

128.   The Basic Document for Account/Custody Account Relationship provided, in part:

> I hereby authorize UBS to use all or part of the funds available at any given time in my UBS account to make investments on a fiduciary basis in the name of UBS, but for my account and at my risk.

Id.

129.   The Basic Document for Account/Custody Account Relationship provided, in part:

> The present agreement and/or Declaration shall be exclusively governed by and construed in accordance with Swiss law.  . . . [T]he exclusive place of jurisdiction for any disputes arising out of an in connection with the present Agreement and/or Declaration shall be Zurich, Switzerland.  UBS reserves the right, however, to take legal action against the Undersigned before the authority of his/her domicile or before any other competent authority, in which even exclusively Swiss law shall remain applicable.

> Id. (emphasis in original)

130.   The Basic Document for Account/Custody Account Relationship was signed by Ms. Knöpfel and UBS SFA and noted the "account opening" was "by correspondence."

131.   The UBS SFA Contract Documents included an Asset Management Agreement. See Exhibit C attached hereto.  The Asset Management Agreement required UBS SFA to manage Mr. Knopick's assets according to his "Program Specification," which should have included a "Selected Program", "Investment Strategy", "Reference Currency" and "Specific Investment Instructions."   Members of the Class signed similar documents.

132.   The Asset Management Agreement gave UBS SFA "absolute discretion" to buy and sell assets and "carry out investments on a fiduciary basis in all countries and currencies, execute all types of transactions, decide on investment timing, and "carry out all and any other transactions for your account as it may from time to time determine."  See Exhibit C, Asset

**AMENDED CLASS ACTION COMPLAINT** – Page 36

Management Agreement, paragraph 1.5, p. 1.

133.   The UBS SFA Contract Documents included a "Portfolio Management International" form purporting to provide Mr. Knopick's "Investment Strategies", Risk Tolerance and "Selected Investment Strategy."  Exhibit C, Portfolio Management International. The section entitled "Investment Strategies" was not filled out.  Mr. Knopick indicated above average risk tolerance and a "growth" investment strategy.   The Portfolio Management International form is signed by Mr. Knopick and Mr. Knöpfel and Mr. Knöpfel's signature indicates Mr. Knopick signed it in his presence or the signature was verified.  Members of the Class signed similar documents.

134.   While the "Investment Strategy" section of the Portfolio Management International form was not filled out, Mr. Knopick told both Mr. Knöpfel and Ms. Seifert his investment strategy – to purchase assets with dividends that cover the interest on the margin loans. The Basic Document for Account/Custody Account Relationship had attached to it a copy of Mr. Knopick's passport, with a notary public's attestation of authenticity from Perry County, Pennsylvania, along with a UBS form entitled Verification of the Beneficial Owner's Identity, which was signed by Mr. Knöpfel (indicating his affiliation with UBS SFA), Mr. Wittmer and Mr. Mottet.  Id.

135.   The UBS SFA Contract Documents included a Portfolio Management Asia Opportunities form.  The "Investment Strategies" section of the form was not filled out.  The "Risk Tolerance" section indicated above average risk tolerance and the "Selected Investment Strategy" indicated "Equity."   This document also indicates it was signed in Mr. Knöpfel's presence or the signature was verified.

136.   The UBS SFA Contract Documents include the Client Privacy Notice and

**AMENDED CLASS ACTION COMPLAINT** – Page 37

Disclosure Statement for Discretionary Programs.  See Exhibit C.

137.    Section 2 of the Client Privacy Notice and Disclosure Statement recites "UBS SFA's Fiduciary Responsibilities as a Registered Investment Advisor", which include acting in the client's best interests and in the event of a conflict of interest, UBS SFA must place the client's interests before its own, along with disclosing such conflicts to the client and that UBS SFA must treat all clients fairly and equitably and cannot advantage one client over another, and that the investment decisions or recommendations UBS SFA makes for the client must be suitable and appropriate for the client and *"consistent with the client's investment objectives and goals."*  Exhibit C, Disclosure Statement, Section 2.

138.    According to the Disclosure Statement, the minimum fee UBS SFA obtained for management of Mr. Knopick's UBS Portfolio Management International Account was CHF14,500, but was likely as high as CHF19,575 annually.

139.    According to the Disclosure Statement, the minimum fee UBS SFA obtained for management of Mr. Knopick's UBS Portfolio Management Asian Opportunities account was CHF18,500, but was likely as high as CHF30,525 per year.

140.    While UBS SFA disclosed some of its conflicts of interest in the Disclosure Statement, UBS SFA did not disclose that in 2007 through 2009, it was being investigated by the DOJ and SEC for its involvement in the cross-border tax evasion scheme.  UBS SFA did not disclose that its purpose in obtaining US financial advising clients who properly reported their tax information was to disguise the cross-border tax evasion scheme.  UBS SFA did not disclose that the provision of loans and acceptance of deposits by UBS AG was in violation of state, federal and international banking laws for, among other things, unregistered, uncertified, unlicensed banking activities in Pennsylvania and elsewhere in the US as it relates to other Class

Members.

141.   Further UBS SFA and Mr. Knöpfel held themselves out as experts in international investment strategy, when in reality they were never selling investment strategy, they were selling secrecy for their cross-border tax evasion clients. Members of the Class were similarly treated.

142.   Because of the non-disclosure of the admitted criminal scheme described above, the contracts, or at a minimum, the choice of law and forum selection provisions of these contracts are unlawful, unreasonable and unconscionable.

143.   On November 8, 2013, Mr. Knopick filed a Praecipe for Writ of Summons and served UBS AG via its registered agent for service in Pennsylvania.

144.   On or about July 20, 2014, the Writ was duly served upon UBS SFA pursuant to the Hague Convention.

145.   In September or October, 2008, UBS SFA and Mr. Elste first contacted Mr. Knopick to inform him that his portfolio may be liquidated to pay margin calls.  The margin loans being called were made to Mr. Knopick by UBS AG.  UBS AG violated law and its internal policies by engaging in unreported, unregistered, unlicensed banking activities in relation to Mr. Knopick and other Members of the Class.  The U.S. Senate Permanent Subcommittee on Investigations reported that while "UBS AG is licensed to operate as a bank and broker-dealer in the United States, those licenses do not extend to its non-U.S. offices or affiliates providing banking or securities services to U.S. residents.[2]   UBS AG internal documents provided to the U.S. Senate echo that UBS AG's U.S. licenses "do not permit non-U.S. offices or affiliates of UBS AG to provide banking or securities services to U.S. residents,"

_____

[2] *Tax Haven Banks and U.S. Tax Compliance*, Staff Report, U.S. Senate Permanent Subcommittee on Investigations at 89, July 17, 2008.

**AMENDED CLASS ACTION COMPLAINT** – Page 39

and that U.S. licenses "do not encompass cross-border services provided to U.S. residents by UBS AG offices or affiliates outside of the United States."[3]

146.    Upon information and belief, UBS AG's unlawful banking relationships with U.S. citizens were routine and were facilitated by UBS FS brokers and investment advisers who referred their U.S. customers to UBS AG, resulting in either personal meetings with UBS AG bankers in the U.S., or contacts with UBS AG through the instrumentalities of interstate commerce in the U.S, all facilitated and/or managed by the Global Referral Desk in Weehawken, New Jersey.  Mr. Knopick was required to wire his account opening deposit with UBS SFA to UBS AG, and UBS SFA required that his margin account be opened at UBS AG.  Thus, in order to do business with the SEC-registered investment adviser, UBS SFA, Mr. Knopick and similarly situated class members were required to do business with UBS AG, which was engaging in unlawful banking with U.S. citizens.

147.    On information and belief, the concert of action between UBS FS, Ms. Seifert and other brokers, the Global Referral Desk, UBS SFA, Mr. Knöpfel and other advisors, UBS AG, and its management was known to and communicated to, if not directly operated by, senior management of each of those entities.

148.    At some point between August and October, 2008, Mr. Knöpfel left his job and was replaced by Mr. Elste, but Mr. Elste later concealed from Mr. Knopick all details regarding as to when and why his fiduciary advisor Mr. Knöpfel simply vanished.  As Mr. Knopick's fiduciaries, UBS AG, UBS FS, Ms. Seifert, UBS SFA and Ms. Elste were obligated to inform Mr. Knopick why Mr. Knöpfel was removed and whether he had engaged in misconduct. Members of the Class were similarly situated as it pertained to their UBS fiduciary counterparts, including UBS FS brokers around the country.

---

[3] *Id.*, Ex. 86 at 2, document PSI-OPB-0000269; Ex 85 at 1, document PSI-OPB-0000103.

**AMENDED CLASS ACTION COMPLAINT** – Page 40

149.    As the debt and equity markets melted down in late 2008, UBS SFA and Mr. Elste continued to liquidate Mr. Knopick's portfolio, and upon information and belief, the portfolios of other similarly situated class members, at fire sale prices to satisfy UBS AG's margin calls.  UBS SFA dissuaded Mr. Knopick and other similarly situated class members from withdrawing their remaining money promptly, ostensibly to feed UBS AG's appetite for margin calls (even though it had made the loans unlawfully) and/or to aid in the cover up of the cross-border tax fraud scheme.  In the end, Mr. Knopick's $12+ million investment and all of his gains were whittled to roughly $900,000, as were the portfolios of similarly situated class members.

150.    When Mr. Knopick later asked Ms. Seifert to explain how Mr. Knöpfel could have lost virtually all of his money, Ms. Seifert said that it appeared that Mr. Knöpfel was "gone" and so was Mr. Knopick's money, and that she had observed that in such circumstances, UBS FS or other UBS AG entities typically made the customer whole.  Ms. Seifert's candid admission convinced Mr. Knopick that Ms. Seifert had learned that Mr. Knöpfel had taken Mr. Knopick's money.  Whether Mr. Knöpfel actually misappropriated Mr. Knopick's money is unknown, as UBS AG, UBS FS, Ms. Seifert, and UBS SFA and Mr. Elste have provided no further explanation to Mr. Knopick and have resisted all attempts to obtain additional information.  Given the concert of action between the companies in the UBS AG empire, it is obvious that UBS FS and Ms. Seifert and other UBS FS brokers have access to information regarding Mr. Knöpfel's disappearance and Mr. Knopick's losses, but have chosen to conceal the information from Mr. Knopick.  UBS FS, Ms. Seifert, UBS AG and UBS SFA have all been uncooperative with Mr. Knopick's efforts to obtain the complete file related to his accounts, and have taken preposterous and groundless litigation positions in efforts to avoid providing discovery or litigating in the U.S. (despite being a registered investment advisor).

**AMENDED CLASS ACTION COMPLAINT** – Page 41

151.   In addition, UBS FS and Ms. Seifert have concealed, and continue to conceal, from Mr. Knopick and other similarly situated class members, including current and continuing customers, that:

i)   UBS AG was under criminal investigation in September, 2007, for, among other things, illegal cross-border business with US citizens, a fact that UBS AG learned from the Department of Justice ("DOJ") in 2007 when DOJ informed UBS AG that it had received information about the cross-border tax fraud scheme from Mr. Birkenfeld, a former UBS AG private banker;

ii)   UBS AG was contacted by the SEC in December, 2007, regarding UBS AG's cross-border tax scheme;

iii)   Prior to May, 2008, the government had detained in Florida a senior UBS AG private banking official from Switzerland, allegedly seizing his computer and other evidence;

iv)   In May, 2008, the government arrested a private banker formerly employed by UBS AG on charges of conspiracy to defraud the IRS of $7.2 million in taxes on $200 million in hidden assets;

v)   In June, 2008, Mr. Birkenfeld pleaded guilty to conspiracy to defraud the IRS;

vi)   The remaining facts of the conspiracy, as alleged in paragraphs 1-150 above;

vii)   In February, 2009, UBS AG entered into a Deferred Prosecution Agreement with the DOJ and paid $780 million in order to escape prosecution;

viii)   Former members of UBS SFA's Wealth Management Consulting team, and Knöpfel's co-workers, Mr. Gadola and Mr. Bagios have been convicted of conspiracy to defraud the United States.

152.   The facts concealed from Mr. Knopick and other similarly situated class members by UBS FS and Ms. Seifert and their co-conspirators regarding UBS AG's and UBS SFA's criminal conduct and, in 2007 until February, 2009, the facts regarding the possibility of indictment of UBS AG, its Executives, Managers, Desk Heads and Bankers, and the range of

**AMENDED CLASS ACTION COMPLAINT** – Page 42

possible punishment, and the possible consequences to Mr. Knopick, were material facts to Mr.

Knopick and other similarly situated class members, as they would be to any reasonable investor.

UBS FS and Ms. Seifert and other UBS FS brokers had, and have, a duty to disclose these facts

to Mr. Knopick and other similarly situated class members and, had these facts been known to

Mr. Knopick and the class members, they would never have entered into an investment

agreement with UBS SFA or banking activities with UBS AG.  They are entitled to rescind their

alleged agreements with UBS SFA and UBS AG and, because UBS FS and Ms. Seifert and other

UBS FS brokers caused them to enter those agreements through their inducement and omissions

of material facts, they are responsible for all of the damages Plaintiff and other Class members

have suffered, including but not limited to the amount of the rescission claims of Mr. Knopick

and other similarly situated class members.

153.    UBS FS and Ms. Seifert and other UBS FS brokers' fraudulent concealment of

facts from Mr. Knopick and other similarly situated class members is an independent and

actionable breach of duty, and requires application of the discovery rule to toll the running of any

period of limitations, laches, or estoppel.  In addition, UBS FS and Ms. Seifert and other UBS FS

broker's concealment of material facts entitles Mr. Knopick and other similarly situated class

members to rescind any transaction that Defendants induced them enter, and Defendants are

liable for all losses Mr. Knopick other similarly situated class members incurred as a result of

those transactions.

154.    Mr. Knopick brings his claims regarding UBS FS and Ms. Seifert and other UBS

FS brokers' unlawful referral of him and other Class members to UBS SFA and UBS AG as an

individual claim and as a class action comprising all customers of UBS AG and UBS SFA

similarly situated; *i.e.* persons unlawfully referred to UBS AG and UBS SFA who provided

Form W-9 information and who did not have an undeclared securities account at UBS AG, from 2000 to 2010.  The number of UBS FS customers that were referred to UBS SFA and required to do business with UBS AG, or directly to UBS AG, when UBS AG was prohibited by law and internal policy from providing unreported, unlicensed, unregistered banking services to U.S. citizens is so numerous that joinder of all members is impracticable in this proceeding.  There are questions of law or fact common to the class; *inter alia,* whether UBS FS, its employees and/or the Global Referral Desk wrongfully referred U.S. citizens to UBS AG and UBS SFA when UBS AG was prohibited by law and internal policy from providing banking services to U.S. citizens and UBS AG and UBS SFA were under investigation by the DOJ and SEC for the cross-border tax fraud scheme and whether those customers are entitled to rescind their contracts and receive their money back.  Mr. Knopick's claims are typical of the claims of the class; Mr. Knopick sought only to open a securities account that offered margin lending and he was forced to do business with UBS AG and UBS SFA, which was formed as a part of the cross-border tax fraud scheme.  Mr. Knopick is a suitable class representative and will fairly and adequately protect the interests of the class.

## VI.    CLASS ACTION ALLEGATIONS

155.    Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all others similarly situated.

156.    Plaintiff represents a Class (the "Nationwide Class" or the "Class") initially defined as:

> All persons referred by UBS FS, Ms. Seifert and/or other UBS FS brokers and affiliates to enter into banking contracts with UBS AG and financial advising contracts with UBS SFA, and did so, between 2000 and 2010 who did not have undeclared securities accounts at UBS AG.

**AMENDED CLASS ACTION COMPLAINT** – Page 44

157.   Excluded from the Class are: Officers and directors and employees and family members of officers, directors and employees of UBS FS, UBS AG and UBS SFA.

158.   This action has been brought and may properly be maintained on behalf of the Plaintiff and Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

### A.     Numerosity - Federal Rule of Civil Procedure 23(a)(1)

159.   The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Plaintiffs do not know the exact size or identities of the proposed Class, since such information is in the exclusive control of the Defendants. Thus, the class may consist of three thousand members or more. Therefore, the proposed class is so numerous that joinder of all members is impracticable. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

### B.     Commonality and Predominance - Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)

160.   This action involves common questions of law and fact, which predominate over any questions affecting individual Class and State Subclass members, including, without limitation:

   a.      Whether UBS FS and its employees wrongfully referred U.S. citizens to UBS AG and UBS SFA when UBS AG was prohibited by law and internal policy from providing banking services to U.S. customers;

   b.      Whether UBS FS and its employees wrongfully referred U.S. citizens to UBS AG and UBS SFA when UBS AG and UBS SFA were under investigation by the DOJ and SEC for a cross-border tax fraud scheme and failed to disclose such information to US customers;

**AMENDED CLASS ACTION COMPLAINT** – Page 45

c.      Whether UBS FS and its employees made false and misleading statements to US customers concerning the expertise of UBS SFA and UBS AG in international banking and financial advising;

d.      Whether UBS FS and its employees concealed from US customers that UBS SFA was formed as an act in furtherance of UBS AG's cross-border tax fraud scheme;

e.      Whether those customers are entitled to rescind their contracts and receive their money back;

f.      Whether UBS FS and its employees are liable for the damages incurred by US customers as a result of UBS FS's wrongful conduct.

## C.      Typicality - Federal Rule of Civil Procedure 23(a)(3)

161.    Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendants' wrongful conduct as described above. Plaintiff is a member of the Class and Plaintiff's claims are typical of those of the Class because, among other things, members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal, state and international laws.

## D.  Adequacy of Representation - Federal Rule of Civil Procedure 23(a)(4)

162.    Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other members of the Class he respectively seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The Class interests will be fairly and adequately protected by Plaintiff and his counsel. Plaintiff's interests are consistent with, and not antagonistic to, those of the members of the Class.

## E.      Superiority - Federal Rule of Civil Procedure 23(b)(3)

163.    Class certification pursuant to Rule 23(b)(1) is appropriate because the prosecution of separate actions by individual members of the class would create the risk of

**AMENDED CLASS ACTION COMPLAINT** – Page 46

inconsistent or varying adjudications with respect to individual members of the class, and could substantially impede the ability of other members to protect their interests.

164.    Class certification pursuant to Rule 23(b)(3) is also appropriate because class action treatment is a superior method for the fair and efficient adjudication of the controversy. Common issues predominate over individual issues, and there is no interest by members of the class in individually controlling the prosecution of separate actions.

165.    The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

166.    Without a class action, individual class members would face burdensome litigation expenses, deterring them from bringing suits that would adequately protect their rights. The class action device in this civil RICO action provides access to the courts and a measure of justice and accountability for the individual and business claimants whose incomes, business and properties have been damaged by Defendants' fraudulent and unlawful conduct.

167.    Plaintiff and all Class members seek treble damages for their injury under the federal civil RICO provisions of 18 U.S.C. § 1964(c), including but not limited to economic

damages, cost of the suit, attorney's fees, and any other relief to which they may be entitled in law and/or equity.

## VII.   EQUITABLE TOLLING, DISCOVERY RULE REGARDING STATUTES OF LIMITATIONS

168.   Any applicable statutes of limitations have been tolled by Defendants' illegal, deceptive, and fraudulent practices. Defendants have concealed from Plaintiff and the Class the truth about their illegal, deceptive, and fraudulent practices described herein, thereby tolling the running of any applicable statutes of limitations.

169.   Plaintiffs and members of the Class have been unable to obtain vital information bearing on their claims absent any fault or lack of diligence on their part.  Plaintiff and the other Class members could not reasonably have discovered the fraudulent and unlawful nature of Defendants' conduct.  Many of the facts alleged herein were solely in the possession of the government until the trial of Mr. Weil in October, 2014.  Defendants had actual or constructive knowledge that their conduct was illegal and deceptive, in that they consciously concealed the schemes set forth herein.

170.   Plaintiff and the Class did not have any reason to know of the RICO violations or injuries described herein and did not and could not have known of Defendants' violations of federal, state and international law.  The true facts regarding UBS SFA's formation and role in the UBS AG cross-border tax fraud scheme were not fully revealed until Mr. Leichti testified in the trial of Mr. Weil in October, 2014.  Plaintiff and the Class were relieved of any duty to investigate because they reasonably and justifiably relied on Defendants to fulfill their fiduciary duties. Even assuming there had been some indication of wrongdoing (which there was not), and Plaintiff and the Class had attempted to investigate, such investigation would have been futile because it would not have uncovered the true, unlawful nature of Defendants' criminal enterprise

**AMENDED CLASS ACTION COMPLAINT** – Page 48

and profiteering schemes alleged herein.

171.    The purposes of the statutes of limitations periods are satisfied because Defendants cannot claim prejudice due to a late filing where Plaintiff and the Class filed suit promptly upon discovering the facts essential to their claims, described herein, which Defendants knowingly concealed.  Many of the facts essential to this action were not revealed until the trial of Mr. Weil in October and November, 2014 and Mr. Knopick only learned such facts by sending lawyers to attend the trial of Mr. Weil.  Many of the documents introduced into evidence have still not been released by the government.

172.    Accordingly, Defendants are estopped from relying upon a statute of limitations defense because they purposefully concealed the true nature of the accounts, of UBS SFA, of the Global Referral Desk, and they concealed the fraudulent nature of the loss of monies in the accounts.

173.    The RICO statute of limitations, 15 U.S.C. § 16(i), was tolled from November 6, 2008 to November 3, 2014 during the pendency of the government's prosecution of Raoul Weil in the Southern District of Florida, because this action is based in whole or in part on a matter complained of in the Raoul Weil prosecution and this action was commenced within the period of suspension of the statute of limitations.

## VIII.  **COUNTS**

### **COUNT I - FRAUD**

174.    Plaintiff incorporates by reference each and every paragraph above as if fully set forth herein.

175.    Defendants and other UBS FS brokers represented to Mr. Knopick and similarly situated members of the Class, among other things, that Mr. Knöpfel and other UBS SFA advisors were skilled Swiss investment advisors with significant investment prowess.

176.    Defendants represented to Mr. Knopick and similarly situated members of the Class that, among other things, UBS SFA and UBS AG had expertise in international banking and investing, would act in the best interest of the client in making investment decisions and that their investments would be consistent with the client's objectives and goals, knowing such representations to be false because UBS AG and UBS SFA did not sell investment services, they sold secrecy.

177.    Defendants failed to disclose to Mr. Knopick and similarly situated members of the Class that, among other things, UBS SFA and UBS AG were being investigated by the DOJ and SEC for a cross-border tax evasion scheme and that one of their purposes in obtaining additional US customers was to facilitate the cross-border tax evasion scheme; failed to disclose to Mr. Knopick and similarly situated members of the Class that, among other things, UBS AG was not registered or licensed for banking activities in Pennsylvania or other states in the US and that UBS AG did not properly report tax information and other information to US authorities; and failed to disclose to Mr. Knopick and similarly situated members of the Class that UBS SFA was organized in furtherance of the cross-border tax fraud scheme.

178.    Defendants' representations were false, and information necessary to make other statements accurate was omitted to mislead Mr. Knopick and similarly situated members of the Class.

179.    Upon information and belief, Defendants made these misrepresentations (and omissions) with knowledge of their falsity, reckless disregard for their truth, or without

**AMENDED CLASS ACTION COMPLAINT** – Page 50

reasonable grounds for believing the representations to be true when they were made in order to induce Plaintiff and similarly situated members of the Class to invest and bank with UBS AG and UBS SFA and increase Defendants', or UBS AG's and UBS SFA's profits and fees.

180.    Defendants intended that Mr. Knopick and similarly situated members of the Class would rely on the misrepresentations (and be unaware of the omissions) in deciding whether to invest money and bank with UBS AG and UBS SFA.

181.    Mr. Knopick and similarly situated members of the Class reasonably and justifiably relied on Defendants' misrepresentations and other representations that were misleading in light of omissions, and, as a result, invested with UBS AG and UBS SFA.

182.    UBS AG and UBS SFA, with the knowledge of UBS FS and its employees, thereafter squandered Plaintiff's approximate $12 million investment and the investments of similarly situated members of the Class. Such fraud directly and proximately caused Plaintiff and similarly situated members of the Class substantial damages, as set forth above.

WHEREFORE, Plaintiff and similarly situated members of the Class respectfully requests that this Court enter judgment in their favor and against Defendants awarding Plaintiff and similarly situated members of the Class compensatory damages in an amount in excess of $5,000,000, punitive damages, costs, interest and such other and further relief as this Court may deem just and equitable.

## COUNT II - GROSS NEGLIGENCE

183.    Plaintiff incorporates by reference all of the paragraphs above as if fully set forth herein.

184.    Defendants owed Plaintiff and similarly situated members of the Class a duty to act with due care in carrying out any transactions on their behalf and/or in identifying,

**AMENDED CLASS ACTION COMPLAINT** – Page 51

structuring, analyzing or effectuating any investments on their behalf. Defendants owed Plaintiff and similarly situated members of the Class a duty to abide by state, federal and international banking and reporting laws and requirements. Defendants owed Plaintiff and similarly situated members of the Class a duty to put their interests above the interests of Defendants and their affiliates.

185.    Mr. Knopick clearly explained his investment strategy of investing in blue chip common stocks with high dividend yields and using those dividends to make interest payments on margin loans used, in part, to fund securities purchases, to Mr. Knöpfel. Members of the Class similarly explained their investment strategies to UBS FS brokers and UBS SFA advisors.

186.    However, Defendants knew Mr. Knöpfel ignored Mr. Knopick's specific instructions and invested Mr. Knopick's money wildly and recklessly, trading his dollars into foreign currencies and purchasing an inexplicable collection of stocks and bonds denominated in those foreign currencies. Mr. Knöpfel and other UBS SFA advisors similarly disregarded the instructions of similarly situated members of the Class.

187.    Mr. Knöpfel was never authorized by Mr. Knopick to purchase bonds for Mr. Knopick's account, or to invest contrary to Mr. Knopick's time-proven strategy. Mr. Knöpfel and other UBS SFA advisors were similarly never authorized by members of the Class to deviate from their investment strategies.

188.    Defendants owed Plaintiff and similarly situated members of the Class a duty to ensure that UBS SFA made investment decisions suitable and appropriate for them and consistent with their investment objectives and goals.

189.    Defendants also owed Plaintiff and similarly situated members of the Class a duty to exercise reasonable care in disclosing information material to their investments, including

**AMENDED CLASS ACTION COMPLAINT** – Page 52

disclosing that UBS AG and UBS SFA were under investigation by the DOJ and SEC for a cross-border tax fraud scheme and that US customer accounts were used to facilitate the scheme and that UBS SFA was organized in furtherance of the cross-border tax fraud scheme and was not in the business of selling investment advice, it was in the business of protecting UBS AG's business of selling secrecy.

190.    However, Mr. Knöpfel and his assistant routinely told Mr. Knopick, in telephone calls from Switzerland to Pennsylvania and elsewhere in the U.S., that his investments were performing well, and consistently concealed from Mr. Knopick that 1) his money had been invested against his instructions and 2) his account was excessively leveraged and 3) that his banking relationship with UBS AG was unlawful, unregistered and unreported and was being used as cover for UBS SFA's "black accounts". Members of the Class received similarly false information from their UBS SFA advisors.

191.    Further, when Mr. Knöpfel was removed from his job and replaced by Mr. Elste, Defendants concealed from Mr. Knopick all details regarding when and why his fiduciary advisor simply vanished.  Members of the Class received similar treatment.

192.    Additionally, as the debt and equity markets melted down in late 2008, UBS SFA continued to liquidate Mr. Knopick's portfolio at fire sale prices to satisfy UBS AG's margin calls and Defendants dissuaded Mr. Knopick from withdrawing his money promptly.  Members of the Class received similar treatment.

193.    Defendants grossly breached their duties by misrepresenting material information and recklessly and wantonly failing to manage the funds of Plaintiff and similarly situated members of the Class according to their instructions and with due care, as well as with commercial standards and practices followed by the investment industries.

**AMENDED CLASS ACTION COMPLAINT** – Page 53

194.    As a direct and proximate result of Defendants' gross negligence, Plaintiff and similarly situated members of the Class suffered substantial monetary damages.

WHEREFORE, Plaintiff and similarly situated members of the Class respectfully request that this Court enter judgment in his favor and against Defendants awarding Plaintiff and similarly situated members of the Class compensatory damages in an amount in excess of $5,000,000, punitive damages, costs, interest and such other and further relief as this Court may deem just and equitable.

## COUNT III - BREACH OF FIDUCIARY DUTY

195.    Plaintiff incorporates by reference each and every one of the paragraphs above as if fully set forth herein.

196.    Defendants provided brokerage and investment advisory services to Mr. Knopick beginning in January 2007.  As a result of that relationship, Defendants owed fiduciary duties to Mr. Knopick, which required Defendants to put Mr. Knopick's interests ahead of their own, and discharge the duties of care, loyalty, and good faith.  Members of the Class were similarly situated.

197.    Further, the contract documents with UBS SFA specifically state that UBS SFA will invest the funds in Plaintiff's UBS account on a fiduciary basis.  See Exhibit "C" (Basic Document for Account/Custody Account Relationship).  Members of the Class were similarly situated.

198.    Additionally, UBS SFA has multiple "Fiduciary Responsibilities as a Registered Investment Adviser" which include, but are not limited to: (a) "UBS SFA must act in what it reasonably believes to be in the Client's best interests and in the event of a conflict of interest, UBS-SFA must place the Client's interests before its own"; (b) "UBS-SFA is obligated to disclose to the Client all material conflicts between the Client's and UBS-SFA's interests"; and

**AMENDED CLASS ACTION COMPLAINT** – Page 54

(c) "The investment decisions or recommendations UBS-SFA makes for the Client must be suitable and appropriate for the Client and consistent with the Client's investment objectives and goals" See Exhibit B.  Members of the Class were similarly situated.

199.    Defendants owed fiduciary duties of loyalty, care, and good faith to Plaintiff and similarly situated members of the class.

200.    Mr. Knopick and members of the Class carefully explained their investment strategy when they opened their accounts.

201.    Mr. Knöpfel ignored Mr. Knopick's instructions and invested Mr. Knopick's money wildly and recklessly, trading his dollars into foreign currencies and purchasing an inexplicable collection of stocks and bonds denominated in those foreign currencies.  Mr. Knöpfel was never authorized by Mr. Knopick to purchase bonds for Mr. Knopick's account, or to invest contrary to Mr. Knopick's time-proven strategy.  Members of the Class were similarly treated by Mr. Knöpfel and other UBS SFA advisors and UBS FS Brokers.

202.    Further, and as stated above, at some point between August and October 2008, it appears that Mr.  Knöpfel was removed from his job and replaced by Mr. Elste, but UBS FS, UBS SFA, UBS AG and Mr. Elste concealed from Mr. Knopick all details regarding when and why his fiduciary advisor Mr. Knöpfel simply vanished.  Members of the Class were similarly treated.

203.    As Mr. Knopick's fiduciaries, Defendants were obligated to inform Mr. Knopick when and why Mr. Knöpfel was removed and whether he had engaged in misconduct, as well as the fact that UBS AG and UBS SFA were under investigation by the SEC and DOJ for cross-border tax fraud and that UBS AG was not licensed or registered to engage in banking activities

**AMENDED CLASS ACTION COMPLAINT** – Page 55

in the US and did not report such activities in contravention of state, federal and international law.

204.     Additionally, as the debt and equity markets melted down in late 2008, UBS SFA continued to liquidate Mr. Knopick's portfolio at fire sale prices to satisfy UBS AG's margin calls.  UBS SFA dissuaded Mr. Knopick from withdrawing his money promptly, ostensibly to feed UBS AG's appetite for margin calls.  Members of the Class were similarly treated.

205.     By their actions set forth above, Defendants breached their fiduciary duties owed to Mr. Knopick and similarly situated members of the Class.

206.     Defendants breached their fiduciary duties by misrepresenting material information, both before Mr. Knopick invested in UBS SFA and banked with UBS AG and during the course of the parties' relationship, and failing to ensure management of Mr. Knopick's investment in accordance with his wishes and instructions, as well as the standards and practices followed by the investment industries.  Defendants also breached their fiduciary duties by concealing from Mr. Knopick that UBS SFA and UBS AG were under investigation for cross-border tax fraud by the SEC and DOJ and that UBS AG was not licensed or registered for banking activities in the US and failed to properly report such activities in contravention of state, federal and international law.  Members of the class were similarly treated.

207.     The above-alleged breaches of fiduciary duties were undertaken and committed by Defendants intentionally and in bad faith, by willful misconduct, and in knowing disregard of the rights of Plaintiff and similarly situated members of the Class.

208.     As a direct and proximate result of Defendants' breaches, Plaintiff and similarly situated members of the Class have suffered substantial monetary damages.

WHEREFORE, Plaintiff and similarly situated members of the Class respectfully request that this Court enter judgment in their favor and against Defendants awarding Plaintiff and similarly situated members of the Class compensatory damages in an amount in excess of $5,000,000, punitive damages, costs, interest and such other and further relief as this Court may deem just and equitable.

## COUNT IV - UNJUST ENRICHMENT

209.    Plaintiff incorporates all preceding paragraphs, as if fully set forth herein.

210.    Plaintiff and similarly situated members of the Class invested money with UBS AG and UBS SFA as a result of Defendants' misrepresentations.

211.    Defendants knew that the reason Plaintiff and similarly situated members of the Class invested with UBS AG and UBS SFA was the misrepresentations made by Defendants.

212.    Defendants have taken significant monies from Plaintiff and similarly situated members of the Class for their use and benefit, to the detriment of Plaintiff.

213.    Defendants misappropriated Plaintiff's approximate $12 million investment for their own use and benefit.

214.    Defendants have been unjustly enriched by wrongfully using Plaintiff's investment funds for their own purposes, to Plaintiff's detriment, as Plaintiff lost his significant investment in a span of less than three weeks.

215.    Allowing Defendants to retain such funds taken from Plaintiff would be unjust and inequitable.

216.    The Court should require Defendants to repay any and all monies that they took from Plaintiffs for their own use and benefit.

**AMENDED CLASS ACTION COMPLAINT** – Page 57

WHEREFORE, Plaintiff and members of the Class respectfully request that this Court enter judgment in their favor and against Defendants awarding Plaintiff and members of the Class compensatory damages in an amount in excess of $5,000,000, punitive damages, costs, interest and such other and further relief as this Court may deem just and equitable.

## COUNT V - BREACH OF CONTRACT

217    Plaintiff incorporates by reference all preceding paragraphs, as if fully set forth herein.

218.    Plaintiff entered into a written contract with Defendants that established his relationship with Defendants. At a minimum, that contract required Defendants to act in Mr. Knopick's interest, in good faith, and to deal honestly with Mr. Knopick. Members of the Class entered similar contracts.

219.    Defendants were required by contract to, among other things, make investments on a fiduciary basis and disclose material information and avoid conflicts of interest.

220.    However, Defendant Mr. Knöpfel, and other UBS SFA advisors, ignored Mr. Knopick's and other Class member's instructions and invested their money wildly and recklessly, trading dollars into foreign currencies and purchasing an inexplicable collection of stocks and bonds denominated in those foreign currencies. Mr. Knöpfel and the other UBS SFA advisors were never authorized by Mr. Knopick and other Class members to purchase bonds for Mr. Knopick's account, or to invest contrary to Mr. Knopick's time-proven strategy or other Class member's instructions.

221.    Further, in late 2008, UBS SFA continued to liquidate Mr. Knopick's portfolio at fire sale prices to satisfy UBS AG's margin calls.  UBS SFA dissuaded Mr. Knopick from withdrawing his money promptly, ostensibly to feed UBS AG's appetite for margin calls. Members of the Class were treated similarly.

**AMENDED CLASS ACTION COMPLAINT** – Page 58

222. In a matter of weeks, Mr. Knopick's $12+ million investment was whittled to approximately $900,000. Members of the Class had similar results.

223. By their actions set forth above, Defendants failed to perform under their contracts with Plaintiff and the Class members.

224. Defendants' failure to perform their duties under their contracts was without justification and/or excuse, and constituted a total and material breach of the contract between the parties.

225. Plaintiff and the Class members gave consideration that was fair and reasonable, and have performed all conditions, covenants, and promises required to be performed under their contracts with Defendants.

226. As a result of Defendants' breach of the contract, Plaintiff and Class members suffered and will continue to suffer reasonable and foreseeable consequential damages resulting from such breach, including the loss of his investment monies.

227. As a direct and proximate result of Defendants' breach of contract, Plaintiff and class members have suffered substantial monetary damages.

WHEREFORE, Plaintiff and the Class respectfully request that this Court enter judgment in their favor and against Defendants awarding Plaintiff and the Class compensatory damages in an amount in excess of $5,000,000, punitive damages, costs, interest and such other and further relief as this Court may deem just and equitable.

### COUNT VI - VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73. P.S. § 201-2(XXI)

228. Plaintiff incorporates by reference all of the above paragraphs, as if fully set forth herein.

**AMENDED CLASS ACTION COMPLAINT** – Page 59

229.   At all relevant times material hereto, Defendants conducted trade and commerce within the meaning of the Pennsylvania Unfair Trade Practices & Consumer Protection Law ("UTPCPL")

230.   Plaintiff and each Class member is a "person" as defined and construed under the UTPCPL.

231.   Defendants and other UBS FS brokers violated the UTPCPL as Mr. Knopick and the Class are persons who purchased services for their personal purposes, and UBS FS, Ms. Seifert and other UBS FS brokers, UBS AG, UBS SFA, Mr. Knöpfel, and Mr. Elste engaged in unfair or deceptive acts and practices, which include representing that the services had characteristics that they did not have and by engaging in fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding, including all of the allegations set forth in this Complaint.

232.   Defendants introduced Mr. Knöpfel to Mr. Knopick and encouraged Mr. Knopick to entrust his money to Mr. Knöpfel.   Defendants held Mr. Knöpfel out as qualified and responsible, initially blamed Mr. Knopick's losses on Mr. Knöpfel's misappropriation, and then refused to provide further truthful information to Mr. Knopick, all as alleged above.   Defendants failed to ensure management of Mr. Knopick's investment in accordance with his wishes and instructions, as well as the standards and practices followed by the investment industries. Defendants concealed from Mr. Knopick that UBS SFA and UBS AG were under investigation for cross-border tax fraud by the SEC and DOJ, that UBS SFA was organized in furtherance of the cross-border tax fraud scheme, and UBS AG and UBS SFA were using UBS SFA accounts such as Mr. Knopick's for cover and that UBS AG was not licensed or registered for banking

activities in the US and failed to properly report such activities in contravention of state, federal and international law. Members of the class were similarly treated.

233.   Defendants' conduct as set forth above and herein constitutes an unconscionable commercial practice comprised of deceptive acts of practices in violation of the UTPCPL, 73 P.S. § 201-2(xxi).

234.   Plaintiff and the Class suffered actionable and ascertainable losses of money as a result of Defendants' unconscionable, deceptive and/or unfair trade practices, including, but not limited to, the actions as described above and incorporated herein by reference.

235.   As a direct and proximate result of Defendants' violation of the UTPCPL, Plaintiff and the Class have suffered substantial monetary damages, in the amount of their losses, and the attorney's fees they have incurred in pursuing their claims, and the willful and malicious nature of the conduct involved justifies an additional award of treble damages and exemplary damages to the extent allowed by law.

WHEREFORE, Plaintiff and the Class respectfully request that this Court enter judgment in their favor and against Defendants awarding Plaintiff and the Class compensatory damages in an amount in excess of $5,000,000 punitive damages, costs, interest and such other and further relief as this Court may deem just and equitable.

## COUNT VII - VIOLATION OF NEW YORK
## GENERAL BUSINESS LAW § 349

236.   Plaintiff incorporates by reference all of the above paragraphs, as if fully set forth herein.

237.   Defendants and other UBS FS brokers violated, and continue to violate through their deceptive concealment of facts, New York General Business Law § 349 as follows: (i) Mr. Knopick and the Class members dealt with UBS FS and Ms. Seifert and other UBS FS brokers as

**AMENDED CLASS ACTION COMPLAINT** – Page 61

consumers, and UBS FS and Ms. Seifert and other UBS FS brokers engaged in consumer-oriented misconduct which was, and is, deceptive and materially misleading to a reasonable consumer, (ii) UBS FS and Ms. Seifert and other UBS FS brokers engaged, and continue to engage, in acts or practices that were, and are, misleading in a material respect, and (iii) Mr. Knopick and the Class were injured as a result of the deceptive acts or practices, all as alleged above.

238.    Mr. Knopick and the Class have suffered actual damages by Defendants' wrongful conduct in the amount of their losses incurred at UBS SFA and UBS AG and the attorney's fees they incurred in pursuing their claims. The willful and malicious nature of the conduct involved justifies an additional award of treble damages, exemplary damages to the extent allowed by law, and attorney's fees.

WHEREFORE, Plaintiff and the Class respectfully request that this Court enter judgment in their favor and against Defendants awarding Plaintiff and the Class compensatory damages in an amount in excess of $5,000,000, punitive damages, costs, interest and such other and further relief as this Court may deem just and equitable.

## COUNT VIII - RICO VIOLATION 18 U.S.C. 1962(C)

239.    Plaintiff incorporates by reference the allegations contained in all of the preceding paragraphs above as though set forth in their entirety.

240.    In or about 2007 to 2009, in the Eastern District of Pennsylvania and elsewhere, Defendants, being persons employed by and associated with an enterprise as described more fully in the following paragraphs, which enterprise was engaged in, and the activities of which affected interstate and foreign commerce, did unlawfully and knowingly conduct and participate,

directly and indirectly in the conduct of the enterprise's affairs through a pattern of racketeering as set forth in the following paragraphs.

## A.    RICO ENTERPRISE

241.    At all times relevant to this complaint, Defendants, including agents and employees of the Defendants and UBS AG and UBS SFA, Executives, Managers, Desk Heads, Bankers and CAs, certain U.S. customers of UBS AG holding undeclared or "black" accounts, certain professionals who advised UBS AG customers in the creation of "structures" (foundations or corporations in traditional tax-haven jurisdictions), and certain professionals who assisted in the creation and registration of UBS SFA (i) without establishing a lawful U.S. banking facility and (ii) using a third-party Swiss outsourcing partner to place back-office operations beyond SEC scrutiny, collectively, have constituted an "enterprise" as that term is defined in 18 U.S.C. §1961(4), that is, a group of business entities or individuals associated in fact, which included UBS AG, together with UBS SFA and UBS FS which were controlled by UBS AG, and others as alleged herein.  Defendants and UBS AG, UBS SFA, and UBS FS participated in the operation and management of the enterprise, collectively referred to herein as the "UBS Enterprise."

242.    The purpose and objective of the enterprise included maximizing gain and profit by engaging in financial services through both lawful and unlawful means.  UBS AG, UBS FS, UBS SFA, and their agents engaged in unlawful conduct by using the UBS Enterprise to further a fraudulent scheme of conspiring to defraud the U.S. through tax fraud and by causing false and misleading information to be disseminated to account holders, all by mail, email, interstate wires, and interstate carriers regarding the investors' accounts.

## B.    MEANS AND METHODS OF THE ENTERPRISE

243.    The means and methods by which the Defendants and their associates conducted

**AMENDED CLASS ACTION COMPLAINT** – Page 63

and participated in the conduct of the affairs of the enterprise included but were not limited to the following:

a.   UBS AG Executives, Managers, Desk Heads, and Bankers used nominee entities, encrypted laptops, numbered accounts, and other counter surveillance techniques to conceal the identities and offshore assets of certain United States clients;

b.   UBS AG CAs travelled with laptops equipped with a secret second hard drive to avoid detection by U.S. authorities while traveling in the United States;

c.   UBS AG CAs carried business cards without any reference to any UBS entity and without any UBS markings while traveling to the United States;

d.   UBS AG CAs removed names, account numbers, and UBS AG logos from bank statements while on travel to the United States, so that if observed by United States authorities, the statements could not be linked to UBS AG or to any client;

e.   UBS AG printed sanitized account statements with no client name, account number, or reference to UBS AG to send to customers in the U.S.;

g.   UBS AG referred customers, known to UBS AG to be concealing assets and income from the IRS, to lawyers and accountants who formed "structures," or entities, designed to conceal the beneficial owner of assets at UBS AG;

h.   UBS AG violated the terms of its QI Agreement with the U.S. by concealing information in order to further the conspiracy to defraud the U.S.;

i.   UBS AG organized UBS SFA in a manner designed to conceal information regarding UBS AG's conspiracy to defraud the U.S., and thus protect the conspirators, through the registration with the SEC of UBS SFA as an Investment Advisor, the use of UBS AG as the depository institution and Wegelin & Co. as the back-office service provider.

## C.   **PATTERN OF RACKETEERING (MAIL FRAUD)**

244.   The Defendants' pattern of racketeering activity consists of multiple acts of mail fraud under 18 U.S.C. §1341, in that from May 9, 2007 to June 4, 2009, in the Eastern District of Pennsylvania and elsewhere, Defendants did knowingly and willfully devise and intend to devise a scheme and artifice to defraud, and obtain money and property from plaintiffs and members of

**AMENDED CLASS ACTION COMPLAINT** – Page 64

the class by means of false and fraudulent pretenses, representations and promises, namely, (a) that UBS SFA and UBS AG would act in the best interest of the client in making investment decisions and (b) that their investments would be consistent with the client's objectives and goals, and (c) that UBS SFA would invest funds belonging to clients on a fiduciary basis, and (d) that UBS SFA would act in what it reasonably believed to be in the client's best interest, and (e) that in the event of a conflict of interest, UBS SFA would place the client's best interests before its own, and (f) that UBS SFA was obligated to disclose to its clients all material conflicts, and (g) that the investment decisions or recommendations made by UBS SFA on behalf of its clients would be suitable and appropriate and consistent with the client's investment objectives and goals, knowing that the pretenses, representations, and promises were false when made, and on or about the dates indicated below, and for the purpose of executing and attempting to execute said scheme and artifice to defraud, the Defendant UBS AG caused to be placed in authorized depositories for mail matter, to be sent and delivered by the United States Postal Service, to the recipient listed below the item(s) described below, each such instance being a separate act of mail fraud:

| DATE | DESCRIPTION | RECIPIENT |
|------|-------------|-----------|
| May 9, 2007 | Disbursement | Nicholas Knopick |
| September 29, 2007 | Account Statement | Nicholas Knopick |
| October 2, 2007 | Debit Advice | Nicholas Knopick |
| September 20, 2008 | Repayment | Nicholas Knopick |
| September 24, 2008 | Repayment | Nicholas Knopick |
| September 24, 2008 | Repayment | Nicholas Knopick |
| September 26, 2008 | Repayment | Nicholas Knopick |
| September 27, 2008 | Debit Advice | Nicholas Knopick |
| October 14, 2008 | Interest Calculation | Nicholas Knopick |
| January 1, 2009 | Closing of Service Prices | Nicholas Knopick |
| May 30, 2009 | Credit Advice | Nicholas Knopick |
| June 4, 2009 | Certification | Nicholas Knopick |

**AMENDED CLASS ACTION COMPLAINT** – Page 65

### D.     PATTERN OF RACKETEERING (WIRE FRAUD)

245.     The Defendants' pattern of racketeering activity further consisted of multiple acts of wire fraud under 18 U.S.C. §1343, in that on or about the dates listed below, for the purpose of executing and attempting to execute said scheme and artifice to defraud, in the Eastern District of Pennsylvania and elsewhere, the Defendant UBS AG did transmit and cause to be transmitted in interstate and foreign commerce, by means of wire communications, writings, pictures, or sounds as indicated below, each such instance being a separate act of wire fraud:

| DATE | ORIGIN | DESTINATION | DESCRIPTION |
|---|---|---|---|
| April 3, 2007 | Zurich, Switzerland | Marysville, PA | Facsimile |
| April 3, 2007 | Zurich, Switzerland | Marysville, PA | Facsimile |
| April 3, 2007 | Zurich, Switzerland | Marysville, PA | Facsimile |
| April 11, 2007 | Zurich, Switzerland | Marysville, PA | Facsimile |

---all in violation of Title 18, United States Code, Section 1962(C).

246.     Defendants' conduct and pattern of racketeering activity foreseeably and proximately caused damages to Plaintiff and to members of the Class. The Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiff and members of the Class to be injured in their business and property. Under the provisions of Section 1964(c) of RICO, the Defendants are jointly and severally liable to Plaintiff and members of the Class for three times the damages that Plaintiff and the Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

### COUNT IX - CONSPIRACY TO VIOLATE 18 U.S.C. 1962(C)

247.     Plaintiff incorporates herein by reference the allegations contained in all of the preceding paragraphs above as though set forth in their entirety.

248.     At all relevant times, Defendants, UBS AG, UBS SFA, and others known and unknown to the plaintiff, were members and associates of a criminal enterprise referred to herein

as "UBS Enterprise," an organization engaged in, among other things, wire fraud, mail fraud, conspiracy to commit wire fraud, and conspiracy to commit mail fraud. At all relevant times, UBS Enterprise operated in the Eastern District of Pennsylvania and elsewhere.

### A.     RACKETEERING ENTERPRISE

249.    The UBS Enterprise, including its leadership, agents, and associates, constitutes an "enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact. The enterprise engaged in, and its activities affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

### B.     PURPOSES OF THE ENTERPRISE

250.    The purposes of the UBS Enterprise included, but were not limited to, the following:

a.      Enrichment through providing certain financial services through unlawful means;

b.      Development of an expanding base of clients of legal and illegal services;

c.      Generating, preserving, and protecting the UBS Enterprise's profits and client base through acts of, among other things, mail fraud and wire fraud;

d.      Obtaining "net new money" for management by UBS AG and UBS SFA;

e.      Assisting and facilitating certain clients in evading their income tax obligations;

f.      Avoiding detection of the UBS AG cross-border tax evasion scheme by providing seemingly legitimate advisory services to US citizens who were properly reporting to the Internal Revenue Service;

g.      Inducing U.S. citizens into contracting with the UBS Enterprise, to invest their monies with the UBS Enterprise, and then for Defendants to perpetuate

**AMENDED CLASS ACTION COMPLAINT** – Page 67

a fraud on them  to avoid U.S. penalties and criminal charges by effectively "losing" the investment.

### C.     MEANS AND METHODS OF THE ENTERPRISE

251.   The means and methods by which the Defendants and their associates conducted and participated in the conduct of the affairs of the enterprise included but were not limited to the following:

a.     UBS AG Executives, Managers, Desk Heads, and Bankers used nominee entities, encrypted laptops, numbered accounts, and other counter surveillance techniques to conceal the identities and offshore assets of certain United States clients (referred to herein as "black accounts");

b.     UBS AG CAs travelled with laptops equipped with a secret second hard drive to avoid detection by U.S. authorities while traveling in the United States;

c.     UBS AG CAs carried business cards without any reference to any UBS entity and without any UBS markings while traveling to the United States;

d.     UBS AG CAs removed names, account numbers, and UBS AG logos from bank statements while on travel to the United States, so that if observed by United States authorities, the statements could not be linked to UBS AG or to any client;

e.     UBS AG printed sanitized account statements with no client name, account number, or reference to UBS AG;

f.     Managers, Desk Heads, and Bankers of the UBS Enterprise provided unlicensed and unregistered banking services and investment advice to United States clients in person, and by mailings, email, telephone calls, and facsimile, to and from the United States;

g.     UBS AG established and used UBS SFA as an artifice to further its unlawful "black account" business.

h.     Plaintiffs incorporate by reference the preceding paragraphs as if set forth at length herein

### D.     THE RICO CONSPIRACY

252.   Beginning in or about 2000, and continuing to on or about the date of this

**AMENDED CLASS ACTION COMPLAINT** – Page 68

complaint, in the Eastern District of Pennsylvania and elsewhere, the Defendants, and others known and unknown to the plaintiff, each being persons associated with the criminal enterprise as described herein, which enterprise engaged in the activities which affected interstate and foreign commerce, did knowingly and intentionally, combine, conspire, confederate and agree together and with each other to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple acts involving Mail Fraud, in violation of 18 U.S.C. §1341, and Wire Fraud, in violation of 18 U.S.C. §1343.  It was further part of the conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

## E.    OVERT ACTS

253.    In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, the Defendants and others known and unknown to the plaintiff, committed the following overt acts, on or about the dates indicated below, in the Eastern District of Pennsylvania and elsewhere:

a.    On or after 2003, Defendant UBS AG instituted a "referral campaign;"

b.    On or after 2003, Defendant UBS AG instituted the "KeyClient" initiative;

c.    In or around June, 2003, Defendant UBS AG initiated an incentive program allowing each "Country Team" to receive a percentage of revenues generated by the Financial Advisor;

d.    In or around 2007, Defendant Ms. Seifert induced Mr. Knopick to deposit/invest money with UBS SFA;

e.    In or around 2007, Defendant Ms. Seifert induced Mr. Knopick to transmit money to UBS AG;

f.    In or around 2000, Defendant UBS AG purchased Paine Webber, a large

**AMENDED CLASS ACTION COMPLAINT** – Page 69

United States stock brokerage firm;

g.    In or around 2001, Defendant UBS AG placed all "black accounts" on portfolio management status in order to eliminate calls and contact with United States citizens;

h.    On or about January 22, 2003, Defendant UBS AG began issuing Form 1099s to clients, but not to the IRS;

i.    On or about January 24, 2004, Defendant UBS AG sent form letters to United States clients stating that UBS AG was dedicated to the protection of their identities;

j.    On or about August 17, 2004, Defendant UBS AG met with lawyers and accountants to discuss the creation of structures and other vehicles for clients who wanted to conceal their UBS AG accounts and income derived therefrom from United States and Canadian tax authorities;

k.    In or around September 2004, Defendant UBS AG provided training to Desk Heads and Bankers on how to avoid detection by authorities when traveling to the United States;

l.    On or about April 25, 2005, Defendant UBS AG instructed Managers, Desk Heads, and Bankers to grow the United States cross-border business;

m.    In or around 2005, Defendant UBS AG tasked Philip Marcovici with approaching the IRS to see if UBS AG's non W-9 customers could receive amnesty from the United States for non-payment of tax;

n.    In or around December 2005, Defendant UBS AG solicited new business from existing and prospective United States clients in Miami Beach, Florida;

o.    On or about September 26, 2006, Defendant UBS AG trained Desk Heads and Bankers on how to conduct business discreetly by using mail that would not show UBS AG's name and address, by changing hotels while traveling, and by using encrypted laptop computers when traveling to the United States and when meeting with United States clients;

p.    On or about April 2007, Defendant UBS AG opened unlawful bank accounts for Mr. Knopick;

q.    In or around January 2007, Defendants UBS FS and Ms. Seifert opened a brokerage account for Mr. Knopick;

r.    In March or April 2007, Defendant Ms. Seifert introduced Mr. Knopick to Mr. Knöpfel, and represented Mr. Knöpfel to be a skilled investment

**AMENDED CLASS ACTION COMPLAINT** – Page 70

advisor;

s.    On or about February 5, 2007, Defendants UBS FS, UBS SFA, and Ms. Seifert induced Mr. Knopick to wire $12,445,483.47 from his Wachovia Bank account in Pennsylvania to UBS AG;

t.    On or about January 19, 2007, Defendant UBS FS induced Mr. Knopick to sign the "Client Information and Agreement for Individuals";

u.    On or about April 3, 2007, Defendant UBS AG induced Mr. Knopick to sign the "Basic Document for Account/Custody Account Relationship with UBS AG";

v.    On or about April 3, 2007, Defendant UBS AG induced Mr. Knopick to sign the "Basic Agreement for Collateral Loans";

w.    On or about April 11, 2007, Defendants UBS AG and UBS SFA induced Mr. Knopick to sign the "Specific Safe Custody and Pledgeholdership Agreement";

x.    Between 2007 and late 2008, Defendants UBS SFA and Ms. Seifert ignored Mr. Knopick's stated investment strategy;

y.    In September 2008, Defendants UBS AG and UBS SFA concealed from Mr. Knopick all details regarding why his fiduciary advisor Mr. Knöpfel had vanished;

z.    In late 2008, Defendant UBS SFA dissuaded Mr. Knopick from withdrawing his money.

...all in violation of Title 18, United States Code, Section 1962(d).

254.    Defendants' conduct and pattern of racketeering activity foreseeably and proximately caused damages to Plaintiff and to members of the Class. The Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiff and members of the Class to be injured in their business and property. Under the provisions of Section 1964(c) of RICO, the Defendants are jointly and severally liable to Plaintiff and members of the Class for three times the damages that Plaintiff and the Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

**AMENDED CLASS ACTION COMPLAINT** – Page 71

255.     Plaintiff and the other Class members have been injured in their business and property by reason of these violations in that Plaintiff and the other Class members have lost at least hundreds of millions of dollars that they would not have lost had Defendant not engaged in its pattern of racketeering activity.

256.     By virtue of these violations of 18 U.S.C. § 1962(c), Defendant is liable to Plaintiff and the other Class members for the damages Plaintiff and the other Class members have sustained, plus the cost of this suit, including reasonable attorneys' fees.

WHEREFORE, Plaintiff and the Class respectfully request that this Court enter judgment in their favor and against Defendants awarding Plaintiff and the Class compensatory damages in an amount in excess of $5,000,000, punitive damages, costs, interest and such other and further relief as this Court may deem just and equitable.

## IX.     **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, and for the wrongs cited factually and legally in this Complaint, judgment should be rendered in Plaintiff and the Class members' favor against Defendants as follows:

a.   An award of compensatory damages that will fairly represent the economic injuries to the Plaintiff and Class members;

b.   Rescission of all unlawful contracts.

c.   An award of treble damages herein pursuant to 18 U.S.C. § 1964(c) and/or applicable state law;

d.   An award of attorneys' fees pursuant to 18 U.S.C. § 1964(c) and/or applicable state law;

e.   Pre-judgment interest on all awards;

f.   Punitive damages

g.   Appropriate injunctive relief;

h.   An order certifying the Class and any appropriate subclasses as set forth herein under the appropriate provisions of F.R.C.P. 23, appointing Plaintiff as Class Representative, and appointing the undersigned counsel as counsel for the Class; and

i.   All further relief as the Court and/or the jury may deem appropriate, legal or equitable, in any form to which Plaintiffs may be entitled.

Plaintiffs demand a trial by jury on all issues so triable.

**AMENDED CLASS ACTION COMPLAINT** – Page 73

Dated: February  19      , 2015

Respectfully submitted,

KUTAK ROCK LLP

By:

Julie B. Negovan, ID No. 81231
KUTAK ROCK LLP
Two Liberty Place, Suite 28B
50 South 16th Street
Philadelphia, PA  19102
(215) 299-4384

*Counsel for Plaintiff*

**AMENDED CLASS ACTION COMPLAINT** – Page 74

## CERTIFICATE OF SERVICE

I, Julie B. Negovan, Esq., hereby certify that on this 19th day of February, 2015, I

caused to be served the foregoing Amended Class Action Complaint, via Email, upon all

counsel of record as follows:

STRADLEY RONON STEVENS &
YOUNG, LLP
David C. Franceski, Jr., Esquire
Alex L. Rubenstein, Esquire
2005 Market Street, Suite 2600
Philadelphia, PA 19103
(DFranceski@stradley.com)

GIBSON, DUNN & CRUTCHER LLP
Gabriel Herrmann
200 Park Avenue
New York, NY 10166
(GHerrmann@gibsondunn.com)

Julie B. Negovan, Esq.

**AMENDED CLASS ACTION COMPLAINT** – Page 75

# EXHIBIT A

*JW 012 19 67*

**❖ UBS**

Client ID *1883286400*

# Client Information and Agreement for Individuals

## Basic Information

Complete a separate form for each Sole Owner Primary Account Holder Joint Account Holder Minor Custodian Parent Guardian Committeeman or Conservator

If you have additional client addresses please fill out the Additional Client Address Information form

**This address cannot be a post office box**

| | |
|---|---|
| Nichola | W |
| First Name | Middle Name |
| Knopick | |
| Last Name | |

Citizenship  ☑ USA  ☐ Other *(specify)*

*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*
Social Security Number

Passport/C EDULA and Green Card Number
(if non-U S and no Social Security Number specified)

E-mail Address *(optional)*

Tax Bracket *(optional)*

151 Idle Road
Legal Residence Address Line 1

Legal Residence Address Line 2

| | | |
|---|---|---|
| Marysville | PA | 17053 |
| City | State | Zip |

Home phone  [7|1|7] – [9|5|7] – [4|4|0|5]

Fax *(optional)*  [ | | | ] – [ | | | ] – [ | | | | ]

Mobile *(optional)*  [ | | | ] – [ | | | ] – [ | | | | ]

Have you moved in the past 6 months?  ☑ No  ☐ Yes
*If yes please provide proof of residence at your current address*

## Financial Information

If you share assets with another person please provide financial information (e g annual income liquid assets net worth) per individual For example a total net worth of $50 000 should be split as you deem appropriate

Annual Income $ *72,000.00*

Liquid As ets $ *15,000,000.00*

Net Worth $ *15,000,000.00*
(exclusive of residence)

Investment Experience *(in years)*

| | | |
|---|---|---|
| *29* Equities | *29* Bonds | *29* Futures |
| *29* Options Buy | *29* Options Sell | |

Other financial firms where accounts are held *(optional)*

Do you currently have any loans outstanding?  *(optional)*
☐ No  ☐ Yes specify

| | |
|---|---|
| Loan 1 Amount | Interest Rate |
| Loan 2 Amount | Interest Rate |

Is the Client or spouse any beneficial owners trustees/ executors or any of their relatives who share the same home acting as an individual a fiduciary or corporate officer a control person of any publicly traded corporation (i e policy making officers directors or 10% share holders)?  ☑ No  ☐ Yes specify

| | |
|---|---|
| Firm | Percentage |

## Personal Information

If you answer yes to the NYSE Rule 407 question a letter of authorization from the firm specified must be obtained before the account can be opened

Date of Birth *05/21/1951*

Gender  ☑ Male  ☐ Female

Marital Status
☐ Single  ☐ Married  ☑ Divorced  ☐ Widowed

Number of dependents [0|1]

| | | |
|---|---|---|
| Dependent Name *(optional)* | Social Security # | Date of Birth |
| 1 | | |
| 2 | | |
| 3 | | |

Emergency Contact Name and Phone Number *(optional)*

Is the Client the client's spouse any beneficial owners or any trustees/executors affiliated with any securities firm broker/dealer subsidiary of a financial institution securities or commodities exchange self regulatory organization or the UBS auditor (currently Ernst & Young)? (NYSE Rule 407)  ☑ No  ☐ Yes specify

Firm

Is the Client an employee or related to an employee of UBS AG its subsidiaries or affiliates (e g UBS Financial Services Inc UBS Securities LLC)?  ☑ No  ☐ Yes specify

Affiliate/Subsidiary

Employee Name/SS#

Continue ➡

©2006 UBS Financial Services Inc All rights reserved Member SIPC

1

JW01219-67

**❀ UBS**

## Employment Information

This section must be completed if your employment status is employed or self-employed

Status *(select one)*
- [✓] Employed
- [ ] Retired
- [ ] Unemployed
- [ ] Self Employed
- [ ] Self Supported
- [ ] Work in the Home
- [ ] Student
- [ ] Volunteer

Employer Name  *UPS WORLD HEADQUARTERS*
Employer's Street Address  *55 GLENLAKE PARKWAY NE*
City  *ATLANTA*   State  *GA*   Zip  *30328*

Occupation  *UPS - PILOT*

Business Phone *(optional)*  *1-800-742-5877*

Industry (i e Construction Service etc) *(optional)*

Business Fax *(optional)*  |___|___|-|___|___|___|-|___|___|___|___|

## Client Agreement

**BY SIGNING BELOW I UNDERSTAND ACKNOWLEDGE AND AGREE TO EACH OF THE FOLLOWING**

**A.** That I have reviewed the section entitled Conducting Business with UBS Guide to Investment Advisory and Broker Dealer Services I understand the material distinctions between advisory and broker dealer services and acknowledge that the Master Account Agreement found in the Important Account Information and Disclosures booklet establishes a brokerage account and UBS obligations as it pertains to that account will be that of a broker dealer as described in the disclosure section and in the brokerage agreement

**B** UBS Financial Services does not provide legal or tax advice

**C** In accordance with the last paragraph of the Master Account Agreement titled Arbitration I am agreeing in advance to arbitrate any controversies which may arise with UBS Financial Services and others

**D** Unless I write to and authorize UBS Financial Services to do so UBS Financial Services will not supply my name to issuers of any securities held in my account I will receive information from UBS Financial Services regarding those securities but I will not receive information regarding those securities directly from the issuer

**E** I have received and read a copy of this Client Information and Agreement For Individuals form the IRA Account Application or Resource Management Account Application form ( Account Application ) as applicable and the Master Account Agreement (which contains a copy of these Paragraphs A through F) and I agree to be bound by their terms and conditions to the same extent as if those terms and conditions were contained in this document as of this date

**F** I have received a copy of read and understand the Firms Loan Disclosure Statement Information About Your Relationship with UBS and the Important Account Information and Disclosures booklet containing among other things the Master Account Agreement UBS Retirement Money Fund prospectus UBS RMA Money Funds prospectus UBS Financial Services Client Privacy Notice the Deposit Account Sweep

Program Disclosure Statement the Statement of Credit Practices Instructions for W 9 Preparation Selected Fee & Charges and other terms and conditions and important information regarding my account with UBS Financial Services I agree to be bound by the terms and conditions in the Important Account Information and Disclosures booklet to the same extent as if those terms and conditions were contained in this document

**G** Information I provide in this form will supersede contrary information I may have provided in a previous Client Information and Agreement for Individuals form or account application and agreement

**W 9 Form Certification**

I certify as the Account Holder or in my representative capacity for the Account Holder by signing below and under penalties of perjury that (1) the taxpayer identification number set forth herein is the Account Holder's correct taxpayer identification number (or the Account Holder is waiting for a number to be issued to the Account Holder) and (2) the Account Holder is not subject to backup withholding because (a) the Account Holder is exempt from backup withholding or (b) the Account Holder has not been notified by the Internal Revenue Service (IRS) that the Account Holder is subject to backup withholding as a result of a failure to report all interest or dividends or (c) the IRS has notified the Account Holder that the Account Holder is no longer subject to backup withholding and (3) the Account Holder is a U S person (including a U S resident alien)

**Certification Instruction** The Account Holder understands that the Account Holder must strike out item (2) above if the Account Holder has been notified by the IRS that the Account Holder is subject to backup withholding because the Account Holder failed to report all interest or dividends on the Account Holder's tax return **The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding**

Is this a custodial account? [ ] Yes [✓] No    If yes only the custodian's signature is required

**▶ Sign Here**

Signature  _____   1-19-07
Nicholas W Knopick
Print Name                                Date  1-19-07

2   CL INDIV (Rev 9/06)

Stop ■

©2006 UBS Financial Services Inc All rights reserved Member SIPC

# Master Account Agreement

*Client Agreement – Client Information and Agreement For Individuals Form*

**BY SIGNING THE CLIENT INFORMATION AND AGREEMENT FOR INDIVIDUALS FORM, I UNDERSTAND, ACKNOWLEDGE AND AGREE TO EACH OF THE FOLLOWING:**

**A.** That I have reviewed the section entitled Conducting Business with UBS: Guide to Investment Advisory and Broker Dealer Services. I understand the material distinctions between advisory and broker-dealer services and acknowledge that, when the agreement contained in the Important Information and Disclosure booklet is executed to establish a brokerage account, UBS' obligations as it pertains to that account will be that of "broker-dealer" as described in the disclosure section and in the brokerage agreement.

**B.** UBS Financial Services does not provide legal or tax advice.

**C.** In accordance with the last paragraph of the Master Account Agreement titled "Arbitration," I am agreeing in advance to arbitrate any controversies which may arise with UBS Financial Services and others.

**D.** Unless I write to and authorize UBS Financial Services to do so, UBS Financial Services will not supply my name to issuers of any securities held in my account. I will receive information from UBS Financial Services regarding those securities, but I will not receive information regarding those securities directly from the issuer.

**E.** I have received and read a copy of the Client Information and Agreement For Individuals form, the IRA Account Application or Resource Management Account Application form ("Account Application"), as applicable, and the Master Account Agreement, and I agree to be bound by their terms and conditions to the same extent as if those terms and conditions were contained in this document.

**F.** I have received a copy of, read and understand the Firm's Loan Disclosure Statement, Information About Your Relationship with UBS, and this booklet containing, among other things, the Master Account Agreement, UBS Retirement Money Fund prospectus, UBS RMA Money Funds prospectus, UBS Financial Services' Client Privacy Notice, the Deposit Account Sweep Program Disclosure Statement, the Statement of Credit Practices, Instructions for W-9 Preparation, Selected Fee & Charges and other terms and conditions and important information regarding my account with UBS Financial Services. I agree to be bound by the terms and conditions in this booklet to the same extent as if those terms and conditions were contained in the Client Information and Agreement For Individuals form.

**G.** Information I provide in this form will supersede comparable information I may have provided in a previous Client Information and Agreement for Individuals form or account application and agreement.

*Client Agreement – Resource Management Account Application*

**BY SIGNING THE ACCOUNT APPLICATION, I UNDERSTAND, ACKNOWLEDGE AND AGREE TO EACH OF THE FOLLOWING:**

**A.** I have reviewed the section entitled Conducting Business with UBS: Guide to Investment Advisory and Broker Dealer Services. I understand the material distinctions between advisory and broker-dealer services and acknowledge that, the Master Account Agreement found in the "Important Account Information and Disclosures" booklet establishes a brokerage account, and UBS' obligations as it pertains to that account will be that of a "broker-dealer" as described in the disclosure section and in the brokerage agreement.

**B.** Upon execution of this Resource Management Account Application ("Account Application"), I will have supplied all of the information requested in the Account Application and the Client Information and Agreement For Individuals form, and I confirm that all of the information provided is true and accurate. I understand that I will receive a written notice of certain information I have provided about myself and this Account and I agree to review that notice and promptly notify UBS Financial Services in writing of any material changes to any or all of the information contained in the Client Information and Agreement For Individuals form and this Account Application, including, but not limited to, information relating to my financial situation or investment objectives.

**C.** **In accordance with the last paragraph of the Master Account Agreement titled "Arbitration," I am agreeing in advance to arbitrate any controversies which may arise with UBS Financial Services and others.**

**D.** **If my account is established with margin, certain of the securities in my account may be loaned to UBS Financial Services or to others.**

**E.** My account will be charged an annual service fee as described in the Fees and Charges section of the Master Account Agreement.

**F.** If I select the RMA Premier Level program, an additional annual upgrade fee will be charged as described in this booklet.

**G.** I have received a copy of, read and understand this booklet containing, among other things, the Master Account Agreement, the Bill Payment and Electronic Funds Transfer Services Agreement and the UBS American Express Cardholder Agreement. I agree to be bound by the terms and conditions in this booklet to the same extent as if those terms and conditions were contained in the Resource Management Account Application.

**H.** I agree that this Account is also governed by my Client Information and Agreement For Individuals form, and the other documents incorporated there by reference.

**I.** **If I have applied for the UBS Visa Signature credit card I agree to be bound by the terms and conditions stated in the UBS Visa Signature Credit Card Acknowledgement in the Account Application.**

6

*Client Agreement – IRA Account Application*
I hereby establish the type of Individual Retirement Account selected on this Application ("IRA") and designate UBS Financial Services Inc. ("UBS Financial Services") to serve as custodian of the IRA under the terms of the related Custodial Agreement and effective upon UBS Financial Services Inc.'s acceptance. **BY SIGNING THE ACCOUNT APPLICATION, I UNDERSTAND, ACKNOWLEDGE AND AGREE THAT:**

**A.** I have reviewed the section entitled Conducting Business with UBS: Guide to Investment Advisory and Broker Dealer Services. I understand the material distinctions between advisory and broker-dealer services and acknowledge that, the Master Account Agreement found in the "Important Information and Disclosures" booklet establishes a brokerage account, and UBS' obligations as it pertains to that account will be that of a "broker-dealer" as described in the disclosure section and in the brokerage agreement.

**B.** Upon execution of this IRA Account Application ("Account Application"), I will have supplied all of the information requested in the Account Application and the Client Information and Agreement For Individuals form, and I confirm that all of the information provided is true and accurate. I understand that I will receive a written notice of certain information I have provided about myself and this Account and I agree to review that notice and promptly notify UBS Financial Services in writing of any material changes to any or all of the information contained in the Client Information and Agreement For Individuals form and this Account Application, including, but not limited to, information relating to my financial situation or investment objectives.

**C.** An annual service fee will be charged as described in the Fees and Charges section of the Master Account Agreement.

**D.** I have received a copy of, read and understand this booklet containing, among other things, the Master Account Agreement, the Custodial Agreement and Disclosure Statement applicable to the IRA. I agree to be bound by the terms and conditions in this booklet to the same extent as if those terms and conditions were contained in the IRA Account Application.

**E.** Pursuant to the Custodial Agreement, any interest in this IRA that is not effectively disposed of by the beneficiary designation I make in this Application or any subsequent beneficiary designation will be paid to my surviving spouse, and if no surviving spouse, to my estate.

**F.** I agree that this Account is also governed by my Client Information and Agreement For Individuals form, and the other documents incorporated there by reference.

### Important Information About UBS Bank USA Deposit Sweep Program

Resource Management Accounts (RMA), IRA RMA accounts, Business Services Account BSA Accounts, Coverdell Education Savings Accounts, and Individual Retirement Accounts of Eligible Participants **automatically** default to the Deposit Account Sweep Program unless you select one of the other sweep options available. You should review the UBS Financial Services Deposit Account Sweep Program Disclosure Statement carefully before selecting their sweep option and should note the following:

The Deposit Accounts are insured by the FDIC to a maximum of $100,000 (for individual accounts) or $200,000 (for joint accounts) (in each case, including principal and interest) for the total amount of all Deposit Accounts held in each recognized legal capacity (for example, individual accounts, joint accounts, certain retirement accounts, etc.). If you have multiple accounts at UBS Financial Services held in the same recognized legal capacity that sweep into the Deposit Accounts, once those accounts exceed, as applicable, $100,000 or $200,000 in the aggregate, then your aggregate funds on deposit with UBS Bank USA will exceed FDIC insurance coverage limits. UBS Financial Services is not responsible for any insured or uninsured portion of the Deposit Accounts.

The Deposit Accounts are insured by the FDIC to a maximum of $100,000 (for individual accounts), $200,000 (for joint accounts) and $250,000 for some retirement accounts (in each case, including principal and interest) for the total amount of all Deposit Accounts held in each recognized legal capacity (for example, individual accounts, joint accounts, certain retirement accounts, etc.). If you have multiple accounts at UBS Financial Services held in the same recognized legal capacity that sweep into the Deposit Accounts, once uninvested cash in those accounts exceed, as applicable, $100,000, $200,000 or $250,000 in the aggregate (as applicable), then your aggregate funds on deposit with UBS Bank USA will exceed FDIC insurance coverage limits. UBS Financial Services is not responsible for any insured or uninsured portion of the Deposit Accounts.

UBS Bank USA, UBS AG and UBS Financial Services Inc. may receive substantial financial benefits for activities related to the Deposit Accounts.

**Please see the UBS Financial Services Deposit Account Sweep Program Disclosure Statement for details.**

*Resource Management Account, Business Services Account BSA, ERISA Plan, Individual Retirement Account, and Coverdell Education Savings Account Agreement*

### Authorization

Trust account clients may opt for the Personal Trust Account (PTA) which is an RMA for trust accounts and hereafter deemed included in references to "RMA."

You understand and agree that your request to open an Account is subject to the receipt of a signed application and the approval by UBS Financial Services in its sole discretion. If approved, UBS Financial Services will open your RMA or UBS Financial Services BSA after receipt by UBS Financial Services of a signed Application and, if applicable, a completed section for checks and UBS American Express Card or UBS Visa Signature credit card and/or margin if you select such features. Certain of the services may be subject to limitations on their availability as required by law, regulation, rule or UBS Financial Services' policies. You will automatically be considered for margin unless you have indicated on the Application your election not to be considered for margin or you have requested the opening of an Account for which UBS Financial Services Inc. does not extend margin (e.g., an Individual

7

Retirement Account, ERISA Plan, Coverdell Education Savings Account, 403(b)(7) Account, UGMA, UTMA, Estate or 529 Plan Account). By signing the Application, you acknowledge that you have received and read this booklet.

Your authorization shall remain in full force and effect until a reasonable time following the receipt by UBS Financial Services of written notice of revocation.

## Sweep Options
Resource Management Accounts and UBS Financial Services BSA accounts of Eligible Participants automatically default to the Deposit Account Sweep Program (without limit if no limit is selected) unless you affirmatively elect a tax-free Fund (that is, California Municipal Fund, New Jersey Municipal Fund, New York Municipal Fund or Tax-Free Fund on the Application (the "Primary Sweep Option").

If you are not an Eligible Participant and do not affirmatively elect a Fund on the Application, available funds will be automatically swept into the Money Market Portfolio, except for ERISA Plans which sweep into Retirement Money Fund.

If you have chosen a limit for the Deposit Account Sweep Program, available balances in excess of such limits will automatically be invested in the Funds, Other Sweep Option or, if applicable, Retirement Money Fund (Individual Retirement Accounts, Coverdell Education Savings Accounts, and ERISA Plans only) selected on the Application.

You hereby authorize UBS Financial Services to invest or "sweep" available credit balances, for which no interest is otherwise earned or paid, in the Account into the Deposit Accounts, or the Funds, or Other Sweep Option selected on the Application, depending upon whether or not you are an Eligible Participant, or if you have elected a tax-free Fund, as instructed in the Application, and subsequently liquidate any such shares so purchased or withdraw Deposit Account balances at such times, and for such periods of time as UBS Financial Services may decide in its sole discretion.

Additionally, you authorize UBS Financial Services to make withdrawals in accordance with the terms of this booklet. You agree that UBS Financial Services has the right to withhold any redemption, liquidation or withdrawal proceeds or other payments from your Account until all funds placed on account in your Account have been collected. The collection periods are set forth in this booklet.

You acknowledge that UBS Financial Services may delay acting on your instructions or effecting payments until your Account contains funds sufficient to meet your obligations.

If you are opening an account for an ERISA Plan, you are required to select a money market fund sweep feature or Other Sweep Option. If no money market fund sweep feature or Other Sweep Option is selected, you authorize UBS Financial Services Inc. to sweep available credit balances into the UBS Retirement Money Fund subject to the terms and conditions contained in the

prospectus which is provided to you upon opening the Account. If you affirmatively elect not to have a sweep feature, there will be no automatic sweep from the Account and credit balances will not earn an investment return.

This authorization shall remain in full force and effect until a reasonable time following the receipt by UBS Financial Services' of written notice of revocation.

## Check Writing Privilege
If you agree to accept the check writing feature on the Application, you may write checks or authorize drafts against an RMA or UBS Financial Services BSA checking account serviced by the Check Provider. You may use these checks only in conjunction with your RMA or UBS Financial Services BSA and only up to amounts within the Account's "Withdrawal Limit" as defined in this booklet. You authorize UBS Financial Services to reimburse the Check Provider in federal funds when checks or drafts are presented to the Check Provider and to automatically debit your RMA or UBS Financial Services BSA on the day of payment to the Check Provider. You agree to have sufficient assets in your RMA or UBS Financial Services BSA on the day UBS Financial Services receives notification for payment from the Check Provider of payment of a check as well as on the day you write the check. You understand that the checks may be used in the same manner and are subject to the normal procedures, rules and regulations as regular checks payable at the Check Provider. You hereby authorize the Check Provider to honor checks (a) bearing a signature with an approved first name, a middle initial or a name deleted or added if the Check Provider otherwise reasonably believes the signature to be authorized and (b) bearing only one signature unless you instruct the Check Provider in writing that multiple signatures are required. Further, you authorize the Check Provider to honor unsigned drafts presented by third parties based on a signed separate written authorization from you to any such third party.

## UBS American Express® Card
You understand and agree that by signing the Application, you have requested one or more UBS American Express Card(s) (each, a "Card") unless you have elected otherwise on the Application or the account is a trust, estate, guardian, committeeman, or conservator account. Cards are not permitted where the Account is an Individual Retirement Account, ERISA Plan, Coverdell Education Savings Account, 529 Plan, or 403(b)(7) Account. You authorize UBS Financial Services and the Card Issuer to effect Card transactions in the manner described in this booklet.

You understand that the Card Issuer will allow Card transactions to the "Withdrawal Limit" (as described in this booklet). You agree to have sufficient available assets to make payment in full for Card transactions as they become available and understand that if sufficient assets are not available to cover Card transactions, the Card Issuer may suspend and/or then cancel your Card. You agree that the use of any Card in connection with your RMA or UBS Financial Services BSA will also be governed by the terms and conditions contained in the Cardholder Agreement set forth in this

Important Account Information and Disclosures booklet and you agree to comply with such terms and conditions.

American Express converts transactions in foreign currencies into U.S. dollars. Unless a particular rate is required by applicable law, foreign transactions are converted using wholesale interbank rates selected by American Express on the business day prior to the day on which the transactions are processed by American Express. The currency conversion rate used on the conversion date may differ from the rate in effect on the date you used your UBS American Express Card. American Express assesses a currency conversion factor of 1.5% to the converted amount (in other words to the U.S. dollar equivalent of the foreign transaction) and this factor will be aggregated with the converted amount on your statement.

If you are a UBS Select American Express Cardholder, and you use your UBS American Express Card or account to effect a transaction with a business, other entity or person located outside of the United States, the Card Issuer will charge a Foreign Country Transaction Fee of one-half of one percent (0.50%) of the U.S. dollar amount. The Card Issuer's Foreign Country Transaction Fee is in addition to the currency conversion factor assessed by American Express discussed in the previous paragraph.

UBS Premier American Express Cardholders will not be charged a Foreign Country Transaction Fee by the Card Issuer and will only be assessed the currency conversion factor by American Express as discussed above.

By accepting a Card, you agree that you will not dispose of your assets in your RMA or UBS Financial Services BSA or any other account you may have with UBS Financial Services, if such disposal will negatively affect your ability to pay for Card transactions. You understand and agree that UBS Financial Services has the right to apply assets in any of your accounts with UBS Financial Services to pay debts incurred on your Card, or to pursue any of your other assets to pay debts incurred on your Card.

### Limitations
You agree that Cards or checks issued in connection with your RMA or UBS Financial Services BSA cannot be used to purchase securities or any other products or services available through UBS Financial Services. You further understand and agree that UBS Financial Services may request and the Card Issuer and Check Provider may provide UBS Financial Services with copies of checks and/or Card and bill payment drafts processed from your RMA or Business Services Account BSA.

### Payments
You authorize UBS Financial Services to pay from the Withdrawal Limit in your RMA or UBS Financial Services BSA all debts incurred by you to UBS Financial Services, the Card Issuer or the Check Provider in connection with RMA or UBS Financial Services BSA services as set forth in the "Payments" section of this booklet. Debts include, but are not limited to, the amounts you owe to UBS Financial Services for securities purchases, RMA or UBS Financial Services BSA Account fees, drafts, fees for federal fund wires, customary transactional and brokerage fees as well as

interest you may owe UBS Financial Services as a result of margin calls and/or loans in any of your accounts with UBS Financial Services. Debts also include any Card transactions, Bill Payment service transaction debits, Electronic Funds Transfers, drafts or check charges, or any other means by which you authorize a third party to debit any of your accounts with UBS Financial Services (in the case of the Card Issuer or Check Provider limited, however, to the amount of the Withdrawal Limit). This is in addition to, and not in any way limiting, any other rights UBS Financial Services may have, including without limitation, under the heading "Security Interest" of the General Terms and Conditions hereof.

*Margin Agreement*

### Authorization
You will automatically be considered for margin unless you have indicated on the Application that you do not wish to be considered for margin or you have requested the opening of an Account for which UBS Financial Services Inc., which provides margin services for UBS Financial Services clients, does not extend margin (e.g., an Individual Retirement Account, ERISA Plan, Coverdell Education Savings Account, 403(b)(7) Account, UGMA, UTMA, Estate or 529 Plan Account). For Managed Account programs, margin is not permitted unless expressly approved by UBS Financial Services. If you are adding services to an existing Account that has margin, the margin feature will automatically apply to your upgraded Account. You acknowledge that UBS Financial Services will receive increased compensation in connection with the Account from your use of margin borrowing. In return for UBS Financial Services' extension or maintenance of credit in connection with this Account, you acknowledge that UBS Financial Services and its successors and assignees are authorized in the usual course of business to lend, relend, hypothecate, pledge or repledge separately or together with property of others, either to UBS Financial Services or to others, any Property which UBS Financial Services may carry for you on margin or until such time as payment is received for any such Property. Due to industry regulations, in certain circumstances, such loans may limit, in whole or in part, your ability to exercise voting rights of the securities lent. UBS Financial Services will determine which of your voting rights are limited via an impartial lottery allocation system. Therefore, in some cases, you may receive proxy materials indicating voting rights for a fewer number of shares than are held in your Account, or you may not receive any proxy materials. You agree to participate in the lottery allocation system and to be bound by its results. In connection with such loans and in connection with securities loans made to you in connection with short sales, UBS Financial Services is authorized to receive and retain certain benefits (including, but not limited to, interest on collateral posted for such loans) to which you will not be entitled. Your authorization of a margin feature shall remain in full force until UBS Financial Services receives written notice of revocation.

### Margin Requirements
You agree to maintain in the Account such positions and margin as required by all applicable statutes, rules, regulations, procedures and customs or as UBS Financial Services deems necessary or

9

advisable, and where applicable, to satisfy any and all margin calls issued in connection with the Account.

## Risk

You understand that there are substantial risks involved in trading securities on margin, especially in periods of market volatility. When you buy on margin, losses can increase significantly just as gains can increase. A decline in the value of the securities securing your margin loan may require you to deposit additional funds into the Account. Unlike a cash trade, when a trade is done on margin, losses can exceed the amount of capital you committed to the trade. If you fail to promptly meet a margin call, and under certain other circumstances, UBS Financial Services can, among other things, force the sale of securities in the Account without notifying you, and you may have to sell the securities at unfavorable prices. For small transactions, the costs involved in utilizing margin may outweigh any benefit to you. Please review carefully the disclosure document entitled "Loan Disclosure Statement—Risk Factors You Should Consider Before Using Margin or Other Loans Secured by Your Securities Accounts" included with the Application for a detailed discussion of the risks involved with the use of margin.

## Liquidation and Covering Positions

UBS Financial Services shall have the right, at any time and without prior notice, to satisfy a margin call or to obtain full payment of the margin loan, all without demand for margin or additional margin, other notice of sale or purchase, or other notice of advertisement. To satisfy a margin call or to obtain full payment of the margin loan, UBS Financial Services shall have the right in accordance with UBS Financial Services' general policies regarding UBS Financial Services' margin maintenance requirements then in existence (or, if in its discretion UBS Financial Services considers it necessary for your or UBS Financial Services' protection; or, in the event of a petition in bankruptcy, or for the appointment of a receiver, is filed by or against you, or an attachment is levied against any account with UBS Financial Services or in the event of your death or dissolution) to (i) require additional collateral, (ii) sell any or all Property in any of your accounts with UBS Financial Services, whether carried individually or jointly with others, (iii) buy any or all Property which may be held short in the Account, (iv) cancel any open orders and close any or all outstanding contracts or (v) liquidate any of your accounts with UBS Financial Services. Any such sales or purchases may be made at UBS Financial Services' discretion on any exchange or other market where such business is usually transacted, or at public auction or private sale, and UBS Financial Services may be the purchaser for UBS Financial Services' own account. UBS Financial Services shall not be responsible for losses incurred by you if UBS Financial Services sells your Property or positions, irrespective of whether or not UBS Financial Services notifies you of a margin call giving rise to such sale. UBS Financial Services may at any time, and in its sole discretion, subject to applicable rules and regulations, amend the requirements applicable to your margin account, including changing the level of credit available to you and applicable maintenance requirements. It is understood that a prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of UBS Financial Services' right to sell or buy without demand or notice as herein

provided. In addition, as set forth in the "Liquidation of Collateral or Account" section in this booklet, UBS Financial Services may satisfy any and all amounts that you owe in connection with the Account from any or all Property held in the Account or in any other account you may have with UBS Financial Services.

## Agreement for Joint Accounts

The form of ownership selected for your Account may have significant legal consequences. Any references to a particular form of joint ownership contained in the Application or other Account documentation are for convenience only and you should not rely on the reference as meaning such form of ownership is recognized in a particular state or otherwise appropriate for you.

If you need information about what form of ownership is appropriate for you, you should consult your tax or legal advisor. UBS Financial Services and its employees do not give tax or legal advice. If the Application includes an election for a Joint Account, you request and instruct UBS Financial Services to open an account (the "Joint Account") on UBS Financial Services' books for the purchase and sale of stocks, bonds, options and other securities, evidences of indebtedness and commodities. You agree that any and all controversies which may arise between you and UBS Financial Services are subject to the arbitration and governing law clauses contained herein. See the "Applicable Law" and "Arbitration" sections.

Any individual who is a Joint Account Holder has full power and authority to make purchases and sales, including short sales (if you have authorized margin), to withdraw any and all Property from, or to do anything else in reference to the Joint Account, either individually or in your joint names, and UBS Financial Services, the Card Issuer and the Check Provider are authorized and directed to act upon instructions received from any individual Account Holder and to accept payment and securities from any individual Account Holder for the credit of the Joint Account. In consideration of UBS Financial Services carrying a Joint Account on margin or otherwise, you each agree to be jointly and severally liable for the Joint Account and in connection with any transaction in the Joint Account and to pay on demand any debit balance or losses at any time due in the Joint Account. Any and all notices, communications, or any demands for margin calls sent to any individual Account Holder shall be binding upon all, and may be given by mail or other means of communication. UBS Financial Services, in its sole discretion, may at any time demand payment on any debit balance or losses, irrespective of when due, in the Joint Account, suspend all activity in the Joint Account pending instructions from a court of competent jurisdiction or require that instructions pertaining to the Joint Account or the property therein be in writing signed by both or all Account Holders. The individual authority of each individual Account Holder to act in connection with the Joint Account shall continue until a reasonable time after UBS Financial Services receives written notice from any individual Account Holder closing the Joint Account.

Each Account Holder agrees to indemnify and hold UBS Financial Services, the Primary Sweep Option, or Other Sweep Options or the RMA Money Market Portfolio, as applicable, and the Card

Issuer and Check Provider harmless from and against any losses, causes of action, damages and expenses arising from or as a result of UBS Financial Services or the Card Issuer or Check Provider following the instructions of any of the Account Holders.

*General Terms and Conditions*

**Client Representation**
The individual(s) signing the Application represent(s) to have reached the age of majority according to the laws of the state of your residence and according to the laws of the State of New York or if the individual(s) is signing on behalf of an organization, he/she/it has the authority to execute this Agreement. You represent that it is duly authorized to conduct business in the jurisdiction from which it transacts business. You agree to abide by UBS Financial Services' policies, and the "Rules and Regulations" as set forth in this booklet. You will notify UBS Financial Services promptly if you are or become employed by any of the following: any exchange or any corporation of which any exchange owns a majority of the capital stock; any member or firm registered on any exchange; any bank, trust company, insurance company; or any company or individual dealing, either as broker or principal, in stocks, bonds or any other securities, commodities, commercial paper or other financial instruments or assets. Except as provided for, or disclosed, in this Agreement, no one other than you has or will have an interest in the Account unless and until UBS Financial Services is notified in writing by you, and under such circumstances until UBS Financial Services Inc., UBS Financial Services' clearing firm, agrees to continue to carry the Account. You understand that UBS Financial Services is prohibited under the National Association of Securities Dealers (NASD) Free Riding and Withholding Interpretation from selling securities in certain public offerings to persons restricted by such rules. Unless you have so described on the Application, you are not presently so restricted, and if you are or become so restricted, you agree to notify UBS Financial Services promptly. You (or where you are not a natural person, each of the individual(s) signing the Application) represent that he, she or it has and will have all necessary licenses, authorizations, consents, approvals (and if you are not an individual, powers in its authorization papers) to enable you to effect all transactions in investments under the Terms and Conditions of this Agreement. The individual(s) signing the Application further represents and warrants that if you are a corporation, limited liability company, partnership, sole proprietorship, foundation/charitable organization, ERISA Plan, custodian, conservator, guardian, executor or trustee, each of such individuals or entities signing on behalf of you have the authority to open this Account on your behalf and to conduct transactions on your behalf, including without limitation, transactions involving the remittance or withdrawal of cash or other Property to or from an account and transfers/distributions from the Account by check, automatic fund transfer, debit card (if used) or otherwise to such individuals or entities and others.

Subject to any applicable financial privacy laws and regulations, you understand and agree that data regarding you and the Account may be shared with UBS Financial Services' affiliates. Further, subject to any applicable financial privacy laws and

regulations, you request that UBS Financial Services share such personal financial data with the Card Issuer and Check Provider and other non-affiliates of UBS Financial Services as is necessary or advisable to effect, administer or enforce, or to service, process or maintain, all transactions and accounts contemplated by this Agreement. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information and/or documentation that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents. We may also screen your name against various databases to verify your identity. In the event that UBS Financial Services is unable to verify your identity, UBS Financial Services shall have the right, at any time and without prior notice, to (i) sell any or all Property in any of your accounts with UBS Financial Services, whether carried individually or jointly with others, (ii) buy any or all Property which may be held short in your account, (iii) cancel any open orders and close any or all outstanding contracts, (iv) liquidate any of your accounts with UBS Financial Services, or (v) distribute the assets in your Account to you. UBS Financial Services shall not be responsible for losses you incur if UBS Financial Services sells your Property or positions, nor for taxable consequences of liquidating assets and/or distributing them to you.

You authorize UBS Financial Services to obtain a credit report or other credit references concerning you (including, without limitation, making verbal or written inquiries concerning your credit history) or to otherwise verify or update credit information given to UBS Financial Services at any time. You authorize the release of this credit report or other credit information to the Card Issuer and Check Provider or to UBS Financial Services affiliates as it deems necessary or advisable to effect, administer or enforce, or to service, process or maintain all transactions and accounts contemplated by this Agreement, and for the purpose of offering additional products, from time to time, to you. You authorize UBS Financial Services to exchange your information with any party it reasonably believes is conducting a legitimate credit inquiry in accordance with the Fair Credit Reporting Act. UBS Financial Services may also share credit or other transactional experience with your designated UBS Financial Services Financial Advisor or other parties designated by you.

**Rules and Regulations**
All transactions in the Account shall be subject to the constitution, rules, regulations and custom and usage of the exchange or market and its clearing agency, if any, on which such transactions are executed by UBS Financial Services or UBS Financial Services' agents, including UBS Financial Services Inc. and other subsidiaries and affiliates. Such transactions are also subject, where applicable, to the provisions, rules and regulations of the Securities and Exchange Commission, the Commodity Futures Trading Commission, and the Board of Governors of the Federal Reserve System in existence at this time and as later amended and supplemented. You acknowledge that UBS Financial Services is subject to examination by various federal, state and self-regulatory

11

organizations and that books and records maintained by UBS Financial Services are subject to inspection and subpoena by these regulators and by federal, state, and local law enforcement officials. You also acknowledge that such regulators and officials may, pursuant to treaty or other arrangements, in turn disclose such information to the officials or regulators of other countries, and that U.S. courts may be required to compel UBS Financial Services to disclose such information to the officials or regulators of other countries. You agree that UBS Financial Services may disclose to such regulators and officials information about your transactions in the Account without notice to you. In addition, UBS Financial Services may in the context of a private dispute be required by subpoena or other judicial process to disclose information or produce documentation related to you, the Account or other accounts at UBS Financial Services. You acknowledge and agree that UBS Financial Services reserves the right, in its sole discretion, to respond to subpoenas and judicial process as it deems appropriate.

**Anti-Money Laundering**
UBS Financial Services is firmly committed to compliance with all applicable laws, rules and regulations, including those related to combating money laundering. You understand and agree that you must take all necessary steps to comply with the anti-money laundering laws, rules and regulations of your country of origin, country of residence and the situs of your transaction.

**Liability**
You acknowledge and agree that you will be personally liable for any fees or other obligations accruing to UBS Financial Services under this Agreement and you (including each joint account holder) hereby agree to indemnify UBS Financial Services, the Other Sweep Options or the Funds as applicable, and the Card Issuer and the Check Provider against any losses arising from (a) any and all Account transactions effected or incurred by any person authorized to effect such transactions, including without limitation redemption of any shares of Funds, Other Sweep Options and any other money market fund and similar fund shares, deposits and withdrawals of funds from the Primary Sweep Option, use of the check writing privilege (including unsigned drafts presented by third parties), security transactions, Card transactions, Bill Payment Services and Electronic Funds Transfer Service transactions and (b) any debits, charges, fees or other obligations in the Account.

You shall at all times be liable for the payment of any amounts advanced, any debit balances or other obligations owing in the Account and you shall be liable to UBS Financial Services for any deficiency remaining in the Account in the event of liquidation thereof, in whole or in part, by either you or UBS Financial Services. Additionally, you agree to be liable to UBS Financial Services for any accrued interest on any such amounts at UBS Financial Services' then customary rate, if applicable, or otherwise the maximum rate allowable by law. You further agree to indemnify UBS Financial Services against any loss, cost, expense, liability or damages arising out of your obligations hereunder. You will be liable for the reasonable costs and expenses of collection (including attorney's fees), for any unpaid losses, fees or other

amounts owed by you to UBS Financial Services or against which you have indemnified UBS Financial Services under the preceding sentence. You shall be liable for any and all losses, claims, damages, penalties, fines, settlements, costs, causes of action, debts, dues, sums of money, accounts, accountings, reckonings, acts, omissions, demands, obligations, actions, suits, proceedings, judgments, liabilities and expenses (including without limitation all expenses of litigation or preparation therefor, whether or not UBS Financial Services is a party thereto) which UBS Financial Services may pay or incur arising out of any claims by any person or entity in any way relating to this Account. Neither UBS Financial Services nor its officers, directors, employees or agents shall under any circumstances or for any reason have any liability to you for any consequential damages arising out of this Agreement and/or any services provided pursuant to this Agreement. You (and, in the case of a Joint Account, each individual Account Holder) agree that, in the event of the death of any Account Holder, the survivor(s) or the estate shall immediately give UBS Financial Services written notice thereof, and UBS Financial Services may, before or after receiving such notice, take such actions, require such papers, inheritance or estate tax waivers or federal transfer certificates, retain such portion of the Account or any other account you may have with UBS Financial Services and restrict transactions in the Account as UBS Financial Services may deem advisable to protect UBS Financial Services against any tax, liability, penalty or loss under any present or future laws or otherwise. Your estate and the Account shall be jointly liable for all costs (including reasonable attorney's fees and costs) UBS Financial Services and/or the Card Issuer and the Check Provider may incur in connection with the disposition of the Account and related assets and liabilities in the event of your death, disability or dissolution.

UBS Financial Services and/or the Card Issuer and the Check Provider shall be entitled to recover from a Joint Account or from any Account Holder prior to any distribution of Property such costs as it may incur, including reasonable attorney's fees, as a result of any dispute between the Account Holders relating to or arising from a Joint Account or occasioned by the death of one or more Account Holders holding a Joint Account.

The estate of any Account Holder holding a Joint Account who shall have died shall be liable and the survivor shall continue to be liable, jointly and severally, to UBS Financial Services and/or the Card Issuer and/or the Check Provider for any net debit balance or loss in the Joint Account in any way resulting from the completion of the transactions initiated prior to receipt, by UBS Financial Services, of the written notice of the death of the decedent, or incurred in the liquidation of the Joint Account or the adjustment of the interests of the respective parties. The estate of the decedent and the survivor shall hereby jointly and severally agree to fully indemnify and hold harmless UBS Financial Services and the Card Issuer and the Check Provider from any liability for any taxes which may be owed in connection therewith or any claims by third parties.

If the Account is maintained with rights of survivorship, in the event of the death of either or any Account Holder, all assets in the Account shall pass to and be vested in the survivor(s) on the

same terms and conditions as previously held, without in any manner releasing the decedent's estate from the liabilities herein.

## Security Interest

As security for the payment of all liabilities or indebtedness presently outstanding or to be incurred under this or any other agreement between UBS Financial Services and you, you grant UBS Financial Services a security interest in any and all Property belonging to you or in which you may have any legal, equitable or other interest held by UBS Financial Services or carried in any of your accounts with UBS Financial Services. All Property shall be subject to such security interest as collateral for the discharge of your obligations to UBS Financial Services, wherever or however arising and without regard to whether or not UBS Financial Services made loans with respect to such Property. In enforcing UBS Financial Services' security interest, UBS Financial Services shall have the discretion to determine the amount, order and manner of Property to be sold and shall have all the rights and remedies available to a secured party under the UCC. Without UBS Financial Services' prior written consent, you will not cause or allow any of the Property held in any of your accounts with UBS Financial Services, whether now owned or hereafter acquired, to be or become subject to any liens, security interests, mortgages or encumbrances of any nature other than UBS Financial Services' security interest therein.

## Liquidation of Collateral or Account

UBS Financial Services may satisfy any and all amounts that you owe UBS Financial Services in connection with the Account from Property held by UBS Financial Services or carried in any of your accounts with UBS Financial Services. Additionally, UBS Financial Services may sell any or all Property held in any of your accounts with UBS Financial Services and cancel any open orders for the purchase or sale of any Property without notice in the event of your death or dissolution or whenever in UBS Financial Services' discretion UBS Financial Services considers it necessary for its protection. In such events UBS Financial Services also may borrow or buy-in all Property held in any of your accounts with UBS Financial Services required to make delivery against any sale effected for you. Such sale or purchase may be public or private and may be made without advertising or notice to you and in such a manner as UBS Financial Services may in its discretion determine. No demands, calls, tenders or notices by UBS Financial Services shall invalidate this waiver by you. At any such sale UBS Financial Services may purchase the Property free of any right of redemption and you shall be liable for any remaining deficiency in any of your accounts with UBS Financial Services, plus any accrued interest on such deficiency at UBS Financial Services' then customary rate, if applicable, or, if not applicable, the maximum rate allowable by law. UBS Financial Services shall not be liable to you in any way for any adverse tax consequences resulting from a liquidation of appreciated collateral.

## Orders, Executions, Deliveries, Settlements and Oral Authorizations

Any order which you give shall be binding upon you, and your personal representative(s) or authorized agents until UBS Financial Services receives notice of your death, in the case of an individual,

or dissolution, in the case of an entity. Such death or dissolution and notice will not affect UBS Financial Services' right to take any action which UBS could have taken if you had not died or been dissolved. You agree that UBS Financial Services shall incur no liability in acting upon oral instructions given to UBS Financial Services by you or your authorized agent concerning the Account. In giving orders to sell, you will inform UBS Financial Services which sales are "short" sales and which are "long" sales. A "short" sale means any sale of a security not owned by the seller or any sale that is consummated by delivery of a borrowed security. The designation of a sale order as "long" is your representation that you own the security, and if the security is not in UBS Financial Services' possession at the time of the contract for sale, you agree to deliver it to UBS Financial Services by the settlement date. In case of non-delivery of a security, UBS Financial Services is authorized to purchase the security to cover your position and charge any loss, commissions and fees to the Account. You agree that if UBS Financial Services fails to receive payment for securities purchased by you, UBS Financial Services may, without prior demand or notice, sell securities or other Property held by UBS Financial Services in any of your accounts with UBS Financial Services and any resulting loss may be charged to the Account. You understand and acknowledge that securities can be traded in more than one marketplace. Unless you direct that an order to purchase or sell securities be executed on a specified exchange or market and UBS Financial Services agrees to such execution, UBS Financial Services will, in its sole discretion, subject to applicable regulatory requirements and without prior notification to you, execute the order on the over-the-counter market in any location or on any exchange, including a foreign exchange where such security is traded, either on a principal or agency basis.

## Principal Transactions; Client/Firm Relationship

You understand that UBS Financial Services Inc. may execute securities transactions in the Account acting as principal and expressly directs UBS Financial Services Inc. to enter into such principal transaction in any case where UBS Financial Services Inc. would execute such transactions as principal in the ordinary course of its business. Unless otherwise agreed to in writing, (1) you agree that UBS Financial Services Inc. shall have no authority or responsibility to act as a "fiduciary" as such term is defined in Section 3(21) of ERISA or Section 4975(e)(3) of the Internal Revenue Code, or to act as an "investment adviser" as such term is defined in Section 1.1 of the Investment Advisers Act of 1940, and (2) you shall make your own independent decisions regarding investments in the Account.

## For ERISA Plans, Trusts and Custodial Accounts

If you are acting as executor, trustee, conservator, guardian or custodian, you understand that you are a fiduciary on behalf of the beneficial owners of the Account and that you have a fiduciary duty to use the services and features provided through the Account for the benefit of the beneficial owners of the Account and not for your own benefit. You acknowledge that you have made an independent determination that Account activity is suitable and appropriate for the beneficial owners of such Account and that the compensation to be received by UBS Financial

13

Services in connection with the Account is reasonable. You understand and agree that this determination is solely your responsibility and not UBS Financial Services'.

### Non-disclosure of Confidential and Material, Non-public Information

UBS Financial Services provides a variety of services to its customers. In connection with providing these services, employees of UBS Financial Services may from time to time come into possession of confidential and material, non-public information. Under applicable law, employees of UBS Financial Services are prohibited from improperly disclosing or using such information for their personal benefit or for the benefit of any other person, regardless of whether such other person is a customer of UBS Financial Services. UBS Financial Services maintains and enforces written policies and procedures that (1) prohibit the communication of such information to persons who do not have a legitimate need to know and (2) assure that UBS Financial Services meets its obligations to customers and otherwise remains in compliance with applicable law. You understand and agree that these policies and procedures are necessary and appropriate and recognizes that, in certain circumstances, employees of UBS Financial Services will have knowledge of certain confidential and material, non-public information which, if disclosed, might affect your decision to buy, sell or hold a security, but that they shall be prohibited from communicating such information to you. You also understand and agree that UBS Financial Services shall have no responsibility or liability to you for failing to disclose such information to you as a result of following its policies and procedures designed to provide reasonable assurances that it is complying with the law.

### Non-U.S. Securities

If the Account contains securities issued by a non-U.S. issuer, you acknowledge, to the extent UBS Financial Services Inc. is acting solely as a custodian with respect to such securities, that absent arrangements by either the issuer or you with UBS Financial Services to the contrary regarding distribution of issuer communications, UBS Financial Services Inc. will not be obligated to distribute issuer communications to you.

### Restrictions on Trading

You understand that UBS Financial Services may, in its sole discretion, with or without prior notice, prohibit or restrict trading of securities or substitution of securities in the Account and refuse to enter into any transactions with you.

### Deposits of Funds

All checks for deposit to the Account should be made payable to, or be endorsed to, UBS Financial Services Inc or to UBS Financial Services Inc. for the benefit of [Your Name] and/or [Title of Account].

### Electronic Transfer of Funds

When giving UBS Financial Services instructions to accept or transfer funds electronically to or from the Account to any bank or other entity, you agree to provide UBS Financial Services with an accurate name and account number designating the account to receive such funds. You acknowledge that neither UBS Financial

Services nor the bank or other receiving or transmitting entity is under any obligation to verify the identity of the beneficiary of the funds transfer and may rely exclusively upon the name or account number provided by you. You agree to indemnify and hold UBS Financial Services harmless from and against any and all cost, expense, claims or liabilities arising from the provision by you of an inaccurate name or account number. When accepting or transferring funds, neither UBS Financial Services nor the bank or other receiving or transmitting entity is under any obligation to determine whether the name and number provided by the Client refer to the same person or entity.

### Transfer of Excess Funds; Exchange Rate Fluctuations

UBS Financial Services may transfer excess funds between any of your accounts (including the Account) with UBS Financial Services (including commodity accounts) for any reason not in conflict with the Commodity Exchange Act or any other applicable law. If UBS Financial Services effects any transactions for you requiring a foreign currency, any profit or loss as a result of a fluctuation in the applicable exchange rate will be charged or credited to the Account.

### Principal, Interest and Dividend Payments

With respect to principal and interest payments on debt instruments, UBS Financial Services may credit the Account with principal and interest due on the payment dates and UBS Financial Services will be entitled to recover any such payments from you if the same are not actually received by UBS Financial Services from the trustee or paying agent. You acknowledge that interest will not be paid to you on credit balances in the Account unless specifically agreed to by UBS Financial Services in writing. UBS Financial Services is not required to remit interest or dividends to you on a daily basis.

### Impartial Lottery Allocation System; Call Features

When UBS Financial Services holds bonds or preferred stocks on your behalf in UBS Financial Services' (street) name or in bearer form which are callable in part, you agree to participate in the impartial lottery allocation system of the called securities in accordance with the provisions of the New York Stock Exchange, Inc. rules. Further, you understand that when the call is favorable, no allocation will be made to any account in which UBS Financial Services, its officers, or employees have a beneficial interest until all of your other positions in such securities are satisfied on an impartial lottery basis. You understand that UBS Financial Services may not receive timely notice of calls and may be required to allocate called securities on an "as of" basis. In those cases, you agree to participate in the lottery allocation system and to be bound by its results. For debt securities, call or other redemption features, in addition to those disclosed on the trade confirmation, may exist. Debt securities subject to call or redemption features, such as sinking funds, may be redeemed in whole or in part before maturity, or before the first scheduled call dates. The existence of sinking funds, or other special mandatory redemption features, may not be disclosed on a trade confirmation. It is your obligation to review all prospectuses and offering statements you may receive, and to understand the risks of extraordinary calls or early redemptions, which may affect yield. Issuers may from time

to time publish notices of offers to redeem debt securities within limited time, price and tender parameters. You understand and agree that UBS Financial Services is not obligated to notify you of such published calls, nor will UBS Financial Services tender any securities on your behalf when you have failed to request the tender in a timely manner.

## Fees and Charges

You will pay UBS Financial Services the applicable RMA/Business Services Account BSA annual service fee as set forth in this section. The annual service fee and any other fees are subject to change by UBS Financial Services at any time. UBS Financial Services reserves the right to begin to impose charges for utilization of RMA or Business Services Account BSA features beyond the annual fee at any future date. You authorize UBS Financial Services to charge the annual service fee and to charge your Account for all other fees you owe. If this is a Custodial account and you do not select any RMA features the RMA annual service fee is waived. If the Custodial account has any of the RMA features, the RMA annual service fee will apply.

You will pay the Check Provider and/or UBS Financial Services customary fees for specially imprinted checks, stop payment orders, copies of checks more than one month old, and checks returned for insufficient funds.

UBS Financial Services reserves the right to begin to impose charges for utilization of RMA or Business Services Account BSA features beyond the annual fee at any future date.

You understand that UBS Financial Services Inc. may impose various service charges and other fees relating to the Account as well as charge commissions, fees, markups and/or other fees and charges for execution of transactions to purchase and sell securities, options or other Property through UBS Financial Services and its affiliates, which amounts may include, but not be limited to, transaction fees (rounded to the nearest penny on each sale transaction); subscription fees for U.S. Government and Government agency issues; security transfer fees; insurance premiums, and other charges associated with the handling and transfer of securities, funds and assets. You agree to pay such charges, commissions and/or fees at UBS Financial Services Inc.'s then prevailing rates. You also understand that such charges, commissions and/or fees may be imposed or changed from time to time without notice to you, unless required by rules or regulations, and you agree to be bound thereby.

Unless the Account is for an Individual Retirement Account, ERISA Plan, 403(b)(7) Account, or Coverdell Education Savings Account that UBS Financial Services Inc. has investment discretion over or has agreed in writing to act as a "fiduciary" (as defined in Section 3(21) of ERISA or Section 4975(e)(3) of the Internal Revenue Code) to, UBS Financial Services will earn income (at prevailing market rates on overnight investments) on deposits and credits to the Account, until the cash balances are invested or swept into the Deposit Account Sweep Program, a money fund or Other Sweep Option.

Once cash balances are credited to the Account they are generally invested in the applicable sweep option on the next business day pursuant to the policies contained in this booklet (subject to any investment minimums for the sweep option, as provided in the applicable prospectus). You agree that the amount of income shall be part of UBS Financial Services Inc. compensation for services rendered with respect to the Account, which shall be separate from and in addition to compensation described in the applicable fee schedule for the Account and that the amount of such compensation, together with all compensation received by UBS Financial Services, is reasonable. You may be subject to an account transfer fee if you instruct UBS Financial Services Inc. to transfer the Account. In addition, you will be charged an administrative fee for the Account if it produces revenues below a minimum threshold amount for the 12-month period ending each November 30. If this is an Individual Retirement Account, you may be subject to an account transfer fee if you instruct UBS Financial Services Inc. to transfer the Account. You agree to pay a late charge, to the extent permitted by law, if you purchase securities on a cash basis and fail to pay for such securities by the settlement date. Any late charge UBS Financial Services Inc. may impose will be at the maximum rate of interest set forth in UBS Financial Services Inc.'s then current "Statement of Credit Practices" (which is found in this booklet), if applicable, or otherwise at the maximum rate permissible by law, and may be charged from the settlement date to the date of payment, without regard to UBS Financial Services Inc.'s rights to sell the securities in accordance with this Agreement and applicable laws, rules and regulations. You may obtain UBS Financial Services Inc.'s then current fees and charges by contacting your Financial Advisor or the local branch office.

15

Set forth below are some of the more common fees and charges normally associated with the maintenance of the Account, but the list is not all-inclusive. Your Financial Advisor can supply specific information regarding fees and charges that may apply to the Account. Note, however, that certain types of accounts, such as UBS InsightOne, are exempt from several of the charges listed below as a result of fees charged for such accounts instead of transaction fees.

| | |
|---|---|
| Resource Management Account[1,5] (Primary Account) | $150.00 |
| Resource Management Account[1,5] (Secondary Account) | $ 75.00 |
| IRA Resource Management Account (Primary Account) | $150.00 |
| IRA Resource Management Account (Secondary Account) | $ 75.00 |
| Individual Retirement Account (IRA)[5] | $ 40.00 |
| Coverdell Education Savings Account (CESA)[1] | $ 40.00 |
| 403(b)(7) Custodial Account[1] | $ 40.00 |
| Qualified Plan Prototype Document Fee[1] | $100.00 |
| RMA/IRA Fee Cap[5] | $325.00 |
| Business Services Account BSA[1] | $150.00 |
| Business Services Account BSA Qualified Plans[1] | $150.00 |
| UBS Rewards[2] | $ 50.00 |
| IRA and 403(b)(7) Termination/Transfer Fee | $ 75.00 |
| CESA Transfer Fee | $ 75.00 |
| Resource Management Account/Business Services Account BSA Termination Fee | $ 75.00 |
| Processing and Handling Fee (per transaction) | $ 5.25 |
| Account Transfer Fee | $ 75.00 |
| Security Transfer Fee[3] | $ 25.00 |
| Returned Check | $ 25.00 |
| Account Maintenance Fee[4] | $ 75.00 |
| Stop Payment Transfer Fee | $ 15.00 |
| RMA / Business Services Account BSA Bounced Check Fee | $ 15.00 |
| Bill Payment, Automatic Payment, or Electronic Funds Transfer Returned-Item Fee | $ 15.00 |
| Federal Fund Wire Transfer (outgoing wires only) | $ 25.00 |

**Program Level Fees**

| | Select Level | | Premier Level | | Charter Level | |
|---|---|---|---|---|---|---|
| **Single Account** | | | | | | |
| Account Holder | $ | 0 | $ | 350 | $ | 1500 |
| 2nd Individual | $ | 0 | $ | 175 | $ | 1000 |
| 3rd Individual | $ | 0 | $ | 175 | $ | 1000 |
| 4th Individual | $ | 0 | $ | 175 | $ | 1000 |
| 5th Individual and above | $ | 50 | $ | 175 | $ | 1000 |
| **Joint Account** | | | | | | |
| Account Holder | $ | 0 | $ | 350 | $ | 1500 |
| 2nd Individual | $ | 0 | $ | 0 | $ | 0 |
| 3rd Individual | $ | 0 | $ | 175 | $ | 1000 |
| 4th Individual | $ | 0 | $ | 175 | $ | 1000 |
| 5th Individual and above | $ | 50 | $ | 175 | $ | 1000 |

A change from Premier Level to Charter Level will result in another fee being assessed to the account. We will rebate the Premier Level fee to the account if the account upgrades to the Charter Level within 6 months of the Premier Level fee being charged

1 Annual fee.
2 For Business Services Account BSA, this fee is deducted from your account at the end of the month following enrollment.
3 Per security charge for legal transfer, transfer and ship, and restricted stock re-registration.
4 This fee is charged if the account generates less than $100 in commissions, account fees (e.g., fees for RMA, Business Services Account BSA, Managed accounts under a wrap fee program) or margin interest over a specified 12 month period.
5 Eligibility for the RMA and IRA Fee Cap will be calculated based on the number of RMAs and IRAs in your Marketing Relationship. For information on how UBS Financial Services determines your Marketing Relationship, please see Section III, page 12 of this booklet.

16

### Interest Charges

All amounts advanced and other balances due shall be charged interest in accordance with UBS Financial Services' usual custom, which may include the compounding of interest, including any increases in rates which reflect adjustments in, as applicable, UBS Financial Services' Base Loan Rate (as such term is defined in the Statement of Credit Practices) or other reference rate (i.e., LIBOR Rate or Prime Rate) referred to in the applicable Statement of Credit Practices and such other charges as UBS Financial Services may make to cover UBS Financial Services' facilities and extra services.

*Additional Compensation*

**Revenue Sharing Compensation.** In addition to the sales loads and 12b-1 fees, and processing fees, UBS Financial Services Inc. receives revenue sharing payments from many of the distributors and/or advisors of the mutual funds that we sell. These amounts are based on two components (i) the amount of sales by UBS Financial Services Inc. of the mutual funds of a particular fund family, and (ii) the amount of mutual fund assets of that particular fund family held by UBS Financial Services Inc. clients. These payments are made in exchange for, and represent the value to those mutual fund companies of, being able to distribute their mutual funds through our network of Financial Advisors and their clients. We require that these payments be made directly by the distributor or advisor to us and do not permit payments to be made by use of mutual fund portfolio trading commissions, because revenue sharing payments are intended to compensate us for ancillary services in connection with effecting sales of mutual fund shares. We receive payments of this kind from many of the approximately 150 mutual fund distributors and/or advisors whose mutual funds are made available to our clients. Generally, UBS does not rebate any of these amounts to you or pay them to the Financial Advisor or his or her branch office.

**Please see our public website at**
*www.ubs.com/mutualfundrevenuesharing* **for a current description of our revenue sharing compensation.**

We receive payments of this kind from many of the approximately 150 different mutual fund distributors and/or advisors whose mutual funds are made available to our clients. Revenue sharing payments are intended to compensate UBS Financial Services Inc. for ancillary services in connection with effecting purchases of shares of the funds. These payments are made in exchange for, and represent the value to those mutual fund companies of, being able to distribute their mutual funds through our network of Financial Advisors and their clients.

Based on our reviews and evaluations of the mutual fund companies, we divide the universe of fund companies whose funds we offer into two categories: (i) fund companies with branch access ("Tier I" fund companies); and (ii) fund companies without branch access ("Tier II" fund companies). Representatives of Tier I fund companies are provided, subject to Branch Office Manager discretion, greater access to our branch offices and Financial Advisors for training, marketing and other promotional activities. As a general

rule, such in-person branch access and marketing support is not provided to Tier II fund companies. Branch access and other corporate support provides enhanced opportunities for the mutual fund companies to promote their mutual funds to our Financial Advisors, which could cause our Financial Advisor to focus on, and recommend to clients, mutual funds from Tier I fund companies in the normal course of their business. Tier I fund companies represented approximately 80% of our total mutual fund sales in 2004. A list of our Tier I mutual fund companies is available on our public website at *www.ubs.com/mutualfundrevenuesharing.*

Many mutual funds companies in both Tier I and Tier II pay revenue sharing to us. While the payment of revenue sharing is a factor in determining whether a fund company is placed in Tier I or Tier II, such payment is never the sole determinant in these decisions. UBS Financial Services Inc. determines the level of access to our branches based on our own review and evaluation of mutual funds and fund families.

Although we seek to apply a level, standard payment schedule for all of the mutual fund companies whose funds we sell, we recognize that mutual fund companies approach revenue sharing in a variety of ways, and that some mutual fund companies may decline to pay revenue sharing exactly at the levels listed above or at all, which may present a financial disincentive for us to promote the sale of those funds that do not pay us at the levels listed above. **Please see** *www.ubs.com/mutualfundrevenuesharing* **for a detailed description of the revenue sharing compensation.**

We also receive networking fees in consideration for certain other services we provide mutual funds. These fees generally are paid from investor assets in mutual funds, but in some cases may be subsidized in part by affiliates of the mutual funds, and are generally calculated by applying our standard networking rate of $12 to each mutual fund position that exceeds $500 and is held at UBS.

Revenue sharing payments may present a conflict between our interests and the interests of our customers, because the payments give us a financial incentive to recommend that our customers buy and hold shares of those funds that we maintain on our distribution platform and for which we receive revenue sharing payments. Although approximately 2,500 mutual funds from nearly 150 different mutual fund families are available through our distribution system, this is only a part of the universe of mutual funds that are available to our customers in the marketplace. Certain other mutual may be purchased by our customers through the FundConnect system for a separate charge. In addition, because the rate and amount of revenue sharing payments that we receive may vary among the 150 mutual fund families on our distribution platform, we may have a financial disincentive to promote the sale of those funds that do not pay us at those stated rates.

In addition to commissions received in connection with the sale or distribution of annuity contracts and unit investment trust units to our clients, we receive revenue sharing compensation from many of the insurance companies underwriting the annuity contracts, affiliates of the insurance companies or sponsors of the unit investment trusts we distribute.

17

**Contributions to Training and Education Expenses.** In addition to the contributions listed above, from time to time, mutual fund, insurance companies, money managers or their affiliates ("vendors") may subsidize a portion of the cost of training and achievement seminars we offer to Financial Advisors through specialized firm-wide programs and consulting training forums.

The subsidies may vary among vendors, and no vendor is required to participate in the seminars or to contribute to the costs of the seminars in order to have their products available or distributed through our platform. Your Financial Advisor does not receive a portion of these payments.

**Non-Cash Compensation.** In addition to the revenue sharing payments describe above, we and our Financial Advisors, may, from time to time, receive non-cash compensation from mutual fund companies, money managers, insurance vendors, and sponsors of products we distribute in the form of: (i) occasional gifts; (ii) occasional meals, tickets or other entertainment; (iii) sponsorship support of training events for our sales force; and/or (iv) various forms of marketing support.

**Other Compensation.** In addition, our affiliates receive trading commissions and other compensation from mutual funds and insurance companies whose products we distribute.

**Disability or Incompetency**
This Agreement shall survive your death, dissolution, disability or incompetence.

**Unforeseeable Events/Force Majeur**
UBS Financial Services shall not be liable for losses caused directly or indirectly by government restrictions, exchange controls, exchange or market rulings, suspension of trading, war, strikes or other conditions beyond UBS Financial Services' control, including but not limited to, extreme market volatility, trading volumes, or the failure of any processing or trading system whether proprietary or non-proprietary in nature.

**Successors and Assigns**
This Agreement shall be binding upon you and your personal representatives, heirs, estate, executors, administrators, committee and/or conservators, successors and assigns, and shall inure to the benefit of UBS Financial Services and its successors and assigns and each subsequent holder of this Agreement. You may not assign or transfer any of your rights or obligations under this Agreement without UBS Financial Services' prior written consent. UBS Financial Services may assign this Agreement or any of its rights and powers under this Agreement, and, in the event of such assignment, the assignee shall have the same rights and remedies as if originally named in this Agreement in UBS Financial Services' place. From and after the date of any such assignment, UBS Financial Services shall have no further liability to you under the terms of this Agreement.

**Sub-Brokers**
UBS Financial Services may employ sub-brokers and shall be responsible only for reasonable care in their selection. UBS Financial Services may deal with market makers or members of any exchange known as specialists or known as odd-lot dealers and in the execution of your orders they may act as sub-brokers for you and may also buy or sell the Property for themselves as dealers for their own account.

UBS Financial Services Inc. may hold securities as a Securities Intermediary in accordance with industry custom and practice and employ one or more Securities Intermediaries, including Securities Intermediaries outside the United States, with respect to any and all Property held for you.

**Introduced Accounts**
If the Account has been introduced to UBS Financial Services Inc. and is carried by UBS Financial Services Inc. only as a clearing broker, you agree that UBS Financial Services Inc. is not responsible for the conduct of the introducing broker and UBS Financial Services Inc.'s only responsibilities to you relate to UBS Financial Services Inc.'s execution, clearing and bookkeeping of transactions in the Account and to any other services and responsibilities agreed to in writing by UBS Financial Services Inc. During the term of any clearing agreement between UBS Financial Services Inc. and any introducing broker/dealer that UBS Financial Services Inc. is providing clearing services for, UBS Financial Services Inc.'s rights and benefits under this Agreement shall inure to any such introducing broker/dealer. UBS Financial Services Inc. is authorized to accept from the introducing broker, without further inquiry or investigation by UBS Financial Services Inc., (a) orders for the purchase or sale in the Account of such securities and other Property on margin or otherwise, and (b) any other instructions from the introducing broker concerning the Account. In no event shall UBS Financial Services Inc. be liable for any acts or omissions of any introducing broker or its agents, contractors or employees.

**Independent Research**
UBS Financial Services offers you access to independent research on all domestic and selected international stocks covered by UBS Research. The providers of this independent research are chosen by an Independent Consultant, not by UBS Financial Services. You agree that UBS Financial Services will not be responsible or liable for (i) the procurement decisions of the Independent Consultant with respect to the independent research, (ii) the independent research or its content, (iii) customer transactions, to the extent based on the independent research, or (iv) claims arising from or in connection with the inclusion of independent research ratings in the Firm's confirmations and periodic account statements or on the UBS independent research website, to the extent such claims are based on those ratings. You also agree that UBS Financial Services will not be required to supervise the production of the independent research procured by the independent consultant and will have no responsibility to comment on the content of the independent research.

18

## Changes to Agreement

Upon written notice to you, UBS Financial Services may change this Agreement at any time and may cease to offer any or all services described in this Agreement. Any such change will become effective on the date of the notice unless the notice specifies a later date. However, you will remain liable for any outstanding debits and/or charges in the Account. Your continued acceptance of services under this Agreement will be deemed to constitute acceptance of such change. All other changes to this Agreement shall not be effective except by a writing signed by UBS Financial Services.

## Termination of Account

You understand that you or UBS Financial Services may terminate the Account or any Account feature or service at any time and for any reason. If the Account is terminated either by UBS Financial Services or you, you will promptly return any unused checks and Card(s). Failure to return such checks and Card(s) to UBS Financial Services may result in a delay in complying with your instructions as to the disposition of your assets in the Account. You will remain responsible for debits and charges whether arising before or after such termination. You agree to pay UBS Financial Services and the Card Issuer and the Check Provider promptly for all amounts outstanding in the Account. Upon termination, you authorize UBS Financial Services to liquidate all of your securities that cannot be transferred into your name and to distribute all such assets to you whether or not such liquidation and/or distribution shall cause taxable consequences to you. You further agree that UBS Financial Services may withhold from the assets then in the Account any amounts that UBS Financial Services reasonably believes necessary to pay (1) any federal, state or local tax withholding obligations of UBS Financial Services and (2) for any outstanding debts to UBS Financial Services or the Card Issuer and the Check Provider or their respective affiliates or subsidiaries, and to apply such assets first to pay UBS Financial Services, and second to pay the Card Issuer and the Check Provider, if applicable.

## Additional Documentation

Should any supplemental agreements be required as a result of your request for UBS Financial Services to approve additional services or features available from UBS Financial Services, or be required for any other reason whatsoever, you will execute UBS Financial Services' form of such agreements, which shall thereupon supplement and, if applicable, become part of this Agreement and apply to the Account.

## Waiver Not Implied

UBS Financial Services' failure to insist at any time upon strict compliance with this Agreement or with any of its terms or any continued course of such conduct on UBS Financial Services' part shall not constitute or be considered a waiver by UBS Financial Services of any of its rights or your obligations.

## Binding Notice of Agreement

You expressly agree that UBS Financial Services shall not be bound by any representation or agreement made by any of UBS Financial Services' employees or agents which purports to affect or diminish UBS Financial Services' rights under this Agreement.

## Accuracy of Reports; Communications

You shall carefully review all monthly or quarterly account statements and confirmations promptly upon receipt for accuracy and consistency with your instructions and investment objectives. You shall immediately notify the Branch Office Manager of the UBS Financial Services Branch Office where the Account is maintained if such documents are not received in a timely manner or are inaccurate. Unless otherwise set forth in this booklet, confirmation of orders and monthly or quarterly statements of the Account shall be conclusive if not objected to in writing addressed to the Branch Office Manager of the UBS Financial Services Branch Office where the Account is maintained within ten days after mailing by UBS Financial Services to you. You acknowledge that UBS Financial Services may rely upon your failure to object in a timely manner to transactions or entries and shall not be responsible for losses which could have been avoided had you given prompt notice as provided above. All such documents shall thereafter be deemed accurate and in accordance with your instructions and investment objectives. Notwithstanding the foregoing, if you are mistakenly credited with funds or securities, you shall promptly return such funds or securities upon your discovery of the error or upon request by UBS Financial Services. UBS Financial Services shall not be responsible for any transactions not reflected on your monthly or quarterly statement unless an objection is made in writing to the Branch Office Manager in accordance with the above requirements. You shall notify UBS Financial Services in writing if you do not receive a confirmation within ten days from the date of a transaction.

You acknowledge and agree that UBS Financial Services may, from time to time, monitor and/or electronically record conversations between you and UBS Financial Services' employees or agents for the purpose of quality assurance, employee training, and the mutual protection of you and UBS Financial Services. Any such recordings may be offered by UBS Financial Services as evidence in any arbitration or other proceeding relating to this Agreement or the Account.

You acknowledge that the price of any security shown on a confirmation which has been executed on more than one exchange, or in more than one market, or had multiple executions, may be the average price of the security for those executions and agree to the use of such average price trades on confirmations issued by UBS Financial Services Inc. Actual prices, quantities of each execution and market of execution shall be provided upon written request.

## Written Notice

Communications may be sent to you at your address or at such other address as you give to UBS Financial Services in writing. All communications so sent, whether by mail, telegraph, facsimile, electronic mail, messenger or otherwise will be considered to have been given to you personally upon such sending, whether or not you actually received them.

19

Except for ERISA Plans and Individual Retirement Accounts, where UBS Financial Services has forwarded proxy materials to you, and does not receive voting instructions from you within the designated time frame, UBS Financial Services will exercise its discretionary vote as recommended by the Board of Directors of the issuer of the security, where permitted by the rules of the New York Stock Exchange.

## Entire Agreement

The provisions of this Agreement and the documents referenced herein constitute, and are intended to constitute, the entire agreement between you and UBS Financial Services with respect to the Account and supercede any prior agreements relating thereto. Other than as expressly provided in this Agreement, UBS Financial Services does not undertake any obligations and incurs no duties or obligations other than those set forth in this Agreement, statute or government regulation.

## Applicable Law

This Agreement, its enforcement and the relationship between you and UBS Financial Services shall be governed by the laws of the State of New York, including the arbitration provisions contained herein, without giving effect to the choice of law or conflict of laws provisions thereof, and shall be binding upon you, your authorized agents, personal representatives, heirs, successors and assigns, provided that there is no inconsistency with the federal securities laws, and provided further in connection with any Card issued, the Cardholder Agreement shall be governed by federal laws and the law designated by the Card Issuer in the Cardholder Agreement. In the event that the arbitration clause contained herein is found to be unenforceable, you and UBS Financial Services agree that they will, for purposes of determining all matters with regard to this Agreement, submit to the exclusive jurisdiction of the courts of the State of New York and the federal courts sitting in the Southern District of New York. You also consent to service of process by certified mail to the Account's address of record and waives any forum non-conveniens and venue claims. You and UBS Financial Services agree that if any term, covenant, condition, or provision of this Agreement is held to be invalid, void, or unenforceable, the remainder of the provisions shall remain in full force and effect, and shall in no way be impaired or invalidated and shall be construed (to the maximum extent possible) in such a way as to give effect to the intent of the invalid, void, or unenforceable provision in question.

## Arbitration

This agreement contains a predispute arbitration clause. By signing an arbitration agreement the parties agree as follows:

- Arbitration is final and binding on the parties. All parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.

- The parties are waiving their right to seek remedies in court, including the right to jury trial. Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.

- Pre-arbitration discovery is generally more limited than and different from court proceedings. The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.

- The arbitrator's award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. The arbitrators do not have to explain the reason(s) for their award.

- The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

- The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.

- The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.

- You agree, and by carrying an account for you UBS Financial Services Inc. agrees, that any and all controversies which may arise between you and UBS Financial Services Inc. concerning any account(s), transaction, dispute or the construction, performance, or breach of this or any other Agreement, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration. Any arbitration under this Agreement shall be held under and pursuant to and be governed by the Federal Arbitration Act, and shall be conducted before an arbitration panel convened by the New York Stock Exchange, Inc. or the National Association of Securities Dealers, Inc. you may also select any other national security exchange's arbitration forum upon which UBS Financial Services Inc. is legally required to arbitrate the controversy with Client, including, where applicable, the Municipal Securities Rulemaking Board. Such arbitration shall be governed by the rules of the organization convening the panel. You may elect in the first instance the arbitration forum, but if you fail to make such election, by registered letter or telegram addressed to UBS Financial Services Inc. at 1200 Harbor Boulevard, 10th Floor, Weehawken, NJ 07086, Attn: Legal Department, before the expiration of five days (5) after receipt of a written request from UBS Financial Services Inc. to make such election, then UBS Financial Services Inc. may make such election. The award of the arbitrators, or of the majority of them, shall be final, and judgment upon the award rendered may be entered in any court of competent jurisdiction.

- No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration Agreement against any person who has initiated in court a putative class action; who is a member of a putative class who has opted out of the class with respect to any claims encompassed by the putative class action until:
  - (I)   THE CLASS CERTIFICATION IS DENIED;
  - (II)  THE CLASS IS DECERTIFIED; OR
  - (III) THE CUSTOMER IS EXCLUDED FROM THE CLASS BY THE COURT.

- Such forbearance to enforce an Agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.

- You expressly agree that service of process in any action shall be sufficient if served by certified mail, return receipt requested, at your last address known to UBS Financial Services Inc.

- You expressly waive any defense to service of process as set forth above.

21



UBS Financial Services Inc.
www.ubs.com/financialservicesinc
060920 · R049

UBS Financial Services Inc. and UBS International Inc. are subsidiaries of UBS AG.

# EXHIBIT B

 **UBS**

UBS AG
Postfach
8098 Zürich
Tel. +41-44-234 11 11

Wealth Management
Legal WM Americas (International)

Patrick Mathieu
PIDMX9
Bahnhofstrasse 45
CH-8098 Zürich
Tel. +41-44-2348909
Fax +41-44-2374712
patrick.mathieu@ubs.com

www.ubs.com

Mr. Nicholas Knopick
211 N. Record Suite 450
Dallas, TX 75202
United States of America

10 December 2013

**Re: Nick Knopick / Account relationship 0230-257253**

Dear Mr. Knopick

Reference is made to your letter dated 14 October 2013 in captioned matter which was forwarded by UBS Swiss Financial Advisers AG to the UBS AG Legal Department.

First of all, we would like to apologize for the delay in responding to your document request for your former account relationship 0230-257253. This was partially due because your letter did not contain an account number and the account relationship in question being closed since 2009 so that part of the documentation had to be retrieved from the archive.

Based on your request, please find enclosed the following sets of documentation:

- Basic account opening documents, including credit agreements;
- Instructions and correspondence;
- Account statements for EUR current account 0230-257253.61E; and
- Account statements for USD current account 0230-257253.60B.

We hope that with these enclosures, we have adequately responded to your document request.

Yours sincerely

UBS AG

Patrick Mathieu
Executive Director
Legal Counsel

Gilles Fages
Director
Legal Counsel

Enclosures mentioned

p.11

## ⚜ UBS

Master no. 920.257253

# Basic document for account/custody account relationship

### Basic data

| | |
|---|---|
| Type of relationship | Named account relationship individual |
| Account-holding branch office | UBS AG* Zurich, Switzerland |
| | (* hereinafter referred to throughout the Agreement as 'UBS') |
| Status of documents | Account opening |

### Accountholder

Mr.
Title (Mr/Mrs/Miss/Ms/Other)

| | |
|---|---|
| KNOPICK | NICHOLAS |
| Last name | First name |
| 151 Idle Road | |
| Street/No. | |
| Marysville, PA  17053-9503 | USA |
| Postal code/City | Country |
| 1951-05-12 | USA |
| Birth date | Nationality |

Please enclose copies of the identification documents presented

### Correspondence instructions

Except in special circumstances, correspondence is

☒ to be sent to the domicile address (original)          Number of copies    1

☐ to be sent to the following address

☐ Original                                      ☐ Duplicate

| | |
|---|---|
| Number of copies | Number of copies |
| Language of correspondence   English | |
| Home phone no.   (717) 957-4405 | Office phone no.   (717) 342-1040 |

### General authorization for fiduciary investments

I hereby authorize UBS to use all or part of the funds available at a given time in my UBS account to make investments on a fiduciary basis in the name of UBS, but for my account and at my risk. UBS shall only make use of this authorization, once I have instructed them to do so. Should UBS not receive or not receive in time (i.e. at least five days before maturity of the investment concerned) other instructions from me, UBS may choose debtor, amount, currency and maturity at its discretion and is subject to any measures ordered by the country of the currency concerned and the country where the funds are invested. The authorization to re-invest shall remain in force even after my death or incapacity to act.

| | | | | |
|---|---|---|---|---|
| 63055 E  V5 | 26.01.2007 | j9 | 30.03.2007 | Page 1/2 |

1-20070425-014967

p.12

**❊ UBS**

Master no. 030-257253

**General conditions and place of jurisdiction**

UBS may credit remittances received in a currency for which there is no corresponding account to an already existing account or may maintain them in the currency received. UBS is also specifically entitled to open additional accounts in the name of the accountholder in order to credit remittances in foreign currencies. The following regulations/conditions also apply to this account/custody account relationship:

General Conditions, Basic conditions for the use of electronic aids, Special Terms and Conditions for the use of the UBS customer card with PIN code, Regulations governing safe custody and metal accounts, Information from the Swiss Bankers Association on the changes to the Consumer Credit Act.

I have received and taken note of those conditions/regulations and agree to be bound by them.

I hereby agree to inform UBS immediately of any change in address. If UBS does not have my current address, I will pay all

the currently valid charges and fees. If the consent of the spouse is required by law for an account to be opened, UBS is entitled to assume that this consent has been given.

UBS is not obliged to execute instructions or orders received by e-mail or any other form of electronic communication unless there is a special written agreement.

The present Agreement and/or Declaration shall be exclusively governed by and construed in accordance with Swiss law. The place of performance of all obligations of both parties, the place of debt collection, the latter only for Customers domiciled outside Switzerland, as well as the exclusive place of jurisdiction for any disputes arising out of and in connection with the present Agreement and/or Declaration shall be Zurich, Switzerland.

UBS reserves the right, however, to take legal action against the Undersigned before the authority of his/her domicile or before any other competent authority, in which event exclusively Swiss law shall remain applicable.

I instruct UBS to maintain an account in accordance with the information supplied above.

Place/Date: LANSVILLE PA   4-3-07

Signature: JONOPICK NICHOLAS

---

For internal bank use only    Account opening ☐ by correspondence    ☒ in person

Customer identification carried out as per regulations

GU-Ref._____    Customer Adviser's signature

Signature of the supervisor required for all clients within WMI, GWM, Multinationals and Recovery.

GU-Ref._____    Supervisor's signature

63055 E  V5    26.01.2007    js    30.03.2007

Fridolin Wittmer
EB6N-WTD
Mgmt W9 Americas
+41-44-237 23 02

Mark Mollez
WM W9 US Clients
B16A EM7X-MFQ
044/237 3345

2/2