# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NICHOLAS KNOPICK, individually and on behalf of those similarly situated. | : | Civil Action No. : 2:14-cv-05639-GJP |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | HONRABLE GERALD J. PAPPERT |
| UBS Financial Services, Inc. and Susan Seifert | : | |
| Defendants. | : | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND STRIKE AND, ALTERNATIVE CROSS MOTION FOR LEAVE TO AMEND

Plaintiff Nicholas Knopick, by and through his undersigned counsel, hereby submits this Memorandum of Law in Opposition to Defendant's Motion to Dismiss and Strike and Plaintiff's Cross Motion for Leave to Amend.

# Table of Contents

I.      Introduction ...........................................................................................................1

II.     Relevant Procedureal History ..........................................................................2

III.    Statement of Facts ...............................................................................................4

        A. Pertinent Facts Underlying Plaintiff's Substantive Claims ......................................4

        B. Allegations Establishing UBS AG's Banking Fraud, UBS SFA's Tax Fraud and
        UBS FS's Complicity and Inducement of Plaintiff to Enter Illegal Contracts..............5

        C. UBS's Fraud and Illegal Contracts with Mr. Knopick and Class Members..........12

        D. Allegations of Damages and Causation.....................................................16

IV.     Legal Argument...................................................................................................17

        A. Defendant's Motion is Barred Pursuant to Rule 12(g)(2) .....................................17

        B. SLUSA Does Not Bar Plaintiff's State-Law-Based Class Action Claims Since
        Plaintiff Does Not Allege Fraud In Connection With Covered Securities...........19

        C. Plaintiff's RICO Allegations Meet the Requirements of Rule 8 ..........................22

             1.  Plaintiff Has Sufficiently Alleged Defendant's RICO Violations Were the
                 Proximate Cause of His Harm...................................................................23

             2.  Plaintiff's RICO Claims Are Not Actional Securities Fraud Claims; And
                 Therefore Are Not Excluded Claims Under PLSRA......................................30

             3.  Plaintiff Has Plausibly Averred A RICO Conspiracy and Properly Alleged
                 UBS FS's Activities In Furtherance Thereof ..................................................32

        D. Plaintiff's Class Action Allegations Comply with Rule 23...................................34

             1.  Plaintiff Has Properly Alleged Predominance and Commonality.................34

             2.  Plaintiff Has Properly Alleged Class Action Superiority ..............................37

             3.  Plaintiff's Claims Are Typical of the Class....................................................38

             4.  Plaintiff's Defined Class Is Ascertainable....................................................39

             5.  Plaintiff Is Entitled To Proceed with Discovery Or to Amend If Necessary ..40

        E. Plaintiff Is Entitled To Pursue His State Law Claims In the Alternative .............41

        F. Plaintiff Has Alleged Sufficient Equitable Tolling Allegations As To His
        Negligence Claims............................................................................................41

V.      Plaintiff's Alternative Cross Motion to Amend .........................................42

VI.     Conclusion .........................................................................................................41

**Table of Authorities**

Cases:

*Albany Ins. Co. v. Almacenadora Somex S.A.*, 5 F3d 907 (5th Cir. 1993) ........................18
*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)...................................23, 27, 30
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................20, 22
*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519
    (1983)...............................................................................24
*Baby Neal for and by Kanter v. Casey*, 43 F.3d 48 (3d Cir. 1994) .........................34
*Backus v. Conn. Cmty. Bank*, 789 F.Supp.2d 292 (D.Conn. 2001 .........................21
*BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 756 (7th Cir.2011). .........27, 29
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)...................................20, 22
*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) ....................23, 25-27, 29
*Byrd v. Aaron's, Inc.*, 784 F.3d 154 (3d Cir. 2015)........................................40
*Chadbourne & Parket LLP v. Troice*, ___ U.S. ___, 134 S.Ct. 1058 (2014)...........20, 21
*Eagletech Commc'ns Inc. v. Citigroup, Inc.*, 2008 WL 3166533 (S.D.Fla. June 27, 2008) .........31
*Eisenberg v. Gagnon*, 766 F.2d 770 (3d Cir. 1985).....................................36, 37
*GCL, LLC v. Schwab*, No. 11–04593, 2012 WL 4321972 (E.D.Pa. September 21, 2012)...........17
*Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187 (3d Cir. 2009) .....................22
*Gentry v. Resolution Trust Corp.*, 937 F.2d 899, 908 (3d Cir. 1991)........................33
*G–I Holdings, Inc. v. Baron & Budd*, 238 F.Supp.2d 521 (S.D.N.Y.2002)....................41
*Gilmore v. Shearson/American Exp. Inc.*, 811 F.2d 108 (2d Cir. 1987) .......................18
*Glessner v. Kenny*, 952 F.2d 702 (3d Cir. 1991) ..........................................34
*Grasty v. Amalgamated Clothing and Textile Workers Union*, 828 F.2d 123 (3d Cir. 1987).........38
*Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010) ..................................23, 28
*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992) ....................23-27
*Humphreys v. Budget Rent a Car Sys.*, Civil Action No. 10-cv-1302, 2014 U.S. Dist. LEXIS
    55438 (E.D. Pa April 22, 2014).......................................................40
*Ikuno v. Yip*, 912 F.2d 306 (9th Cir. 1990).............................................33
*In re Beacon Assocs. Litig.*, 745 F.Supp.2d 386 (S.D.N.Y. 2010) ..........................21
*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010) ........................22
*In re LIBOR-Based Financial Instruments Antitrust Litig.*, 935 F.Supp.2d 666, 726 (S.D.N.Y.
    2013).............................................................................31
*In re Linerboard Antitrust Litig.* 305 F.3d 145 (3d Cir. 2002)............................37
*In re Prudential Ins. Co. of Am. Sales Litig.*, 148 F.3d 283 (3d Cir. 1998). .........34, 39
*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2010). ....................36
*Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 260-261 (3d cir. 1995) ...........36
*Lancaster Community Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397 (9th Cir. 1991).........33
*Landsman & Funk P.C. v. Skinder-Strauss Assoc.*, 640 F.3d 72 (3d Cir. 2011).........................34
*Mandelbaum v. Fiserv, Inc.*, 787 F.Supp.2d 1226 (D. Colo. 2011) .........................21
*Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247 (2010). ........................31
*NBL Flooring, Inc. v. Trumball Ins. Co.*, Civil Action No. 10-4938, 2011 U.S. Dist. LEXIS
    110518 (E.D. Pa Sept. 27, 1011).....................................................40
*Negron v. School Dist. Of Philadelphia*, 994 F. Supp. 2d 663 (E.D.Pa. 2014)...................17
*Newton v. Merrill Lynch*, 259 F.3d 154 (3d Cir. 2001)......................................38

*P.V. v. School Dist. Of Philadelphia*, No. 2:11-CV-04027, 2011 U.S. Dist. LEXIS 125370
    (E.D. Pa Oct. 31, 2011) ...............................................................................................40
*Reed v. United Transp. Union*, 488 U.S. 319 (1989). ...............................................................38
*Sargiss v. Magarelli*, 12 N.Y.3d 527 (2009) ............................................................................41
*Scott v. District of Columbia*, 101 F.3d 748 (D.C.Cir.1996)....................................................41
*Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162 (3d Cir. 1989) .........................................32
*Stanbury Law Firm v. Internal Revenue Service*, 221 F.3d 1059 (8th Cir. 2000)......................34
*Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011). ..............................................35
*Thomas v. UBS AG*, 706 F.3d 846 (7th Cir. 2013) ..................................................................27
*United States v. Biasucci*, 7786 F.2d 504 (2d Cir.), *cert. denied*, 479 U.S. 827 (1986)...............33
*Wartsila NSD N. Am., Inc. v. Hill Int'l*, Inc., No. 99–cv–4565 (D.N.J. June 22, 2004) ...............17
*Weiss v. Regal Collections*, 385 F.3d 337 (3d Cir. 2004)...........................................................41

Statutes and Rules

Federal Rule of Civil Procecure 8 .....................................................................................22, 41
Federal Rule of Civil Procedure 12(b)(6).................................................................17, 18, 19, 22
Federal Rule of Civil Procedure 12(g)(2).......................................................................17, 18, 19
Federal Rule of Civil Procedure 15 .........................................................................................42
Federal Rule of Civil Procedure 23 ...............................................................................34, 40, 41
15 U.S.C. § 77r............................................................................................................................21
15 U.S.C. § 78j.............................................................................................................................31
15 U.S.C. §§ 78bb(f)(5)(E)..........................................................................................................21
18 U.S.C. § 1961(1).....................................................................................................................30
18 U.S.C. § 1961(1)(B)................................................................................................................30
18 U.S.C. § 1961(5).....................................................................................................................30
18 U.S.C. § 1962(c).....................................................................................................................30
Private Securities Litigation Reform Act ("PSLRA"), codified in part at 18 U.S.C. § 1964(c) ...30
Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ...................22, 30
Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 112 Stat. 32277 ......................1

# I. INTRODUCTION

Plaintiff's claims in his Amended Complaint are focused on the misrepresentations of UBS FS in connection with the banking fraud and tax fraud of UBS AG and UBS SFA, not securities fraud. UBS AG was not authorized to provide banking services to US citizens in the US, including receipt of deposits, wire transfers of funds or extensions of consumer credit. Yet, UBS FS recommended to Mr. Knopick that he do business with UBS AG in order to obtain "net new money", obtain commissions and perks, and help the "integrated business" of UBS AG reach its goals. Further, UBS AG and UBS SFA were engaged in tax fraud against the IRS in connection with their non-W9 compliant clients, which tax fraud restricted communications with US clients regarding their investments and ultimately resulted in prosecution of UBS AG and UBS SFA, a fire sale of US-client assets through margin calls in order to fund the $780 million fine, and rapid divestiture by UBS AG of its US cross-border business.

Importantly, UBS FS, UBS AG and UBS SFA used the US mail and wire to both induce Mr. Knopick and the class members to enter into these illegal relationships and ultimately, to inform them that their investments had been liquidated, stolen or lost without telling them the liquidation was necessary to cover up the tax fraud or fund the fine or rapidly divest the US cross-border business.

Even more importantly, the frauds alleged were not in connection with "covered securities" as that term is defined in the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 112 Stat. 3227. While Plaintiff does not have extensive information evidencing all of the various trades by UBS SFA either in his own account or in the class members' accounts, the information obtained to date suggests (as the allegations in the Amended Complaint express and imply), the focus of UBS SFA's investment advice was the foreign market (and secrecy).

1

These transactions then, are not "actionable" as securities fraud to preclude RICO claims, nor are they "covered" securities as defined in SLUSA to preclude the state-law based class claims.

Given the preliminary stage of this action, Plaintiff's class action allegations and alternative pleading of state law claims are perfectly adequate and permissible. It is respectfully requested that this Court deny Defendant's Motion and allow discovery to proceed based upon the current allegations, or allow Plaintiff to amend to address specific concerns this Court may have concerning any claim's sufficiency based upon Defendant's current arguments, while allowing discovery to proceed.

## II.    RELEVANT PROCEDURAL HISTORY

Plaintiff originally commenced this action against UBS Financial Services, Inc. ("UBS FS") and Susan Seifert in the Court of Common Pleas of Dauphin County by Writ of Summons in November of 2013. Defendants moved to compel arbitration, ostensibly pursuant to the terms of the parties' agreements. This was Defendant's first bite at the apple.[1]

On October 1, 2014, Plaintiff commenced this action by filing a Class Action Complaint against UBS FS and Susan Seifert.[2] On December 19, 2014, Defendants filed a Motion to Dismiss Plaintiff's Complaint under Rule 12 ("UBS FS Rule 12 Motion")[3] arguing all of the same arguments in the current motion, except the argument based upon SLUSA.

Pursuant to Fed.R.Civ.Pro. 15(a)(1)(B) (allowing amendment as of right in response to a Rule 12 motion), Plaintiff filed an Amended Complaint in this matter on February 19, 2015.

---

[1] The Court of Common Pleas granted Defendants' motion to compel arbitration by Order dated May 16, 2014. Plaintiff commenced a FINRA arbitration proceeding in FINRA's Philadelphia district. UBS FS made multiple motions to FINRA to obtain dismissal of Plaintiff's claims. FINRA ruled that Plaintiff's individual claims were subject to arbitration and would not be dismissed. The FINRA action is stayed.

[2] Dkt. No. 1.

[3] Dkt. No. 8

("Amended Complaint" or "Am.Comp.").[4]

On March 2, 2015, this Court entered an order to show cause why venue is proper in the Eastern District of Pennsylvania, and if venue is not proper, why this case should not be transferred to the Middle District of Pennsylvania.[5] On March 11, 2015, Plaintiff entered a Notice of Voluntary Dismissal as to Susan Siefert only pursuant to Rule 41(a)(1)(A)(i).[6]

In response to the Court's March 2, 2015 Order to Show Cause on the venue issue, UBS FS re-asserted its argument (first made in its Rule 12 Motion described above), that the forum selection clause in the parties' contract should be enforced and venue was not proper in the Eastern District. ("UBS FS Response to Venue OSC").[7]

On March 16, 2015, this Court entered an Order determining that venue was proper in the Eastern District of Pennsylvania and that, among other things, Defendant's Response to the Court's Order to Show Cause raising the forum selection clause in the parties' agreement was construed as a Motion to Transfer Venue pursuant to 28 U.S.C. § 1404(a). On April 13, 2015, this Court entered an Order denying UBS FS's Motion and ordering UBS FS to respond to the Amended Complaint.[8]

On May 15, 2015, UBS FS filed the instant Motion to Dismiss and Strike and a Motion to Stay Discovery.[9] Defendant's Motion to Dismiss and Strike contains essentially the same arguments as its prior Rule 12 Motion, but included a new argument, that SLUSA Precludes Knopick's State Law Claims.[10]

---

[4] Dkt. No. 14.
[5] Dkt. No. 18.
[6] Dkt. No. 19.
[7] Dkt. 21.
[8] Dkt. No. 30. On April 17, 2015, this Court entered a Scheduling Order, which contained no stay of discovery, despite the request of UBS FS for such a stay during the scheduling conference. Dkt. No. 33.
[9] Dkt. No. 39.
[10] Dkt 39-7, p. 29-32.

## III. STATEMENT OF FACTS

### A.    Pertinent Facts Underlying Plaintiff's Substantive Claims[11]

Plaintiff brings this action on his own behalf and as a Class Action on behalf of all other citizens of Pennsylvania and elsewhere who have been wronged by Defendant.[12] Plaintiff and the Class seek to rescind contracts and to recover damages caused to the Plaintiff and the Class by Defendant's a) recommendations as a fiduciary to enter into illegal contracts with UBS AG and UBS Swiss Financial Advisors ("UBS SFA"); b) recommendations as a fiduciary to enter into a financial advising relationship with Andreas Knöpfel ("Mr. Knöpfel"), a UBS AG representative, who was a participant in the UBS AG cross-border tax fraud scheme then being investigated by the Securities Exchange Commission ("SEC") and Department of Justice ("DOJ"); c) recommendations as a fiduciary that Mr. Knöpfel and UBS AG and UBS SFA were competent, even experts, at international investments, investment management and financial advising; and d) failure to disclose that UBS AG and UBS SFA were under investigation by the SEC and the DOJ for a cross-border tax fraud scheme.[13]

UBS AG, UBS SFA, UBS FS, Susan Seifert, Andreas Knöpfel and, later, Rene Elste, all together induced Mr. Knopick and the class members to a) enter illegal banking contracts, including depositing money with UBS AG in violation of law, b) transmit money to UBS AG and receive transmissions of money from UBS AG in contravention of law, c) borrow from and repay money to UBS AG in contravention of law; d) rely upon UBS SFA, Mr. Knöpfel and Mr. Elste to invest, manage, and provide financial advising services, when they were not qualified to do so, and when they were under investigation by the SEC and the DOJ.[14]

---

[11] Plaintiff incorporates by reference the verified allegations in the Amended Complaint.
[12] Am.Com., Dkt. No 14 ¶ 1.
[13] Id.
[14] Am. Comp., ¶ 8.

**B.** **Allegations Establishing UBS AG's Banking Fraud, UBS SFA's Tax Fraud and UBS FS's Complicity and Inducement of Plaintiff to Enter Illegal Contracts**

UBS AG is not certified as a bank to engage in this Commonwealth in the business of receiving money for deposit or transmission pursuant to Section 105 of the Pennsylvania Banking Code of 1965.[15] UBS SFA is registered as an investment advisor in the United States with the SEC.[16] UBS FS is an American subsidiary of UBS AG and is a registered broker-dealer and investment advisor and employs Susan Seifert in its Baltimore office.[17]

Beginning prior to 2000, UBS AG operated a cross-border business with US clients that employed approximately 60 private bankers who frequently traveled to the US to conduct business with their US clients.[18] The cross-border business provided banking and international investment services to approximately 20,000 US clients with assets worth over $20 billion. Approximately 17,000 of the 20,000 US cross-border clients concealed their identities and the existence of their UBS accounts from the IRS. Many of these clients willfully failed to pay tax to the IRS on income earned on their UBS AG accounts. UBS AG assisted these US clients in concealing the income earned on UBS AG accounts by failing to report IRS Form 1099 information to the IRS. From 2002 through 2007, the cross-border business generated approximately $200 million a year in revenue for UBS AG.[19]

To carry out its illegal scheme, UBS AG routinely sent its employees, called Client Advisors ("CAs"), to the U.S. to meet with US customers to discuss their secret Swiss accounts. To avoid detection by US authorities, the CAs travelled with Travel Access Server laptops, which were equipped with a secret, second hard drive that could only be accessed by entering a

---

[15] Id., ¶ 18.
[16] Id., ¶ 17.
[17] Id., ¶ 15, 16.
[18] Id., ¶ 23.

password after opening the computer's Solitaire game while using a coded USB stick. The second hard drive allowed remote access from the US to client account information hosted on a server in Zurich. The second hard drive, however, could be erased by the CA, if detected by U.S. authorities, simply by entering a special code. CAs also carried Palm Pilots that likewise could be erased by entering a code. UBS AG's CAs routinely lied to US Customs officers at the border about their role at UBS AG to conceal the fact they were entering the US to conduct unlawful business.[20]

UBS AG's internal policies forbade any agent "who communicates with a prospective client concerning banking products or services [to] communicate with that prospective client concerning securities services or products."[21] Nevertheless, when UBS FS introduced Mr. Knopick to Mr. Knöpfel, an agent of UBS AG, the topics discussed were both banking (i.e. deposits and margin lending) and international securities products and services.[22]

UBS AG's policies further instructed agents: "Traveling Officers may not be directly involved in the execution of the account opening documentation while in the United States or in mailing of the documentation from the prospective client to the booking center outside of the United States."[23] Yet, as set forth in more detail below, that is exactly what happened when Mr. Knopick opened his UBS AG and UBS SFA accounts.

UBS AG developed "Case Studies" for its illegal "cross-border" business as part of the training and development of its employees. In these Case Studies, UBS AG instructs, for example, "with the intention to avoid having to carry [sensitive – i.e. damaging] documents

---

[19] Id., ¶ 24.
[20] Id., ¶ 25.
[21] Id., ¶ 3.
[22] Id. While the allegation does not specify "international" securities products, as set forth in more detail below, that was the contemplation of the arrangement.
[23] Id., ¶ 4.

with you, [to send] an envelope with some of the sensitive account related data to your hotel (alternatively, a friend . . .; a family member; a local business contact)."[24] This was to avoid "US jurisdictional means."[25]

Despite these internal strictures attempting to avoid US laws (by avoiding "US jurisdictional means"), UBS AG instituted an aggressive "Referral Campaign", providing incentives to UBS AG's and/or UBS FS's US brokers to introduce their US clients with "Net New Money" to UBS AG and its financial advisors. UBS instituted the "KeyClient" initiative and the "Referral Program" to achieve two goals: Achieve Net New Money ambitions and to "increase cooperation between UBS, the Private Bank and the other Business Groups of UBS and between the Client Advisors and the Product Specialist." According to UBS AG, "[t]he success of these initiatives [were] crucial for the success of the Integrated Business Model of UBS."[26] In furtherance of this initiative, UBS operated the Global Referral program and UBS FS managed the Global Referral Desk in Weehawken, New Jersey to solicit US customers to invest in Switzerland.[27]

Pursuant to the Referral Program, each "Country Team" making a referral would get .33% of the revenues generated by the Financial Advisor for four years. UBS AG set a target of 5 referrals from each Client Advisor, with a reward for each Client Advisor achieving the most referrals being a Breitling wristwatch customized with the UBS logo.[28]

UBS AG employed Executives and Managers who were respectively at the highest levels of management that oversaw legal, compliance, tax, risk and were responsible for regulatory compliance, compensation, and traveling to the US to meet with UBS AG's wealthiest US

---

[24] Id., ¶ 5.
[25] Id., ¶ 66. This phrase was used throughout the UBS internal guidance, translated "mail fraud/wire fraud."
[26] Id., ¶ 6.
[27] Id., ¶ 34(g), 75.

clients. Mangers reported to Executives.[29] UBS AG's Desk Heads exercised direct management over the day-to-day operations of the business and traveled to the US to conduct unlicensed banking and investment advisory activity. Desk Heads reported to Managers.[30]

UBS AG's Bankers were not licensed to engage in banking and investment advisory activity in the US but they routinely traveled to the US to conduct unlicensed banking and investment advisory activity. While in Switzerland, Bankers routinely communicated with their clients in the US about banking and investment advice.[31]

In approximately 2000, UBS AG voluntarily entered into the Qualified Intermediary Agreement ("QI Agreement") with the IRS that required UBS AG to, *inter alia*, withhold taxes from US clients who directed investment activities in foreign securities from the US.[32]

As early as September 13, 2001, Franz Zimmermann in UBS AG's legal department wrote a memorandum to Martin Liechti, head of UBS AG's Americas business unit, regarding "[c]ross-border activities into the United States from non-U.S. Offices of UBS."[33] Mr. Zimmermann wrote that "the potential sanctions are severe" to penalize the unlicensed business with US citizens. Mr. Zimmermann offered as an alternative to the illegal US securities business the "Establishment of a Swiss SEC-registered Subsidiary." Establishment of UBS SFA was part of the illegal tax scheme by purportedly legalizing the securities business, only one of the three - tax, securities, and banking – illegal aspects of the scheme.[34]

A "SEC-registered" subsidiary would, ostensibly, legalize securities sales to UBS AG's W-9 customers; *i.e.* the 10% of UBS AG's US customers who chose to provide their identity to

---

[28] Id.. ¶ 7.
[29] Id., ¶¶ 26-27.
[30] Id., ¶ 28.
[31] Id., ¶ 29.
[32] Id., ¶ 34(b).
[33] Id., ¶ 38.

UBS AG and the IRS, while UBS AG continued to hide the accounts of other 90% of US customers from the IRS. A registered subsidiary with a number of compliant accounts (such as Mr. Knopick's) would also provide a distraction for UBS AG and its tax-cheat US customers, who could point to *de minimis* accounts at the registered entity to divert attention from, or prevent further investigation into, the "black accounts" at UBS AG.[35]

By the end of 2001, UBS AG ostensibly put all "black accounts" on portfolio management status where UBS AG made all investment decisions, eliminating contact with US citizens. UBS AG also decided to open a SEC-registered unit for its W-9 business, but the W-9 unit was not operational until 2005, because the set-up of a compliant entity in Switzerland added costs and did not generate substantial additional revenues.[36] To implement the "portfolio management status" of the black accounts, it appears UBS AG required its non-W9 clients to execute a "Supplement for new Account US Status Assets and Income/Declaration for US Taxable Persons", which contained the following restriction on the purchase or sale of US securities:

> Waiver of right to invest in US securities. I am aware of the new tax regulations. To this end, I declare that I expressly agree that my account shall be frozen for all investments in US securities.[37]

In 2002, Hansruedi Schumacher, the Manager directly responsible for the Swiss CAs conducting illegal securities business in the US, with Mr. Liechti, gave a presentation to UBS AG's Group Executive Committee informing them UBS AG was not compliant with its QI

---

[34] Id., ¶ 35, 39.

[35] Id., ¶ 38.

[36] Id., ¶ 3, 30, 34(j). According to the testimony in the case of *U.S. v. Rauol Weil*, some larger, more important clients got personal visits from Swiss CA's assuring them that business as usual prevailed, and they could still direct their accounts from the US.

[37] Declaration of Julie Negovan dated June 19, 2015 ("Neg.Dec."), Ex. A, Government Trial Exhibits 320.078, 320.00081, 320.0108, 320.0123 in the case of *U.S. v. Rauol Weil*, CA No. 08-60233 (S.D.Fl.) ("Weil Trial Exhibits). There is no indication in the information obtained by Plaintiff thus far that any of the white accounts

Agreement with the IRS.[38]   For example, on September 26, 2002, a Desk Head instructed Bankers that if they have contact with US clients in the US, the Bankers should not report the contact in UBS AG's computer system to avoid reporting under the QI Agreement.[39]

On January 22, 2003, UBS AG's outside counsel at Baker & McKenzie warned UBS AG that immediate action was required to build a defense against a future US criminal case.   UBS AG reacted by limiting written communications about offshore "structures" (shell corporations and foundations in tax-haven jurisdictions established at UBS AG's suggestion) for US clients and issuing Form 1099 information to certain customers but not to the IRS.[40]

In September 2004, Desk Heads and Bankers received training in Switzerland on how to avoid detection by authorities when traveling in the United States on UBS AG business.[41] Around that time, Christos Bagios, who joined UBS SFA from UBS AG, advised customers to open a white account at UBS SFA to deceive US authorities so they did not suspect the same customers had black accounts at UBS AG.   In particular, Mr. Bagios admitted to attending a meeting in California to discuss with a US client his white UBS SFA account and his black UBS AG account.   In 2007, Mr. Bagios permitted a customer to move $470,000 through a UBS SFA account to repatriate the funds from an undeclared UBS AG account. Mr. Bagios described this process as washing the funds through accounts at UBS SFA before repatriating them to the US.[42]

In August, 2007, UBS AG Executives decided to "freeze" the black US business rather than exit the business to comply with US law.   Soon after, UBS AG learned the DOJ was

---

invested in anything other than non-US securities.

[38] Am.Comp., ¶ 41; perhaps because, even though the non-W9 clients were not invested in US securities per the Supplement for new Account US Status, any direction regarding investments in foreign securities that originate from the US by US citizens are subject to reporting and withholding under the QI Agreement.

[39] Id., ¶ 43.

[40] Id., ¶ 46.

[41] Id., ¶ 52.

[42] Id., ¶ 64.

investigating UBS AG's US cross-border business and that former-UBS AG employee and whistle-blower Bradley Birkenfeld had contacted the DOJ about the cross-border business.[43]

Importantly, Mr. Knopick's investments were not made to participate in UBS AG's tax fraud scheme involving so-called "black accounts" at UBS AG.[44]

On July 7, 2008, Mark Branson, the CFO of UBS Global Wealth Management and Business Banking in Zurich, appeared before the US Senate Permanent Subcommittee on Investigations and brashly asserted, "[t]his cross-border business was and is entirely legal in both Switzerland and the United States." Mr. Branson was forced to eat his words eight months later, after UBS AG had admitted wrongdoing as part of a plea deal with the government, when Mr. Branson again appeared before the Subcommittee and groveled, "Mr. Chairman, we deeply regret our breaches of U.S. law."[45]

In February, 2009, after liquidating Mr. Knopick's account via margin calls, UBS AG admitted, among many specific details, that: i) from 2000 to at least 2007, UBS AG participated in a scheme to defraud the US and the IRS; ii) UBS private bankers facilitated US taxpayers who were evading taxes, by meeting with them in the US and communicating with them by US jurisdictional means, enabling US taxpayers to conceal from the IRS their UBS AG accounts; and, iii) UBS AG Executives and Managers who knew of the conduct continued to operate and expand the US cross-border business because of its profitability.[46]

UBS AG eventually entered into a Deferred Prosecution Agreement ("DFA") and paid a $780 million fine. A year later, UBS AG sought amendment of the DPA because, among other

---

[43] Id., ¶ 65.

[44] Id., ¶ 21.

[45] Id., ¶ 68; Neg.Dec., Ex. B, *Tax Haven Banks and US Tax Compliance: Hearings Before the Permanent Subcommittee,* July 17 and July 25, 2008, p. 37 and March 4. 2009, p. 28.

[46] Id., ¶ 66; Neg.Dec., Ex. C, *US v. UBS AG,* Case No. 09-60033 (S.D.Fl), DPA dated February 11, 2009 and Amendment to DPA dated October 22, 2010.

things, it could not comply with the securities reporting requirements without disclosing its illegal banking activities. Nothing in the DPA states that any part of UBS's scheme was ever legal.[47]

## C.    UBS's Fraud and Illegal Contracts With Mr. Knopick and Class Members

Based upon the recommendation of UBS FS's Ms. Seifert, without knowledge of the SEC and DOJ investigation of UBS AG and UBS SFA, and without knowledge that the contracts were illegal, on April 3, 2007, Mr. Knopick signed the Basic Document for Account/Custody Account Relationship with UBS AG ("UBS AG Basic Document").[48]

Two months prior to signing any agreement with UBS AG, on February 5, 2007, Mr. Knopick wired to UBS AG $12,445,483.17 from his Wachovia bank account in Pennsylvania.[49] UBS SFA required that Mr. Knopick wire this deposit to UBS AG and that he open a margin account at UBS AG (both illegal banking activities) in order to do business with UBS SFA.[50]

The UBS AG Basic Document was signed by Mr. Knopick in Marysville, Pennsylvania, on April 3, 2007 and by UBS' Fridolin Wittmer "Mgmt W9 Americas" and Mark Mottet "WM W9 US Clients", on March 30, 2007, noting the "account opening" had taken place "in person."[51]    Mr. Knopick also signed the UBS AG Basic Agreement for Collateral Loans in Marysville, Pennsylvania on April 3, 2007.    Mr. Knopick also signed a UBS form entitled

---

[47] Am.Comp., ¶ 67. *Cf.* Neg.Dec., Ex. C.  In fact, on page 2 of the DPA, UBS admits its illegal activities allowed "United States tax payers to evade reporting requirements and to trade in securities as well as other financial transactions (including *making loans for the benefit of,* or other assets transfers directed by the United States Taxpayers . . . )." (emphasis added). Paragraph 5 of the DPA (which UBS had to amend a year later), required UBS to stop doing business with US customers through any UBS entity that was not registered to do business in the US with the SEC.

[48] Id., ¶ 108.

[49] Id, ¶ 78.

[50] Id, ¶ 146.

[51] Id., ¶ 111.

"Creation of Pledge" on April 11, 2007 in Marysville, Pennsylvania. The identified pledged assets were Mr. Knopick's UBS SFA accounts.[52]

Mr. Knopick also signed a UBS form "Specific Safe Custody and Pledgeholdership Agreement" between himself, UBS AG and UBS SFA on April 3, 2007 in Marysville, Pennsylvania.[53] The Pledgeholdership Agreement makes clear that UBS AG "as lender" and Mr. Knopick "as borrower" have signed the Basic Agreement for Collateral Loans, "which requires [Mr. Knopick] to provide collateral to UBS as security for the performance of the obligations in respect of the Basic Agreement for collateral loans."[54]

Mr. Knopick signed the Basic Document for Account/Custody Account Relationship with UBS SFA dated January 23, 2007 and also April 3, 2007 in Marysville, Pennsylvania ("UBS SFA Basic Document").[55] The UBS SFA Basic Document specifically provided for all correspondence to be "sent to my/our home address" indicated as Marysville, Pennsylvania.[56]

The UBS SFA Basic Document provided, in part:

> I hereby authorize UBS to use all or part of the funds available at any given time in my UBS account to make investments on a fiduciary basis in the name of UBS, but for my account and at my risk.[57]

The UBS SFA Basic Document was signed by Mr. Knöpfel and UBS SFA and noted the "account opening" was "by correspondence."[58] Mr. Knopick also signed the USB SFA Asset Management Agreement, which gave UBS SFA "absolute discretion" to buy and sell assets and "carry out investments on a fiduciary basis in all countries and currencies, execute all types of

---

[52] Id., ¶ 114-116; Ex. B to Am.Comp.
[53] Id., ¶ 117; Ex. B to Am.Comp.
[54] Id., ¶ 118; Ex. B to Am.Comp.
[55] Id., ¶ 126; Ex. C to Am. Comp.
[56] Id., ¶ 127; Ex. C to Am. Comp.
[57] Id., ¶ 128; Ex. C to Am. Comp.
[58] Id., ¶ 130-131; Ex. C to Am.Comp.

transactions, decide on investment timing," and "carry out all and any other transactions for your account as it may from time to time determine."[59]

In addition, the UBS SFA Portfolio Management International form was part of the UBS SFA contract documents, signed by Mr. Knopick and Mr. Knöpfel, and Mr. Knöpfel's signature indicates Mr. Knopick signed it in his presence.[60]   Importantly, the Portfolio Management International form applicable to account XXXX_5 specifies:

> The main objective is to allocate client assets to international (or non-US) investments as per the selected Investment Strategy and Reference Currency below.  The portfolio can contain securities denominated in USD and/or other currencies. (*emphasis added*)

The UBS SFA contract documents included a Portfolio Management Asia Opportunities form applicable to account XXXXX _8 indicating it was signed in Mr. Knöpfel's presence or the signature was verified.[61]  The Portfolio Management Asia Opportunities form specifies:

> The main objective is to allocate client assets to Asian investments as per the selected Investment Strategy and Reference Currency below.  The portfolio can contain securities denominated in Asian currencies, USD and/or other currencies.[62]

The UBS SFA Contract Documents include the Client Privacy Notice and in Section 2 it recites "UBS SFA's Fiduciary Responsibilities as a Registered Investment Advisor", which include acting in the client's best interests and in the event of a conflict of interest, UBS SFA must place the client's interests before its own and that the investment decisions or recommendations UBS SFA makes for the client must be suitable and appropriate for the client and *"consistent with the client's investment objectives and goals."*[63]

---

[59] Id., ¶ 132; Ex. C to Am.Comp., Asset Management Agreement, paragraph 1.5, p. 1.
[60] Id., ¶ 133; Ex. C to Am. Comp.
[61] Id., ¶ 135; Ex. C to Am.Comp.
[62] Ex. C to Am.Comp.
[63] Am.Com., ¶ 137; Ex. C to Am.Comp., Client Privacy Notice, Section 2.

Mr. Knöpfel and his assistant (also an agent of UBS AG and UBS SFA) routinely told Mr. Knopick, in telephone calls from Switzerland to Pennsylvania and elsewhere in the US that his investments were performing well, and consistently concealed from Mr. Knopick that 1) his money had been invested against his instructions and 2) his account was excessively leveraged with illegal loans from UBS AG secured by his UBS SFA investments. They also never disclosed that UBS AG and UBS SFA were under investigation for a cross-border tax evasion scheme in the US and that UBS SFA, and his account had been created as a cover for, and in furtherance of, that scheme.[64] UBS AG faxed numerous communications to Mr. Knopick in Pennsylvania including communications regarding deposits and withdrawals from Mr. Knopick's UB AG accounts, increases to Mr. Knopick's credit at UBS AG and payments by Mr. Knopick to UBS AG on account of his loans.[65] Also, on numerous occasions, Mr. Knopick withdrew cash loaned by UBS AG and the money was transferred from UBS AG in Switzerland to Mr. Knopick's US bank accounts. Also, UBS AG and UBS SFA increased Mr. Knopick's margin loans by transfer of cash between them.[66]

UBS AG recognized "it may be necessary to obtain a state license to offer lending products . . . [and that] state consumer protection laws [] may apply," yet UBS AG opened banking accounts, accepted deposits and entered into loan transactions with Mr. Knopick and other class members in the US without complying with licensing or consumer protection laws.[67]

The U.S. Senate Permanent Subcommittee on Investigations had reported that while "UBS AG is licensed to operate as a bank and broker-dealer in the United States, those licenses do not extend to its non-US offices or affiliates providing banking or securities services to US

---

[64] Id., ¶ 86.
[65] Id., ¶ 84.
[66] Id., ¶ 80-81.
[67] Am.Comp., ¶ 2.

residents."[68] UBS AG documents provided to the US Senate echo that UBS AG's U.S. licenses "do not permit non- US offices or affiliates of UBS AG to provide banking or securities services to US residents," and that US licenses "do not encompass cross-border services provided to US residents by UBS AG offices or affiliates outside of the United States."[69]

### D.    Allegations of Damages and Causation

In September 2008 (as the DOJ was closing in on UBS AG's cross-border tax evasion scheme and indicting Mr. Weil), UBS SFA, through Rene Elste, first contacted Mr. Knopick to inform him that his portfolio needed to be liquidated to pay the UBS AG loans. Mr. Knöpfel had apparently leveraged Mr. Knopick's UBS SFA account to purchase volatile securities, and had purchased bonds that paid interest at rates lower than the rate on the UBS AG margin loans.[70]

As the debt and equity markets melted down in late 2008, UBS SFA and Mr. Elste continued to liquidate Mr. Knopick's portfolio, and upon information and belief, the portfolios of other similarly situated class members, at fire sale prices to satisfy UBS AG's margin calls. UBS SFA dissuaded Mr. Knopick and other similarly situated class members from withdrawing their remaining money promptly, ostensibly to feed UBS AG's appetite for margin calls (even though it had made the loans unlawfully) and/or to aid in the cover up of the cross-border tax fraud scheme. In the end, Mr. Knopick's $12+ million investment and all of his gains were whittled to roughly $900,000, as were the portfolios of similarly situated class members.[71]

When Mr. Knopick asked Ms. Siefert to explain how Mr. Knopfel, UBS AG and UBS SFA could have lost virtually all of his money, Ms. Siefert said that Mr. Knopfel had left UBS

---

[68] Neg.Dec., Ex. D, Subcommittee Report, p. 89.

[69] Id., ¶ 145.

[70] Am.Comp., ¶ 87; while the Amended Complaint allegation does not specify the foreign nature of the investments, based upon the Program Management forms in the account opening documents, it can be inferred. Further, if necessary, Plaintiff will amend the allegations to so specify.

[71] Id., ¶ 146.

SFA and that she had observed in other such circumstances, UBS FS or its sister companies typically would make the customer whole. UBS FS has been uncooperative with Mr. Knopick's efforts to obtain information and has taken preposterous and groundless litigation positions in order to avoid providing discovery or litigating the issues.[72]

## II.    LEGAL ARGUMENT

### A.    Defendant's Motion is Barred Pursuant to Rule 12(g)(2)

Federal Rule of Civil Procedure 12(g)(2) provides for limitations on further motions to dismiss under Rule 12 and states as follows:

> Except as provided in Rule 12(h)(2)[allowing for a motion for judgment on the pleadings] or (3) [allowing for a motion based on lack of subject matter jurisdiction], a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.

This rule prohibits exactly what UBS FS has done here, filing successive pre-answer motions raising arguments that could have been raised, but were not, in prior motions.[73]

In *GCL, LLC v. Schwab*, No. 11–04593, 2012 WL 4321972, at *2–4 (E.D.Pa. September 21, 2012), the Court specifically held that Rule 12(g)(2) by its plain language incentivizes parties to consolidate pre-answer motions and therefore should apply to a second 12(b)(6) motion that raises a failure to state a claim objection that was available to defendant but omitted from a previous 12(b)(6) motion. Quoting *Wartsila NSD N. Am., Inc. v. Hill Int'l, Inc.*, No. 99–cv–4565 (D.N.J. June 22, 2004) (internal quotations and citations omitted), the Court stated as follows:

> It may at times appear overly formalistic for a court to disallow a 12(b)(6) motion only to entertain a motion for Summary Judgment or a 12(c) motion on the pleadings a short time later. To allow [a successive 12(b)(6) motion], however, would vitiate the purpose behind Rule 12(g). The present version of Rule 12

---

[72] Am.Comp., ¶¶ 91-92
[73] See *Negron v. School Dist. Of Philadelphia*, 994 F. Supp. 2d 663, 666 (E.D.Pa. 2014)

reflects the tension between two sometimes disparate aims. In particular, Rule 12 seeks to promote judicial economy and at the same time protect parties from unintentionally waiving defenses to claims. Considered together 12(g) and 12(h) express the closely related objectives of eliminating multiple preliminary motions (Rule 12(g)) and compelling the early assertion of matters in abatement, while preserving a party's ability to interpose more significant defenses at later points in the action (Rule 12(h)). In this way, Rule 12 balances these competing values by requiring the consolidation of defense motions in 12(g) and by creating limited exceptions in 12(h). The Rule has operated to proscribe the filing of successive motions since 1948.

Rule 12(g)(2)'s prohibition ordinarily applies even after an amended complaint is filed, if the basis for the motion to dismiss was available to the defendant at the time of the original complaint, an amended complaint will not trigger a new opportunity for the motion.[74]

In this case, UBS FS hijacked this Court's valid request for briefing on the limited issue of venue, to assert its argument concerning application of the forum selection clause.[75] This was the same argument it had previously styled as cause for dismissal pursuant to Rule 12(b)(6) in its prior Motion to Dismiss.[76] While the argument was ultimately styled as a motion to transfer, UBS FS should not be immune from application of Rule 12(g) due solely to artful pleading. Rather, having taken that bite from the apple in March, UBS FS should now be required to answer the Amended Complaint.

Further, the prior Motion to Dismiss (and venue motion) failed to raise any argument relating to the SLUSA.[77] This is exactly the situation contemplated by the Rule. UBS FS moved to dismiss the original complaint, Plaintiff amended the complaint in an attempt to address the issues raised (which did not include any argument under the SLUSA); and now UBS FS makes the same motion but includes arguments under the SLUSA, which could have

---

[74] See *Albany Ins. Co. v. Almacenadora Somex S.A.*, 5 F3d 907, 909 (5th Cir. 1993); *Gilmore v. Shearson/American Exp. Inc.*, 811 F.2d 108, 112 (2d Cir. 1987).

[75] Dkt. 21.

[76] Dkt. 8.

[77] Compare Dkt. No. 8 with Defendants' Motion to Dismiss and Strike, Dtk. No. 39-7. p. 29-32.

been raised before. As set forth in more detail below, any conceivably connected securities transactions did not involve "covered securities" under the SLUSA.[78] While some of the allegations of the Amended Complaint expressly refer to the "international" nature of the securities trades involving UBS SFA,[79] if UBS FS had raised the issue of application of the SLUSA to Plaintiff's claims, Plaintiff would have included additional specificity in the Amended Complaint allegations concerning the nature of the UBS SFA securities transactions.

For example, as set forth in Exhibit C to the Amended Complaint in the Program Management forms, Mr. Knopick contemplated that his securities investments with UBS SFA would be allocated to "international" and "Asian" transactions and as set forth in Exhibit A to Neg.Dec., UBS SFA's non-W-9 clients froze their accounts to US securities. Since UBS FS did not raise the SLUSA arguments in its prior motion to dismiss, it should be barred from doing so now, pursuant to Rule 12(g)(2). Further, since UBS FS did not raise any of its current arguments in connection with its venue motion, Rule 12(g)(2) prohibits their consideration at this time; UBS FS should be made to answer and raise the issues in a Rule 12(c) motion or otherwise.

Therefore, it is respectfully requested that this Court deny the Motion to Dismiss, in the alternative, grant Plaintiff leave to amend and allow discovery to proceed.

### B. SLUSA Does Not Bar Plaintiff's State-Law-Based Class Action Claims Since Plaintiff Does Not Allege Fraud In Connection With *Covered Securities*

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of a complaint. In deciding a motion to dismiss, courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled

---

[78] See Section II.B, *supra.*

to relief."[80] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "[81] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[82] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" will not suffice. *Id.* "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element."[83]

SLUSA prohibits plaintiffs from maintaining a class action "based upon the statutory or common law any State" in which the plaintiffs allege "a misrepresentation or omission of a material fact *in connection with the purchase or sale of a covered security.*"[84] A party seeking to establish that an action falls within SLUSA's preclusive scope has the burden to show that the action satisfies SLUSA's requirements.[85]

A security is a covered security under SLUSA if such security is—

(A) listed, or authorized for listing, on the New York Stock Exchange or the American Stock Exchange, or listed, or authorized for listing, on the National Market System of the Nasdaq Stock Market (or any successor to such entities);

(B) listed, or authorized for listing, on a national securities exchange (or tier or segment thereof) that has listing standards that the Commission determines by rule (on its own initiative or on the basis of a petition) are substantially similar to the listing standards applicable to securities described in subparagraph (A); or

(C) a security of the same issuer that is equal in seniority or that is a senior

---

[79] E.g., Am.Comp., ¶ 1.

[80] *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008).

[81] *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

[82] *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937.

[83] *Phillips,* 515 F.3d at 234 (3d Cir.2008) (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955).

[84] 15 U.S.C. § 78bb(f)(1) (emphasis added); *Chadbourne & Parket LLP v. Troice,* ___ U.S. ___, 134 S.Ct. 1058, 1062 (2014).

[85] *Id.*

security to a security described in subparagraph (A) or (B).

15 U.S.C. § 77r. Thus, SLUSA defines "covered security" narrowly to include only securities traded on a national exchange and those issued by investment companies.[86]

For purposes of SLUSA, Courts have held plaintiff's state law class action claims barred where plaintiffs believed their assets were being used to purchase and sell covered securities, even if no such trades were taking place.[87] Thus, a plaintiff's expectation that his investment would include the purchase and sale of blue chip stocks satisfies the "covered security" element of SLUSA. In this case, the converse is true. Plaintiff contemplated that his investments would be in international and Asian markets as set forth in the Program Management forms attached to his account contracts with UBS SFA.[88] Further, it appears UBS AG also required/requested its non-W9 clients to execute a "Supplement for new Account US Status Assets and Income/Declaration for US Taxable Persons", which contained the following restriction on the purchase or sale of US securities:

> Waiver of right to invest in US securities. I am aware of the new tax regulations. To this end, I declare that I expressly agree that my account shall be frozen for all investments in US securities.[89]

Since Plaintiff's claims are not connected to covered securities transactions, SLUSA does not apply and Plaintiff's state-law based class claims are appropriate. To the extent the

---

[86] 15 U.S.C. §§ 78bb(f)(5)(E), 77r(b)(1)–(2); *Troice*, 134 S.Ct. at 1062.

[87] *See Backus v. Conn. Cmty. Bank,* 789 F.Supp.2d 292, 307 (D.Conn. 2001) (finding that alleged deception involved covered securities where no such securities were purchased, but "the relationship between Plaintiffs and their custodians ... was formed for the purpose of placing Plaintiffs' funds with [an investment manager] for investment in covered securities"); *Mandelbaum v. Fiserv, Inc.,* 787 F.Supp.2d 1226, 1246 (D. Colo. 2011)("For SLUSA purposes, deception is deemed to have occurred 'in connection with the purchase or sale of any security' even if a security was not actually purchased, provided the plaintiff had submitted funds to the defendant with the understanding that such funds would be used to purchase securities"); *In re Beacon Assocs. Litig.,* 745 F.Supp.2d 386, 393, 430 (S.D.N.Y. 2010) (finding that plaintiffs alleged a misrepresentation or omission in connection with the purchase or sale of a covered security where parties' stated objective was to invest plaintiffs' funds in stocks listed on the Standard & Poor's 100 index, even though no such investments ever took place).

[88] Exhibit C to Am.Com., Program Management International form and Program Management Asia form.

allegations of the Amended Complaint are not specific enough in connection with this issue, Plaintiff respectfully requests the opportunity to amend in the interest of justice.

## C. Plaintiff's RICO[90] Allegations Meet the Requirements of Rule 8.

In determining a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the allegations of the complaint "in the light most favorable to the plaintiff."[91] A complaint will survive the motion to dismiss if plaintiff has plead "enough facts to state a claim to relief that is plausible on its face."[92] A complaint satisfies the plausibility standard when the factual pleadings "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[93] However, nothing in *Twombly* or *Iqbal* changed the other pleading standards for a motion to dismiss pursuant to Rule 12(b) (6) and the requirements of Rule 8 still apply.[94] The Supreme Court did not abolish the Rule 12(b)(6) requirement that "the facts must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on those merits."[95] Rule 8 also still requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."[96] The determination for "plausibility" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[97] Plaintiff respectfully submits his RICO allegations state a claim sufficient to survive Defendants' Motion to Dismiss as set forth in more detail below.

---

[89] Neg. Dec. Ex A, Weil Trial Exhibits.

[90] Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* (hereinafter "RICO")

[91] *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010)(internal quotation marks omitted) (quoting *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009).

[92] *Twombly*, 550 U.S. at 570.

[93] *Iqbal*, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 556)

[94] *See Phillips v. Co. of Allegheny*, 515 F.3d 224, 231 (3d Cir.2008)

[95] *Phillips*, 515 F.3d at 231 (citing *Twombly*, 550 U.S. at 553)

[96] *Iqbal*, 556 U.S. at 677-78 (citing Fed.R.Civ.P. 8(a)(2).

[97] *Iqbal*, 556 U.S. at 679.

### 1. Plaintiff Has Sufficiently Alleged Defendant's RICO Violations Were the Proximate Cause of His Harm

The civil damages provision of RICO provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor ... and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."[98] In relevant part, section 1962 prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce" from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."[99] A "racketeering activity" can consist of a wide range of predicate offenses, including, as alleged in this case, mail and wire fraud and a "pattern" of such activity requires at least two racketeering acts.[100]

A RICO causation analysis is necessarily informed by the Supreme Court's decisions in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), and its progeny, *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006); *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008); *Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010). The *Holmes* and *Bridge* decisions provide the most useful analysis to the facts at issue here.

In *Holmes*, the Supreme Court held civil RICO's "by reason of" language contains both but-for causation and proximate causation requirements.[101] There, the Supreme Court upheld entry of summary judgment for the defendant on RICO claims brought by a plaintiff who was subrogated to the rights of others, based on plaintiff's failure to meet the proximate cause requirement.[102] The *Holmes* plaintiff alleged defendant had engaged in an enterprise to

---

[98] 18 U.S.C. § 1964(c).

[99] 18 U.S.C. § 1962(c).

[100] 18 U.S.C. §§ 1961(1) and (5).

[101] 503 U.S. at 268.

[102] Id. at 262–64, 271–74. *Holmes* is distinguishable on its facts because this is a motion to dismiss, not summary

manipulate stock prices and complained this conduct caused the plaintiff to pay the claims of customers of two broker-dealers that had become insolvent once the fraud was revealed.[103] The Court determined the only connection between the RICO conduct and the claimed harm was the broker-dealers' insolvency, which was too attenuated to the proximate cause requirement.[104]

The *Holmes* Court stated, "[a]t bottom, the notion of proximate cause reflects 'ideas of what justice demands, or of what is administratively possible and convenient.'"[105] As a result, the Court explained, it was "us[ing] 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." Id. Because of "the infinite variety of claims that may arise" in which a court must analyze proximate causation, it is "virtually impossible to announce a black-letter rule that will dictate the result in every case."[106]

In addition to analyzing the directness of the injury, the *Holmes* Court provided three functional factors with which to assess whether proximate cause exists under RICO. First, the Court noted concerns about proof, reasoning that "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors."[107] Second were concerns about administrability and avoiding multiple recoveries: "[R]ecognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different

---

judgment and Plaintiff here has alleged a close nexus between his harm (loss of his investment) and the fraud (failure to disclose the illegal banking and tax fraud) whereby the investments were liquidated to meet the illegal margin loan call.

[103] See Id. at 261–63.

[104] Id.

[105] Id. at 268 (quoting W. Keeton, et al., Prosser & Keeton on Law of Torts § 41, at 264 (5th ed.1984)).

[106] Id. at 272 n. 20 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 536 (1983)) (internal quotation marks omitted).

levels of injury from the violative acts, to obviate the risk of multiple recoveries." Third, the Court focused on the societal interest in deterring illegal conduct and whether that interest would be served in a particular case: "[T]he need to grapple with [the previous two] problems [may be] simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely."[108]

Holmes makes clear that both the directness concern and the three functional factors are part of the proximate cause inquiry.[109] Indeed, the Court warned its "use of the term 'direct' should merely be understood as a reference to the proximate-cause enquiry that is informed by the concerns" of justice and administrability.[110]

In *Bridge*, 128 S.Ct. 2131, the Court considered the RICO claims of direct victims and addressed the question of whether first-party reliance on the misrepresentations is required under RICO, answering that question "no." Plaintiffs alleged defendants made misrepresentations to county tax authorities to win more bids at tax lien auctions than they would have won absent the fraud.[111] Plaintiffs were other bidders at the auctions whose bids had tied with defendants' bids, and whose claimed injury was the deprivation of their share of winning bids.[112]

A unanimous Court held that first-party reliance is not an element of proximate cause in a private RICO claim predicated on mail fraud.[113] Thus, even where the plaintiffs did not receive the misrepresentations at issue—the county was the party that had relied on the

---

[107] 503 U.S. at 269.
[108] Id. at 269–70.
[109] See Id. at 271–74.
[110] Id. at 272, n. 20, 268.
[111] *Bridge*, 128 S.Ct. at 2135–36.
[112] Id. at 2136.

misrepresentations—the plaintiffs had sufficiently alleged proximate causation under RICO.[114] In this case, Mr. Knopick did receive the misrepresentations – or more accurately - the omissions at issue here. UBS FS failed to tell Mr. Knopick when referring him to UBS AG and UBS SFA that UBS AG was not authorized for banking in the US, that USB AG and UBS SFA were perpetrating a massive tax fraud on the IRS, and that they would use Mr. Knopick's account as cover for their illegal activity until it was beneficial to them to liquidate the account by calling the margin loans.[115] Nevertheless, *Bridge* stands for the proposition that Mr. Knopick's RICO claims may properly be based in part on the misrepresentations of UBS AG and UBS SFA to the IRS (which UBS FS failed to disclose).

*Bridge* also supports the conclusion that Plaintiff here meets the proximate cause requirement for several additional reasons. First, *Bridge* held plaintiffs there "clearly were injured by [defendants'] scheme," as they lost valuable property they would not otherwise have lost.[116] Here, Plaintiff was likewise a "primary and intended victim [ ] of [UBS FS's] scheme to defraud because, among other things, his injury was a "foreseeable and natural consequence"[117] of UBS's overall scheme—a scheme that was designed to fraudulently induce US customers to invest with UBS SFA by using UBS AG illegal margin accounts and then call the margin loans to cover up the tax fraud scheme or to pay the fine.[118] The allegations that UBS FS was specifically tasked with finding US customers and incentivized to provide UBS AG with "net new money"[119] also support the conclusion that Plaintiff's injury was a natural consequence of UBS's fraudulent scheme. "The doctrine of proximate cause ... protects the

---

[113] Id. at 2134
[114] Id. at 2138, 2143–44.
[115] Am. Comp. ¶¶ 69, 73, 90, 95, 120, passim.
[116] *Bridge*, 128 S.Ct. at 2139.
[117] Id.
[118] Am. Comp. ¶¶ 69, 73, 90, 95, 120, passim.

ability of primary victims of wrongful conduct to obtain compensation. . ."[120] Here, Plaintiff was a primary victim.

Further, the *Bridge* Court saw no risk of multiple recoveries or other policy reasons to limit recovery.[121] Nor did it see a "more immediate victim ... better situated to sue."[122] So too here: none of the three functional problems that the *Holmes* test is meant to avoid are present in this case. To the contrary, the functional interests in justice and administrability work in Plaintiff's favor. Because Plaintiff was both the natural and foreseeable victim of the fraud and the intended victim of the fraud, there is no risk of duplicative recovery. Importantly, UBS has never had to pay any damages to the US tax cheats.[123] So there is no risk of multiple recoveries due to a suit by another actor. Plaintiff is also in the best position to enforce the law because Plaintiff is the party that directly suffered economic injury from UBS's scheme.[124] And, Plaintiff has alleged sufficient information to ascertain the amount of his damages attributable to UBS's conduct, i.e., the loss of his initial investment.[125]

Thus, Plaintiff has met both the direct relationship and functional tests articulated in *Holmes* and its progeny. Respectfully, this Court should reject UBS FS's argument that there are too many steps in the causal chain between its misrepresentations and Plaintiff's alleged injury to meet the proximate cause "direct relation" requirement as a matter of law. UBS FS's characterization misconstrues the way in which the Supreme Court has framed the direct relation test. Moreover, the adoption of UBS FS' view would undercut the core proximate

---

[119] Am. Comp., ¶¶ 6, 34(g).

[120] *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 756 (7th Cir.2011).

[121] See *Bridge*, 128 S.Ct. at 2144 (citing *Holmes*, 503 U.S. at 258; *Anza*, 547 U.S. at 451)

[122] Id.

[123] See *Thomas v. UBS AG*, 706 F.3d 846, 851 (7th Cir. 2013)("The plaintiffs are tax cheats, and it is very odd, to say the least, for tax cheats to seek to recover their penalties . . . from the source, in this case UBS, of the income concealed from the IRS. . . This lawsuit, including the appeal is a travesty.")

[124] See *Holmes*, 508 U.S. at 269–70.

causation principle of allowing compensation for those who are directly injured, whose injury was plainly foreseeable and was in fact foreseen, and who were the intended victims of a defendant's wrongful conduct.

The Supreme Court's decision in *Hemi Group,* 130 S.Ct. 983, does not, as USB FS argues, lead to a contrary conclusion. As an initial matter, that case produced a 4–1–3 decision with no majority on the proximate cause question.[126] Further, this case is not analogous.

In *Hemi Group,* the defendant's alleged RICO conduct was using the mails to violate the federal Jenkins Act, which requires out-of-state cigarette vendors to report customer information to the customers' states of residence.[127] Thus, if the defendant's scheme could even be said to have a foreseen or intended victim, it was New York State (to whom Hemi Group owed the Jenkins Act reports), not the plaintiff New York City.[128] Further, *Hemi Group* raised a policy problem not at issue here: in that case, allowing the city to bring what was essentially a Jenkins Act claim under the rubric of RICO would have risked "turning RICO into a tax collection statute."[129] Plaintiff's case involves no such unusual policy risk. If anything, the risk cuts in the other direction: accepting UBS FS's argument on proximate cause as a matter of law would effectively preclude banking clients from bringing suit under RICO as the primary victims of fraudulent, illegal activities, and from recovering for their economic injuries. That could mean that no viable plaintiffs would remain to "vindicate the law as private

---

[125] Am. Comp., ¶ 90; See *Holmes,* 508 U.S. at 269.

[126] *See Hemi Group,* 130 S.Ct. at 995 (Ginsburg, J., concurring in part and concurring in the judgment) (providing fifth vote to overturn the decision below, "[w]ithout subscribing to the broader range of the Court's proximate cause analysis")

[127] *Id.* at 987 (plurality opinion).

[128] *Cf. Id.* at 990 (identifying the state as a "better situated" plaintiff).

[129] *Id.* at 993 n. 2; *see also Id.* at 995 (Ginsburg, J., concurring in part and concurring in the judgment) (stating that she would have rejected the city's claim as an attempted "end-run" around the scope of the Jenkins Act).

attorneys general."[130]

In fact, the causal chain in this case is anything but attenuated. UBS FS has always known that because UBS AG was not licensed to do banking in the US, any US UBS SFA customers would be entering illegal contracts with UBS AG as a necessary part of their investment.[131] UBS FS also knew the main purpose of UBS SFA's existence was to further the tax evasion scheme and that any US W-9 compliant customer was merely a cover for that scheme, so not only was the customer's margin loan illegal, it was at risk of immediate call should the tax scheme be discovered.[132] And, in fact, that is exactly what happened: the DOJ discovered the tax scheme in the fall of 2008, UBS AG called the margin loans and liquidated Plaintiff's assets to 1) try to cover up the extent of the scheme and 2) to gain cash to pay the fine. While Plaintiff has also alleged improper investments by UBS SFA as a cause of his loss, clearly, the penultimate loss was caused by UBS AG's calling the margin loans.[133] Plaintiff has sought recovery of his clear economic loss in this case, and his injury occurred when UBS AG called its illegal margin loans because of the DOJ investigation/discovery of its tax scheme.

Thus, the fraudulent scheme worked as intended, inducing US customers like Plaintiff to enter into illegal banking arrangements with UBS AG, invest with UBS SFA, allow reporting to the IRS to cover up the fact that a majority of the accounts did not report, and then provide a fund for UBS AG to tap and accounts for it to liquidate and sacrifice when it got caught in the tax scheme.[134] To the extent UBS FS argues that Plaintiff's losses resulted from a general decline in the market, rather than showing a lack of proximate causation, this

---

[130] Holmes, 503 U.S. at 269–70.

[131] Am.Comp. ¶ 45.

[132] Am.Comp. ¶¶ 69, 73, 90, 95, 120, passim.

[133] See Am.Comp. ¶ 146; Neg. Dec., Ex. R, September 17, 2008 email from Rene Elste to Mr. Knopick; See Bridge, 128 S.Ct. at 2144 (noting that other auction bidders, not the county officials who relied on defendants' misrepresentations, were the intended victims of defendants' RICO conduct); BCS Servs., 637 F.3d at 756.

argument presents a question as to the amount of damages.[135]

## 2. Plaintiff's RICO Claims Are Not Actionable Securities Fraud Claims; And Therefore Are Not Excluded Claims Under PLSRA.

Count VIII of Plaintiff's Amended Complaint is based in 18 U.S.C. § 1964(c) and alleges that Defendants violated 18 U.S.C. § 1962(c). Section 1962(c) prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate commerce or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." A pattern of racketeering activity is established by showing at least two predicate acts that occurred within ten years of each other. 18 U.S.C. § 1961(5). Any crime enumerated in 18 U.S.C. § 1961(1) may constitute a predicate act, which includes mail and wire fraud. 18 U.S.C. § 1961(1)(B). However, any crime which constitutes a securities fraud is expressly excluded by the Private Securities Litigation Reform Act ("PSLRA"), codified in part at 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court ... except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.")(emphasis added).[136]

Courts have articulated the inquiry into PLRSA's prohibition of RICO claims based in actionable securities fraud as finding both whether plaintiff could have brought a securities fraud claim based on the RICO predicate acts and whether the SEC could have brought such a

---

[134] Am.Comp., ¶ 69, 73, 90, 95, 120, passim.

[135] Cf. Anza, 547 U.S. at 466 (Thomas, J., concurring in part and dissenting in part) ("Proximate cause and certainty of damages, while both related to the plaintiff's responsibility to prove that the amount of damages he seeks is fairly attributable to the defendant, are distinct requirements for recovery in tort.").

[136] Plaintiff's claims generally are not based upon allegations of securities fraud, they are based upon allegations of banking and tax fraud. Am. Comp., passim. Nevertheless, as discussed in detail below, Plaintiff's claims are not "actionable" as securities fraud claims because they are extraterritorial.

claim.[137] Importantly in this case, the Supreme Court has limited the application of Section 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j, (and SEC Rule 10b-5) to actors who employ "manipulative or deceptive device[s]" in two contexts: (1) transactions involving "the purchase or sale of a security listed on an American stock exchange," and (2) transactions involving "the purchase or sale of any other security in the United States."[138] Indeed, the Supreme Court has held Section 10(b) has no extraterritorial reach.[139] To determine whether the transactions at issue were "domestic transactions," under *Morrison*, the consideration is "not ... the place where the deception originated, but [the place where] purchases and sales of securities" occurred.[140] It is the "location of the transaction that establishes (or reflects the presumption of) the [Security Exchange] Act's inapplicability." *Id.* at 268, 130 S.Ct. 2869.[141]

In this case, while the place of each of the purchases and sales of securities is not specifically alleged in the Amended Complaint, the Amended Complaint identifies the securities transactions as "international."[142] Further, as set forth in the Program Management forms signed by Plaintiff and attached as Exhibit C to the Amended Complaint, Plaintiff contemplated that his assets would be allocated to "international" and "Asian" securities. Further, as set forth in the ""Supplement for new Account US Status Assets and Income/Declaration for US Taxable"

---

137 *See e.g. In re LIBOR-Based Financial Instruments Antitrust Litigation*, 935 F.Supp.2d 666, 726 (S.D.N.Y. 2013); *Eagletech Commc'ns Inc. v. Citigroup, Inc.*, 2008 WL 3166533, at *14 (S.D.Fla. June 27, 2008) (holding that "the PSLRA acts as a bar to Plaintiffs' RICO claims" because "the predicate acts are actionable as securities fraud and may be prosecuted by the SEC").

138 *Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247, 273 (2010).

139 *Id.* at 262, 266–67 (determining that Section 10(b) and Rule 10b-5 had no extraterritorial effect in civil context)

140 *Id.* at 266.

141 *Id.*

142 Am. Comp., ¶ 1, 24.

Persons', signed by the UBS AG non-W9 customers, their accounts were restricted from

purchasing or selling US securities.[143]

Thus, based upon the information available to Plaintiff at this time and as alleged in the

Amended Complaint, the securities transactions at issue were extraterritorial; and therefore, not

actionable. Since the securities transactions are not actionable, any of Plaintiff's RICO claims

relating to such transactions are not prohibited by PLRSA.[144]

### 3. Plaintiff Has Plausibly Averred A RICO Conspiracy and Property Alleged UBS FS's Activities In Furtherance Thereof

In its argument for dismissal of Plaintiff's §1962(d) RICO conspiracy claim, UBS FS

selectively quotes from the Amended Complaint and omits the clear allegations of its own

fraudulent activities. Regardless, as set forth above, Plaintiff has alleged UBS FS's liability

under § 1962(c) as well as coordinated activities in furtherance of the scheme, the period of the

conspiracy, the object of the conspiracy, the overt acts taken in furtherance of the conspiracy,

the agreement to commit the predicate acts, and knowledge that the acts were part of a pattern

of racketeering activity.[145] Defendant complains Plaintiff did not sufficiently allege "agreement

to, and his or her knowledge of, the conspiracy."[146] Defendant suggests that the recitation of

the elemental language in Paragraph 252 of the Amended Complaint is insufficient, but fails to

acknowledge the allegations in the other 255 paragraphs of the Amended Complaint.

The *mens rea* associated with a RICO claim is properly alleged where defendant is

---

[143] Neg. Dec, Ex. A, Weil Trial Exhibits.

[144] To the extent UBS attempts to misinterpret this argument to convince the court Plaintiff is seeking "extraterritorial" application of RICO, that is not the case. As has been recognized, this is "*not an extraterritorial* assertion of jurisdiction. . . Someone who fires a rifle from Canada into the United States and wounds his victim can plainly be convicted of attempted murder [here]." *US v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1130 D.C. Cir. 2009)(emphasis in original).

[145] *See generally Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162 (3d Cir. 1989). Plaintiff incorporates by reference his arguments in Sections C(1) and (2) above, establishing valid pleading of UBS FS's RICO liability under § 1962(c). Am.Comp., ¶¶ 247-256.

averred to possess the specific intent associated with the various underlying predicate

offenses.[147] *Mens rea* may be shown directly (as by an admission) or circumstantially, as by

"the existence of a scheme which was reasonably calculated to deceive persons of ordinary

prudence and comprehension [when that] intention is shown by examining this scheme

itself."[148] Plaintiff has met this standard. In particular, Plaintiff alleged as follows:

1) UBS SFA was set up to carry on the tax fraud;[149]

2) UBS FS was directed by UBS AG to solicit US customers to provide "net new money" to UBS AG to meet its goals;[150]

3) UBS FS advisors referring US customers to UBS AG/UBS SFA would receive commissions and perks (a Breitling watch with the UBS logo) based upon the volume of activity referred;[151]

4) UBS AG was not authorized to engage in banking transactions with US customers in the US;[152]

5) UBS AG and UBS SFA were engaged in a massive tax evasion scheme with non-W9 compliant US customers, some of whom were also referred by UBS FS advisors;[153]

6) UBS AG and UBS SFA, with the knowledge and assistance of UBS FS, used the accounts of W-9 compliant US customers to cover for non-compliant "black" accounts.[154]

7) When Plaintiff's accounts were liquidated, UBS FS advisor, Seifert, initially told Plaintiff his money would be returned and then later worked with UBS AG and UBS SFA to cover up and hide information from Plaintiff and obstruct his ability to obtain information.[155]

These allegations, and the reasonable inferences to be drawn from them, are much more

than a "formulaic recitation" of liability. Specifically, the allegations that UBS SFA was

---

146 Defendant's Motion, Dkt. 39-7, p. 28.

147 *Gentry v. Resolution Trust Corp.*, 937 F.2d 899, 908 (3d Cir. 1991); *see also Lancaster Community Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397 (9th Cir. 1991)("A specific intent to deceive is an element of the predicate act."); *cert. denied* 502 U.S. 1094 (1992); *United States v. Biasucci*, 786 F.2d 504 (2d Cir.), *cert. denied,* 479 U.S. 827 (1986)("RICO imposes no additional *mens rea* requirement beyond that found in the predicate crimes.")

148 *Ikuno v. Yip*, 912 F.2d 306, 310-311 (9th Cir. 1990).

149 *Id.*, ¶ 34(f), 39, 53, 54, 55.

150 *Id.*, ¶ 30

151 Am.Comp., ¶ 6-7.

152 Am.Comp., ¶ 33, 34

153 Am.Comp., ¶ *passim.*

154 Am.Comp., ¶ 86, 146.

created to further the scheme meets the requirements for pleading where the corporations are

interrelated.[156] Therefore, Plaintiff respectfully requests that UBS FS's motion to dismiss

Plaintiff's RICO conspiracy claims be denied.

**D.    Plaintiff's Class Action Allegations Comply with Rule 23**

Striking a party's pleadings is an extreme measure, and motions to strike are viewed

with disfavor.[157] A court may strike class action allegations in a complaint only in rare cases

where the complaint itself demonstrates that the requirements for maintaining a class action

cannot be met.[158] Allegations, including class action allegations, must be simple, concise, and

direct.[159] As shown below, the Amended Complaint's class action allegations are sufficient,

and the defendant's motion to strike the class action allegations must be denied.

**1.    Plaintiff Has Properly Alleged Predominance and Commonality**

The commonality requirement will be satisfied if the named plaintiff shares at least one

question of fact or law with the grievances of the prospective class.[160] A commonality finding

does not require that all class members share identical claims, and some factual differences

amongst the claims of the putative class are permitted and do not defeat certification.[161] The

common questions of law and fact are plainly shown on the face of the amended

---

155 Am.Comp., ¶ 21, 101-104.

156 Glessner v. Kenny, 952 F.2d 702, 714 (3rd Cir. 1991) overruled on other grounds, Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258, 260-261 (3d Cir. 1995)(recognizing precedent that "the nature of the association between three companies gives rise to a necessary inference that the parties agreed to the ongoing acts, and knew that the acts were part of an overall pattern of racketeering activity" where "the complaint alleged that the relationship between the parent corporation and its subsidiaries was established solely for the purpose of perpetrating securities fraud.")

157 Stanbury Law Firm v. Internal Revenue Service, 221 F.3d 1059, 1063 (8th Cir. 2000).

158 See Landsman & Funk P.C. v. Skinder-Strauss Assoc., 640 F.3d 72, n.30 (3rd Cir. 2011).

159 FED. R. CIV. P. 8(d)(1).

160 Baby Neal for and by Kanter v. Casey, 43 F.3d 48, 56 (3rd Cir. 1994).

161 In re Prudential Ins. Co. of America Sales Practices Litigation, 148 F.3d 283, 301 (3rd Cir. 1999).

complaint.[162] These common questions include:

a. Whether UBS FS and its employees wrongfully referred U.S. citizens to UBS AG and UBS SFA when UBS AG was prohibited by law and internal policy from providing banking services to U.S. customers; and

b. Whether UBS FS and its employees wrongfully referred U.S. Citizens to UBS AG and UBS SFA when UBS AG and UBS SFA were under investigation by the DOJ and SEC for a cross-boarder tax fraud scheme and failed to disclose such information to its U.S. customers; and

c. Whether UBS FS and its employees made false and misleading statements to U.S. customers concerning the expertise of UBS SFA and UBS AG in international banking and financial advising; and

d. Whether UBS FS and its employees concealed from US customers that UBS SFA was formed as an act in furtherance of UBS AG's cross-boarder tax-fraud scheme; and

e. Whether those customers are entitled to rescind their contracts and receive their money back; and

f. Whether UBS FS and its employees are liable for the damages incurred by US customers as a result of UBS FS's wrongful conduct.

And, more to the point, did UBS use Mr. Klopick and its other W9 clients as smoke-screens to divert attention from the many "black accounts" of its US tax-cheat clients?

The predominance inquiry should focus on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct.[163] Here, Plaintiff has alleged that UBS AG – while not authorized to provide banking services to US citizens in the US, through UBS FS recommended to Mr. Klopick and members of the class that he/they do business with UBS AG in order to obtain "net new money", obtain commissions and perks, and help the "integrated business" of UBS AG reach its "ambitions." Meanwhile, UBS AG and UBS SFA were engaged in tax fraud against the IRS in connection with their non-W-9 compliant clients. This tax fraud restricted

---

162 Am.Comp., ¶ 160, and *passim*.

163 *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 298 (3rd Cir. 2011).

communications with US clients regarding their investments and ultimately resulted in the prosecution of UBS AG and UBS SFA, and fire sale of all US-client assets in order to fund the $780 million fine, and rapid divestiture by UBS AG of its US cross-border business.

UBS makes much of the fact that there will be some individualized issues, particularly with respect to damages and reliance. But even if so, the existence of individualized issues in a proposed class action does not *per se* defeat commonality. The presence of individual questions with respect to reliance does not mean that common questions do not predominate.[164] Similarly, individualized issues of damages and reliance may be dealt with by separate proceedings, if necessary; such individual questions do not preclude the class-action device.[165]

Neither is the possibility of state law differences fatal to a class action. Third Circuit precedent provides that "variations in the rights and remedies available to injured class members under the various laws of the fifty states [do] not defeat commonality and predominance."[166] This is particularly so where differences in state law fall into limited and predictable patterns, such that state law differences can be easily dealt with via subclasses.[167]

UBS claims that individual oral misleading statements are not amenable to class action treatment.[168] But the class allegation is not limited to oral misrepresentations. The omissions (e.g. [a] failing to disclose that UBS SFA and UBS AG were being investigated by the DOJ and SEC for a cross-border tax evasion scheme and that one of their purposes in obtaining additional US customers was to facilitate that scheme; and [b] failing to disclose that UBS AG was not registered or licensed for banking activities in Pennsylvania or other states; and [c]

---

164 *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3rd Cir. 1985).

165 *See, e.g. In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 269 (3rd Cir. 2009) (finding predominance where anti-trust injury was susceptible to common proof, even though the amount of damage each plaintiff suffered could not be established by common proof).

166 *Sullivan*, 667 F.3d at 301 (citing *In re: Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3rd Cir. 2010)).

167 *Id.* at 301-02.

defendant's failure to disclose that UBS SFA was organized in furtherance of the cross-border tax fraud scheme)[169] are equally, if not more important, than the oral misleading statements.

In the same vein, UBS FS claims that since reasonable reliance is an element, predominance is defeated because the Court would have to determine that element on an individual basis. This is incorrect for at least two reasons. First, reasonable reliance is only an element of Count I (Fraud) of the amended complaint; it is not an element in Counts II through IX of the complaint. Secondly, the presence of individual questions as to the reliance of each investor does not mean that common questions of law and fact do not predominate.[170]

Lastly, UBS argues that Mr. Knopick's invocation of the doctrine of equitable tolling renders the case "unsuitable for class action treatment."[171] But the Third Circuit has already rejected a similar argument in *In re Linerboard Antitrust Litig.* 305 F.3d 145 (3rd Cir. 2002). In *Linerboard*, a Sherman Act case involving statute of limitations defenses and fraudulent concealment, the Court acknowledged that individual determinations would undoubtedly arise at trial, but held common issues of concealment predominated, because "the inquiry necessarily focuses on [the] defendant's conduct...rather than what plaintiffs did."[172]

Similarly, none of Defendant's arguments here show that the class action allegations are *facially* defective with respect to predominance and commonality.

### 2.      Plaintiff Has Properly Alleged Class Action Superiority

So far as Plaintiff and undersigned counsel are aware, UBS has never been held accountable for the complicity of its US based (former) Paine Webber brokers in arranging

---

[168] *See* Defendant's Motion, Dkt. 39-7, p. 14.

[169] Am.Com., ¶ 177

[170] *See e.g. Eisenberg*, 776 F.2d at 786 (noting that, in the context of a 10b-5 securities fraud case, allowing individual questions as to the reliance of each investor would negate any attempted class action under Rule 10b-5, and that it would be preferable to order separate trials, if necessary, limited to the issue of reliance).

[171] Defendant's Motion, Dkt. 39-7, p. 18.

illegal Swiss accounts, nor for the illegal component of the accounts at UBS SFA, which required Americans – honest Americans providing W-9s -- to open illegal bank accounts at UBS AG. If individual aggrieved W-9 clients were adequately incentivized to bring their claims, one wonders why none have done so. Perhaps other class members were fortunate enough not to have lost the millions that Mr. Knopick lost, and are less incentivized to bring individual litigation against one of the world's largest banks.

Regardless, Defendant's reliance on *Newton v. Merrill Lynch* is misplaced.[173] *Newton* was a 10b-5 class-action lawsuit against broker-dealers for allegedly breaching their duty of best execution.[174] At issue were "hundreds of millions of transactions executed over several years."[175] But unlike the plaintiffs in *Newton*, Mr. Knopick does not complain of the mere timing of any particular transaction. To the contrary, the issues in this case are a) outright fraud, deceit, and misrepresentation b) flagrant disregard of investment objectives (to the point of purchasing bonds that paid less than the interest on the margin loans), and c) liquidating portfolios to satisfy margin calls. The trading minutia will hardly be at issue.

### 3. Plaintiff's Claims Are Typical Of The Class

As long as the claim arises from the same event, practice, or course of conduct and is based on the same legal theory, factual differences do not render a claim atypical.[176] The events, practices, and course of conduct in this case are that UBS referred its W-9 clients into illegal and unlicensed banking relationships, made material misrepresentations, failed to disclose material information that UBS was under investigation by the DOJ and SEC, and

---

[172] *Id.* at 163.
[173] 259 F.3d 154 (3rd. Cir. 2001).
[174] *Id.* at 162.
[175] *Id.* at 191.
[176] *Grasty v. Amalgamated Clothing and Textile Workers Union*, 828 F.2d 123, 130 (3rd Cir. 1987), *rev'd in part on other grounds, Reed v. United Transp. Union*, 488 U.S. 319 (1989).

failed to disclose material information that UBS SFA was formed to further a tax-fraud scheme that benefited UBS's *other*, non W-9, tax cheat clients. The legal theories are plainly set forth on the face of the amended complaint. Nothing about them plainly shows that they cannot be maintained as a class action. Any factual differences between Mr. Knopick and other members of the class do not render Mr. Knopick's claim(s) atypical.

Even if the class representatives' injuries take various forms, it does not negate a finding of typicality so long as the cause of the injuries is some common wrong.[177] In *In re Prudential*, the class was comprised of policyholders who alleged fraudulent and misleading sales practices.[178] Even though their injuries may have taken various forms, the court found that so long as the cause of those injuries was some common wrong, the various forms of the injuries did not negate a finding of typicality.[179]

Here, there is certainly enough pled to show that Mr. Knopick is an adequate representative of the class because he brings causes of action that arise from his own disputes and dealings with defendants. As more fully set out in the amended complaint, the proposed class consists generally of individuals who did not hide their accounts from taxing authorities, and who, like Mr. Knopick, fell victim to the UBS FS brokers' practice and course of conduct of referring them to UBS AG and UBS SFA and not disclosing the illegal scheme.

### 4. Plaintiff's Defined Class is Ascertainable

The ascertainability inquiry is two-fold, requiring a plaintiff to show nothing more than (1) the class is defined with reference to objective criteria, and (2) that there is a reliable and administratively feasible mechanism for determining whether putative class members fall

---

[177] *In re Prudential Ins. Co. of Am. Sales Litig.*, 148 F.3d 283, 312 (3rd Cir. 1998).
[178] *Id.* at 289
[179] *Id.* at 312.

within the class definition. A plaintiff need only show that class members *can* be identified.[180]

As alleged in the Amended Complaint, UBS maintained a Global Referral Desk in New Jersey to solicit US customers to invest in Switzerland.[181] These referrals were certainly tracked, for purposes of commissions, tracking goals, and giving out the aforementioned Breitling wristwatch.[182] Further, UBS must know who its W9 clients were, and who had Paine Webber accounts that got transferred to UBS FS and/or UBS AG. In any event, it is premature for defendants to say the class is unascertainable before discovery.

### 5.   Plaintiff Is Entitled To Proceed With Discovery Or to Amend If Necessary

"Generally, a motion to strike should not be granted when it is in the nature of an opposition to class certification, or if discovery is a necessary prerequisite to determining whether class certification is appropriate."[183] Of course, discovery is almost always an important part and prerequisite of the class-certification process. Since Rule 23 requires a district court to conduct a "rigorous analysis," discovery is often necessary in order to facilitate that analysis.[184]

Many Third Circuit cases view pre-certification motions to strike class allegations as premature.[185] In *P.V.*, the court considered a pre-discovery motion to strike class allegations.[186] Noting that the limited information available to the court at the time hindered its

---

[180] *Byrd v. Aaron's, Inc.*, 784 F.3d 154, 164 (3d Cir. 2015).

[181] Am. Compl. ¶34(g).

[182] Am. Comp. ¶7.

[183] Neg.Dec., Ex. E, *NBL Flooring, Inc. v. Trumball Ins. Co.*, Civil Action No. 10-4938, 2011 U.S. Dist. LEXIS 110518 at *1 (E.D. Pa Sept. 27, 1011)

[184] Neg.Dec., Ex. F, *Humphreys v. Budget Rent a Car Sys.*, Civil Action No. 10-cv-1302, 2014 U.S. Dist. LEXIS 55438 at *52 (E.D. Pa April 22, 2014).

[185] Neg. Dec., Ex. G, *See e.g. P.V. v. School Dist. Of Philadelphia*, No. 2:11-CV-04027, 2011 U.S. Dist. LEXIS 125370 at *11-12 (E.D. Pa Oct. 31, 2011) (collecting cases).

[186] *Id.* at *13-14.

ability to rigorously analyze the issue,[187] the court denied the motion to strike the class action allegations as premature.[188]

Since nothing on the face of the amended complaint shows the class action allegation to be insufficient, the class action process should be allowed to "play out" according to Rule 23, upon deliberation of the parties and the court.[189] In the alternative, Plaintiff should be permitted to amend its complaint as justice requires.

### E. Plaintiff Is Entitled To Pursue His State Law Claims In the Alternative

Plaintiff is entitled to plead his state law claims for fraud, negligence, breach of fiduciary duty and unjust enrichment in the alternative under Rule 8(d)(2). Under that rule, a plaintiff may plead inconsistent theories of liability, and may even argue alternative claims to a jury.[190] Further a plaintiff "need not use particular words to plead in the alternative as long as it can be reasonably inferred that this is what [it was] doing."[191] Such is the case here.

### F. Plaintiff Has Alleged Sufficient Equitable Tolling Allegations As To His Negligence Claims

It is established New York and Federal (and Pennsylvania) law and procedure, "Where it does not conclusively appear that a plaintiff had knowledge of facts from which the [claim] could reasonably be inferred, a complaint should not be dismissed on motion [based on the statute of limitations] and the question should be left to the trier of the facts"[192]

In this case, Plaintiff alleged that he did not know of the facts from which his clam could have been inferred, because, in part, he was deceived by Ms. Seifert into believing UBS

---

[187] *Id.* at 14

[188] *Id.* at 17.

[189] *Weiss v. Regal Collections*, 385 F.3d 337, 346-48 (3rd Cir. 2004).

[190] *See Scott v. District of Columbia,* 101 F.3d 748, 753 (D.C.Cir.1996)

[191] *G–I Holdings, Inc. v. Baron & Budd,* 238 F.Supp.2d 521, 536–37 (S.D.N.Y.2002) (internal quotation marks omitted) (collecting cases)

[192] *Sargiss v. Magarelli,* 12 N.Y.3d 527, 532 (2009).

would "make [him] whole" and in part because UBS strove to keep its banking fraud (as opposed to its tax fraud) from public knowledge.[193]

## V.  PLAINTIFF'S ALTERNATIVE CROSS MOTION TO AMEND

Pursuant to Fed.R.Civ.Pro. 15, leave to amend should be liberally granted.  Thus, to the extent this Honorable Court is convinced by any of the arguments of Defendant concerning deficiencies in Plaintiff's pleading and is unconvinced by Plaintiff's counter-arguments herein, Plaintiff respectfully requests leave to amend his allegations to address any perceived deficiencies in the interest of justice.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff respectfully request this Court deny Defendant's Motion to Dismiss or in the alternative, allow Plaintiff to amend his claims to address the issues in the interest of justice.

Dated: June 19, 2015

Respectfully submitted,

SPRUCE LAW GROUP, LLC

By: *s/Julie Negovan*
   Julie B. Negovan (PA Atty No. 81231)
   Spruce Law Group, LLC
   1622 Spruce Street
   Philadelphia, PA 19103
   Tel.: (267) 546-0623
   jn@sprucelaw.com

**ATTORNEY FOR PLAINTIFF
NICHOLAS KNOPICK**

---

[193] Am.Comp., ¶ 91; Neg. Dec., Ex C, DPA and Amendment.  The language of the DPA upon which UBS FS relies as inquiry notice is so opaque as to the banking fraud, no one other than UBS could have deciphered the fraud from that document.

**CERTIFICATE OF SERVICE**

I, Julie Negovan, hereby certify that the foregoing Plaintiff's Memorandum of Law In Opposition to Defendants' Motion to Dismiss and Strike was served via this Court's ECF system to all counsel of record on this date.


Dated: June 19, 2015                                  */s Julie Negovan*
                                                      Julie Negovan