**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **NICHOLAS KNOPICK, individually and on behalf of those similarly situated,** | **CIVIL ACTION NO. 14-05639** |
| **Plaintiff,** | |
| **v.** | |
| **UBS FINANCIAL SERVICES, INC.,** | |
| **Defendant.** | |

**PAPPERT, J.**                                                                              **AUGUST 18, 2015**

**MEMORANDUM**

Plaintiff Nicholas Knopick ("Knopick") brings this putative class action against UBS Financial Services, Inc. ("FS") claiming that FS, affiliated Swiss corporations, and certain employees of the Swiss corporations disregarded Knopick's instructions, invested his money recklessly, and as a result lost most of his $12 million investment. Non-party but alleged conspirator UBS AG ("AG") is a global financial services company based in Switzerland. (Am. Compl. ¶ 18, ECF No. 14.) Non-party but alleged conspirator UBS Swiss Financial Advisors ("SFA") is a Swiss corporation and a wholly owned subsidiary of AG. (*Id.* ¶ 17.) SFA is also a registered investment advisor with the Securities and Exchange Commission ("SEC"). (*Id.*) FS is an American subsidiary of AG and an SEC registered broker-dealer and investment advisor. (*Id.* ¶ 15.) "AG is [allegedly] the ultimate decision maker for all its subsidiary companies and [they] operate as a single business enterprise directed by [AG]." (*Id.* ¶ 18.)

In February 2009, AG admitted to conspiring to defraud the United States through a scheme that enabled certain United States clients to avoid their reporting and tax obligations on income earned in overseas accounts held by AG. Knopick sues only FS, but relies heavily on

AG's prior criminal wrongdoing in his effort to recoup losses incurred when SFA allegedly disregarded Knopick's instructions and "wildly and recklessly" invested his money.[1] FS moves to dismiss Knopick's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the Court grants FS's motion.[2]

## I.    Background

Though FS is the sole defendant in this case, most of the allegations in the 256-paragraph amended complaint pertain to AG.  In fact, much of the amended complaint's factual background is taken verbatim from a federal information filed against AG.  *See United States v. UBS AG*, No. 09-cr-60033, ECF No. 4 (S.D. Fl. 2009).  While the Court recounts a good deal of that factual background here to set the context in which Knopick purports to assert his claims, AG's criminal troubles are at best tangential to Knopick's specific allegations against FS.

Between 2000 and 2007, AG falsely reported to the IRS, and aided American citizens in falsely reporting, that "nominee offshore structures" were the beneficial owners of accounts held by AG.  (Am. Compl. ¶ 34.)  This scheme enabled approximately 17 million American citizens to conceal their identities and earned income from the IRS.  (*See id.* ¶¶ 24, 66.)  AG assisted its clients' deception by failing to report Form 1099 information to the IRS despite its obligation to do so.  (*Id.* ¶¶ 24, 34.)

AG utilized a number of methods to further this scheme.  AG bankers regularly traveled to the United States to discuss the undisclosed accounts, *i.e.* black accounts, with their clients and used "counter surveillance techniques" to protect their clients' identities while in the United

---

[1]    Despite Knopick's allegations against the UBS "business enterprise," FS continues to serve as Knopick's investment advisor and broker for his United States brokerage account.  (*Id.* ¶¶ 15, 76.)

[2]    FS also moves to strike Knopick's class allegations pursuant to Federal Rules of Civil Procedure 12(f) and 23.  Because the amended complaint must be dismissed in its entirety, the Court does not reach FS's motion to strike.

States.  (*Id.* ¶¶ 25, 34.)  AG also sent communications to clients touting its past success concealing clients' identities from the United States, trained employees to evade detection, organized meetings to further discuss methods of evasion, and limited communication with American clients to avoid United States scrutiny.  (*Id.* ¶¶ 34-52.)

AG also created SFA in 2005.  (*Id.* ¶¶ 17, 39.)  Its purpose was twofold.  First, SFA was created to redirect scrutiny from AG's tax fraud scheme and "to deceive U.S. authorities to not suspect that the same customers had secret, undeclared accounts at [AG]."  (*Id.* ¶ 54; *see also id.* ¶¶ 34, 38, 44, 53.)  As part of this diversion, investors with SFA were required to open bank accounts with AG.  (*Id.* ¶ 2; *see also id.* ¶ 145-46.)  Second, SFA would provide a source of funds that AG could access to pay a fine should its fraud be discovered.  (Pl.'s Opp'n Mot. Dismiss 29, ECF No. 48.)

Finally, AG initiated a Global Referral Program, run through a "Global Referral Desk" in Weehawken, New Jersey, "to manage broker efforts to attract customers to invest in undeclared accounts in Switzerland."  (*Id.* ¶ 34.)  This referral campaign incentivized AG and/or FS's brokers to refer American clients with "new net money" to AG and its financial advisors.  (*Id.* ¶¶ 6, 7.)  FS referred its American clients to SFA and AG—ostensibly through the Global Referral Desk—and arranged meetings in the United States with AG bankers.[3]  (*Id.* ¶¶ 73, 146.)  When making these referrals, FS failed to inform its American clients that AG was not licensed to conduct banking transactions in the United States, that AG was under investigation by the

---

[3]     Knopick was not referred to SFA through the "Global Referral Desk."  Knopick was referred to Andreas Knöpfel ("Knöpfel"), an SFA investment advisor, by his FS investment advisor and broker, Susan Seifert ("Seifert").  (Am. Compl. ¶ 77.)  Seifert, the only link between Knopick and SFA, is no longer a defendant in this case, having been voluntarily dismissed by Knopick in a procedural maneuver to ensure venue in this district.  (*See* Notice of Voluntary Dismissal, ECF No. 19; *see also* Order, ECF No. 23.)

Department of Justice ("DOJ"), and that SFA was designed to further the tax fraud scheme.[4] (*Id.* ¶ 8.)

In August 2007, AG Executives decided to "freeze" the tax fraud scheme "rather than exit the business to comply with U.S. law." (*Id.* ¶ 65.) Soon thereafter, AG learned that the DOJ was investigating its cross-border business. (*Id.*) The SEC also contacted AG in December 2007 regarding the tax scheme. (*Id.* ¶ 151.) AG admitted guilt and signed a deferred prosecution agreement with the DOJ on February 11, 2009, in which in it agreed to pay a $780 million fine and to implement substantial reforms. (*Id.* ¶ 66; *see also* Pl.'s Opp'n Mot. Dismiss Ex. C.)

Knopick established investment and banking relationships with SFA and AG in early 2007—a few months before a whistleblower reported the tax fraud scheme to the DOJ. On January 19, 2007, Knopick formalized a relationship with FS and opened a brokerage account for retirement funds. (*See* Am. Compl. ¶ 76; *see also id.* at Ex. A.) Knopick also signed the "Basic documents for account/custody account relationship" with SFA on January 23, 2007. (*Id.* at Ex. C.) Among these documents was an Asset Management Agreement, which gave SFA "absolute discretion" to "buy and sell in cash or on a forward basis . . . any investments in domestic and offshore investment companies, investment funds, any other collective instrument and fund-like instruments, [to] carry out investments on a fiduciary basis in all countries and currencies, [to] decide on investment timing" and "[to] carry out all and any other transactions for [his] account as it may from time to time determine." (*See id.*) Knopick also completed a "Portfolio Management International" form and a "Portfolio Management Asia Opportunities" form on which he indicated an "above average risk tolerance," a "growth" or "equity" investment strategy, and a "main objective" to allocate assets to international and Asian investments. (*Id.*)

---

[4] These alleged facts purporting to link FS to AG, *e.g.* the creation of SFA and the Global Referral Desk, are the few facts which are not included in the information filed against AG.

After opening these accounts, Knopick wired approximately $12 million from his Wachovia

Bank account in Pennsylvania to AG.  (*Id.* ¶ 78.)  Unbeknownst to Knopick, "his investments

and relationship, and the very existence of [SFA], were used by [AG] and [SFA], with [FS's]

knowledge . . . to cover for the 'black accounts.'"  (*Id.* ¶ 21.)

In March or April of 2007, Seifert, Knopick's licensed investment broker and advisor

with FS, introduced Knopick to Knöpfel.  (*Id.* ¶¶ 16, 77.)  Seifert allegedly praised Knöpfel's

"investment prowess," which, along with Knöpfel's claims of success, induced Knopick to open

two investment accounts with SFA.  (*Id.* ¶¶ 77-78, 126, 141.)  Knopick carefully explained his

investment strategy to Knöpfel.  (*Id.* ¶ 78.)  This investment strategy was apparently to invest in

"blue chip common stocks with high dividend yields and us[e] those dividends to make interest

payments on margin loans used, in part, to fund securities purchases."  (*Id.* ¶¶ 134, 185.)

After meeting with Knöpfel, Knopick opened a deposit account and a margin loan

account with AG.  (*Id.* ¶¶ 79, 108, 146.)  On April 3, 2007, Knopick signed the "Basic document

for account/custody account relationship" with AG to open those accounts.  (*Id.* ¶ 108, Ex. B.)

Knopick also signed an AG Basic Agreement for collateral loans.  (*Id.* ¶ 114, Ex. B.)  As part of

this agreement Knopick pledged the assets in his SFA account as collateral for the margin loans.

(*Id.* ¶¶ 116-19.)  Knopick was allegedly required to open these accounts to invest with SFA.  (*Id.*

¶¶ 79, 146.)  Throughout this process Knopick was never informed that AG was not licensed to

conduct banking activities in Switzerland with American citizens.  (*Id.* ¶¶ 79, 145.)

Knöpfel allegedly disregarded Knopick's investment strategy and invested Knopick's

money "wildly and recklessly," by "trading his dollars into foreign currencies and purchasing an

inexplicable collection of stocks and bonds denominated in those foreign currencies."  (*Id.* ¶ 85.)

Despite Knopick's instructions to "purchase assets with dividends that cover the interest on the

margin loans" and Knöpfel's duty to comply with those instructions, Knöpfel apparently "leveraged [Knopick's] account to purchase volatile securities." (*Id.* ¶¶ 87, 134, 137.) He also "purchased bonds that paid interest at a rate lower than the interest rate on the margin loans" even though he was not authorized to do so. (*Id.* ¶¶ 85, 87.)

Knöpfel and his assistant concealed their fraud by regularly informing Knopick that his investments were performing well. (*Id.* ¶ 86.) Knöpfel never disclosed that AG was under investigation by the DOJ or that "his account had been created as a cover for, and in furtherance of, [the tax evasion] scheme." (*Id.* ¶ 86.) AG, SFA, and FS likewise failed to inform Knopick that the DOJ launched an investigation in September 2007 or that AG was contacted by the SEC in December 2007. (*Id.* ¶¶ 86, 151.) Knopick never would have invested with SFA or conducted banking activities with AG if he had known this information. (*Id.* ¶ 152.)

Knöpfel "vanished" sometime between August 2008 and October 2008 and was replaced by Rene Elste ("Elste"). (*Id.* ¶¶ 88, 148.) Knopick was never notified of Knöpfel's disappearance. (*Id.*) In September 2008, "as the DOJ was [allegedly] closing in on [AG's] cross-border tax evasion scheme," SFA, through Elste, contacted Knopick to inform him of the need to liquidate his investment portfolios to satisfy his margin loan obligations. (*Id.* ¶¶ 87, 145.) "As the debt and equity markets melted down in late 2008, [SFA] continued to liquidate [Knopick's] portfolio at fire sale prices to satisfy [AG's] loan repayment requirements." (*Id.* ¶ 90; *see also id.* ¶ 149.) SFA and Elste allegedly dissuaded Knopick from promptly withdrawing his investment to "feed [AG's] appetite for margin calls . . . and/or to aid in the cover up of the cross-border tax fraud scheme." (*Id.* ¶ 149; *see also id.* ¶ 90.) By the end of 2008, Knopick's $12 million investment dwindled to roughly $900,000. (*Id.* ¶¶ 90, 149.)

When Knopick inquired as to the whereabouts of Knöpfel, Seifert informed him that Knöpfel had left SFA. (*Id.* ¶¶ 91, 150) She nevertheless assured Knopick that past clients in his position had been made whole. (*Id.* ¶ 91.) Knopick has since been unable to obtain any information regarding the loss of his investment or the disappearance of Knöpfel.[5] (*Id.*) In that regard, Knopick contends that FS conspired with SFA and AG to conceal the theft or loss of his money by failing to provide any information or explanation regarding Knöpfel's disappearance or the loss of Knopick's investment even though they allegedly have access to this information.[6] (*Id.* ¶¶ 91, 95, 150.) SFA and AG also failed to provide Knopick with any details regarding the disappearance of Knöpfel or his investments. (*Id.* ¶ 148.)

Knopick initiated this case by filing a putative class action complaint on October 1, 2014. (*See* ECF No. 1.) FS moved to dismiss the complaint on December 19, 2014. (*See* ECF No. 8.) Knopick amended his complaint on February 19, 2015.[7] (*See* ECF No. 14.) He asserts nine claims on behalf of himself and the putative class. Knopick's seven state law claims—fraud, negligence, breach of fiduciary duty, unjust enrichment, breach of contract, violation of the Pennsylvania Unfair Trade Practice and Consumer Protection Law, and violation of New York General Business Law § 349—are all predicated upon (1) FS's assertions that SFA and AG "had expertise in international banking and investing" and FS's failure to disclose AG's wrongdoing,

---

[5] At one point in the amended complaint Knopick suggests that Knöpfel stole his money (*see id.* ¶ 150 ), while at other times he asserts that AG called in the margin loans to "feed its appetite for the loan repayments." (*See id.* ¶¶ 90, 95, 149.)

[6] Despite this apparent stonewalling and her alleged central role (recommending Knöpfel) in the loss of most of Knopick's $12 million investment, Seifert "continues to serve as Mr. Knopick's investment advisor and broker." (*Id*. ¶ 16.)

[7] Since Knopick filed his amended complaint, the Court resolved two contested issues in his favor. First, the Court determined that Knopick properly established venue in this District after voluntarily dismissing Seifert from the case. (*See* Order, ECF No. 23.) The Court subsequently denied FS's motion to enforce a forum selection clause and transfer this case to the Southern District of New York. (*See* Mem. Opinion, ECF No. 30.) A more detailed description of the case's protracted procedural history can be found in *Knopick v. UBS Financial Services, Inc.*, No. 14-cv-05639, 2015 WL 1650070 (E.D. Pa. Apr. 14, 2015).

(2) Knöpfel's disregard of Knopick's instructions and his decision to "wildly and recklessly" invest Knopick's money, and (3) the liquidation of Knopick's portfolios to satisfy AG's "appetite for margin calls" that "whittled" Knopick's $12 million investment to $900,000 "in a matter of weeks." (*See* Am. Compl. ¶¶ 175-82, 185-93, 200-06, 210-13, 219-22, 231-32, 237-38.) Knopick's two federal claims, which allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 28 U.S.C. § 1961 *et seq.*, are based on the theory that FS fraudulently induced Knopick, and others, to invest with SFA and AG, so that AG could further its scheme to defraud the United States. (*See* Pl's Opp'n Mot. Dismiss 26.) Knopick ultimately complains that Knöpfel disregarded his investment instructions and lost his money (either by theft or by making it possible for AG to call in his margin loans), and he contends that FS's fraudulent referral exposed him to this harm.

FS now moves to dismiss Knopick's amended complaint contending that (1) the state law class action claims are precluded by the Securities Litigation Uniform Standards Act ("SLUSA") and (2) Knopick lacks standing to assert the RICO claims.[8] (*See* Def.'s Mot. Dismiss, ECF No. 39.) The motion was fully briefed (*see* ECF Nos. 48, 53) and the Court held oral argument on July 15, 2015. Twelve days later, Knopick moved for leave to file a sur reply to address "issues raised for the first time in Defendants' [sic] Reply Memorandum and in Defendants' [sic] Oral Argument on July 15, 2015." (*See* Mot., ECF No. 59.) Knopick was granted leave to file the sur reply, which the Court accepted on July 27, 2015. (*See* ECF Nos. 60, 61.)

## II.      Legal Standard

FS moves to dismiss the amended complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). "In deciding a Rule 12(b)(6) motion, a court must consider only the

---

[8]       FS also moved to stay discovery pending the Court's disposition of this motion. (*See* Mot., ECF No. 40.) The Court granted that motion on July 16, 2015. (*See* Order, ECF No. 56.)

complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complaint's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). Courts must "take as true all the factual allegations of the [complaint] and the reasonable inferences that can be drawn from them." *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010). However, the Court "need not credit a plaintiff's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.* 132 F.3d 902, 906 (3d Cir. 1997) (citation omitted).

To withstand a motion to dismiss, the complaint must contain "'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'" *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)). "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler*, 578 F.3d at 210-11 (citation omitted). A motion to dismiss will be granted if the factual allegations in the complaint are insufficient "to raise the right of relief above the speculative level." *W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 169 (3d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

### III. The Private Securities Litigation Reform Act of 1995 and the Securities Litigation Uniform Standards Act of 1998

In 1995 Congress adopted "legislation targeted at perceived abuses of the class-action vehicle in litigation involving nationally traded securities." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006). This legislation, the Private Securities Litigation Reform Act of 1995 ("PSLRA"), codified at 15 U.S.C. §§ 77z-1 and 78u-4, was designed to reduce "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and

'manipulation by class action lawyers of the clients whom they purportedly represent' that had become rampant in recent years." *Id.* (quoting H.R. Conf. Rep. No. 104-369, p.31 (1995)). The PSLRA sought to reduce these abuses by limiting recoverable damages and attorney's fees, providing a "safe harbor" for forward-looking statements, imposing new restrictions on the selection of (and compensation awarded to) lead plaintiffs, mandating the imposition of sanctions for frivolous litigation, and authorizing a stay of discovery pending resolution of any motion to dismiss. *Id.* (citing 15 U.S.C. § 78u-4). The PSLRA "also imposes heightened pleading requirements in actions brought pursuant to § 10(b) [of the Securities Exchange Act of 1934] and [the Securities and Exchange Commission's] Rule 10b-5." *Id.*; *see also Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 298 (3d Cir. 2005) ("The PSLRA implemented a host of procedural and substantive reforms, including more stringent pleading requirements to curtail the filing of meritless lawsuits.") (citation and internal quotation marks omitted).

The PSLRA had an unintended consequence. "It prompted at least some members of the plaintiffs' bar to avoid the federal forum altogether. Rather than face the obstacles set in their path by the [PSLRA], plaintiffs and their representatives began bringing class actions under state law, often in state court." *Dabit*, 547 U.S. at 82. "By 1998, Congress concluded that plaintiffs were circumventing the requirements of the PSLRA by filing private securities class actions in state rather than federal court. SLUSA was designed to close this perceived loophole by authorizing the removal and federal preemption of certain state court securities class actions." *Rowinski*, 398 F.3d at 298 (citing 15 U.S.C. § 78a). SLUSA thus "forbids the bringing of large securities class actions based upon violations of state law." *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1062 (2014).

The pertinent provision of SLUSA provides:

> "Class action limitations—No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging—
>
> > (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
> >
> > (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1). Both the Supreme Court and the Third Circuit Court of Appeals have endorsed a broad reading of SLUSA. As the Supreme Court explained, "a narrow reading of the statute would undercut the effectiveness of the [PSLRA] and thus run contrary to SLUSA's stated purpose, viz., 'to prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives' of the [PSLRA]." *Dabit*, 547 U.S. at 86. Similarly, the Third Circuit noted that "Congress envisioned a broad interpretation of SLUSA to ensure the uniform application of federal fraud standards." *Rowinski*, 398 F.3d at 300.

FS moves to dismiss Knopick's state law class action claims, arguing that they are prohibited by SLUSA. Knopick first contends that FS's SLUSA argument, which was not raised in FS's initial motion to dismiss, is prohibited by Rule 12(g)(2).[9] He also asserts that his claims are not precluded by SLUSA because the material misrepresentations he alleges were not made in connection with the purchase or sale of covered securities. The Court considers these arguments in turn.

---

[9] Knopick also argues that FS's motion to dismiss is barred in its entirety because the grounds for dismissal articulated in the instant motion were not raised in FS's motion to transfer venue. Rule 12(g)(2), however, only bars successive motions brought under Rule 12. The Court expressly treated FS's motion to transfer venue as brought pursuant to 28 U.S.C. § 1404(a). (*See* Order, ECF No. 23.)

Rule 12(g) generally requires that all available defenses and objections be consolidated in a single motion, stating:

> Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.

Fed. R. Civ. P. 12(g)(2).[10]  Rule 12(h)(3) provides "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).  A litigant may thus challenge a court's subject matter jurisdiction at any time.  *See Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 571 (2004) ("Challenges to subject-matter jurisdiction can of course be raised at any time prior to final judgment.").

SLUSA "provides that private state-law 'covered' class actions alleging untruth or manipulation in connection with the purchase or sale of a 'covered' security may not 'be maintained in any State or Federal court."  *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 637 (2006).  "If the action is precluded, neither the district court nor the state court may entertain it, and the proper course is to dismiss."  *Id.* at 644.  As the Second Circuit recently observed "a dismissal under SLUSA simply means that the lawsuit 'may [not] be maintained' *as a covered class action*.  It does not adjudicate against any plaintiff the right to recover on the claim."  *In re Kingate Mgmt. Ltd. Litig.*, 784 F.3d 128, 135 n.9 (2d Cir. 2015).  "SLUSA preemption is [thus]

---

[10]  "The Eastern District of Pennsylvania splits on how to handle a serial Rule 12(b)(6) motion that raises a failure to state a claim objection that was available to the defendant but omitted from an earlier 12(b)(6) motion."  *Negron v. Sch. Dist. of Phila.*, 994 F. Supp. 2d 663, 666 (E.D. Pa. 2014).  Some courts strictly adhere to the plain language of Rule 12(g)(2) and bar a defendant from raising an argument in a subsequent motion.  *See Negron*, 994 F. Supp. 2d at 666-67; *GCL, LLC v. Schwab*, No. 11-cv-04593, 2012 WL 4321972, at *3-4 (E.D. Pa. Sept. 21, 2012).  Others read Rule 12(g)(2) with an eye toward judicial economy and permit a defendant to raise an argument in a subsequent motion.  *See Garges v. People's Light & Theater, Co.*, No. 09-cv-2456, 2012 WL 202828, at *3 (E.D. Pa. Jan. 24, 2012); *Penn-Mont Benefit Servs., Inc. v. Crosswhite*, No. 02-cv-1980, 2003 WL 203570, at *6 (E.D. Pa. Jan. 29, 2003).  The Court need not wade into this issue, however, because the challenged argument here is jurisdictional and thus falls under Rule 12(h)(3).

jurisdictional." *See In re Lord Abbett Mut. Funds Fee Litig.*, 553 F.3d 248, 254 (3d Cir. 2009);

*see also LaSala v. Bordier et CIE*, 452 F. Supp. 2d 575, 577 n.1 (D.N.J. 2006) (observing that

SLUSA preemption is "a subject matter jurisdiction inquiry" despite plaintiff's allegations of

diversity jurisdiction pursuant to 28 U.S.C. § 1332), *vacated on other grounds by* 519 F.3d 121

(3d Cir. 2008). Rule 12(g)(2) does not prohibit FS from raising this jurisdictional challenge in a

successive Rule 12 motion.[11]

### b. *SLUSA Preclusion*[12]

As stated above, a court must dismiss (1) a covered class action (2) brought under state

statutory or common law (3) alleging a misrepresentation or omission of a material fact (4) in

connection with the purchase or sale (5) of a covered security. *See* 15 U.S.C. § 78bb(f)(1);

*Rowinski*, 398 F.3d at 299 ("SLUSA preempts, *inter alia*, covered class actions alleging a

misrepresentation or omission of a material fact in connection with the purchase or sale of a

covered security."). "The securities-trade ingredient is designed to distinguish between state-

law-based suits that, no matter how pleaded, in essence allege securities fraud, and those that

allege other wrongs." *LaSala v. Bordier et Cie*, 519 F.3d 121, 128 (3d Cir. 2008).

There is no dispute that this is a covered class action[13] and that the amended complaint

alleges seven state law claims predicated upon material misrepresentations and omissions which

---

[11]     Technically FS should have sought dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) or
12(h)(3). FS's failure to do so is immaterial, however, because the Court has "an ever-present obligation to satisfy
[itself] of [its] subject matter jurisdiction and to decide the issue *sua sponte*." *Washam v. Proud*, No. 13-cv-0606,
2013 WL 2626997, at *3 (E.D. Pa. June 11, 2013).

[12]     Courts refer to SLUSA's prohibition of state law based securities class action lawsuits as both "pre-
emption" and "preclusion." *Compare Kircher*, 547 U.S. at 636 ("The Act has a preclusion provision and a removal
provision"), *with Dabit*, 547 U.S. at 87 ("SLUSA does not actually pre-empt any state cause of action. It simply
denies plaintiffs the right to use the class-action device to vindicate certain claims."), *and Rowinski*, 398 F.3d at 300
("SLUSA preempts any covered class action 'alleging' a material misrepresentation or omission in connection with
the purchase or sale of securities."). The Court accordingly uses the terms interchangeably.

[13]     A covered class action "is a lawsuit in which damages are sought on behalf of more than 50 people."
*Dabit*, 547 U.S. at 83 (citing 15 U.S.C. § 78bb(f)(5)(B)). Knopick alleges that the prospective class contains

induced Knopick and the putative class members to enter into investment contracts with SFA through which they purchased securities. (Pl.'s Sur Reply 2.) Knopick contends, however, that his expectation that SFA would invest in international and Asian markets on his behalf prevents a finding that the misrepresentations and omissions were made in connection with the purchase of covered securities.

To satisfy the "in connection with" element, the misrepresentation or omission must be "material to a decision by one or more individuals (other than the fraudster) to buy or to sell a covered security." *Troice*, 134 S. Ct. at 1066. A "covered security" means "a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933, at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred." 15 U.S.C. § 78bb(f)(5)(E). The Securities Act of 1933 defines a covered security as a security listed or authorized for listing on a national exchange or a security issued by an investment company that is registered under the Investment Company Act of 1940. 15 U.S.C. § 77r(b)(1)-(2).

The allegations in the amended complaint and the arguments in Knopick's briefing carefully avoid identifying any of the securities SFA and Knöpfel purchased on Knopick's behalf. Because SLUSA presents a jurisdictional issue, Courts must look beyond the omission of certain key words or legal theories in a complaint to determine whether the elements of SLUSA preemption are satisfied. *Rowinski*, 398 F.3d at 304-05; *see also Romano v. Kazacos*, 609 F.3d 512, 523 (2d Cir. 2010) ("SLUSA requires our attention to both the pleadings and the realities underlying the claims."). Indeed, "it is appropriate to look outside the pleadings to determine whether SLUSA jurisdiction exists." *Montoya v. N.Y. State United Teachers*, 754 F. Supp. 2d

approximately 3,000 individuals and asserts that the class members' claims involve common questions of law or fact. (Am. Compl. ¶¶ 159, 160.)

466, 472 (E.D.N.Y. 2010); *see also U.S. Mortg., Inc. v. Saxton*, 494 F.3d 833, 842 (9th Cir.

2007) (noting that a district court may consider evidence offered by a defendant to support

SLUSA preclusion), *abrogated on other grounds by Proctor v. Vishay Intertechnology, Inc.*, 584

F.3d 1208 (9th Cir. 2009); *accord Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891

(3d Cir. 1977) ("Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction[,] its

very power to hear the case[,] there is substantial authority that the trial court is free to weigh the

evidence and satisfy itself as to the existence of its power to hear the case.").

FS submits Knopick's "Performance Overview 05.02.07-28.02.07" and his "Portfolio

valuation statement as of 31st March 2008," which Knopick provided to Seifert in March 2007

and March 2008, to demonstrate that Knopick purchased covered securities. (*See* Def.'s Reply,

Ex 2.) After carefully reviewing these statements and publicly available data, it is clear that

Knopick purchased covered securities.[14] *See CNA v. U.S.*, 535 F.3d 132, 145 (3d Cir. 2008)

("The District Court was permitted to make factual findings, beyond the pleadings, that were

decisive to determining jurisdiction.") (citation omitted). For example, in March 2008 Knopick

held shares of at least eleven index funds[15] traded on United States exchanges.[16] (*See* Def.'s

---

[14]     Even in the context of Rule 12(b)(6) motion, the Court could take judicial notice of this information. *Accord Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 600 n.3 (3d Cir. 2000) (taking judicial notice of the opening and closing stock prices on the New York Stock Exchange for Mylan [stock] during the period of July 17 to August 4, 1998 as reported by Quotron Chart Services.").

[15]     An index fund is "a mutual fund that seeks to match the performance of the market as a whole by holding the shares that compose an index such as the S&P 500. The basic goal of the indexing strategy is to maximize diversification and to minimize fund management expenses." Richard A. Booth, *Index Funds and Securities Fraud Litigation*, 64 S.C. L. Rev. 265, 281 (2012).

[16]     Knopick's holdings include 4,000 shares of MSCI Switzerland Index Fund, 580 shares of MSCI S&P Latin America 40 Index Fund, 2,400 shares of MSCI S&P/Topix 150 Index Fund, 80,000 shares of MSCI Japan Index Fund, 7,140 shares of MSCI Canada Index Fund, 11,850 shares of MSCI Singapore (Free) Index Fund, 6,260 shares of MSCI EMU Index Fund, 9,690 shares of MSCI Hong Kong Index Fund, 12,240 shares of MSCI Taiwan Index Fund, 2,500 shares of SPDR Index Shares Fund–S&P Emerging Europe Exchange Traded Fund, and 1,480 shares of SPDR Index Shares–S&P Emerging Middle East & Africa Exchange Traded Fund. These index funds are all traded on United States exchanges. *See, e.g.*, http://www.morningstar.co.uk/uk/etf/snapshot/snapshot.aspx?id =0p00002d9m (MSCI Switzerland); http://www.morningstar.co.uk/uk/etf/snapshot/snapshot.aspx?id=0p00002daw (MSCI Latin American 40); http://www.morningstar.co.uk/uk/etf/snapshot/snapshot.aspx?id=0p00002dav (MSCI

Reply, Ex. 2.) These index funds are covered securities.[17] Knopick cannot avoid SLUSA's preclusive effect by failing to acknowledge the content of his portfolios. *See Rowinski*, 398 F.3d at 304 ("SLUSA's preemptive force cannot be circumvented by artful drafting.").

Knopick does not challenge the veracity of the evidence provided by FS; he instead asserts that he did not intend to purchase covered securities.[18] He relies on the Supreme Court's recent decision in *Chadbourne & Parke LLP v. Troice* to support his position that his intent is determinative. This reliance is misplaced. The question before the Supreme Court in *Troice* was whether SLUSA prohibits a class action in which the plaintiffs alleged that they purchased *uncovered securitie*s that the defendants falsely stated were backed by *covered securities.* 134 S. Ct. at 1062. The Supreme Court held that the misrepresentation or omission must be material to the decision to buy or sell a covered security. *Id.* at 1066. In so holding, the Court observed that the common thread in every securities case in which the Court found fraud to be "in connection with" a purchase or sale of a security involved "victims who took, who tried to take, who

---

[17] Knopick does not argue that his purchase of uncovered as well as covered securities removes the class action claims from the ambit of SLUSA. Even if he had, such an argument is unavailing. *See Montoya*, 754 F. Supp. 2d at 472 (refusing to "segregate out" a fixed annuity option, *i.e.* an uncovered security, from a program offering variable annuities, *i.e.* covered securities, to avoid SLUSA because the case involved "the sale of a wide variety of investment options, all of which were offered to Plaintiffs, upon the same allegedly false pretense").

[18] Knopick contends, in passing and without making an appropriate motion, that he "should have the opportunity to take discovery of [SFA] to determine what securities were purchased, where and when, and present its own expert analysis as to whether the securities purchased were 'covered securities.'" (Pl.'s Sur Reply 1.) "The court has wide discretion in resolving jurisdictional factual disputes and is under no obligation to grant discovery to Plaintiff to help establish subject matter jurisdiction." *Wright v. New Jersey/Dep't of Educ.*, -- F. Supp. 3d --, 2015 WL 4314268, at *5 (D.N.J. 2015) (citations omitted). The information FS submitted with its reply brief was provided to FS by Knopick, and Knopick had the opportunity to rebut FS's evidence and/or submit his own evidence, both at oral argument and in his sur reply. He elected not to do so. There is no need for additional discovery. *See CNA*, 535 F.3d at 146 (noting that district courts may "dismiss for lack of subject matter jurisdiction at any time, regardless whether . . . the opposing party had an opportunity to conduct discovery" and affirming district court's dismissal after opposing party filed a sur reply brief.). And in any event, Exhibit 2 of FS's reply brief and publicly available documents reviewed by the Court establish that Knopick's portfolio contains covered securities. *Wright*, 2015 WL 4314268, at *5 ("[A] party is not entitled to jurisdictional discovery if the record shows that the requested discovery is not likely to produce the facts needed to withstand a Rule 12(b)(1) motion.").

divested themselves of, who tried to divest themselves of, or who maintained an ownership interest in financial instruments that fall within the relevant statutory definition." *Id.* at 1066-67. The financial instruments in which the fraud victim takes an ownership interest are thus determinative. Knopick's intent to purchase international and Asian securities does not change the fact that he achieved this goal, *inter alia*, by purchasing shares of index funds that are traded on the national exchanges, *i.e.* covered securities.[19]

If through a reasonable reading of the complaint it is evident that the misrepresentations made in connection with a securities trade, implicit or explicit, operates as a factual predicate to a legal claim, then then SLUSA ingredient is met and the class action claim should be dismissed. *See LaSala*, 519 F.3d at 141; *see also Rowinski*, 398 F.3d at 299-300, 305. The material misrepresentations and omissions identified in the amended complaint "induced" Knopick to "enter into a contract with [SFA]" to purchase securities. (Pl.'s Sur Reply 2.) Once Knopick's investment was lost through Knöpfel's alleged reckless investing and AG's margin calls, FS concealed his and other class members' losses through additional misrepresentations and omissions. These factual contentions are at the heart of the seven state law claims. Knopick's state law class action claims are exactly the type of artful pleading SLUSA was designed to prevent. *See Dabit*, 547 U.S. at 86. SLUSA thus mandates their dismissal.

However, "SLUSA does not actually pre-empt such [state-law securities based] claims; it merely denies plaintiffs the right to use the class-action device to vindicate certain claims. Plaintiffs retain the right to bring such a claim as an individual state-law claim or federal securities fraud class action claim." *In re Lord Abbett Mut. Funds Fee Litig.*, 553 F.3d at 251 (citations omitted). Knopick has agreed to arbitrate his individual claims, and thus he cannot

---

[19]    Knopick was certainly aware, despite his intentions, that his investment goals could be pursued in this manner as he acknowledged that SFA had the absolute discretion to "carry out investments as a fiduciary in all countries and currencies." (Am. Compl. Ex. C.)

reassert those claims. (*See* Hr'g Tr. 45:23-46:1, ECF No. 27 (agreeing that the arbitration provision is enforceable as to Knopick's individual claims)). Knopick may, however, reassert his class action as a federal securities fraud class action to the extent he can meet the heightened pleading standards of the PSLRA. Counts I-VII are accordingly dismissed without prejudice.

IV.     **RICO Claims**

Knopick alleges two RICO violations: (1) the existence of an enterprise designed to further AG's tax fraud scheme, which engaged in a pattern of racketeering activity,[20] and (2) a conspiracy related to that enterprise.[21] FS contends that Knopick lacks standing to assert these claims because the RICO predicate acts were not the direct, proximate cause of his injuries. The Court agrees.

"Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue in any appropriate United States district court . . ." 18 U.S.C. § 1964(c). To bring a claim under § 1964(c), a plaintiff must make a threshold showing that "the alleged RICO violation proximately caused a plaintiff's injury-i.e., the violation is not too remote from the injury." *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 443 (3d Cir. 2000).

The Supreme Court requires the examination of three factors to determine whether an alleged RICO violation proximately caused a plaintiff's harm: (1) the directness of the injury, (2) the difficulty of apportioning damages, and (3) whether there are direct victims of the alleged violation that could better vindicate the policies underlying RICO. *Holmes*, 503 U.S. at 269-70; *see also Schrager v. Aldana*, 542 F. App'x 101, 104 (3d Cir. 2013). Both the Supreme Court and the Third Circuit Court of Appeals have held that a RICO complaint should be dismissed at the

---

[20]     The claim alleged in Count VIII pursuant to 18 U.S.C. § 1962(c).

[21]     The claim alleged in Count IX pursuant to 18 U.S.C. § 1962(d).

Rule 12(b)(6) stage if it appears that the alleged injury is indirect. *See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 934 (3d Cir. 1999). Further, a complaint that fails to demonstrate the directness of the injury should be dismissed even if the other two factors are met. *See Allegheny Gen. Hosp.*, 228 F.3d at 444.

        *a.*   *The Allegations in the Amended Complaint*

FS argues that Knopick alleges no fact suggesting a link between the mail and wire fraud described in the amended complaint and the loss of his investment. (*See* Def.'s Mot. Dismiss 25.) Knopick makes no effort to address FS's argument and effectively concedes this issue. *See Nelson v. DeVry, Inc.*, No. 07-cv-4436, 2009 WL 1213640, at *10 (E.D. Pa. Apr. 23, 2009) ("Failure to address even part of a motion in a responsive brief may result in that aspect of the motion being treated as unopposed."). The Court nonetheless considers the causal link between the predicate acts and Knopick's harm as alleged in the amended complaint.

Knopick identifies, as the requisite predicate acts, instances of alleged mail and wire fraud by AG. (Am. Compl. ¶¶ 244-46.) Through these acts, Knopick asserts, AG misrepresented that "[SFA and [AG] would act in the best interest of the client in making investment decisions [and] their investments would be consistent with the client's objectives and goals[,]" that SFA would "invest funds . . . on a fiduciary basis[,]" that SFA would "act in what it reasonably believed to be the client's best interest[,]" that SFA "was obligated to disclose . . . all material conflicts" and, in the event of a conflict, it "would place the client's best interests before its own[,]" and that "the investment decisions or recommendations made by [SFA] . . . would be suitable and appropriate and consistent with the client's investment objectives and goals." (*Id.* ¶ 244.) These misrepresentations were seemingly intended to induce Knopick to invest, and then maintain his investments, with SFA and AG. (*Id.*) However, AG's margin call that occurred

after Knöpfel allegedly failed to follow Knopick's investment instructions caused the loss of his investment.  (*See id.* ¶¶ 85, 90.)

The link between Knopick's loss and the alleged acts of mail and wire fraud is far too attenuated to establish proximate cause.  The alleged causal chain is as follows: (1) AG misrepresented SFA's intent to comply with its fiduciary duties, (2) Knopick relied upon these statements and invested with SFA and AG, (3) Knopick's continued investment enabled Knöpfel to ignore Knopick's investment instructions and over-leverage his account, (4) the value of Knopick's portfolios plummeted, (5) the decreased value permitted AG to initiate margin calls, and (6) Knopick lost all but $900,000 of his investment.  The conduct directly responsible for Knopick's harm is Knöpfel's allegedly reckless investments and AG's subsequent margin loan calls.  The alleged fraud, which was not committed by FS, is far removed from the harm.  The allegations in the amended complaint do not establish RICO standing.

### b. *Knopick's Theory in His Opposition to FS's Motion to Dismiss*

Knopick shifts his predicate act theory in response to FS's motion to dismiss.  He now focuses on FS's failure to disclose that "AG was not authorized for banking in the US, that AG and SFA were perpetrating a massive tax fraud scheme on the IRS, and that they would use Mr. Knopick's account as a cover for their illegal activity until it was beneficial to them to liquidate the account by calling the margin loans."  (Pl.'s Opp'n Mot. Dismiss 26.) [22]  Distilled to its essence, this theory asserts that, through these omissions, FS fraudulently induced Knopick to invest with SFA so that AG and SFA could defraud the IRS, and then, when the fraud was

---

[22] Knopick's theory changed a second time at oral argument.  There Knopick asserted that every single communication sent to him that did not disclose (1) the true purpose of SFA, (2) AG's tax fraud scheme, and (3) the illegality of Knopick's banking relationship with AG was a predicate act of mail and wire fraud.  (Hr'g Tr. 70:12-70:25.) Absent from the amended complaint, however, is *any* reference to *any* communication between FS and Knopick that occurred after Seifert's referral in March or April of 2007.

detected, mitigate their losses by losing his investment to hide the fraud and collect funds to pay

a future fine. Nevertheless, the ultimate loss occurred when AG called in Knopick's margin

loans after Knöpfel recklessly invested his assets and after AG learned of the DOJ's

investigation. (*Id.* at 29.) As an initial matter, it is improper to use an opposition to a motion to

dismiss to amend a complaint. *See Pa. ex rel. Zimmerman v. PepsiCo*, 836 F.2d 173, 181 (3d

Cir. 1988). Even if Knopick could amend in this manner, his proposed theory does not describe

an injury flowing directly from FS's alleged fraudulent conduct.

### 1. Directness of the Alleged Injury

A plaintiff must demonstrate that the defendant's commission of a predicate act was the

proximate cause of the plaintiff's injury. *See Holmes*, 503 U.S. at 268. At common law,

proximate cause was the demand for some direct relationship between the injury asserted and the

injurious conduct alleged. *Id.* at 268. Proximate cause, however, "is a flexible concept that does

not lend itself to 'a black-letter rule that will dictate the result in every case." *Bridge v. Phoenix

Bond & Indem. Co.*, 553 U.S. 639, 651 (2008) (quoting *Holmes*, 503 U.S. at 272 n.20). The

"central question" is thus "whether the alleged violation led directly to the plaintiff's injuries."

*Anza v. Ideal Steel Supply Co.*, 547 U.S. 451, 461 (2006). "[A] link that is 'too remote,' 'purely

contingent,' or 'indirect' is insufficient." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9

(2010) (plurality opinion).

The Supreme Court's reasoning in *Anza* and *Hemi Group LLC* guides this Court's

analysis. In *Anza*, the plaintiff brought a civil RICO claim against a competing business. 547

U.S. at 454. The plaintiff, a seller of steel mill products and related supplies and services,

asserted that its competitor adopted a practice of failing to charge the requisite New York sales

tax to cash paying customers. *Id.* The plaintiff proceeded on the theory that the underlying

pattern of racketeering activity was the submission of fraudulent tax returns to the State of New York, which gave the competitor a competitive advantage and caused the plaintiff to lose profits. *Id*. at 454, 458-59. The Supreme Court rejected the notion that the proximate cause requirement could be satisfied by claiming that the defendant's aim was to increase its market share at a competitor's expense. *Id.* at 460-61 (citing *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 537 (1983)). The Court instead looked to the predicate acts and determined that the direct victim of the defendant's fraudulent conduct was the State. *Id.* at 457-58. The Court discussed the difficulty in determining what portion, if any, of the plaintiff's lost profits were caused by the competitor's tax fraud, noting that the competitor's "lowering of prices in no sense required it to defraud the state tax authority." *Id.* at 458-59. The Court also noted that the immediate victim, the State, could be expected to pursue its own "relatively straightforward" claims, thereby satisfying the objective of deterrence. *Id.* at 460. The Court ultimately held that the plaintiff did not satisfy the proximate cause requirement, and thus lacked standing. *Id.* at 461.

As in *Anza*, Knopick's causal theory is far too indirect. Knopick claims he was harmed by Knöpfel's reckless investing and AG's subsequent margin loan calls. The alleged RICO violation, however, is FS's failure to disclose AG's tax and banking fraud scheme and the risk it posed to Knopick's investment. FS's alleged fraud did nothing more than induce Knopick to enter into a relationship that had the potential to cause him harm. The cause of Knopick's asserted harms is thus a set of actions entirely distinct from the alleged RICO violations. *See Anza*, 547 U.S. at 458. Furthermore, AG's tax fraud scheme directly targeted the United States, specifically the IRS, depriving it of substantial tax revenue. (*See* Am. Compl. ¶ 24.) The fact

that Knopick was an indirect victim of this tax fraud scheme (which is not even the alleged

RICO violation) does not establish proximate cause. *See Anza*, 547 U.S. at 460-61.

In *Hemi Group LLC*, the Court considered the proximate cause requirement in an action

relating to the sale of cigarettes in New York City. *Hemi Grp. LLC*, 559 U.S. at 5. Both the

State and the City of New York were authorized under New York law to tax the sale of

cigarettes. *Id.* When cigarettes were sold to New York City residents by an out-of-state vendor,

the vendor was required to file a report with the state listing the name, address, and quantity of

cigarettes purchased. The State then forwarded that information to the City so it could collect

the taxes. *Id.* Hemi Group was an out-of-state vendor that allegedly failed to provide its buyers'

information to the State. *Id.* at 6. As a result, New York City never received the information and

lost the opportunity to collect these taxes. *Id.* The City brought a RICO action against Hemi

Group, alleging that its lost tax income resulted from Hemi Group's failure to submit buyer

information to the State. *Id.* at 6-7.

In the plurality opinion, four justices reiterated that "the focus is on the directness of the

relationship between the conduct and the harm." *Id.* at 9, 12. Again, the conduct directly

responsible for the harm—the *customers'* failure to pay taxes—was distinct from the Hemi

Group's alleged fraud. *Id.* at 11. This disconnect was more pronounced than in *Anza* because

Hemi Group allegedly defrauded the state, who then passed incomplete information to the City,

which made it easier for the taxpayers to avoid the cigarette tax. *Id.* The City's theory, which

rested "not just on separate *actions*, but separate actions carried out by separate *parties*" did not

satisfy the proximate cause requirement. *Id.* at 11.

Knopick takes great care, quoting extensively from the information filed against AG, to

describe AG's complex scheme to defraud the United States. Only one act, however, ultimately

harmed Knopick: AG calling in its margin loans "because of the DOJ investigation/ discovery of its tax scheme." (Pl.'s Opp'n Mot. Dismiss 29.) Again, the alleged fraud was FS's failure to disclose AG's scheme to defraud the IRS, the DOJ investigation, and the illegality of banking with AG, which induced Knopick to invest with SFA. As in *Hemi Group LLC*, Knopick's attenuated theory rests "not just on separate *actions*, but separate actions carried out by separate *parties*." 559 U.S. at 11.

Knopick contends that FS always knew that the illegal margin loans were at "risk of immediate call should the tax scheme be discovered." (*Id.*) Foreseeability is not, however, the guiding principle of RICO proximate cause.[23] RICO demands "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268; *see also Bridge*, 553 U.S. at 658. FS's alleged knowledge does not create a direct link between the fraud and the later harm. Further down the causal chain lie: (1) AG's learning of the DOJ and SEC investigations, (2) Knöpfel's investment decisions, (3) the DOJ closing in on AG, (4) AG's decision to initiate the margin calls, and (5) the debt and equity market meltdown in late 2008.

---

[23]     *Bridge v. Phoenix Bond & Indemnity Co.* did not, as Knopick suggests, alter this analysis such that the proximate cause requirement is satisfied where a plaintiff's injury is "a foreseeable and natural consequence" of the defendant's overall scheme. (*See* Pl.'s Opp'n Mot. Dismiss 26.) In *Bridge*, the county treasurer's office held an annual public auction to sell tax liens on delinquent taxpayers' properties. *Bridge*, 553 U.S. at 642. Prospective buyers bid on the liens by stating a percentage of penalties the property owner must pay the winning bidder to clear the lien. *Id.* The bidder willing to accept the lowest penalty would win the right to purchase the lien in exchange for paying the outstanding taxes on the property. *Id.* Due to stiff competition for these liens, most parcels attracted multiple bidders willing to accept a penalty of zero percent. *Id.* The county resolved this problem by allocating parcels on a rotational basis to fairly apportion the liens between the zero percent bidders. *Id.* at 643. This solution required each party to submit bids in its own name and prohibited the submission of simultaneous bids for the same parcel through agents, employees, or related entities. *Id.* The plaintiff alleged that the defendant obtained a disproportionate share of the tax liens by submitting multiple bids through an arrangement with related firms. *Id.* at 643-44.
        The question before the Court was whether a plaintiff asserting a RICO claim predicated on mail fraud must plead and prove that it relied on the defendant's alleged misrepresentations. *Id.* at 641-42, 646. The Court addressed the proximate cause requirement in the course of its opinion and observed that the plaintiff's alleged injury—the loss of valuable liens—was the "direct result of petitioner's fraud." *Id.* at 657-59. The Court distinguished *Anza*, stating that "there are no independent factors that account for respondent's injury, there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue." *Id.* The Court did not, however, abrogate the standard set forth in *Holmes* and confirmed in *Anza*. *See id.* at 654-55.

The Supreme Court cautioned that a RICO proximate cause analysis "is not to go beyond the first step." *Holmes*, 503 U.S. at 271. Accepting Knopick's theory requires the Court to move well beyond that first step, something the Court cannot and will not do.

### 2. *Difficulty Apportioning Damages*

The Court must also consider the difficulty of apportioning damages. *Holmes*, 502 U.S. at 269. "The less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors." *Id.* Knopick contends that he alleges "sufficient information to ascertain the amount of his damages attributable to [FS's] conduct, i.e., the loss of his initial investment." (Pl.'s Opp'n Mot. Dismiss 27.) This loss is not, however, attributable solely to FS's misrepresentations and omissions. Ascertaining Knopick's damages will require the Court to determine the impact of AG, SFA, and Knöpfel's conduct as well as the 2008 market crash. Knopick's lawsuit against these non-party conspirators, pending in the Middle District of Pennsylvania, further complicates this analysis.[24] Allowing Knopick to proceed with these RICO claims against FS would "open the door to 'massive and complex damages litigation, which would not only burden the courts, but would also undermine the effectiveness of treble-damages." *Holmes*, 503 U.S. at 274 (quoting *Associated Gen. Contractors*, 459 U.S. at 545) (internal brackets omitted). The likelihood that the Court will have to engage in "intricate and uncertain inquiries" due to the attenuation between the alleged fraud and the harm further militates against a finding of proximate cause. *See Anza*, 547 U.S. at 459-60.

---

[24]     A nearly identical putative class action lawsuit against AG, SFA, Elste, Knöpfel, and Joseph Scoby is presently pending in the Middle District of Pennsylvania. *See Knopick v. UBS AG*, No. 14-cv-02090, ECF No. 19.

### 3. Presence of a Directly Injured Victim

The third proximate cause inquiry is whether Knopick's claim could be vindicated by another, more directly injured party. *Holmes*, 503 U.S. at 269-70. "The requirement of a direct causal connection is especially warranted where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." *Anza*, 547 U.S. at 460. The adjudication of the directly injured victim's claims would be "relatively straightforward" and thus "there is no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly." *Id.*

The direct victim of AG's tax fraud scheme, the United States government, entered a deferred prosecution agreement with AG more than five years ago. The government has therefore "vindicate[d] the law by pursuing [its] own claims." *Anza*, 547 U.S. at 460. Knopick nevertheless contends that he is in the best position to enforce the law because he too suffered an economic injury as a result of AG's fraud facilitated by FS. (Pl.'s Opp'n Mot. Dismiss 27.) While Knopick contends that he suffered some injury as a result of FS's conduct, the causal link between FS's actions and Knopick's investment losses is far too remote. *See Allegheny Gen. Hosp.*, 228 F.3d at 444; *Steamfitters Local Union No. 420 Welfare Fund*, 171 F.3d at 933-34. Neither the theory plead in the amended complaint nor the theory Knopick proffered in his opposition to FS's motion to dismiss demonstrates the proximate causation necessary to establish RICO standing. Knopick's individual RICO claims embodied in Counts VIII and IX are dismissed.

Because Knopick's individual RICO claims have been dismissed, the purported class's RICO claims must also be dismissed. *See Bass v. Butler*, 116 F. App'x 376, 385 (3d Cir. 2004) (dismissal of a class representative before the class is certified requires simultaneous dismissal of

the complaint of the class); *accord Brown v. Phila. Hous. Auth.*, 350 F.3d 338, 343 (3d Cir. 2003) ("[W]hen claims of the named plaintiffs become moot before class certification, dismissal of the action is required.").  Counts VIII and IX are accordingly dismissed in their entirety.

## V.        Knopick's Cross-Motion for Leave to Amend

Knopick concludes his brief in opposition to FS's motion to dismiss with a request for leave to amend.  (Pl.'s Opp'n Mot. Dismiss 42.)  Specifically, Knopick asks the Court to "allow Plaintiff to amend to address specific concerns this Court may have concerning any claim's sufficiency based upon Defendant's current arguments, while allowing discovery to proceed." (*Id*. at 2.)  Knopick has neither identified the amendments he intends to make nor provided the Court with a proposed second amended complaint.

Under Federal Rule of Civil Procedure 15(a), a party may amend a pleading once as a matter of course within 21 days after service of the pleading or within 21 days after service of any responsive pleading or motion.  Fed. R. Civ. P. 15(a)(1).  Beyond this right, a party may amend its pleading only with leave of court or consent of counsel, but "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Nevertheless, amendment is not an open-ended remedy available to plaintiffs who fail to state a claim.  *Forman v. Davis*, 371 U.S. 178, 182 (1962) ("[T]he grant or denial of an opportunity to amend is within the discretion of the District Court . . .").  "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility."  *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).  "Futility means the complaint, as amended, would fail to state a claim upon which relief could be granted."  *In re Merck & Co. Inc. Secs., Derivative & ERISA Litig.*, 493 F.3d 393, 400 (3d Cir. 2007) (citation omitted).

Despite prior amendment and arguing at least two alternative theories in response to FS's motion to dismiss, Knopick has not remedied the myriad deficiencies in his pleading nor has he given the Court any reason to believe he will be able to do so. His latest RICO theory does not demonstrate a direct link between the FS's referral and his injury. Allowing Knopick to amend his complaint again to allege this theory or any other proximate cause theory based on the facts in the amended complaint would be futile. *See, e.g.*, *Holst v. Oxman*, 290 F. App'x 508, 510 (3d Cir. 2010) (affirming district court's denial of leave to amend because plaintiff's proposed amendment to her RICO claim "fail[ed] to state a claim under RICO and would therefore be futile."). Similarly, SLUSA prevents Knopick from relying on the class action device to allege his state law claims. Knopick cannot, without manufacturing a completely different harm, eliminate the predicate facts amounting to securities fraud from his state law claims. Further amendment of the state law claims would be futile. *See, e.g.*, *Kundratic v. Thomas*, 407 F. App'x 625, 630 (3d Cir. 2011) (affirming district court's denial of plaintiff's request for leave to file a second amended complaint where "defendants' motion to dismiss placed plaintiff on notice of the Complaint's deficiencies, and plaintiff proved unable to cure these fatal shortcoming.").

Moreover, "[i]n non-civil rights cases, the settled rule is that properly requesting leave to amend a complaint requires submitting a draft amended complaint." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252-53 (3d Cir. 2007). Knopick has not done that, and his failure to do so is independently "fatal to [his] request. *Id.* at 253; *see also U.S. ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 243 (3d Cir. 2013) ("Because [plaintiff] did not properly move to amend his complaint, 'it could hardly have been an abuse of discretion for the District Court not to have afforded him such leave *sua sponte*.'") (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1280 (D.C. Cir. 1994)). While Knopick retains the right to

attempt to reassert the claims in Counts I-VII as a federal securities fraud class action (*see supra* Section III.b. at pp. 17-18), his cross-motion for leave to amend is denied.

An appropriate order follows.

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.